**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF ILLINOIS; STATE OF CALIFORNIA; STATE OF NEW JERSEY; STATE OF RHODE ISLAND; STATE OF ARIZONA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; OFFICE OF THE GOVERNOR, *ex rel.* ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEVADA; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania; STATE OF VERMONT; COMMONWEALTH OF VIRGINIA; STATE OF WASHINGTON; STATE OF WISCONSIN, <br><br> *Plaintiffs*, <br><br> v. <br><br> FEDERAL EMERGENCY MANAGEMENT AGENCY; ROBERT J. FENTON, in his official capacity as Senior Official Performing the Duties of the Administrator of the Federal Emergency Management Agency; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; MARKWAYNE MULLIN, in his official capacity as Secretary of the Department of Homeland Security, <br><br> *Defendants.* | Case No. ___ |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. For decades, state and local governments have relied on federal funding—totaling billions of dollars annually—to prepare for, protect against, respond to, and recover from

1

catastrophic disasters. These grants fund first responders' salaries and pay for the training they receive. They fund building improvements to ensure houses of worship and schools are not vulnerable to malicious attacks. They fund computer network testing to identify cyberattack vulnerabilities. They fund projects to mitigate earthquake and flood risks, and to manage active large-scale wildfires. They fund search-and-rescue efforts and food aid after natural disasters. They pay case managers who work directly with disaster survivors to develop recovery plans.

2.    During that time, across presidential administrations of both parties, the U.S. Department of Homeland Security ("DHS") and its sub-agency, the Federal Emergency Management Agency ("FEMA"), have operated these grant programs evenhandedly, supporting all fifty States in their efforts to prepare for and respond to emergencies and threats, understanding that the Nation is at its strongest when all Americans are protected from catastrophe.

3.    But the current Administration has taken a different approach to administering the Nation's emergency management funds. Last year, DHS and FEMA embarked on an unprecedented campaign to leverage the billions of dollars in federal funding that they administer to coerce States into adopting the Administration's preferred policies.

4.    The agencies began by conditioning the receipt of all federal funds they administer on cooperation with federal civil immigration enforcement. This Court vacated these immigration conditions and permanently enjoined FEMA from enforcing them, observing that the agencies' coercion amounted to unconstitutional "economic dragooning." *Illinois v. FEMA*, 801 F. Supp. 3d 75, 96–97 (D.R.I. 2025), *appeal docketed*, No. 25-2131 (1st Cir.). Frustrated by the court's judgment, DHS and FEMA simply cut millions of dollars in funding from jurisdictions they viewed as hostile to the President's immigration agenda. This Court enjoined that action, too, explaining that "[t]o hold hostage funding for programs like these based solely on what appear to

2

be [d]efendants' political whims is unconscionable and, at least here, unlawful." *Illinois v. Noem*, 813 F. Supp. 3d 282, 312 (D.R.I. 2025).

5.     Apparently undeterred by these judgments, DHS and FEMA have continued their campaign of coercion, imposing a raft of new conditions on the same grant programs at issue in *FEMA* and *Noem*.

6.     First, defendants have imposed a set of radical new conditions regarding the States' administration of elections. The Constitution grants the States the power to administer and set the rules governing federal elections, and pursuant to that grant of authority the States have adopted a range of systems for ensuring that votes are counted fairly and accurately. Defendants, however, seek to upend those laws and policies and—using hundreds of millions of dollars in federal funds as a cudgel—impose the current Administration's preferred policies in their place. Under the terms defendants have imposed on one of FEMA's largest grant programs, the Homeland Security Grant Program ("HSGP"), States are required to verify the citizenship of all individuals in state voter databases using a faulty federal system, transition their voting systems to equipment that reads hand-marked paper ballots, conduct costly post-election audits according to nonexistent guidelines to be set by the Secretary of Homeland Security, and more. If States and their instrumentalities do not accede to these unlawful demands, they will lose at least 20% of their total HSGP awards (and potentially the entire awards). Plaintiff States have been allocated over $740 million in Fiscal Year 2026 HSGP funds, meaning DHS and FEMA will hold at least $148 million hostage to these new election-related demands.

7.     Second, DHS has included a set of immigration conditions in its Fiscal Year 2026 Standard Terms and Conditions that are essentially identical to those already vacated and enjoined last year in *FEMA*. DHS and FEMA assert that they are still considering whether to apply these

conditions to the critical HSGP and Emergency Management Performance Grant ("EMPG") programs, among others. But if incorporated into the award agreements for these programs, these terms will hold hostage critical emergency preparedness and response funding unless States promise to devote their scarce resources to the federal government's own task of civil immigration enforcement beyond what state law allows (in some States) or requires (in others).

8.    Finally, DHS and FEMA have imposed aggressive and unprecedented new terms on substantially all 2026 FEMA funding, terms that grant FEMA new authority to terminate funds to the States at any time based on its own subjective assessment of alignment with "agency priorities." For so-called discretionary awards, FEMA demands that recipients agree the agency can cut funds "[f]or convenience, including if the award no longer advances the national interest." These terms effectively impose new, unascertainable, and vague requirements—including newly-defined program goals and agency priorities and any number of other conditions that could give rise to for-convenience termination—on billions of dollars in federal funding, requiring States to surrender control and predictability over federal emergency-management funds that Congress appropriated for the protection of state residents from catastrophic disasters.

9.    These terms are unlawful for the same reasons DHS and FEMA's 2025 campaign was universally enjoined by the courts. Congress never gave DHS or FEMA authority to rewrite state election law, require cooperation with federal immigration agents, or terminate federal funding streams at any time and for any reason. Furthermore, the Administrative Procedure Act ("APA") requires reasoned decisionmaking before imposing conditions of such scale and scope, including an analysis of the statutory authority governing each program and the reliance interests disrupted by sharp changes to the status quo. Finally, the Constitution's Spending Clause

4

forecloses the federal government from imposing coercive conditions on a wide tranche of federal funds using vague and ambiguous language.

10. Plaintiff States are entitled to injunctive and declaratory relief against these conditions in their entirety.

## JURISDICTION AND VENUE

11. The Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Court has authority to grant declaratory, injunctive, and other relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 702, 705, and 706.

12. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants include a United States officer sued in his official capacity. Plaintiff the State of Rhode Island is a resident of this judicial district and a substantial part of the events or omissions giving rise to this Complaint occurred within the District of Rhode Island.

## PARTIES

**A.      Plaintiffs**

13. Plaintiff the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

14. Plaintiff the State of California, represented by and through its Attorney General, Rob Bonta, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

15. Plaintiff the State of New Jersey, represented by and through its Attorney General, Jennifer Davenport, is a sovereign State in the United Staes of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

16.    Plaintiff the State of Rhode Island, represented by and through its Attorney General, Peter Neronha, is a sovereign State in the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

17.    Plaintiff the State of Arizona is a sovereign State of the United States of America. Arizona is represented by and through its chief legal officer, Attorney General Kristin K. Mayes. *See* Ariz. Rev. Stat. § 41-192(A). Attorney General Mayes is authorized to pursue this action on behalf of the State of Arizona. *Id.*

18.    Plaintiff the State of Colorado is represented by Philip J. Weiser, the Attorney General of the State of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colorado Revised Statutes § 24-31-101 to pursue this action.

19.    Plaintiff the State of Connecticut is a sovereign State of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

20.    Plaintiff the State of Delaware is a sovereign State of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

21.    Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L.

Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code § 1-301.81.

22.    Plaintiff the State of Hawai'i, represented by and through its Attorney General Anne Lopez, is a sovereign State of the United States of America. The Attorney General is Hawai'i's chief legal officer and chief law enforcement officer and is authorized by Hawai'i Revised Statues § 28-1 to pursue this action.

23.    Plaintiff Office of the Governor, *ex rel.* Andy Beshear, brings this suit his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," *id.* § 81. In taking office, Governor Beshear swears an oath that he will support the Constitution of the United States and the Kentucky Constitution. *Id.* § 228.

24.    Plaintiff the State of Maine is a sovereign State of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to Me. Rev. Stat. Ann. tit. 5, § 191.

25.    Plaintiff the State of Maryland is a sovereign State of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of Maryland.

26.    Plaintiff the Commonwealth of Massachusetts, represented by and through its Attorney General Andrea Joy Campbell, is a sovereign State of the United States of America. Attorney General Campbell is authorized to pursue this action under Mass. Gen. Laws ch. 12, §§ 3, 10.

27.    Plaintiff the State of Michigan is a sovereign State of the United States of America.  Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

28.    Plaintiff the State of Minnesota is a sovereign State in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of state concern. Minn. Stat. § 8.01.

29.    Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

30.    Plaintiff the State of New Mexico is a sovereign State of the United States.  New Mexico is represented by Attorney General Raúl Torrez, who is the State's Chief Legal Officer.

31.    Plaintiff the State of New York, represented by and through its Attorney General Letitia James, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on its behalf of the State in this matter.

32.    Plaintiff the State of North Carolina is a sovereign State of the United States of America. North Carolina is represented by Attorney General Jeff Jackson, who is the chief law enforcement officer of North Carolina.

33.    Plaintiff the State of Oregon, represented by and through its Attorney General Dan Rayfield, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

34.    Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6).

35.    Plaintiff the State of Vermont is a sovereign State of the United States of America. Vermont is represented by Attorney General Charity Clark, who is the chief law enforcement officer and is authorized by law to initiate litigation on behalf of the State.

36.    Plaintiff the Commonwealth of Virginia is a sovereign State of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

37.    Plaintiff the State of Washington, represented by and through its Attorney General, Nicholas W. Brown, is a sovereign State of the United States of America. The Attorney General of Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Chapter 43.10 RCW.

38.    Plaintiff the State of Wisconsin is a sovereign State in the United States of America. Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized under Wis. Stat. § 165.25(1m) to pursue this action on behalf of the State of Wisconsin.

**B.    Defendants**

39.    Defendant FEMA is a federal agency within DHS that oversees the administration of many of the federal grant programs at issue in this action.

9

40. Defendant Robert J. Fenton is the Senior Official Performing the Duties of the Administrator of FEMA (the "Interim FEMA Head"). The Interim FEMA Head is sued in his official capacity.

41. Defendant DHS is an agency and executive department of the United States government and has responsibility for implementing the federal grant programs at issue in this action, including through FEMA and other subagencies.

42. Defendant Markwayne Mullin (the "DHS Secretary") is the United States Secretary of Homeland Security and the federal official in charge of DHS. The DHS Secretary is sued in his official capacity.

## ALLEGATIONS

**C. Congress Has for Decades Supported State Emergency Preparedness, Response, and Recovery, and States and Their Residents Rely Heavily on That Support.**

43. FEMA is a distinct entity within DHS. *See* 6 U.S.C. §§ 313(a), 316(a). Its mission is to help people before, during, and after disasters and emergencies. By law, the DHS Secretary "may not substantially or significantly reduce . . . the authorities, responsibilities, or functions of [FEMA] or the capability of [FEMA] to perform those missions, authorities, [and] responsibilities, except as otherwise specifically provided in an Act enacted after October 4, 2006." *Id*. § 316(c)(1); *see also id.* § 591h(c).

44. Every year, Congress appropriates billions of dollars to the States for use preparing for, responding to, and recovering from disasters and emergencies. Grants are the primary funding mechanism FEMA uses to commit and award federal funding to eligible state, local, tribal, and territorial governments, along with certain private non-profits, individuals, and institutions of higher learning.

10

45.     Consistent with the structure Congress created and has funded for decades, Plaintiff States rely on these federal grants as a critical tool to support their efforts to mitigate, prepare for, respond to, and recover from catastrophic events like natural disasters and malicious attacks. State emergency management budgets are largely committed to preexisting priorities—including, for example, emergency management staff. Indeed, many federal grants may be used to support only those activities that are not already directly funded by the State. Federal grants therefore typically support disaster management initiatives that would not exist but for the federal grant funds and would disappear without them.

46.     FEMA's grant programs include the "preparedness grant programs" that annually provide "more than two billion dollars in funding to state, local, tribal Nations, and territorial governments, as well as transportation authorities, nonprofit organizations, and other eligible entities." *Simplifying FEMA Preparedness Grants*, 88 Fed. Reg. 62098, 62099 (Sept. 8, 2023). "For decades, FEMA has provided federal assistance to aid states in building and sustaining capabilities to measurably improve the nation's readiness in preventing, preparing for, protecting against, and responding to terrorist attacks and other hazards." *Id.* at 62098–99. Preparedness programs include large programs such as HSGP and EMPG.

47.     Congress established HSGP in direct response to the horrific events of September 11, 2001. The USA PATRIOT Act, enacted on October 26, 2001, established a grant program to allow States "to prepare for and respond to terrorist acts," Pub. L. No. 107-56, § 1014(a), 115 Stat. 272, 399—a program that became HSGP. When Congress expanded the preparedness programs in 2007 with comprehensive legislation "[t]o provide for the implementation of the recommendations of the" 9/11 Commission, Pub. L. No. 110-53, 121 Stat. 266, 266, it made HSGP permanent. Today, Plaintiff States rely on hundreds of millions in HSGP funds annually.

**1.      Homeland Security Grant Program – State Homeland Security Program**

48.      Homeland Security Grant Program – State Homeland Security Program ("SHSP") grants exist to provide federal funding to States to build the necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism.

49.      SHSP funds have been available to States since the first version of the program was created by the USA PATRIOT Act in 2001. The program is codified at 6 U.S.C. §§ 603, 605–609.

50.      FEMA is required to allocate SHSP funds pursuant to a risk assessment, which determines each State's "relative threat, vulnerability, and consequences from acts of terrorism," considering objective factors such as population density and history of threats. *Id*. § 608(a)(1). Recipients may then expend SHSP funds for uses permitted by statute, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries. *Id*. § 609(a). The permitted uses do not include civil immigration enforcement. *See id.* And the statute says nothing about the States' administration of elections. *Id*.

51.      Because SHSP grants are based on a statutory risk formula, not an exercise of the agency's discretion, each State is entitled to a minimum and specific allocation based on the risk assessment whenever a notice of funding opportunity is posted.

52.      The FEMA Administrator "shall ensure" that each State receives no less than an amount equal to 0.35% of the total funds Congress appropriated for SHSP grants. *Id*. § 605(e)(1)(A)(v).

53.      States collectively receive hundreds of millions of dollars per year in SHSP grants. They use these funds for a wide range of counterterrorism and emergency preparedness purposes, including, but not limited to, funding state special operations command teams (including SWAT teams and bomb squads) and funding mutual aid networks of police departments, fire departments,

emergency services, and public works departments to mobilize first responders from outside an immediate jurisdiction in the event of a disaster.

54. SHSP funds allow States to advance counterterrorism and emergency preparedness purposes in ways they otherwise could not. The multijurisdictional emergency response organizations funded by SHSP would be forced to shut down absent federal funding.

55. Because each SHSP grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in at least the two years thereafter.

56. As an example of how States use SHSP funding, Illinois has used its SHSP funding for a wide range of initiatives that prevent, prepare for, protect against, and respond to acts of terrorism. Those efforts include first responder mutual aid networks, which coordinate terrorism responses from outside an immediate jurisdiction. SHSP funds also support the Illinois Statewide Terrorism and Intelligence Center, which facilitates communication across jurisdictions between public safety officials regarding national terrorism trends. SHSP funds also pay for the Illinois State Police's SWAT and Statewide Weapons of Mass Destruction Team.

57. New Jersey has used its SHSP funding to fund the salaries of state agency staff who provide cybersecurity training, plan risk mitigation efforts, and combat domestic violent extremism. SHSP funds have also enabled the development and maintenance of several technological systems, including automated license plate recognition, unmanned aircraft detection, and the New Jersey Interoperability Communications System, which is a statewide radio system designed to strengthen communication among local, county, state, and federal first responders.

58. Rhode Island uses SHSP funding for several specialized teams that are the only personnel in Rhode Island with the expertise and training to respond to incidents such as a

wilderness search and rescue, attacks involving a weapon of mass destruction or an explosive device, or a terrorist attack at a port.

59.     Furthermore, New York has used SHSP funds to administer and manage terrorism and targeted violence prevention grants and 12 local FBI-certified bomb squads to detect and respond to explosive incidents throughout the State. SHSP funding has also been critical in New York's establishment of local specialty teams, including explosive detection canine teams, tactical teams, and HazMat teams. SHSP funding supports the operations of the State's only fusion center, the New York State Intelligence Center. This funding is critical to supporting incident command operations, radiation interdiction efforts, cybersecurity activities, and weapons of mass destruction programs and staffing for intelligence analysts. In addition, SHSP funding supports citizen preparedness initiatives across the State, and New York has used SHSP funds to reduce vulnerabilities in crowded open spaces.

60.     Pennsylvania uses SHSP funds to train law enforcement and other public safety personnel in specialized event procedures such as event planning and preparedness. In 2026, SHSP funds have been used to prepare first responders to support large public events across Pennsylvania.  SHSP funds are passed through to eight Regional Task Forces, each of which is comprised of multiple counties from within Pennsylvania. In addition to special event preparation, the Regional Task Forces use SHSP funds to procure needed equipment and supplies, such as explosive detecting canines, CBRN detection equipment, and personnel protective equipment.

61.     On June 24, 2026, FEMA posted a Notice of Funding Opportunity ("NOFO") for Fiscal Year 2026 funding under the HSGP program, including SHSP. *See* Ex. A. FEMA posted a revised NOFO on July 9, 2026. Ex. B.

62.     That NOFO described FEMA's allocation of SHSP as shown in Table 1 below.

14

**Table 1: Funds Allocated to Plaintiff States for SHSP for FY2026**

| Plaintiff State | FY2026 Allocation |
|---|---|
| Arizona | $4,651,543 |
| California | $52,359,684 |
| Colorado | $4,362,750 |
| Connecticut | $4,362,750 |
| Delaware | $4,362,750 |
| District of Columbia | $4,362,750 |
| Hawai'i | $4,362,750 |
| Illinois | $9,784,372 |
| Kentucky | $4,362,750 |
| Maine | $4,362,750 |
| Maryland | $4,672,967 |
| Massachusetts | $5,091,328 |
| Michigan | $4,362,750 |
| Minnesota | $4,362,750 |
| Nevada | $4,362,750 |
| New Jersey | $14,820,780 |
| New Mexico | $4,362,750 |
| New York | $59,188,020 |
| North Carolina | $4,362,750 |
| Oregon | $4,362,750 |
| Pennsylvania | $8,816,599 |

| Rhode Island | $4,362,750 |
|---|---|
| Vermont | $4,362,750 |
| Virginia | $8,204,345 |
| Washington | $5,091,740 |
| Wisconsin | $4,362,750 |
| **TOTAL** | **$242,485,378** |

### 2.    Homeland Security Grant Program – Urban Area Security Initiative

63.    Homeland Security Grant Program – Urban Area Security Initiative ("UASI") grants serve the same overall purposes as SHSP grants. These funds are used to build necessary capacity to prevent, prepare for, protect against, and respond to acts of terrorism but with a focus on high-threat, high-density urban areas.

64.    UASI funds have been available to States since the first version of the program was created by appropriations statute in 2003. *See* Pub. L. No. 108-90, 117 Stat. 1137, 1146. The program is codified at 6 U.S.C. §§ 603–604, 606–609.

65.    FEMA is required to follow considerations set by statute to determine "the relative threat, vulnerability, and consequences from acts of terrorism" faced by metropolitan areas to designate high-risk urban areas that may submit applications for UASI grants. *Id*. § 604(b). FEMA is required to allocate UASI funds pursuant to a risk assessment, which determines each high-risk urban area's "relative threat, vulnerability, and consequences from acts of terrorism," considering factors such as population density and history of threats. *Id*. § 608(a)(1).

66.    Because UASI grants are based on a statutory risk formula, not an exercise of the agency's discretion, each eligible State is entitled to a specific allocation based on the risk

16

assessment whenever a notice of funding opportunity is posted, tied to the FEMA-designated eligible urban area or areas in that State.

67.     Recipients must use UASI funds for permitted uses, such as enhancing homeland security, conducting training exercises, upgrading equipment, or paying salaries. *Id*. § 609(a). The permitted uses do not include civil immigration enforcement. *See id.* And the statute says nothing about the States' administration of elections. *Id*.

68.     States that receive UASI funds must provide the high-risk urban area with at least 80% of the grant funds. *Id*. § 604(d)(2)(A). Any funds retained by the State must be expended on items, services, or activities that benefit the high-risk urban area. *Id*.

69.     States collectively receive hundreds of millions of dollars per year in UASI grants, passing most of these funds along to the high-risk urban areas. States and the local government entities to which they pass these funds use UASI funds for myriad counterterrorism and emergency preparedness purposes, including support for urban fusion centers, SWAT teams, canine units, and bomb squads.

70.     UASI funds allow States and local government entities to advance counterterrorism and emergency preparedness purposes in ways they otherwise could not.

71.     Because each UASI grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in at least the two years thereafter.

72.     As an example of how States use UASI funding, Illinois has one eligible high-threat, high-density urban area, the Chicago metropolitan statistical area. Illinois passes approximately 90% of UASI funds on to fire departments, law enforcement, other first responders, and emergency preparedness offices in the greater Chicago area. These funds provide critical

17

funding for the Chicago Office of Emergency Management, the Chicago Crime Prevention and Intelligence Center, and the Cook County Department of Emergency Management and Regional Security. Chicago uses UASI funds for preparedness purposes including, but not limited to, replacing and sustaining its stock of respirators necessary for mass casualty incidents, maintaining training for fire department special operations teams, and developing policy and training regarding active shooters and coordinated terrorist attack scenarios.

73.    Similarly, New Jersey passes UASI funds through to seven contiguous counties in the New York City metropolitan area, including the major cities of Newark and Jersey City, eight medical centers in urban areas throughout the State, and six state-level agencies that perform preparedness work in service of those geographic areas. New Jersey has used UASI funds to enhance urban search and rescue, including training and equipment and gear upgrades and replacements.

74.    Massachusetts utilizes UASI funds to support integral security for physical and technological infrastructure across the Commonwealth, including programs on gunshot detection, monitoring criminal activity in conjunction with local police departments, and running urban fusion centers throughout the state, including the Boston Regional Intelligence Center. In addition, UASI funds enhance capabilities to respond to all-hazards events throughout the Metro-Boston Region in support of the Special Weapons and Tactics (SWAT) Program.

75.    Pennsylvania has two eligible high-threat, high-density urban areas: the Philadelphia and Pittsburgh metropolitan statistical areas. UASI funds are passed through to the Southeast Pennsylvania Regional Task Force for the Philadelphia area and Southwestern Pennsylvania Emergency Response Group for the Pittsburgh area. UASI funds are utilized to sustain Emergency Operations Centers, and specialized teams such as Special Weapons and

18

Tactics (SWAT) teams, federally recognized Explosive Ordnance Disposal (EOD) teams, and Urban Search and Rescue teams and associated capabilities.

76.    FEMA posted the NOFO for Fiscal Year 2026 funding under the HSGP program, including UASI, on June 24, 2026, and posted a revised NOFO on July 9, 2026. Exs. A, B.

77.    That NOFO described FEMA's allocation of UASI as shown in Table 2 below.

| Table 2: Funds Allocated to Plaintiff States for UASI for FY2026 | | |
|---|---|---|
| **Plaintiff State** | **Funded Urban Area** | **FY2026 Allocation** |
| **Arizona** | Phoenix-Mesa-Chandler, AZ | $11,512,287 |
| **California** | Anaheim-Santa Ana-Irvine, CA | $7,689,327 |
| | Los Angeles-Long Beach-Glendale, CA | $33,962,648 |
| | Riverside-San Bernardino-Ontario, CA | $6,530,082 |
| | Sacramento-Roseville-Folsom, CA | $3,994,615 |
| | San Diego-Chula Vista-Carlsbad, CA | $16,266,915 |
| | San Francisco-San Jose-Oakland, CA | $28,731,786 |
| **Colorado** | Colorado Springs, CO | $2,757,605 |
| | Denver-Aurora-Lakewood, CO | $5,790,761 |
| **District of Columbia** | Washington-Arlington-Alexandria, DC VA-MD-WV | $32,167,653 |
| **Hawai'i** | Honolulu, HI | $5,694,660 |
| **Illinois** | Chicago-Naperville-Elgin, IL-IN-WI | $30,990,822 |
| **Maryland** | Baltimore-Columbia-Towson, MD | $6,895,987 |
| **Massachusetts** | Boston-Cambridge-Newton, MA-NH | $14,909,697 |
| **Michigan** | Detroit-Warren-Dearborn, MI | $7,205,819 |

| Minnesota | Minneapolis-St. Paul-Bloomington, MN-WI | $8,344,639 |
|---|---|---|
| Nevada | Las Vegas-Henderson-Paradise, NV | $7,671,239 |
| New Jersey | Newark-Jersey City-New Brunswick, NJ-PA | $32,128,653 |
| New York | New York-White Plains, NY | $142,481,143 |
| North Carolina | Charlotte-Concord-Gastonia, NC-SC | $3,862,875 |
| Oregon | Portland-Vancouver-Hillsboro, OR-WA | $5,539,967 |
| Pennsylvania | Philadelphia-Camden-Wilmington, PA-NJ-DE-MD | $16,601,884 |
| | Pittsburgh, PA | $4,185,597 |
| Virginia | Richmond, VA | $3,099,953 |
| | Virginia Beach-Norfolk-Newport News, VA-NC | $7,802,388 |
| Washington | Seattle-Tacoma-Bellevue, WA | $11,212,216 |
| Wisconsin | Milwaukee-Waukesha, WI | $2,684,441 |
| TOTAL | | $460,715,659 |

78.     HSGP also includes a third program called Operation Stonegarden, which provides funding to States to enhance security along the United States's land and water borders. Plaintiff States that receive Operation Stonegarden funding include Arizona, California, Maine, Michigan, Minnesota, New Mexico, New York, Pennsylvania, Vermont, and Washington. These Plaintiff States have been allocated a total of $37,600,600 in HSGP funds under Operation Stonegarden for Fiscal Year 2026.

**3.      Emergency Management Performance Grant Program**

79.     The Emergency Management Performance Grant program provides federal funding to States to assist state, local, tribal, and territorial emergency management agencies in

implementing FEMA's National Preparedness System, including by building continuity-of-government capabilities to ensure essential functions are available in a catastrophic disaster.

80.    EMPG funds have been available to States since an initial appropriation for the program in 2003. *See* Pub. L. No. 108-7, 117 Stat. 11, 515–16. The program is now codified at 6 U.S.C. § 762 after being made permanent by the Post-Katrina Emergency Management Reform Act of 2006.

81.    FEMA's allocation of EMPG funds is set by statutory formula. For each year's apportioned amount of EMPG, FEMA must allocate to certain territories a baseline amount of 0.25% of the appropriated funds and to the States a baseline amount of 0.75% of the appropriated funds. *Id*. § 762(d)(1). FEMA must apportion the remaining amount among the States on a population-share basis. *Id*. § 762(d)(2).

82.    Because EMPG grants are formula grants and not competitive grants, each State is entitled to a specific allocation whenever a notice of funding opportunity is posted.

83.    States collectively receive hundreds of millions of dollars per year in EMPG grants. They use these funds for emergency preparedness purposes, including funding the salaries of operations personnel who coordinate disaster response efforts and funding communications, facilities, and vehicles used for disaster response.

84.    EMPG funds allow States to advance emergency preparedness purposes in ways they otherwise could not. States would otherwise not be able to employ the emergency management staff funded by EMPG funds, severely diminishing States' ability to coordinate a disaster response.

85.     Because each EMPG grant typically remains open for three years, an award in one fiscal year usually allows States to continue to support program activities in at least the two years thereafter.

86.     States use EMPG funding for a wide range of emergency response programming. For instance, EMPG dollars fund the salaries of state agency personnel who lead statewide coordination efforts in response to a natural disaster or mass casualty event, such as state emergency operations plans, hurricane response plans, severe weather plans and procedures. The EMPG program also funds communications, facilities, and vehicles for disaster response in State-level agencies. EMPG monies also fund the ongoing costs of the software program used at the state emergency operations centers, which are the physical locations where state emergency managers direct all strategic and operational activities in the event of a disaster or public health emergency. For example, Rhode Island uses EMPG funds to lead statewide coordination efforts in response to disasters or mass casualty events. EMPG funds pay for communications, facilities, vehicles and equipment for disaster response.

87.     States also pass through EMPG funds to localities, who likewise fund the salaries of local emergency managers and local support staff statewide as well as software and communications to support local emergency response. For instance, California distributes EMPG funding to 59 local government entities and tribes to improve and fill critical gaps for existing emergency management systems.

88.     Plaintiff States rely on EMPG funds being available to cover emergency response and preparation costs in a manner consistent with FEMA's past practices. Plaintiff States engage in months-long preparation processes and negotiations with subgrantees to identify priority initiatives and projects in anticipation of receiving EMPG funds at the beginning of the fiscal year.

Any impediment to accessing EMPG funds as anticipated would require Plaintiff States and their subgrantees to re-engage in this process and find alternative funding for past expenses, causing not only delays in the implementation of these projects, but wholesale elimination of certain projects and termination of staff.

89.    On June 15, 2026, FEMA posted the NOFO for Fiscal Year 2026 funding under the EMPG program. Ex. C.

90.    That NOFO described FEMA's allocation of EMPG as shown in Table 3 below.

**Table 3: Funds Allocated to Plaintiff States for EMPG for FY2026**

| Plaintiff State | FY2026 Allocation |
| --- | --- |
| Arizona | $6,996,925 |
| California | $25,591,548 |
| Colorado | $6,052,730 |
| Connecticut | $4,690,830 |
| Delaware | $3,150,506 |
| District of Columbia | $2,935,850 |
| Hawai'i | $3,369,006 |
| Illinois | $9,982,780 |
| Kentucky | $5,228,993 |
| Maine | $3,358,490 |
| Maryland | $6,200,863 |
| Massachusetts | $6,721,662 |
| Michigan | $8,464,306 |
| Minnesota | $5,945,987 |

| | |
|---|---|
| **Nevada** | $4,452,734 |
| **New Jersey** | $8,124,620 |
| **New Mexico** | $3,774,915 |
| **New York** | $14,250,779 |
| **North Carolina** | $9,091,374 |
| **Oregon** | $5,033,692 |
| **Pennsylvania** | $10,182,190 |
| **Rhode Island** | $3,182,483 |
| **Vermont** | $2,907,147 |
| **Virginia** | $7,733,109 |
| **Washington** | $7,217,965 |
| **Wisconsin** | $6,029,423 |
| **TOTAL** | **$180,670,907** |

### 4.    Additional FEMA Grant Programs

91.    FEMA also administers additional grant programs, including multiple grant programs for which FEMA has already posted a NOFO for Fiscal Year 2026 funding.

92.    For example, the **Port Security Grant Program ("PSGP")** provides federal funds to States to support increased port-wide risk management and protect critical marine transportation system infrastructure from acts of terrorism, major disasters, and other emergencies. PSGP funds have been available to States and their instrumentalities since the program was created by the Maritime Transportation Security Act of 2002. PSGP grants are awarded on a competitive basis as outlined in the pertinent notice of funding opportunity. Eligible funding must support an Area Maritime Security Program at one of the port areas designated for special security protections by

the Secretary of Homeland Security. Multiple Plaintiff States apply for this competitive grant on an annual basis, and collectively receive millions of dollars per year in grants. They use these funds to purchase and upgrade port security systems, including threat detection technology. The PSGP statute does not authorize FEMA to condition funds on assistance in immigration enforcement or to terminate funds at any time and for any reason.

93.    The **Transit Security Grant Program ("TSGP")** likewise provides funds to support transportation infrastructure security. TSGP provides funds to transit agencies to protect critical surface transportation infrastructure and the traveling public from acts of terrorism. Eligible public transportation agencies may apply for TSGP funds, 6 U.S.C. § 1135(a)(2), and DHS must "select the recipients of grants based solely on risk," *id.* § 1135(c)(2). State subdivisions collectively receive millions of dollars per year in TSGP funds. They use these funds to protect critical transportation infrastructure and the traveling public from acts of terrorism and increasing the resilience of the transportation infrastructure itself. The TSGP statute does not authorize FEMA to condition funds on assistance in immigration enforcement or to terminate funds at any time and for any reason.

94.    The **Nonprofit Security Grant Program ("NSGP")** provides federal funding to States to help nonprofits in those States increase the physical security of their facilities at risk of a terrorist or other extremist attack. The program was created in response to concerns that nonprofit organizations, particularly religious institutions, have faced increasing threats from extremists and other violent organizations. Nonprofit organizations eligible to participate in the NSGP are generally organizations exempt from tax under section 501(c)(3) of the Internal Revenue Code, such as houses of worship, museums, educational facilities, senior centers, community centers, and day camps. Eligible nonprofit organizations submit an application to their State, describing

25

the nature of the threats they face, and States then apply to FEMA for NSGP funds on behalf of the eligible nonprofit organizations. States collectively receive hundreds of millions of dollars per year in NSGP grants. They use these funds for myriad nonprofit security purposes, including, but not limited to, funding security systems and physical building improvements. The NSGP statutes do not authorize FEMA to condition funds on assistance in immigration enforcement or to terminate funds at any time and for any reason.

95.    FEMA and/or DHS administers additional grant programs for which States are eligible applicants, including programs for which defendants have not yet posted NOFOs for Fiscal Year 2026 funds. Plaintiff States in this lawsuit challenge the application of the challenged conditions as to any of the grants and programs that defendants administer, not merely those discussed herein.

**D.    FEMA's Attempts to Use Grant Funds to Coerce States.**

96.    Since January 2025, defendants have engaged in a concerted campaign to use the grant programs administered by DHS and FEMA to force States and local governments to adopt the current Administration's preferred policies.

97.    Last year, defendants focused their efforts primarily on immigration policy, attempting to use federal funds to coerce the States into assisting in immigration enforcement. Courts universally held this campaign unlawful. *See FEMA*, 801 F. Supp. 3d 75; *Noem*, 813 F. Supp. 3d 282; *City & Cnty. of San Francisco v. Trump*, 783 F. Supp. 3d 1148, 1204 (N.D. Cal. 2025), *appeal docketed*, No. 25-3889 (9th Cir.); *New York v. Noem*, 812 F. Supp. 3d 321, 336 (S.D.N.Y. 2025).

98.    This campaign is not a secret. Indeed, since his first day in office, President Trump has attempted to use DHS-administered funding to coerce States into abandoning state laws and policies limiting state and local entanglement with federal immigration enforcement.

26

99.     On January 20, 2025, President Trump issued an executive order directing the Secretary of Homeland Security to "ensure that so-called 'sanctuary' jurisdictions do not receive access to Federal funds," and to take "any other lawful actions, criminal or civil" that the Secretary of Homeland Security deem warranted. Exec. Order No. 14159, 90 Fed. Reg. 8443 (2025).

100.     On April 28, 2025, President Trump issued another Executive Order relating to jurisdictions with policies designed to focus their scarce resources on crime and improve relations between law enforcement and communities. *See* Exec. Order No. 14287, 90 Fed. Reg. 18761 (2025). The EO requires "the Attorney General, in coordination with [DHS]" to publish a "list" of "sanctuary jurisdictions" and to "notify each sanctuary jurisdiction regarding its defiance of Federal immigration law enforcement and any potential violations of Federal criminal law." *Id*. § 2(a).  Section 3(a) of the April 28 Executive Order then directs agencies to "identify appropriate Federal funds to sanctuary jurisdictions, including grants and contracts, for suspension or termination, as appropriate," *id.* § 3(a), 90 Fed. Reg. at 18761–62, expanding to all federal agencies a similar directive in the January 20 Executive Order that applied only to the Attorney General and DHS, 90 Fed. Reg. at 8446, § 17.

101.     In the spring of 2025, DHS posted updated "standard terms and conditions" on its website. Those revised versions included provisions requiring state and local recipients to certify that they would assist defendants in enforcing federal immigration law.

102.     Plaintiff States are responsible for maintaining the day-to-day safety of all residents of their communities, and in doing so, make critical choices about whether to devote their scarce law enforcement and other agency resources to assisting the federal government in enforcing federal civil immigration law. States have exercised that sovereign prerogative in different ways, with many choosing to limit their entanglement in the enforcement of federal immigration law and

others choosing, at minimum, not to categorically *require* their law enforcement officers to assist in that project. All Plaintiff States' decisions in this area are consistent with the basic rule that the States "remain independent and autonomous within their proper sphere of authority," *Printz v. United States*, 521 U.S. 898, 928 (1997)—a principle that has no greater force than in the context of States' exercise of their police powers for the protection of their residents.

103.    Some States accordingly brought suit to challenge the 2025 immigration conditions as unlawful and unconstitutional. This Court agreed and granted the States' motion for summary judgment, holding that the immigration conditions violated the APA and the Constitution. *See FEMA*, 801 F. Supp. 3d 75.

104.    The court explained that DHS's decision to promulgate the conditions was arbitrary and capricious because it had failed to "examine[] the relevant data or articulate[] a fact-based reason" for doing so, instead relying principally on the President's executive order "calling upon agencies to terminate funding to 'sanctuary jurisdiction[s].'" *Id*. at 93. DHS, the court explained, had provided no "actual explanation of why it is necessary to attach sweeping immigration conditions to all the grants at issue . . . , regardless of their statutory purpose or programmatic objectives." *Id*. Moreover, the court concluded that DHS "engaged in a wholly under-reasoned and arbitrary process," "did not meaningfully evaluate the States' reliance interests," and compounded these failures by using "vague and confusing language" that "ma[de] vague compliance a nearly impossible-to-achieve moving target." *Id.* at 94.

105.    The court also held that the conditions violated the Spending Clause because they were "not reasonably related to the purposes of the grants to which they attach" and were coercive, amounting to "'economic dragooning' of the sort condemned in" *National Federation of Independent Businesses v. Sebelius* ("*NFIB*"), 567 U.S. 519 (2012). *FEMA*, 801 F. Supp. 3d at 96.

28

The court also concluded that the conditions were "unlawfully ambiguous," in that they required the States to provide "cooperation" and to participate in "joint operations" and "information sharing" without defining what those terms entailed. *Id*. The conditions also purported to prohibit the States from operating programs that "benefit[ted] illegal immigrants" or "incentivize[d] illegal immigration," terms the court concluded "provides no meaningful standards and is hopelessly vague." *Id*. The result was that "States cannot predict how DHS will interpret these vague terms, yet they risk losing billions in federal funding for any perceived violation." *Id*.

106.    After the court vacated and permanently enjoined the immigration conditions, defendants took a different tack to implementing the President's instructions. One day after the *FEMA* decision, FEMA simply cut the funding of SHSP or UASI recipients that the Department of Justice had identified as "sanctuary jurisdictions." DHS sent States final HSGP award letters reflecting massive funding reallocations away from these jurisdictions toward other jurisdictions. The States subject to such cuts promptly sued, alleging the reallocation exceeded defendants' statutory authority and was arbitrary and capricious under the APA. This Court granted summary judgment for those States, concluding that defendants had "blatantly target[ed] sanctuary jurisdictions for funding cuts," despite the fact "[s]anctuary status was surely not among the factors that Congress considered when, in the aftermath of the September 11 attacks, it authorized HSGP to provide counterterrorism funding to state and local governments." *Noem*, 813 F. Supp. 3d at 305.

E.    **The President's Attempts to Control Election Administration in the States.**

107.    While defendants were attempting to implement and enforce one set of presidential policy priorities, a second campaign was underway—a campaign to require the States to change the ways in which they administer elections throughout the United States.

108. The President's constitutional role in elections is limited to enforcing election laws enacted by Congress. Nonetheless, the President has repeatedly sought to usurp control over the States' administration of their elections though numerous means, including by executive orders, litigation, and agency action. Courts have correctly determined that the President's actions on this front are unconstitutional and contrary to law.

109. The Constitution is clear: as the sovereigns closest to the people, the States have primary responsibility for regulating elections. As Madison explained at the Virginia Convention, "[i]t was found necessary to leave the regulation of [federal elections], in the first place, to the state governments, as being best acquainted with the situation of the people." 3 Records of the Federal Convention of 1787, p. 312 (M. Farrand ed. 1911).

110. Thus, the Framers deliberately drafted the Constitution to grant primary responsibility to regulate elections to the *States*, subject only to preemption by Congress. *See* THE FEDERALIST NO. 59 (Alexander Hamilton); U.S. Const. art. I, § 4, cl. 1; U.S. Const. art. II, § 1, cl. 2, 4. The Constitution's Elections Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. And the Electors Clause specifies that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art. II, § 1, cl. 2.

111. The Constitution therefore "invests the States with responsibility for the mechanics of [federal] elections," but allows Congress—not the President, unilaterally—to preempt those choices. *Foster v. Love*, 522 U.S. 67, 69 (1997). Unless Congress provides otherwise, States have

the authority "to provide a complete code for [federal] elections, not only as to times and places, but in relation to notices, registration, . . . protection of voters, [and] prevention of fraud and corrupt practices." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013).

112.    Consistent with the constitutional division of authority, although Congress has established limited baseline requirements for the conduct of federal elections, it has generally left the States considerable discretion in how to meet those requirements.

113.    For instance, Congress passed the National Voter Registration Act ("NVRA") in 1993 to reduce barriers to voter registration and improve the accuracy of voter registration rolls. *See* 52 U.S.C. § 20501(b). But the NVRA addresses citizenship solely by providing that the federal mail voter registration form must require the applicant to attest that they meet "each eligibility requirement (including citizenship)" and sign under penalty of perjury. *Id.* § 20508(b)(2). It does not mandate that States use any particular method to ascertain whether voters are U.S. citizens.

114.    Likewise, Congress enacted the Help America Vote Act ("HAVA") in 2002, in the wake of the contested 2000 presidential election, to help upgrade the States' voting infrastructure. HAVA set forth new voting machine standards and required States to replace outdated systems, 52 U.S.C.  §§ 20902, 21081; required the replacement of punch card or lever voting machines, *id.* § 20902; and set new standards for voting systems, *id.* § 21081. But HAVA vests the States with discretion on the "methods of complying" with voting machine standards, *id.* § 21085, and designates them as "minimum requirements" which States may choose to exceed, *id.* § 21084. For example, the voting machine guidelines promulgated by the Election Assistance Commission, known as the Voluntary Voting System Guidelines, *id.* §§ 21101(a), 20962(a), approve of a range of voting systems, including those that rely on barcodes, QR codes, and ballot marking devices.

115. For several years, Congress has considered measures intended to establish new voting requirements for federal elections. *See, e.g.*, SAVE Act, H.R. 8281, 118th Cong. (2024); SAVE Act, H.R. 22, 119th Cong. (2025); SAVE America Act, H.R. 7296, 119th Cong. (2026). No such proposal has passed the Senate or been presented to the President for signature.

116. Exercising the substantial discretion granted to them by the Constitution and federal law, state officials create statutes, regulations, and guidance that comprehensively govern a wide range of election issues, from early voting to redistricting. Election codes differ significantly by State, with each State tailoring its rules to its own needs and those of its residents.

117. **Voter Registration and Qualifications.** States have adopted different statutory schemes to undertake voter registration and assess voter qualifications, including citizenship verification. For example, in many States, voter identity and qualifications are generally confirmed with documentation and attestation under penalty of perjury during the registration process. *See* 10 Ill. Comp. Stat. 5/4-10, 5/5-9, 5/6-37; Cal. Elec. Code §§ 2111, 2112, 2150, 2196; Cal. Code Regs. tit. 2, §§ 19073, 20107; Mass. Gen. Laws ch. 51, §§ 36, 42, 44, 47A; Md. Code Ann., Election Law, § 3-202(a)(1)(i); Minn. Stat. § 201.071. Registered voters may then avail themselves of a more streamlined process at the polls or while casting a mail ballot. 10 Ill. Comp. Stat. 5/17-19, 5/19-2; Cal. Elec. Code §§ 3011, 3019, 14216; *see also* Cal. Code Regs. tit. 2, § 19075. In other states, such as Pennsylvania, registered voters must provide proof of identity before voting in person for the first time in an election district and when applying for an absentee or mail-in ballot. *See* 25 P.S. §§ 3050(a), 3146.2b(c), 3150.12b(a).

118. **Voter Roll Maintenance.** States have also adopted different programs to maintain their voter rolls and remove the names of ineligible voters from the rolls. For example, in California, each county has primary responsibility for carrying out its list maintenance practices

in accordance with California and federal law. This includes confirming registrants' addresses, *see* Cal. Elec. Code §§ 2220-2227, and checking registrations against a number of data points to determine accuracy, including based on data from state agencies. *See generally* VoteCal Guidance Documents.[1] Similarly, Illinois requires each county to conduct biennial canvasses of registered voters to verify residence and eligibility.  10 Ill. Comp. Stat. 5/4-30, 5/5-25; 26 Ill. Admin. Code 216.40. Rhode Island entrusts the Secretary of State, with the assistance of local authorities, with the responsibility for updating the statewide central voter register using information from federal, state, and local sources for the exclusive purpose of voter registration, and holding all such information confidential. R.I. Gen. Laws §§ 17-6-1.2; 17-9.1-26, -27, 34(f); *see also* Minn. Stat. §§ 201.021, .02. Pennsylvania's 67 county voter registration commissions perform list maintenance activities on an ongoing basis under the Commonwealth's voter registration law. 25 Pa. C.S. § 1901. In New Jersey too, each county is responsible for maintaining its registration records in physical or electronic copy. N.J. Stat. Ann. §§ 19:31-3-3.3; -10-10.1. The Secretary of State collates each county's records into a statewide database of all registered voters pursuant to Federal and State law, *id.* at § :31-31, which is reviewed each year by the Attorney General and serves as the basis for an annual report to the Governor and State Legislature Leadership on the health of voter registration, *id.* at § :31-33.

119.    **Vote Tabulation and Audit**. States have set out comprehensive statutory schemes regarding the tabulation of votes and certification and audit of election results. For example, in California, state law sets out specific procedures for preparing for the canvass, Cal. Elec. Code §§ 15000-15007; ballot processing, *id.* §§ 15100-15149; the semifinal official canvass, *id.* §§ 15150-15290; the official canvass, including a 1% manual audit, *id.* §§ 15300-15377; declaration

---

[1] https://tinyurl.com/2pzw44dr.

of results, *id.* §§ 15400-15402; duties of the Secretary of State, including compilation, publication, and certification of the vote, *id.* §§ 15550-15505; disposition of ballots and supplies by elections officials, *id.* §§ 15550-15553; processes for recounts, *id.* §§ 15600-15649; and process for tie votes, *id.* §§ 15650-15673. Similarly, Illinois has specific provisions for validating and counting provisional ballots, 10 Ill. Comp. Stat. 5/18A-15, vote-by-mail ballots, *id.* 5/19-8, and absentee ballots submitted by servicemembers, *id.* 5/20-8; canvassing votes cast by voting machines, *id.* 5/24-16, central-count voting systems, *id.* 5/24A-10.1, optical scan technology voting systems, 5/24B-10.1, or direct recording electronic voting systems, *id.* 5/24C-12; and declaring and certifying the results, *id.* 5/22-7, 5/22-9. Substantially all States have set out specific requirements in statute for post-election audits. *See, e.g.*, 10 Ill. Comp. Stat. 5/24A-15, 5/24B-15, 5/24C-15; N.J. Rev. Stat. § 19:61-9; R.I. Gen. Laws § 17-19-37.1 to 37.4; Mass. Gen. Laws ch. 54, § 109; Minn. Stat. § 206.89; 25 P.S. § 3031.17; N.C. Gen. Stat. § 163-182.1(b)(1).

120.   **Voting Machine Standards.** States have also adopted a variety of approaches to ensuring that their voting machines meet federal statutory requirements as well as security, functionality, and performance needs. Elections officials in Plaintiff States have made voting machine purchases in reliance on their State's own statutory and regulatory framework governing voting technology. California, for instance, promulgates its own California Voting System Standards designed to meet federal standards and "incorporate best practices in election technology." Cal. Elec. Code § 19101(a); *see also* Minn. Stat. § 206.57. New Jersey thoroughly regulates the procurement, use, testing, and security of voting machines. N.J. Stat. Ann. §§ 19:47-1-68, :48-1-8. Electronic voting equipment is governed by a statutory scheme specifically tailored to ensure preservation of ballot secrecy and system security, *id.* at §§ :53A-1-17, including a

34

requirement for public pre-election testing of tabulating equipment, post-election verification testing of the same, and preservation of all such testing materials. *Id.* at § 19:53A-8.

121.    Despite having no constitutional role in election administration, the President has repeatedly attempted to undermine state administration of elections. He has explicitly stated his purpose is to "nationalize" or "take over" the running of elections, and that he views the states as "agent[s] for the federal government in elections."[2] In pursuit of these ends, the President has issued two executive orders dictating vast changes to election administration, his Administration has filed 30 lawsuits against States that refused to provide the federal government access to unredacted copies of their state voter rolls, and federal agencies have updated federal databases to improperly attempt to screen voter eligibility.

122.    On March 25, 2025, the President issued Executive Order No. 14248, entitled *Preserving and Protecting the Integrity of American Elections* ("2025 Elections EO"). The 2025 Elections EO orders the DHS Secretary and the FEMA Administrator to "heavily prioritize" States' compliance with the Voluntary Voting System Guidelines 2.0 in awarding HSGP funding. *See* 2025 Elections EO § 4(d). Additionally, the 2025 Elections EO directs the Attorney General and the DHS Secretary to "take all appropriate actions . . . to prevent non-citizens from being involved in the administration of any Federal election," even though no federal law authorizes the Executive to set rules or procedures for selecting election administrators. *See* 2025 Elections EO § 6(a).

123.    The 2025 Elections EO also orders certain federal agencies, including DHS and the Social Security Administration ("SSA"), to put systems in place for state and local authorities to

---

[2] Karen Yourish et al., *The Many Ways Trump Is Trying to Tip the Scales for the Midterms*, N.Y. Times (July 2, 2026), https://tinyurl.com/yc468hnj.

verify the citizenship or immigration status of registered voters or individuals registering to vote. *See* 2025 Elections EO §§ 2(b), 3(a). The Executive Order triggered an overhaul of the Systematic Alien Verification for Entitlements ("SAVE") system—a system operated by DHS to maintain immigration status data used to verify noncitizens' eligibility for certain public benefits. The 2025 SAVE overhaul modified the system in three major ways: (1) to include the records of natural-born citizens, (2) to access SSA records, including Social Security numbers, and (3) to permit bulk searches of records by SAVE users.

124.    The Administration has tried (and failed) to require States to utilize the federal government's SAVE system to verify citizenship of registered voters. A court has held the Administration's SAVE system modification to be unlawful, including findings that the SAVE System does not reliably verify citizenship. *See League of Women Voters v. DHS*, __ F. Supp. 3d __, 2026 WL 1784297, at *6 (D.D.C. June 22, 2026) ("Internal 'Privacy Threshold Analysis' documents from July and September 2025 show that DHS was aware that . . . '[s]hortfalls in data accuracy' in SSA citizenship data integrated into the new SAVE system 'could cause incomplete or false results.'"), *appeal docketed*, No. 26-5243 (D.C. Cir.); Computer Matching Agreement (CMA) between DHS-USCIS and Cal. Dep't of Healthcare Servs., at 11 (DHS-USCIS estimating a 5% to 10% percent error rate in SAVE's database).[3] Indeed, the SAVE system relies on data recording an individual's citizenship at a particular moment in time, failing to reflect changes in citizenship status that may have occurred after. *See League of Women Voters*, 2026 WL 1784297, at *6.

125.    Moreover, the modified SAVE system interfaces with the Social Security Administration's citizenship data, which a previous audit diagnosed with a 7% error rate. U.S. Soc.

_____

[3] https://tinyurl.com/2v7rf8vz.

Sec. Admin. Off. of the Inspector Gen., No. A-08-06-26100, Congressional Response Report: Accuracy of the Social Security Administration's Numident File 13 (Dec. 18, 2006).[4] At the time of the audit, that translated to the database falsely identifying 3.3 million U.S. citizens as noncitizens. *Id*. The same audit also identified a 4.1% discrepancy between the citizenship data in DHS's SAVE system and SSA's data. *Id.* at 5 & n.11.

126.    Several courts have also preliminarily or permanently enjoined other sections of the 2025 Elections EO as unlawful, in that it violates the separation of powers and statutory authority and unconstitutionally commandeers state resources. *See California v. Trump*, 786 F. Supp. 3d 359, 380 (D. Mass. 2025) ("only Congress has the power to adjust state election rules"), *appeal docketed*, No. 25-1726 (1st Cir.);[5] *California v. Trump*, __ F. Supp. 3d __, 2026 WL 1826535, at *3, *22 (D. Mass. June 24, 2026); *League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 74 (D.D.C. 2025); *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34 (D.D.C. 2026), *appeal docketed*, Nos. 25-5476 *et al.*; *Washington v. Trump*, 814 F. Supp. 3d 1173 (W.D. Wash. 2026).

127.    Almost exactly one year after issuing the 2025 Elections EO, on March 31, 2026, the President issued Executive Order No. 14399, entitled *Ensuring Citizenship Verification and Integrity in Federal Elections* ("2026 Elections EO"). The 2026 Elections EO erects shadow voter eligibility lists within the federal government and uses threats of investigation and prosecution to coerce States into disenfranchising voters missing from those lists. It also directly interferes with mail voting by mandating that the United States Postal Service ("USPS") refuse to deliver voted ballots from voters not on USPS's precleared list, which is maintained outside the control of the

---

[4] https://tinyurl.com/79cyyuv9.

[5] The States did not challenge Section 6(a) of the 2025 Elections EO in this lawsuit as DHS and FEMA had not implemented the conditions at issue here at the time that case was brought.

States. *See* 2026 Elections EO §§ 2, 3. These provisions have also recently been permanently enjoined as unconstitutional and ultra vires as to the November 2026 election. *California v. Trump*, __ F. Supp. 3d __, 2026 WL 1826490, at \*3 (D. Mass. June 25, 2026), *appeal docketed*, Nos. 26-1774 *et al*.

128.    Finally, beginning in 2025, the President, through the Justice Department, began demanding complete and unredacted state voter registration lists, including voters' Social Security numbers and driver's license numbers, from at least 48 states and the District of Columbia. The federal government has sued at least 30 states and territories that have refused to provide this information. The federal government has stated that the purpose of these requests is to find alleged noncitizens who may be on the voter rolls by processing the voter rolls through the SAVE database, and to provide them to DHS for immigration enforcement. *See, e.g.*, *United States v. Weber*, 816 F. Supp. 3d 1168, 1184-86 (C.D. Cal. 2026) (finding that U.S. Department of Justice's stated purpose for voter roll requests was contrived and actual purpose was to create centralized federal voter registration database and run records through SAVE for DHS immigration enforcement purposes), *appeal docketed*, No. 26-1232 (9th Cir.); Tr. of Mar. 26, 2026 Motion Hearing at 50, *United States v. Amore*, No. 25-cv-639 (D.R.I.) (Doc. 47) (the Acting Chief of the Voting Section of the Civil Rights Division explaining that the agency planned to run the voter roll data it collects "against DHS's SAVE database").

129.    All district court judges that have reached a ruling so far have dismissed the federal government's lawsuits as improper and illegal, and the only Court of Appeals to have issued an order has agreed. *See*, *e.g.*, *Weber*, 816 F. Supp. 3d at 1168 (dismissing complaint); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026) (same), *aff'd*, 179 F.4th 470 (6th Cir. 2026); *United States v. Amore*, __ F. Supp. 3d __, 2026 WL 1040637 (D.R.I Apr. 17, 2026) (same), *appeal*

*docketed*, No. 26-1665 (1st Cir.); *United States v. Schmidt*, __ F. Supp. 3d __, 2026 WL 1850016 (W.D. Pa. June 27, 2026) (same); *United States v. Scanlan*, __ F. Supp. 3d __, 2026 WL 1864054 (D.N.H. June 29, 2026) (same), *appeal docketed*, No. 26-1783 (1st Cir.); *United States v. Koski*, 2026 WL 2032532 (E.D. Va. July 14, 2026) (same).

130.    Thus, while the President has repeatedly attempted to seize the power over elections from States and Congress, the courts have largely blocked his direct attempts at usurping power. The President now tries to accomplish the same goals by imposing conditions on HSGP grants.

**F.    FEMA Imposes the Election Conditions on HSGP Funds.**

131.    FEMA released the FY 2026 HSGP NOFO on June 24, 2026, and issued a revised NOFO on July 9, 2026 (Exs. A, B) (the "HSGP NOFO").

132.    In addition to setting out the generally applicable terms and conditions that FEMA intends to impose on the HSGP grant program, the NOFO sets out five "National Priority Areas" ("NPAs") for States to address in their grant applications and directs that 30% of funding awarded to a State must be allocated to projects addressing those priority areas. One such NPA relates to "[e]nhancing election security" (the "Election Security NPA"). Ex. B at 11, 15.

133.    The Election Security NPA requires grantees to make "at least one investment that supports physical and/or cyber election security." *Id.* at 15. Applicants are required to allocate at least 3% of the SHSP and UASI award to such investments.

134.    The Election Security NPA contains the following five additional requirements ("Election Conditions"):

- **Submit a transition plan:** Submit a plan for transitioning from electronic voting systems that utilize bar codes or QR codes to count votes to equipment that accepts hand-marked paper ballots. The plan, for all jurisdictions currently using such systems, must include a timeline and, if necessary, a funding request to eliminate ballot marking devices and utilize hand-marked paper ballots.

- **Post-election manual audit:** Demonstrate proof of compliance with a post-election 5% manual audit, conducted according to the guidelines established by the Secretary, to ensure that electronic voting systems accurately count votes.

- **Voter/ballot reconciliation:** Ensure that each election jurisdiction reconciles the number of voters who voted in each federal election to the number of ballots cast, using the methodology established by the Secretary.

- **Voter roll citizenship verification:** Utilize the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements (SAVE) system to verify the citizenship of all individuals in the state voter registration database within 120 days of accepting the grant award[]. To mitigate operational vulnerabilities exploitable by terrorist or foreign actors and advance HSGP counterterrorism objectives, the State's chief election official must take timely corrective action, consistent with applicable law, to remove verified non-U.S. citizens from the database.

- **Election worker citizenship verification:** Utilize the SAVE system, or another authorized government system, to verify U.S. citizenship for any person working at a polling place in any capacity, or operating any election system in the jurisdiction, including temporary agency workers and vendors who work on or with election systems. To prevent sabotage, infiltration, or foreign interference, the State's chief election official must ensure verified non-U.S. citizens are prohibited from operating election systems or working at polling places, consistent with applicable law, thereby hardening critical infrastructure under HSGP.

Ex. B at 15–16.

135.    The NOFO acknowledges that use of the modified SAVE system has been held unlawful, *see League of Women Voters*, 2026 WL 1784297, but still requires additional citizenship verification. Specifically, the NOFO advises that "for any person who is registered to vote but for whom a State does not have records of citizenship, the State may resolve this uncertainty by

submitting relevant information to USCIS for an immigration records search consistent with the requirements of 8 U.S.C. § 1373." Ex. B at 15. Section 1373, however, only prohibits federal, state, or local government restrictions on the exchange of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," and does not affirmatively require state or local governments to provide any information to USCIS or any federal agency. *See Munoz v. Garland*, 71 F.4th 1174, 1178 n.4 (9th Cir. 2022).

136.    The 2026 NOFO also contains a withholding provision, in connection with the Election Security NPA and Election Conditions, stating that FEMA will withhold 20% of the recipient's total HSGP award "until the recipient submits proof of compliance with the FY 2026 Election Security NPA requirements and the Department verifies/confirms that proof." Ex. B at 16.

137.    On July 9, 2026, DHS issued guidance addressing the Election Conditions. While its guidance reiterates that "FEMA will withhold from drawdown 20% of each recipient's total HSGP award" until recipients submit "proof of compliance" with the Election Conditions, the guidance also adds language stating that "[s]ustained noncompliance" with the Election Conditions may result in "remedies for noncompliance under 2 C.F.R. § 200.339." Ex. D. These remedies, in turn, include that a federal agency may "[s]uspend or terminate the Federal award in part or in its entirety." 2 C.F.R. § 200.339(d).

138.    On July 17, 2026, the DHS Secretary expressly stated defendants' purpose in imposing the Election Conditions: "we are going to make [the Administration's preferred] security

41

enhancements mandatory. Meaning that, if these States want a grant . . . they're going to have to implement" the Election Conditions.[6]

### G.    FEMA Reissues the Immigration Conditions, but Equivocates About Their Application to Critical Programs.

139.    On April 16, 2026, DHS posted its Fiscal Year 2026 Standard Terms and Condition ("FY26 Standard Conditions") on the DHS website. *See* Ex. E.

140.    The FY26 Standard Conditions state that "[a]ll recipients, including pass-through entities and their subrecipients, are responsible for complying with the DHS Standard Terms and Conditions." Ex. E at 2. The document adds that "[t]he DHS Standard Terms and Conditions apply to all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2026, and flow down to subrecipients unless a term or condition specifically indicates otherwise." *Id*.

141.    Despite the court orders in place enjoining defendants' attempts to tie grant funding to the Administration's immigration priorities, the FY26 Standard Conditions again include a set of conditions requiring the States to assist the federal government in enforcing federal civil immigration law.

142.    Specifically, the FY26 Standard Conditions include a set of conditions entitled "Communication and Cooperation with the Department of Homeland Security and Immigration Officials." These conditions operate as follows:

- *The Information Sharing Condition*: Grant recipients "must comply with the requirements of 8 U.S.C. §§ 1373 and 1644," which prohibit restrictions on government entities or officials exchanging information with DHS concerning the citizenship or immigration status, lawful or unlawful, of any individual.

---

[6] DHS Sec'y Mullin, Press Conference (July 17, 2026), https://tinyurl.com/2dbz38wb (from 9:15 to 9:38).

- *The Compliance Condition*: Grant recipients must comply with various criminal laws that prohibit, among other things, "encouraging or inducing" noncitizens to unlawfully enter the United States.

- *The Cooperation Condition*: Grant recipients must "honor requests for cooperation, such as participation in joint operations, sharing of information, or requests for short term detention of an alien pursuant to a valid detainer."

- *The Access Condition*: Grant recipients must provide federal immigration agents "access to detainees" in correctional facilities to inquire as to such individuals' right to be or remain in the United States.

- *The Publicization Condition*: Grant recipients must not "leak or otherwise publicize the existence of" any federal immigration enforcement operations.

- *The Certification Condition*: Grant recipients must certify compliance with the above conditions and require subgrant recipients to do the same.

Ex. E at 5–6.

143. The FY26 Standard Conditions also include a condition titled "Federal Anti Discrimination Laws Material to the Government's Payment Decisions Under the False Claims Act" which request (at 2(a)(ii)) that recipients of grant awards certify that "[t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration" (the "Benefits Condition"). *Id*. at 10–11.

144. Plaintiff States refer to these conditions together as the "Immigration Conditions."

145. The Immigration Conditions are substantially identical to those enjoined in *FEMA*, except for one additional paragraph. That paragraph states that "[t]he Department of Homeland Security will analyze whether the conditions in this section will be applied to any grant program in a way that is consistent with the specific statutes that apply to each grant program because the purpose of each grant program has a nexus to immigration activities, law enforcement, or national security, including preventing and responding to acts of terrorism and extremism, and DHS may

43

tailor the conditions in this section to a specific grant program. DHS will clarify in the grant documents whether and how the terms in this section apply to each grant." Ex. E at 5.

146. To date, FEMA has issued over thirty NOFOs that identify opportunities to apply for Fiscal Year 2026 funding.

147. Although the FY26 Standard Conditions assert that DHS and FEMA will clarify whether and how the Immigration Conditions will apply to each funding program, the FY26 Standard Conditions also state that they "apply to all new federal awards of federal financial assistance (federal awards) for which the federal award date occurs in FY 2026."

148. In addition, multiple NOFOs for critical emergency-management grant programs add to the confusion.

149. For instance, the HSGP NOFO states:

> An immigration term and condition, including those in the DHS Standard Terms and Conditions, may be material to the Department of Homeland Security's decision to make this grant award, and the Department of Homeland Security may take any remedy for noncompliance, including termination, if the state or territorial recipient or any local government subrecipient fails to comply with this term and condition. No final agency determination has been made as of the date of this publication.

Ex. B at 59.

150. Substantially the same text appears in the EMPG, TSGP, and PSGP NOFOs. Ex. C at 34; Ex. F at 43; Ex. G at 50. Over $1 billion has already been allocated to the Plaintiff States under HSGP, EMPG, and TSGP alone.

151. In an effort to avoid unnecessary litigation, Plaintiff States' counsel asked counsel for defendants whether FEMA intended to impose terms on federal grant funds requiring the States to assist in federal immigration enforcement. Counsel for defendants responded that "these issues

are being discussed as part of ongoing administrative processes, and it is not clear when those processes will conclude."

**H.     FEMA Imposes the Termination Conditions on All FEMA Grants.**

152.    The Office of Management and Budget ("OMB") is a component of the Executive Office of the President and has periodically promulgated "guidance" governing federal grants. Such guidance has been incorporated by federal agencies into their own regulations.

153.    OMB's Uniform Guidance has permitted grant award termination only under carefully cabined circumstances. *See* 2 C.F.R. §§ 200.339 to 200.343 (collectively addressing "Remedies for Noncompliance"). 2 C.F.R. § 200.340(a) enumerates the specific grounds for which a federal grant award "may be terminated": (1) by the federal agency "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award"; (2) by the federal agency "with the consent of the recipient or subrecipient"; (3) by the recipient "upon sending … a written notification of the reasons for such termination"; and (4) by the federal agency "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." This last clause, § 200.340(a)(4), has long been understood to allow agencies to terminate grants for failing to meet *established* agency priorities—not to terminate based on *new or changed* priorities after an award is made. Indeed, Plaintiff States are not aware of an instance prior to January 20, 2025, in which § 200.340(a)(4) was invoked to terminate an award to Plaintiff States on the grounds that the award did not effectuate new "program goals or agency priorities" identified *after* the time of the award.

154.    Notwithstanding the circumscribed scope of authority given to Executive Branch agencies to terminate awarded federal funding, President Trump announced shortly after the 2024 election that he would be ordering a full-scale effort to "dismantle Government Bureaucracy" and "cut wasteful expenditures." In the weeks and months after his inauguration, President Trump

issued a series of executive orders directing federal agencies—in consultation with the newly created United States Department of Government Efficiency ("DOGE")—to terminate existing federal grants or contracts to a wide variety of federal funding recipients, including Plaintiff States. Federal agencies, including defendants, complied by engaging in an unprecedented campaign to terminate grants based on untenable interpretations of existing regulation.

155.    Many Plaintiff States filed suit in the District of Massachusetts—including against defendants—in June 2025 to seek a declaratory judgment clarifying whether existing regulations, particularly § 200.340(a)(4), provided federal agencies with virtually unfettered authority to withhold federal funding any time they no longer wish to support the programs for which Congress has appropriated funding. *See New Jersey v. U.S. Off. of Mgmt. & Budget*, No. 25-cv-11816 (D. Mass. June 24, 2025).

156.    In an Executive Order dated August 7, 2025, titled "Improving Oversight of Federal Grantmaking," the President directed, among other things, that the Director of OMB "revise the Uniform Guidance" to "clarify and require all discretionary grants to permit termination for convenience, including when the award no longer advances agency priorities or the national interest." Exec. Order No. 14,332, 90 Fed. Red. 38929, 38932. (Aug. 7, 2025). The President also directed agency heads for "discretionary grants" to "permit immediate termination for convenience, or clarify that such termination is permitted, including if the award no longer advances agency priorities or the national interest." *Id.*

157.    In response, on May 29, 2026, OMB and dozens of federal agencies (including DHS) issued a Notice of Proposed Rulemaking to revise existing guidance and regulation tied to § 200.340 to enumerate new proposed grounds for grant terminations. The proposed rule would add a new discretionary termination provision that would be "generally applicable to discretionary

awards" and would allow federal agencies to terminate grant awards if an agency "determines that a termination is in the interest of the Federal Agency . . . , including if a Federal award does not effectuate programs goals, Federal Agency priorities, or the national interest as they exist at the time of the termination." 91 Fed. Reg. 32198, 32258 (May 29, 2026). The proposed rule states that it will not be effective before October 1, 2026, and is not anticipated to apply to awards before "fiscal year 2027." *Id.* at 32235. Many Plaintiff States submitted comments objecting to the proposed rule on July 13, 2026.

158.    Notwithstanding that existing regulation does not permit terminating grant awards based on program goals or agency priorities that change after a grant award is issued (or that are inconsistent with federal statutes and congressional appropriations) and even though OMB's rulemaking on this issue remains ongoing, and no Final Rule altering the existing regulation has yet been adopted or become effective, DHS revised its own FY26 Standard Conditions in April 2026 to include, among other things, a new "for convenience" termination provision:

> DHS may terminate a federal award, in whole or in part, for the following reasons:
>
> (a) If the recipient fails to comply with the terms and conditions of the federal award;
>
> (b) With the consent of the recipient, in which case the parties must agree upon the termination conditions, including the effective date, and in the case of partial termination, the portion to be terminated;
>
> (c) Pursuant to the terms and conditions of the federal award; or
>
> (d) For convenience, pursuant to Executive Order 14332, Improving Oversight of Federal Grantmaking, including when the award no longer advances agency priorities or the national interest, but subject to appropriate exceptions, including agreements entered into in furtherance of international trade agreements or those awarded by the Department of Commerce under title XCIX of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116-283), the CHIPS and Science Act of 2022 (Public Law 117-167), or Division F of the Infrastructure Investment and Jobs Act (Public Law 117-58).

Ex. E at 15–16.

159. When FEMA subsequently began issuing its NOFOs for FY26, it chose to replace the termination provision in the FY26 Standard Condition with an even more aggressive termination provision. That condition states:

FEMA, in its sole discretion, may terminate the federal award in whole or in part for one of the following reasons consistent with 2 C.F.R. § 200.340:

a. If the recipient or subrecipient fails to comply with the terms and conditions of the federal award.

b. With the consent of the recipient, in which case FEMA and the recipient must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated.

c. If the federal award no longer effectuates the program goals or agency priorities. Under this provision, FEMA may terminate the award for these purposes if any of the following reasons apply:

  i.   FEMA determines that a specific award objective is ineffective at achieving program goals as described in this NOFO;

  ii.  FEMA determines that an objective of the award as described in this NOFO will be ineffective at achieving program goals or agency priorities;

  iii. FEMA determines that the design of the grant program is flawed relative to program goals or agency priorities;

  iv.  FEMA determines that the grant program is not aligned to either the DHS Strategic Plan, the FEMA Strategic Plan, or successor policies or documents;

  v.   FEMA changes or re-evaluates the goals or priorities of the grant program and determines that the award will be ineffective at achieving the updated program goals or agency priorities; or

  vi.  For other reasons based on program goals or agency priorities described in the termination notice provided to the recipient pursuant to 2 C.F.R. § 200.341.

d. For convenience, including if the award no longer advances the national interest. Termination for convenience only applies to discretionary awards, as that term is defined at 2 C.F.R. § 200.1. The term "discretionary award" does not include grants where legislation establishes an entitlement to the funds on the part of the recipient, such as block grants or those awarded based on a statutory formula.

*See, e.g.*, Ex. B at 49.

160.    These new and expansive termination provisions (the "Termination Conditions") are an unauthorized continuation of the Administration's concerted efforts to seize greater control over federal grantmaking by claiming the power to revoke grant awards at any time for any reason.

161.    This conclusion is confirmed by the recent decision from the District of Massachusetts in *New Jersey v. OMB*. On July 17, 2026, that court granted summary judgment to the Plaintiff States in that case and against the OMB and other federal agencies—including defendants—holding that, "[a]fter review of the plain language, regulatory scheme, regulatory history, [and] the Spending Clause of the U.S. Constitution, . . . the court agrees . . . and finds that the Termination Clause [at 2 C.F.R. § 200.340] does not permit agencies to terminate grants based on program goals and agency priorities identified after grants were awarded." *New Jersey v. OMB*, No. 25-cv-11816, __ F. Supp. 3d __, 2026 WL 2069832, at *11 (D. Mass. July 17, 2026) ("*OMB*"). The court further noted that the defendants in that case—including DHS and FEMA—admitted that 2 C.F.R. § 200.340 "does not permit the withholding of congressionally appropriated funds on account of changed agency priorities," and "fully agree[d] that the government must comply with federal statutes and regulations in terminating grants." *Id.* at *10. Although *OMB* arose as a request for a forward-looking declaration clarifying the meaning of § 200.340 following prior grant terminations instead of, as here, in the context of the imposition of a new and broad termination condition on future grant funding, the court's reasoning and conclusion confirm that the Termination Conditions defendants seek to impose—including provisions allowing termination based on "updated program goals or agency priorities" or "for convenience"—are inconsistent with what existing regulation authorizes.

## I.    The Conditions are Unlawful.

162.    All three sets of challenged conditions are unlawful in multiple respects.

### 1.    The Election Conditions are unlawful.

163.    The Election Conditions are unlawful in multiple respects. First, the Conditions are contrary to law. An "agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). And if Congress wishes to upset the federal-state balance of power, as the Election Conditions do, "it must make its intention to do so unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Here, neither the HSGP authorizing statutes nor any other provision of law confers on defendants the power to rewrite state election laws as a condition of obtaining HSGP funding.

164.    Second, the Election Conditions are arbitrary and capricious. In imposing the Conditions, defendants relied on factors that Congress did not intend them to consider; failed to consider whether the States had relied on the existing federal framework governing voting systems; and failed to consider important aspects of the problem. Plaintiff States have relied on their discretion under federal law to adopt myriad statutory and regulatory frameworks related to voting systems and have invested hundreds of millions in voting technology and election infrastructure in reliance on those frameworks. Defendants' decision to impose the Election Conditions ignored these weighty interests and others, and provided no explanation or evidence to justify adoption of the conditions.

165.    Third, the Election Conditions violate the U.S. Constitution's Spending Clause. The Spending Clause requires conditions on federal funds to be imposed "unambiguously," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), but the Election Conditions are hopelessly ambiguous, summarily requiring the States to comply with vague "guidelines" and "methodology" that DHS has not yet adopted or made available to the States. The Spending Clause also requires conditions on federal funds to be related to "the federal interest in" the particular federal program,

51

*South Dakota v. Dole*, 483 U.S. 203, 207 (1987), but the Election Conditions impose conditions unrelated to the federal funding they encumber, requiring States to comply with specific policies regarding voter eligibility and vote tabulation as a condition for obtaining millions of dollars in funding to prevent and respond to terrorist attacks.

166.    The Election Conditions, if not enjoined, will harm the States. Plaintiff States have adopted a comprehensive array of laws and policies for administering elections. The Election Conditions seek to override those sovereign choices by dictating either a uniform method of election administration that conflicts with state laws and policies, or by requiring Plaintiff States to be bound by vague requirements that defendants have yet to define.

167.    For instance, the condition requiring a transition away from voting machines that use bar codes or QR codes, to equipment that reads hand-marked paper ballots, conflicts with the sovereign choices that Plaintiff States have made to invest millions of dollars purchasing and improving voting equipment to more effectively and accurately tabulate votes. Consistent with HAVA's requirements to improve voting system technology—and consistent with the current federal Voluntary Voting System Guidelines, which expressly approve of voting machines that read QR codes—many States have exercised their discretion under HAVA to invest millions of dollars updating their voting systems to use technology such as QR code reading, consistent with state and federal law. But the Election Conditions would require the States to abandon years of work and millions of dollars of investment on a dime, all in order to obtain unrelated funding that Congress earmarked for the prevention of terrorist attacks.

168.    Likewise, the condition requiring Plaintiff States to verify the citizenship of all individuals on their state voter rolls through the modified SAVE system conflicts with States' privacy laws and their statutory schemes regulating voter qualification. The modified SAVE

52

system's database relies upon data like an individual's Social Security numbers and driver's license numbers to verify their citizenship. But federal law does not require that States use the SAVE system, and many States have adopted privacy laws prohibiting election officials from sharing certain information from their voter rolls with any persons, including the federal government. By requiring Plaintiff States to use the SAVE system to verify the citizenship of individuals on their voter rolls, defendants require Plaintiff States to violate their state laws protecting the confidentiality of voter registration information, and seek the same result that over a dozen federal courts have rejected in other contexts. *Supra* ¶¶ 128–129.

**2.  The Immigration Conditions are unlawful.**

169.  Defendants' immigration conditions have already been vacated and defendants are already subject to a permanent injunction regarding the attachment of civil immigration conditions to federal funds. *See* Order, *Illinois v. FEMA*, No. 25-cv-206 (D.R.I. Oct. 14, 2025) (Doc. 75). That order states that "[t]he contested conditions and all award articles titled 'Compliance with Federal Immigration Law' are set aside and vacated pursuant to 5 U.S.C. § 706(2)" and bars defendants from "enforcing against Plaintiff States and their instrumentalities and subdivisions: (a) the contested conditions, (b) the 'Compliance with Federal Immigration Law' award articles, and (c) any materially similar term requiring cooperation with federal immigration enforcement as a condition on federal funds." *Id*.  The Immigration Conditions are materially similar to the enjoined conditions in *FEMA.* In fact, the conditions are almost identical.

170.  But even if there were no court order in place barring defendants' inclusion of an immigration condition, the Immigration Conditions remain unlawful in multiple respects.

171.  First, the Immigration Conditions are contrary to law. No statute confers upon DHS or FEMA the power to impose an immigration condition, nor do the authorizing statutes for HSGP, EMPG, or other preparedness programs permit conditioning receipt of funds on state policies

regarding cooperation with immigration authorities. *See Noem*, 813 F. Supp. 3d at 305 ("Sanctuary status was surely not among the factors that Congress considered when, in the aftermath of the September 11 attacks, it authorized HSGP to provide counterterrorism funding to state and local governments."). Defendants' threat to impose the Immigration Conditions on these programs thus seriously exceeds the scope of their authority.

172.    Second, the Immigration Conditions are also arbitrary and capricious. The APA requires that agencies' decisions be "reasonable and reasonably explained." *Ohio v. Env't Prot. Agency*, 603 U.S. 279, 292 (2024). The imposition of the Immigration Conditions is neither. The funds that DHS is holding hostage are intended to fund emergency preparedness and other homeland security measures. Plaintiff States have received these grants year over year and rely on them to fund critical preparedness, mitigation, and relief efforts. DHS now insists that the States are not entitled to these funds unless they help enforce federal immigration law. But its decision reflects no effort to consider the factors that must undergird it, including the statutory scheme, the States' reliance interests, and the detrimental effects of imposing the condition on state and local law enforcement. *See FEMA*, 801 F. Supp. 3d at 93.

173.    Third, the Immigration Conditions are also unconstitutional under the Spending Clause. As the court explained in *FEMA*, the States rely on FEMA grants "for billions of dollars annually in disaster relief and public safety funds," and "[d]enying such funding if states refuse to comply with vague immigration requirements leaves them with no meaningful choice, particularly where state budgets are already committed." *Id.* at 96. The conditions' ambiguity exacerbates the defect: They require the State to "provide 'cooperation' and participate in 'joint operations' and 'information sharing,' but without defining what compliance entails." *Id.* "States cannot predict how DHS will interpret these vague terms, yet they risk losing billions in federal funding for any

perceived violation." *Id.* "Such ambiguity deprives the states of the ability to make informed decisions, rendering the conditions constitutionally invalid." *Id.* The 2026 conditions are word-for-word identical to the 2025 conditions, and are thus unconstitutional for the same reasons.

**3.      The Termination Conditions are unlawful.**

174.    The Termination Conditions, too, are unlawful in multiple respects.

175.    First, the Termination Conditions are contrary to law. By permitting termination of grants based on program goals and agency priorities that are newly defined after the grants are accepted or inconsistent with the statutes authorizing the relevant grants, and by permitting the termination of "discretionary" grants for convenience, the Termination Conditions run afoul of both existing regulations governing grant terminations and the statutes authorizing the grant programs administered by defendants. *See, e.g.*, *OMB*, 2026 WL 2069832, at *10-11.

176.    Second, the Termination Conditions are arbitrary and capricious. Not only do the Conditions not comply with defendants' own regulations, but defendants have failed to consider important aspects of the problem, such as whether federal grant statutes underlying the grant programs and projects permit the Termination Conditions, and they relied on factors Congress did not intend them to consider. Defendants have also failed to consider the serious reliance interests that States and others have engendered in the current funding landscape. In addition, they have not considered alternatives to their changed position and have offered no reasoned or reasonable explanation for why they chose to depart from the longstanding interpretation of existing regulation, why the Termination Conditions are necessary, or why existing regulation is insufficient.

177.    Third, the Termination Conditions are unconstitutional under the Spending Clause. They effectively impose new, unascertainable, and vague requirements—including new post-acceptance program goals and agency priorities and any number of other conditions that could

give rise to for-convenience termination—on already-accepted awards without the unambiguous and pre-award notice required. They also operate as unlawful coercion by threatening the total loss of critical preparedness and disaster-relief funding to extract compliance defendants could not lawfully compel directly. And they authorize termination of grant programs for reasons that are untethered to the federal interest in the underlying grant programs.

**FIRST CAUSE OF ACTION**

**Violation of the Administrative Procedure Act**
**Agency Action Contrary to Law (Election Conditions)**
**All Plaintiff States**

178.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

179.    Defendants DHS and FEMA are each an "agency" under the APA, 5 U.S.C. § 551(1), and the decision to promulgate and impose the Election Conditions is an "agency action" under the APA, *id.* § 551(13).

180.    The decision to promulgate and impose the Election Conditions also constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

181.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

182.    An executive agency "has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n*, 476 U.S. at 357. A federal agency cannot impose conditions on federal funding unless

56

Congress has vested it with the authority to do so. *City of Providence v. Barr*, 954 F.3d 23, 45 (1st Cir. 2020).

183.    The Election Conditions are unlawful in multiple respects. Neither the HSGP authorizing statute nor any other provision of law confers on defendants the power to impose the Election Conditions as a requirement for receiving HSGP grant funding. Indeed, the HSGP authorizing statute affirmatively precludes Defendants from imposing those conditions, requiring instead that funding be allocated according to statutory prioritization factors. 6 U.S.C. § 608. While the statute allows the FEMA Administrator to consider "the anticipated effectiveness of the proposed use of the grant" in accomplishing program objectives, *id.* § 608(a)(2), it does not authorize defendants to condition funding on a State's rewriting of its election codes.

184.    The decision to promulgate and impose the Election Conditions is also contrary to federal law in other respects. For example, HAVA's provisions authorizing the promulgation of federal voting system guidelines expressly makes those standards "voluntary," 52 U.S.C. §§ 21101, 20962, 20971, but the Election Conditions would require Plaintiff States to adopt defendants' preferred policies on voting systems in order to obtain federal funds.

185.    The Election Conditions will cause irreparable harm to Plaintiff States.

186.    Pursuant to 5 U.S.C. § 706(2)(C) and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the promulgation and imposition of the Election Conditions is contrary to law, vacatur of the conditions, and a permanent injunction preventing defendants from putting the conditions into effect or basing funding decisions on Plaintiff States' compliance with them.

57

**SECOND CAUSE OF ACTION**

**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action (Election Conditions)**
**All Plaintiff States**

187.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

188.    Defendants DHS and FEMA are each an "agency" under the APA, 5 U.S.C. § 551(1), and the decision to promulgate and impose the Election Conditions is an "agency action" under the APA, *id.* § 551(13).

189.    The decision to promulgate and impose the Election Conditions also constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

190.    Under the APA, a court must set aside final agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency acts arbitrarily and capriciously if it fails "to assess whether there were reliance interests [at stake], determine whether they were significant, and weigh any such interests against competing policy considerations." *DHS v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1915 (2020).

191.    The HSGP Election Conditions are arbitrary and capricious under these well-established standards.

58

192.    In imposing the Election Conditions, defendants relied on factors that Congress did not intend defendants to consider. The SHSP and UASI authorizing statutes require DHS to award grants based on a statutory risk formula related to terrorism threats, and do not authorize the conditioning of awards on granular election integrity measures. 6 U.S.C. § 608. Nor can authority to impose election-policy conditions be implied from permitted uses of the funding: Congress identified permitted uses for both grants, none of which mentions election integrity or how state or local officials tabulate votes. *See* 6 U.S.C. § 609(a). Nor do any other federal laws require or authorize the Election Conditions.

193.    Defendants also "failed to address whether there was 'legitimate reliance' on" the existing federal framework governing voting systems. *See Regents*, 591 U.S. at 30. Plaintiff States have relied on their discretion under federal law to adopt myriad statutory and regulatory frameworks related to voting systems, and have invested hundreds of millions in voting technology and election infrastructure in reliance on those frameworks. Defendants ignored these weighty reliance interests and provided no explanation or evidence to justify these new Election Conditions.

194.    Additionally, in imposing the Election Conditions, defendants failed to consider important aspects of the problem or offer explanations in line with evidence, including the SAVE System's documented error rates; how the Election Conditions' required uses of the SAVE System conflict with federal and state laws; how the Election Conditions contradict the current federal Voluntary Voting System Guidelines; the inability of Plaintiff States to comply with the Election Conditions due to vague or undefined requirements; the inability of state emergency agencies or local recipients to comply with the Election Conditions because they do not control the relevant election laws or systems; the lack of explanation or evidence that would support the requirement

59

of expanded manual audits or vague vote reconciliation; the unique needs of voters with disabilities; and evidence suggesting that the insufficiency of alternative means of safeguarding election integrity, such as the many existing, robust state and federal laws, policies, and systems already in place to do so.

195. The HSGP Election Conditions will cause irreparable harm to Plaintiff States.

196. Pursuant to 5 U.S.C. § 706(2)(A) and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Election Conditions are arbitrary, capricious, and an abuse of discretion; vacatur of the conditions; and a permanent injunction preventing defendants from putting the conditions into effect or basing funding decisions on Plaintiff States' compliance with them.

**THIRD CAUSE OF ACTION**

**Violation of the U.S. Constitution**
**Spending Clause (Election Condition)**
**All Plaintiff States**

197. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

198. The Spending Clause of the U.S. Constitution vests the spending power in Congress, not the President or any executive agency. U.S. Const. Art. I, Sec. 8, cl. 1.

199. Even when Congress has delegated some of its federal funding authority to the Executive Branch, there are limits to the conditions that can be imposed. *See South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

200. First, the Spending Clause requires any conditions on federal funds to be imposed "unambiguously," *Pennhurst*, 451 U.S. at 17, so that States deciding whether to accept such funding can "exercise their choice knowingly, cognizant of the consequences of their participation," *Dole*, 483 U.S. at 207. Accordingly, Congress must provide States clear notice of the applicable funding conditions. *See*, *e.g.*, *Landor v. Louisiana Dep't of Corr. & Pub. Safety*,

60

146 S. Ct. 1931, 1941 (2026); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

201.    The Election Conditions are impermissibly vague and ambiguous, failing to provide the States clear notice of what they require. Both the "Post-election manual audit" and "Voter/ballot reconciliation" conditions summarily require Plaintiff States to comply with "guidelines" or "methodology" that will be "established by the Secretary [of DHS]." Defendants do not define, identify, or provide any criteria for what these guidelines or methodology might entail. The Election Conditions thereby present unlawfully ambiguous conditions in violation of the Spending Clause.

202.    Second, the Spending Clause requires conditions on federal funding to be related to "the federal interest in" the particular project or program. *Dole*, 483 U.S. at 207. Here, the Election Conditions are unlawful because they impose conditions unrelated to the federal funding they encumber. The HSGP authorizing statutes require DHS to award grants to aid state and local governments in safeguarding critical infrastructure against threats of terrorism, which statutory provisions define to include "[e]xplosive[]," "[n]uclear," "[b]iological," "[c]hemical," and "[c]yber" attacks, among other things. 6 U.S.C. § 608(b). The Election Conditions, which address the verification of voter eligibility and how state and local officials tabulate votes, bears no reasonable relationship to that statutory purpose.

203.    Federal courts possess the power in equity to "grant injunctive relief … with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015); *see also Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935) (noting that plaintiffs are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials).

204.   Defendants' violations of the Spending Clause have caused and will continue to cause ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

205.   Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Election Conditions violate the Spending Clause, and a permanent injunction preventing defendants from putting the conditions into effect or basing funding decisions on Plaintiff States' compliance with them.

## FOURTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act
### Agency Action Contrary to Constitutional Right (Election Conditions)
### All Plaintiff States

206.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

207.   The APA requires that a court set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

208.   The Election Conditions violate the Spending Clause for the reasons set out above. *Supra* ¶¶ 197–205.

## FIFTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act
### Agency Action Contrary to Law (Immigration Conditions)
### All Plaintiff States Except Arizona and North Carolina[7]

209.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

---

[7] North Carolina and Arizona do not join in the fifth, sixth, seventh, and eighth causes of action, related to the Immigration Conditions, or the related allegations or requests for relief. *See, e.g.*, N.C. Session Law 2026-19.  References to "Plaintiffs" or "Plaintiff States" in those contexts refer to all Plaintiff States except Arizona and North Carolina.

210.    Defendants DHS and FEMA are each an "agency" under the APA, 5 U.S.C. § 551(1), and the decision to promulgate and impose the Immigration Conditions is an "agency action" under the APA, *id.* § 551.

211.    The decision to promulgate and impose the Immigration Conditions also constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

212.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." *Id.* § 706(2)(A)-(D).

213.    Defendants lack the statutory authority to promulgate and impose the Immigration Conditions. No provision of DHS's authorizing statutes authorizes the agency to promulgate or impose these terms, and the statutes authorizing defendants to administer specific grant programs also preclude their imposition.

214.    The Immigration Conditions will cause irreparable harm to Plaintiff States.

215.    Pursuant to 5 U.S.C. § 706(2)(C) and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the promulgation and imposition of the Immigration Conditions is contrary to law, vacatur of the conditions, and a permanent injunction preventing defendants from putting the conditions into effect or basing funding decisions on Plaintiff States' compliance with them.

## SIXTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action (Immigration Conditions)
### All Plaintiff States Except Arizona and North Carolina

216.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

63

217.    Defendants DHS and FEMA are each an "agency" under the APA, 5 U.S.C. § 551(1), and the decision to promulgate and impose the Immigration Conditions is an "agency action" under the APA, *id.* § 551.

218.    The decision to promulgate and impose the Immigration Conditions also constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

219.    Under the APA, a court must set aside final agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A); *see State Farm*, 463 U.S. at 52 (agency action must be supported by a "rational connection between the facts found and the choice made"); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must provide "reasoned explanation" for departing from prior policy and must provide "a more detailed justification than what would suffice for a new policy" when "its prior policy has engendered serious reliance interests that must be taken into account"); *accord FDA v. Wages & White Lion Invs., LLC*, 145 S. Ct. 898, 917 (2025).

220.    Defendants failed to comply with these bedrock requirements in multiple respects. Indeed, this Court already enjoined defendants from imposing substantially identical immigration enforcement conditions on grants that were issued to States, in part, because they were arbitrary and capricious.  *See FEMA*, 801 F. Supp. 3d at 93-94. The Immigration Conditions are arbitrary and capricious for the reasons set out in that opinion.

221.    Even setting aside the *FEMA* opinion, defendants acted arbitrarily and capriciously in promulgating the Immigration Conditions. First, defendants failed to consider "an important aspect of the problem," *State Farm*, 463 U.S. at 4: whether the federal grant statutes that Congress created and charged them with administering actually allowed them to condition access to grant

funds on Plaintiff States' agreeing to lend state resources to federal immigration enforcement. Defendants have provided no analysis showing any effort to ascertain whether the relevant statutes permit them to impose the Immigration Conditions. Defendants' failure to consider the legality of their actions violates the APA.

222.    Second, defendants "failed to address whether there was 'legitimate reliance' on" the existing funding landscape—which there was. *Regents*, 591 U.S. at 30. Plaintiff States rely on the annual receipt of funds that the Immigration Conditions now endanger, relying on hundreds of millions in federal funding annually to support critical programs like terrorism prevention and emergency management. Defendants not only failed to "weigh" these longstanding and substantial reliance interests "against competing policy concerns," they simply "ignore[d]" them. *Regents*, 591 U.S. at 30-33.

223.    Third, defendants likewise "entirely failed to consider" the adverse impact on criminal enforcement and public safety if States were to adhere to the Immigration Conditions. *State Farm*, 463 U.S. at 43. Under those conditions, States "must agree that they will comply" with requirements "related to coordination and cooperation with [DHS] and immigration officials." But some States limit their participation in federal civil immigration enforcement to "build trust between their law enforcement agencies and immigrant communities and ensure that noncitizens feel comfortable reporting crimes, cooperating with investigators, and serving as witnesses." *Providence*, 954 F.3d at 30. Defendants altogether failed to weigh that interest against their own policy preferences. They violated the APA in doing so.

224.    The Immigration Conditions will cause irreparable harm to Plaintiff States.

225.    Pursuant to 5 U.S.C. § 706(2)(C) and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the promulgation and imposition of the Immigration Conditions is arbitrary,

capricious, and an abuse of discretion; vacatur of the conditions; and a permanent injunction preventing defendants from putting the conditions into effect or basing funding decisions on Plaintiff States' compliance with them.

## SEVENTH CAUSE OF ACTION

### Violation of the U.S. Constitution
### Spending Clause (Immigration Conditions)
### All Plaintiff States Except Arizona and North Carolina

226.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs. The Constitution vests the spending power in Congress, not the President or any executive agency. U.S. Const. art. I § 8, cl. 1.

227.    Even if Congress had delegated the authority to defendants to impose the Immigration Conditions, the U.S. Constitution prohibits grant conditions that are "so coercive as to pass the point at which pressure turns into compulsion." *Dole*, 483 U.S. at 211. Furthermore, the U.S. Constitution prohibits imposing condition on federal grant programs that are wholly unrelated to the purpose of the programs. *Id.* at 207-08.  Finally, the U.S. Constitution permits only unambiguous federal funding conditions. *Id.* at 207. These limits "ensur[e] that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *NFIB*, 567 U.S. at 577.

228.    DHS's attempt to impose the Immigration Conditions violates these constitutional limits. Again, this Court already enjoined Defendants from imposing substantively identical immigration enforcement conditions on FEMA grants that were issued to the States, in part on the grounds that they violate the Spending Clause.  *See FEMA*, 801 F. Supp. 3d at 96. The Immigration Conditions violate the Spending Clause for the same reasons.

229.    Even setting aside the *FEMA* opinion, defendants violated the Spending Clause in imposing the conditions. First, DHS's threat to restrict billions of dollars in counterterrorism and

66

emergency management funds "is much more than 'relatively mild encouragement'—it is a gun to the head" for Plaintiff States. *NFIB*, 567 U.S. at 581 (opinion of Roberts, C.J.); *see also id.* (holding threats to funding as coercive in violation of the Spending Clause because a State "stands to lose not merely 'a relatively small percentage'" of funding from the agency, "but *all* of it"). Plaintiff States and their instrumentalities have been allocated over $1 billion in funding for FY2026 from the preparedness programs to which FEMA has indicated it may apply the Immigration Conditions.

230.    Second, the Immigration Conditions are not related to the federal interest in the projects to which they are attached—namely, Congress's long commitment to furthering state emergency preparedness. *See Dole*, 483 U.S. at 207-08.

231.    Finally, the Immigration Conditions are impermissibly vague. *See Pennhurst*, 451 U.S. at 17.

232.    Federal courts possess the power in equity to "grant injunctive relief … with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 327; *see also Panama Ref. Co. v. Ryan*, 293 U.S. at 414 (noting that plaintiffs are "entitled to invoke the equitable jurisdiction to restrain enforcement" of unconstitutional acts by federal officials).

233.    Defendants' violations of the Spending Clause have caused and will continue to cause ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

234.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Immigration Conditions violate the Spending Clause, and a permanent injunction preventing defendants from putting the conditions into effect or basing funding decisions on Plaintiff States' compliance with them.

## EIGHTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act
### Agency Action Contrary to Constitutional Right (Immigration Conditions)
### All Plaintiff States Except Arizona and North Carolina

235.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

236.    The APA requires that a court set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

237.    The Immigration Conditions violate the Spending Clause for the reasons set out above. *Supra* ¶¶ 226–234.

## NINTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act
### Agency Action Contrary to Law (Termination Conditions)
### All Plaintiff States

238.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

239.    Defendants DHS and FEMA are each an "agency" under the APA, 5 U.S.C. § 551(1), and the decision to promulgate and impose the Termination Conditions is an "agency action" under the APA, *id.* § 551(13).

240.    The decision to promulgate and impose the Termination Conditions also constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

241.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

242.     The Termination Conditions are unlawful in multiple respects. First, agency action is not in accordance with law if the action does not comply with the agency's own regulations. *See, e.g., Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004) (explaining that "law" under the APA "includes, of course, agency regulations"). Existing regulations permit defendants to terminate a grant based on program goals or agency priorities only if the grant "no longer effectuates the program goals or agency priorities" identified before a grant is awarded. 2 C.F.R. § 200.340(a); *see also* 2 C.F.R. § 3002.10 (DHS adoption of 2 C.F.R. pt. 200). Contrary to the Termination Conditions, these regulations do not enable defendants to terminate existing grant awards for their own convenience, or to withhold awarded funds from compliant recipients based on new goals or agency priorities identified *after* an award has been made. *See OMB*, 2026 WL 2069832, at *11 ("After review of the plain language, regulatory scheme, regulatory history, [and] the Spending Clause of the U.S. Constitution, . . . the court agrees . . . and finds that the Termination Clause [at § 200.340(a)] does not permit agencies to terminate grants based on program goals and agency priorities identified after grants were awarded."). Nor do the regulations enable defendants to terminate any grant based on new program goals or agency priorities, even if inconsistent with the grant's statutory purpose—as the Termination Conditions purport to do. *Id.* at *10 (§ 200.340 "does not permit the withholding of congressionally appropriated funds on account of changed agency priorities" and defendants "fully agree that the government must comply with federal statutes and regulations in terminating grants.").

243.     Second, the Termination Conditions are also contrary to law because they exceed DHS and FEMA's statutory authority. DHS and FEMA identify no statute that authorizes them to make all federal funding overseen by FEMA subject to termination at will or based on newly defined program goals or agency priorities. Without statutory authorization, "an agency literally

69

has no power to act." *La. Pub. Serv. Comm'n*, 476 U.S. at 357. Particularly where agencies are making extraordinary claims of regulatory authority that circumvent Congressional intent—such as the power to terminate a federal grant award at any time for any reason—they must identify clear statutory authority for that power, which defendants have failed to do.

244.    Third, unlike the governing regulation, which makes clear that terminations based on program goals and agency priorities are allowed "only to the extent authorized by law," 2 C.F.R. § 200.340(a)(4), the Termination Conditions are "not in accordance with law" because it would permit termination of a grant even where affirmatively inconsistent with federal statutes—such as in the case of statutory formula programs where Congress has mandated that an agency disburse certain funds. *See, e.g.*, 6 U.S.C. §§ 762(b), (d) (for EMPG, FEMA "shall . . . make grants to States" and "shall apportion the amounts appropriated to carry out the program among the States" in accordance with statutory formula). The Termination Conditions are likewise contrary to law because they permit termination of discretionary grants "for convenience," enabling defendants to take those funds back from the States for any reason, or no reason at all. No freestanding or grant-specific statute confers this sweeping authority on defendants. And this expansive authority claimed by defendants would violate separation-of-powers principles by, *inter alia*, effectively creating a backdoor to unlawful impoundment. *See, e.g.*, *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.) (explaining that the Executive "does not have unilateral authority to refuse to spend [congressionally appropriated] funds").

245.    The Termination Conditions will cause irreparable harm to Plaintiff States.

246.    Pursuant to 5 U.S.C. § 706(2)(C) and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the promulgation and imposition of the Termination Conditions is contrary to

law, vacatur of the conditions, and a permanent injunction preventing defendants from putting the conditions into effect or basing funding decisions on Plaintiff States' compliance with them.

## TENTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action (Termination Conditions)
### All Plaintiff States

247.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

248.    Defendants DHS and FEMA are each an "agency" under the APA, 5 U.S.C. § 551(1), and the decision to promulgate and impose the Termination Conditions is an "agency action" under the APA, *id.* § 551(13).

249.    The decision to promulgate and impose the Termination Conditions also constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

250.    Under the APA, a court must set aside agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

251.    Agency actions must be both "reasonable and reasonably explained," *Ohio*, 603 U.S. at 292. An agency must offer "genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id*. If an agency action reflects a changed position and the agency fails to "provide a reasoned explanation for the change, display awareness that [it is] changing position, and consider serious reliance interests," its action is arbitrary and capricious. *Wages & White Lion*, 604 U.S. at 568. And when an agency

71

changes position, it must consider alternatives to its change in position that are "within the ambit of existing [policy]." *Regents*, 591 U.S. at 30.

252. Arbitrary-and-capricious actions include when an agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43.

253. Defendants' decision to promulgate or adopt the Termination Conditions is arbitrary and capricious in multiple respects, including as follows.

254. First, as explained above, defendants' decision to impose the Termination Conditions is inconsistent with and does not comply with § 200.340. *See Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("[A]n agency action may be set aside as arbitrary and capricious if the agency fails to 'comply with its own regulations.'").

255. Second, defendants "failed to consider" a glaringly "important aspect[] of the problem" before them: whether the federal grant statutes that Congress created and charged them with administering actually allow them to impose the Termination Conditions across programs. *Regents*, 591 U.S. at 30. Defendants also relied on factors Congress did not intend them to consider. *See State Farm*, 463 U.S. at 43. The statutory authorization for a grant program, by definition, sets forth the factors Congress requires—and permits—an agency to consider in disbursing and administering grant funds. Here, defendants identify nothing in statute that suggests that Congress intended them to retain authority to rescind grant funds based on changing executive views of certain goals or priorities after an award is made.

256.   Third, defendants "failed to address whether there was 'legitimate reliance' on" the existing funding landscape and whether longstanding policy has "engendered serious reliance interests that must be taken into account"—and it plainly has. *Regents*, 591 U.S. at 30. States rely on the grant programs at issue for billions of dollars used for counterterrorism and emergency preparedness purposes. If grant awards—often multiyear commitments—can be terminated at any moment based on shifting executive priorities or for mere convenience, States and other recipients can no longer rely on them as stable sources of support to protect their residents from terrorism or to provide urgently needed assistance during emergencies.

257.   Fourth, defendants failed to seriously consider alternatives to their change in position that are "within the ambit of the existing [policy]," such as allowing grant recipients to modify their projects in response to shifting agency priorities or to address any other concerns that could lead to for-convenience termination.

258.   Fifth, defendants failed to provide a reasoned explanation for why the Termination Conditions are necessary, particularly given the departure from long-standing agency practice. In particular, the agency has not explained why the longstanding termination provisions already codified at § 200.340 are insufficient to protect the government interest in sound grantmaking.

259.   Sixth, the Termination Conditions rest on an unexplained and unreasonable change in interpretation of § 200.340 to allow defendants to terminate an award based on post-award changes in goals or priorities and for "convenience." Defendants are obligated to supply a reasoned analysis for the change, which they have failed to do. *See Fox*, 556 U.S. at 515 ("An agency may not, for example, depart from a prior policy *sub silentio* …. And of course the agency must show that there are good reasons for the new policy."). Instead, defendants claim that Termination

Conditions are "consistent" with § 200.340 when they plainly are not. *See OMB*, 2026 WL 2069832, at *11-14.

260.    The Termination Conditions will cause irreparable harm to Plaintiff States.

261.    Pursuant to 5 U.S.C. § 706(2)(C) and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the promulgation and imposition of the Termination Conditions is arbitrary, capricious, and an abuse of discretion; vacatur of the conditions; and a permanent injunction preventing defendants from putting the conditions into effect or basing funding decisions on Plaintiff States' compliance with them.

**ELEVENTH CAUSE OF ACTION**

**Violation of the U.S. Constitution**
**Spending Clause (Termination Conditions)**
**All Plaintiff States**

262.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

263.    The Spending Clause of the U.S. Constitution, art. I, § 8, cl. 1, provides that Congress—not the Executive—"shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." The Spending Clause is subject to long recognized limitations that prohibit the imposition of surprise and ambiguous federal funding conditions on funds awarded to the States, prohibit conditions on federal fund that are "so coercive as to pass the point at which pressure turns into compulsion," and prohibit imposing conditions on federal grant programs that are wholly unrelated to the purpose of the programs. *Dole*, 483 U.S. at 207-08.

264.    Defendants' attempt to promulgate and impose the Termination Conditions violates all these constitutional limits.

74

265.    First, the Termination Conditions unlawfully enable defendants to retroactively apply new priorities to previously awarded and obligated funds. "Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. Here, the Termination Conditions impermissibly allow defendants to terminate awards under the purported basis that they do not effectuate policies and priorities not known to Plaintiffs nor included in the terms and conditions of the agreements under which the funding was awarded—or, as to discretionary grants, for any reason at all. Plaintiffs could not possibly comply with priorities unknown at the time of the award, nor should they have to. *See OMB*, 2026 WL 2069832, at *16 (explaining that "if the regulation is construed to allow the program goals and agency priorities the grant is being measured against to change, the required notice is lacking" under the Spending Clause). Plaintiffs design their proposals and applications for funding to achieve the statutory purposes of the funding sources and the specific goals and priorities announced in the Notices of Funding Opportunities. The Termination Conditions amount to a retroactive application of new and unknown conditions on Plaintiffs' awards and defendants assert authority to unilaterally terminate those awards on the basis of such new conditions alone. Plaintiffs will have had no notice of these conditions nor the opportunity to "voluntarily and knowingly" accept them as conditions attached to awards of funding from defendants. The Termination Conditions are also impermissibly vague and do not provide the unambiguous notice required. It is impossible for Plaintiffs to discern the priorities and interests against which their awards may be evaluated for alignment, so the Termination Conditions fail to clarify what conduct is proscribed.

266.    Second, the Termination Conditions function as a coercive threat, forcing Plaintiffs to continually be concerned about the loss of awarded funds and allowing defendants to terminate

75

Plaintiff States' federal awards at any time for mere convenience or changed "priorities." This "is much more than 'relatively mild encouragement'—it is a gun to the head." *NFIB*, 567 U.S. at 581 (opinion of Roberts, C.J.). Plaintiff States receive hundreds of millions of dollars annually from defendants for preparedness grants, counterterrorism measures, and more. The threat of losing that critical funding gives the Termination Conditions coercive force, operating "as a means of pressuring the States to accept policy changes." *Id.* at 580. Indeed, the Termination Conditions let Defendants achieve through the backdoor what they cannot achieve through the front. Defendants know that if they impose unlawful conditions directly on Plaintiff States' grants—such as the Immigration or Election Conditions—courts may strike those conditions down. The Termination Conditions offer a coercive workaround: rather than impose an unlawful condition outright, defendants can use the Termination Conditions as a threat to terminate funding altogether unless Plaintiffs accept or comply with such conditions, using the specter of total defunding as leverage to extract the same result that a direct condition could not lawfully compel.

267.    Third, because the Termination Conditions permit termination for any reason at all, they are not related to the federal interest in the projects to which it is attached—namely, Congress's long commitment to furthering state emergency preparedness and relief purposes, counterterrorism measures, and other homeland security initiatives. The Spending Clause requires that any condition imposed on federal grants to be reasonably related "to the federal interest in particular national projects or programs." *Dole*, 483 U.S. at 207. This requirement ensures that Congress does not use its spending power to exact conditions unrelated to the purpose of the funding itself, effectively regulating outside its enumerated powers under the guise of a spending program. But the Termination Conditions fail this test, because they enable defendants to terminate for reasons unconnected to the federal interest in the particular projects or programs or to use its

76

threat to obtain concessions or compliance with conditions unrelated to the particular program or project.

268.    Defendants' violations of the Spending Clause have caused and will continue to cause ongoing, irreparable harm to Plaintiff States for which there is no adequate remedy at law.

269.    Pursuant to 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Termination Conditions violate the Spending Clause, and a permanent injunction preventing defendants from putting the conditions into effect or basing funding decisions on Plaintiff States' compliance with them.

**TWELFTH CAUSE OF ACTION**

**Violation of the Administrative Procedure Act**
**Agency Action Contrary to Constitutional Right (Termination Conditions)**
**All Plaintiff States**

270.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

271.    The APA requires that a court set aside agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

272.    The Termination Conditions violate the Spending Clause for the reasons set out above. *Supra* ¶¶ 262–269.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray that the Court:

   a. Declare that defendants' promulgation and imposition of the Election Conditions, Immigration Conditions, and Termination Conditions on receipt of funds under the grant programs they administer is contrary to the Constitution and laws of the United States;

77

b.  Declare that the promulgation and imposition of the Election Conditions, Immigration Conditions, and Termination Conditions and any actions taken by defendants' agencies to implement or enforce them violate the Administrative Procedure Act;

c.  Preliminarily and permanently enjoin defendants from implementing or enforcing the Election Conditions, Immigration Conditions, and Termination Conditions (or any condition substantially similar to the challenged conditions) against Plaintiff States, including their subdivisions and instrumentalities, as to any grant program administered by defendants;

d.  Vacate under 5 U.S.C. § 706 defendants' promulgation and imposition of the Election Conditions, Immigration Conditions, and Termination Conditions, and any actions taken by defendants to implement or enforce them;

e.  Issue a writ of mandamus or, in the alternative, preliminary and permanent mandatory injunctive relief compelling defendants to immediately send notices of funding opportunity and award letters that do not include the Election Conditions, Immigration Conditions, and Termination Conditions to Plaintiff States, their subdivisions, and their instrumentalities, as appropriate;

f.  Retain jurisdiction to monitor defendants' compliance with this Court's judgment;

g.  Award the States their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

h.  Award such additional relief as this Court may deem just and proper.

July 23, 2026                                        Respectfully submitted,

**ROB BONTA**                                       **KWAME RAOUL**
  ATTORNEY GENERAL OF CALIFORNIA                      ATTORNEY GENERAL OF ILLINOIS

Michael L. Newman*                                  /s/ Alex Hemmer
  *Senior Assistant Attorney General*               Alex Hemmer*
Lee I. Sherman*                                       *Deputy Solicitor General*
James E. Stanley*                                   Michael M. Tresnowski*
  *Supervising Deputy Attorneys General*              *Assistant Attorney General*
Jesse Basbaum*                                      Office of the Illinois Attorney General
Lisa C. Ehrlich*                                    115 LaSalle Street
Deylin Thrift-Viveros*                              Chicago, IL 60603
  *Deputy Attorneys General*                        (773) 590-7932
                                                    alex.hemmer@ilag.gov
/s/ Delbert Tran
Delbert Tran*
  *Deputy Attorney General*                         *Attorneys for the State of Illinois*
California Department of Justice
455 Golden Gate Ave.
San Francisco, CA 94102
(415) 229-0110
delbert.tran@doj.ca.gov

*Attorneys for the State of California*

79

**JENNIFER DAVENPORT**
  ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy*
  *Deputy Solicitor General*
Mayur P. Saxena*
  *Assistant Attorney General*
Yael Fisher*
Bassam Gergi*
Meghan Musso*
  *Deputy Attorneys General*
New Jersey Office of Attorney General
25 Market Street, PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*


**KRISTIN K. MAYES**
  ATTORNEY GENERAL OF ARIZONA

/s/ Hayleigh S. Crawford
Hayleigh S. Crawford*
  *Deputy Solicitor General*
Office of the Arizona Attorney General
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov
ACL@azag.gov

*Attorneys for the State of Arizona*


**PETER F. NERONHA**
  ATTORNEY GENERAL OF RHODE ISLAND

/s/ Kathryn M. Sabatini
Kathryn M. Sabatini (R.I. Bar No. 8486)
  *Chief, Civil Division*
  *Special Assistant Attorney General*
Paul Meosky (RI Bar No. 10742)
  *Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
ksabatini@riag.ri.gov

*Attorneys for the State of Rhode Island*


**PHILIP J. WEISER**
  ATTORNEY GENERAL OF COLORADO

/s/ Sarah H. Weiss
David Moskowitz*
  *Deputy Solicitor General*
Sarah H. Weiss*
  *Senior Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
sarah.weiss@coag.gov

*Attorneys for the State of Colorado*

**WILLIAM TONG**
  ATTORNEY GENERAL OF CONNECTICUT

/s/ Andrew M. Ammirati
Andrew M. Ammirati*
  *Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5090
andrew.ammirati@ct.gov

*Attorneys for the State of Connecticut*


**BRIAN L. SCHWALB**
  ATTORNEY GENERAL FOR THE DISTRICT OF
  COLUMBIA

/s/ Nicole S. Hill
Nicole S. Hill*
  *Assistant Attorney General*
Office of the Attorney General
  for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov

*Attorneys for the District of Columbia*


**KATHLEEN JENNINGS**
  ATTORNEY GENERAL OF DELAWARE

/s/ Vanessa L. Kassab
Ian R. Liston*
  *Director of Impact Litigation*
Vanessa L. Kassab*
  *Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*


**ANNE E. LOPEZ**
  ATTORNEY GENERAL OF HAWAIʻI

/s/ Kalikoʻonālani D. Fernandes
Kalikoʻonālani D. Fernandes*
  *Solicitor General*
Department of the Hawaiʻi Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR EX REL.
ANDY BESHEAR**, IN HIS OFFICIAL CAPACITY
AS GOVERNOR OF THE COMMONWEALTH
OF KENTUCKY

/s/ S. Travis Mayo
S. Travis Mayo*
  *General Counsel*
Sam Flynn*
  *Chief Deputy General Counsel*
Laura C. Tipton*
  *Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov

*Attorneys for Plaintiff Office of the Governor
ex rel. Andy Beshear, in his official capacity as
Governor of the Commonwealth of Kentucky*


**ANTHONY G. BROWN**
  ATTORNEY GENERAL OF MARYLAND

/s/ Robert N. Brewer
Robert N. Brewer*
  *Assistant Attorney General*
Office of the Maryland Attorney General
200 Saint Paul Place
20th Floor
Baltimore, MD 21202
(410) 576-6924
rbrewer@oag.maryland.gov

*Attorneys for the State of Maryland*


**AARON M. FREY**
  ATTORNEY GENERAL OF MAINE

/s/ John E. Belisle
John E. Belisle*
  *Assistant Attorney General*
Office of Maine Attorney General
6 State House Station
Augusta, Maine 04333-006
(207)626-8800
john.belisle@maine.gov

*Attorneys for the State of Maine*


**ANDREA JOY CAMPBELL**
  ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Nita Kumaraswami Klunder
Nita K. Klunder*
Vanessa Arslanian*
  *State Trial Counsels*
Julia S. Canney*
  *Assistant Attorney General*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2394
nita.klunder@mass.gov

*Attorneys for the Commonwealth of
  Massachusetts*

82

**DANA NESSEL**
  ATTORNEY GENERAL OF MICHIGAN

/s/ Neil Giovanatti
Neil Giovanatti*
  *Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Attorneys for the State of Michigan*


**AARON D. FORD**
  ATTORNEY GENERAL OF NEVADA

/s/ K. Brunetti Ireland
K. Brunetti Ireland*
  *Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Attorneys for the State of Nevada*


**KEITH ELLISON**
  ATTORNEY GENERAL OF MINNESOTA

/s/Katherine Bies
Katherine Bies*
  *Assistant Attorney General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

*Attorneys for the State of Minnesota*


**RAÚL TORREZ**
  ATTORNEY GENERAL OF NEW MEXICO

/s/ Mark Noferi
Mark Noferi*
  *Senior Litigation Counsel*
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 640-2891
mnoferi@nmdoj.gov

*Attorneys for the State of New Mexico*

83

**LETITIA JAMES**
  ATTORNEY GENERAL OF NEW YORK

/s/ Stephen C. Thompson
Rabia Muqaddam*
  *Chief Counsel for Federal Initiatives*
Stephen C. Thompson*
  *Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov

*Attorneys for the State of New York*


**DAN RAYFIELD**
  ATTORNEY GENERAL OF OREGON

/s/ Thomas H. Castelli
Thomas H. Castelli*
  *Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

*Attorneys for the State of Oregon*


**JEFF JACKSON**
  ATTORNEY GENERAL OF NORTH CAROLINA

Laura Howard
  *Chief Deputy Attorney General*

/s/ Daniel P. Mosteller
Daniel P. Mosteller*
  *Associate Deputy Attorney General*
Daniel T. Wilkes*
  *Assistant Deputy Attorney General*
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov
dwilkes@ncdoj.gov

*Attorneys for the State of North Carolina*


**JOSH SHAPIRO**
  GOVERNOR OF THE COMMONWEALTH OF
  PENNSYLVANIA

/s/ Jacob B. Boyer
Jennifer C. Selber*
Jacob B. Boyer*
  *Governor's Office of General Counsel*
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
jacobboyer@pa.gov

*Attorneys for Governor Josh Shapiro*

84

**CHARITY R. CLARK**
  ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Julio A. Thompson*
  *Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5519
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*


**NICHOLAS W. BROWN**
  ATTORNEY GENERAL OF WASHINGTON

/s/ Tyler Roberts
Tyler Roberts*
  *Assistant Attorney General*
Cristina Sepe*
  *Deputy Solicitor General*
Washington State Office of the Attorney
  General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Tyler.Roberts@atg.wa.gov
Cristina.Sepe@atg.wa.gov

*Attorneys for the State of Washington*



*\*pro hac vice* applications forthcoming

**JAY JONES**
  ATTORNEY GENERAL FOR THE
  COMMONWEALTH OF VIRGINIA

/s/ Megan C. Keenan
Megan C. Keenan*
  *Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Attorneys for the Commonwealth of Virginia*


**JOSHUA L. KAUL**
  ATTORNEY GENERAL OF WISCONSIN

/s/ Frances Reyolds Colbert
Frances Reynolds Colbert*
  *Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-9226
frances.colbert@wisdoj.gov

*Attorneys for the State of Wisconsin*