**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF ILLINOIS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY, *et al.*,<br><br>*Defendants*. | Case No. 1:26-cv-00485-MSM-RLA<br><br>Hon. Mary S. McElroy |

**PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 2

A. Congress's Longstanding Support for State Emergency Preparation and Response. ........ 2

B. FEMA's Failed Attempts to Use Grant Funds to Coerce States. ........ 6

C. The President's Failed Attempts to Usurp Power Over Elections. ........ 8

D. This Administration's Failed Attempts to Assert New Power to Terminate Grants for Any Reason. ........ 10

E. FEMA's Present Attempt to Coerce the States. ........ 12

1. The Immigration Conditions ........ 12

2. The Election Conditions ........ 16

3. The Termination Conditions ........ 18

ARGUMENT AS TO LIABILITY ........ 21

I. The Immigration Conditions Are Unlawful. ........ 21

A. The Immigration Conditions exceed FEMA's statutory authority. ........ 22

1. FEMA must identify a clear statement from Congress authorizing the Immigration Conditions but concedes that it cannot do so. ........ 22

2. The statutes at issue do not authorize the Immigration Conditions. ........ 24

B. The Immigration Conditions are arbitrary and capricious. ........ 27

1. Congress has not drawn FEMA's posited "nexus" between immigration enforcement and national security, and FEMA fails to substantiate it. ........ 28

2. FEMA failed to consider the States' reliance interests in billions of dollars in federal funding. ........ 31

3. FEMA failed to consider the Conditions' effects on public safety. ........ 32

II. The Election Conditions Are Unlawful. 34

A. The Election Conditions exceed FEMA's statutory authority. 34

B. The Election Conditions are arbitrary and capricious. 36

1. FEMA has offered no explanation of the Election Conditions but instead has relied on factors that Congress did not intend it to consider. 37

2. FEMA failed to consider several important aspects of the problem, including Plaintiff States' extensive reliance interests. 38

III. The Termination Conditions Are Unlawful. 43

A. The Termination Conditions are contrary to law. 43

1. The Termination Conditions are not authorized by statute. 43

2. The Termination Conditions are contrary to DHS's regulations. 45

B. The Termination Conditions are arbitrary and capricious. 48

IV. All the Conditions Additionally Violate the Spending Clause. 52

A. The Conditions are unlawfully ambiguous. 52

B. The Conditions are not reasonably related to the funding programs to which they apply. 56

C. The Conditions are coercive because they leave the States with "no real option" but to comply. 58

ARGUMENT AS TO REMEDY 60

A. The Court Should Declare Unlawful and Vacate the Promulgation of the Conditions. 60

B. The Court Should Permanently Enjoin Defendants Against Implementing or Enforcing the Conditions Against Plaintiff States. 61

CONCLUSION 65

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*All. for Cannabis Therapeutics v. DEA*,
930 F.2d 936 (D.C. Cir. 1991) ....................40

*Amerijet Int'l, Inc. v. Pistole*,
753 F.3d 1343 (D.C. Cir. 2014) ....................30

*Ariz. All. for Retired Americans, Inc. v. Crosby*,
537 P.3d 818 (Ariz. Ct. App. 2023)....................40

*Arizona v. Inter Tribal Council of Ariz., Inc*,
570 U.S. 1 (2013)....................8

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006)....................52, 55

*Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*,
490 F.3d 1 (1st Cir. 2007) ....................61

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
838 F.3d 42 (1st Cir. 2016) ....................21

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)....................32

*Bradley v. Weinberger*,
483 F.2d 410 (1st Cir. 1973) ....................45

*California v. Dep't of Ed.*,
132 F.4th 92 (1st Cir. 2025) ....................37

*California v. U.S. Dep't of Educ.*,
__ F. Supp. 3d __, 2026 WL 2754968 (D. Mass. Sept. 17, 2026) ....................47

*California v. Trump*,
786 F. Supp. 3d 359 (D. Mass. 2025) ....................9

*California v. U.S. Dep't of Transp.*,
788 F. Supp. 3d 316 (D.R.I. 2025)....................62

*City & Cnty. of San Francisco v. Sessions*,
349 F. Supp. 3d 924 (N.D. Cal. 2018) ....................54, 63

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ....................................................................................63

*City of Arlington v. FCC*,
569 U.S. 290 (2013).........................................................................................22, 24

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020) ..................................................................................23, 65

*City of Chicago v. Sessions*,
321 F. Supp. 3d 855 (N.D. Ill. 2018) ..........................................................................62

*City of Chicago v. Sessions*,
888 F.3d 272 (7th Cir. 2018) ......................................................................................64

*City of Chicago v. U.S. Dep't of Just.*,
822 F. Supp. 3d 873 (N.D. Ill. 2026) ..........................................................................58

*City of Evanston v. Barr*,
412 F. Supp. 3d 873 (N.D. Ill. 2019) ..........................................................................63

*City of Los Angeles v. McLaughlin*,
865 F.2d 1084 (9th Cir. 1989) ....................................................................................44

*City of Philadelphia v. Sessions*,
280 F. Supp. 3d 579 (E.D. Pa. 2017) .....................................................................62–63

*City of Philadelphia v. Sessions*,
309 F. Supp. 3d 289 (E.D. Pa. 2018) ..........................................................................63

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020) ...........................................................22, 25, 27, 33–34

*City of Salem v. Mullin*,
__ F. Supp. 3d __, 2026 WL 2445474 (D. Or. Aug. 20, 2026) ........................20, 50–51, 56–57

*Colorado v. U.S. Dep't of Just.*,
455 F. Supp. 3d 1034 (D. Colo. 2020) ........................................................................62

*Commodity Futures Trading Comm'n v. Brit. Am. Commodity Options Corp.*,
434 U.S. 1316 (1977).....................................................................................................63

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024).......................................................................................................60

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022)....................22

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
192 F. Supp. 3d 54 (D.D.C. 2016)....................29

*DHS v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020)....................28, 31–32, 34, 37, 39, 51

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006)....................61

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016)....................51

*Foster v. Love,*
522 U.S. 67 (1997)....................8, 63

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)....................48

*FCC v. NextWave Pers. Commc'ns Inc.*,
537 U.S. 293 (2003)....................36

*Garcia-Garcia v. Costco Wholesale Corp.*,
878 F.3d 411 (1st Cir. 2017)....................21

*Gordon v. Holder*,
721 F.3d 638 (D.C. Cir. 2013)....................64

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)....................23

*Harmon v. Thornburgh*,
878 F.2d 484 (D.C. Cir. 1989)....................60

*Healey v. Spencer*,
765 F.3d 65 (1st Cir. 2014)....................61

*Illinois v. FEMA*,
801 F. Supp. 3d 75 (D.R.I. 2025)....................1, 7 , 13, 31, 34 , 48, 52–54, 59–60, 64

*Illinois v. Noem*,
813 F. Supp. 3d 282 (D.R.I. 2025)....................1, 5–7, 25, 57

*Int'l Org. of Masters, Mates & Pilots v. NLRB*,
61 F.4th 169 (D.C. Cir. 2023)....................32, 39

*Kansas v. United States*,
249 F.3d 1213 (10th Cir. 2001) ....................62

*Kentucky v. EPA*,
123 F.4th 447 (6th Cir. 2024) ....................51

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) ....................23

*Kearns v. Cuomo*,
981 F.3d 200 (2d Cir. 2020) ....................54

*K–Mart Corp. v. Oriental Plaza, Inc*,
875 F.2d 907 (1st Cir. 1989) ....................61

*La. Pub. Serv. Comm'n v. FCC*,
476 U.S. 355(1986) ....................2, 45

*Landor v. La. Dep't of Corr. & Pub. Safety*,
609 U.S. 59 (2026) ....................22, 24, 58–59

*LULAC v. Exec. Off. of the President*,
818 F. Supp. 3d 34 (D.D.C. 2026) ....................9

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
591 U.S. 657 (2020) ....................37–38

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ....................22

*Lussier v. Runyon*,
50 F.3d 1103 (1st Cir. 1995) ....................50

*Manguriu v. Lynch*,
794 F.3d 119, 122 (1st Cir. 2015) ....................45

*Massachusetts v. United States*,
435 U.S. 444 (1978) ....................56

*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357 (2025) ....................23

*Metro. Gov't of Nashville & Davidson Cnty. v. DHS*,
__ F. Supp. 3d __, 2026 WL 2905123 (D.D.C. Sept. 28, 2026) ....................2, 24, 34–35, 57

*Michigan v. EPA*,
576 U.S. 743 (2015) ... 37

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ... 30, 62

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ... 28, 31–32, 38, 48, 52

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453, 471 (2018) ... 23

*NAACP v. United States*,
No. 25-00965, 2026 WL 1265450 (D. Md. May 8, 2026) ... 44–45

*Nat'l Biodiesel Bd. v. EPA*,
843 F.3d 1010 (D.C. Cir. 2016) ... 45

*Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*),
567 U.S. 519 (2012) ... 58–60

*Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014) ... 47

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) ... 61

*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013) ... 31

*New Jersey v. OMB,*
837 F. Supp. 3d 258 (D. Mass. 2026) ... 11, 47, 56

*New York v. Trump*,
171 F.4th 1 (1st Cir. 2026) ... 38

*News-Press v. DHS*,
489 F.3d 1173 (11th Cir. 2007) ... 65

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ... 45

*Ohio v. EPA*,
603 U.S. 279 (2024) ... 37, 62

*Oklahoma v. Castro-Huerta*,
597 U.S. 629 (2022)....................................................................................................33

*Or. Nat. Res. Council v. Thomas*,
92 F.3d 792 (9th Cir. 1996)...........................................................................................28

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981)..............................................................................................23, 52, 55–56

*Planned Parenthood of Greater Wash. & N. Idaho v. HHS*,
946 F.3d 1100 (9th Cir. 2020)........................................................................................26

*Ramirez v. U.S. Immigr. & Customs Enf't*,
568 F. Supp. 3d 10 (D.D.C. 2021)..................................................................................61

*Republic of Iraq v. Beaty*,
556 U.S. 848 (2009)......................................................................................................55

*Rhode Island v. Trump*,
781 F. Supp. 3d 25 (D.R.I. 2025).............................................................................30, 48

*R.I. Coalition Against Dom. Violence v. Bondi*,
794 F. Supp. 3d 58 (D.R.I. 2025)...................................................................................52

*Robbins v. Reagan*,
780 F.2d 37 (D.C. Cir. 1985).........................................................................................26

*Robert E. Derecktor of R.I., Inc. v. Goldschmidt*,
506 F. Supp. 1059 (D.R.I. 1980)....................................................................................45

*Sasen v. Spencer*,
879 F.3d 354 (1st Cir. 2018)..........................................................................................21

*Smiley v. Holm*,
285 U.S. 355 (1932)........................................................................................................8

*South Dakota v. Dole*,
483 U.S. 203 (1987)...............................................................................................56, 58

*Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*,
852 F.3d 105 (1st Cir. 2017)..........................................................................................21

*Tennessee v. U.S. Dep't of Educ.*,
104 F.4th 577 (6th Cir. 2024).........................................................................................62

*United States v. Amore*,
831 F. Supp. 3d 149 (D.R.I. 2026)..................................................................................10

*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026) ........................................ 10

*United States v. Cnty. of Washtenaw*,
__ F. Supp. 3d __, 2026 WL 2453724 (E.D. Mich. Aug. 21, 2026) ........................................ 53

*United States v. Or. State Med. Soc.*,
343 U.S. 326 (1952) ........................................ 26

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) ........................................ 10

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) ........................................ 60

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
590 U.S. 604 (2020) ........................................ 23–24

*U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
481 U.S. 1301 (1987) ........................................ 65

*Washington v. U.S. Dep't of Educ.*,
167 F.4th 1241 (9th Cir. 2026) ........................................ 51

*West Virginia v. EPA*,
597 U.S. 697 (2022) ........................................ 35–36

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ........................................ 64

*Woonasquatucket River Watershed Council v. USDA*,
186 F.4th 25 (1st Cir. 2026) ........................................ 51

*Worman v. Healey*,
922 F.3d 26 (1st Cir. 2019) ........................................ 59

**Constitutional Provisions, Statutes, and Regulations**

U.S. Const.
art. I, § 4, cl. 1 ........................................ 8
art. II, § 1, cl. 2 ........................................ 8

Pub. L. No. 100-707, 102 Stat. 4689 ........................................ 3

Pub. L. No. 106-386, 114 Stat. 1464 ........................................ 33

Pub. L. No. 107-56, 115 Stat. 272 ........ 3–4

Pub. L. No. 107-296, 116 Stat. 2135 ........ 29

Pub. L. No. 108-7, 117 Stat. 11 ........ 4

Pub. L. No. 109-295, 120 Stat. 1355 ........ 3

Pub. L. No. 115-31, 131 Stat. 135 ........ 26–27

Pub. L. No. 119-56, 140 Stat. 789 ........ 24, 27

Pub. L. No. 119-103, 140 Stat. 987 ........ 12

2 C.F.R.
- § 200.1 ........ 20, 44
- § 200.205 ........ 44
- § 200.339 ........ 10, 17, 51
- § 200.340 ........ 10–11, 19, 45–47, 50
- § 200.341 ........ 10, 21
- § 200.342 ........ 10
- § 200.343 ........ 10
- § 3002.10 ........ 10, 45

5 U.S.C.
- § 703 ........ 61
- § 706 ........ 22, 27, 34, 45, 48, 52, 60

6 U.S.C.
- § 111 ........ 29–30
- § 124h ........ 25
- § 481 ........ 23
- § 482 ........ 23
- § 591 ........ 5
- § 596 ........ 5
- § 596b ........ 5, 27
- § 603 ........ 35
- § 604 ........ 44
- § 605 ........ 5, 25, 44
- § 607 ........ 57
- § 608 ........ 5, 25, 35, 38, 44, 57
- § 609 ........ 38
- § 609a ........ 5, 44
- § 701 ........ 57
- § 741 ........ 57
- § 762 ........ 5, 25, 43–44, 57
- § 1135 ........ 5, 25, 57

8 U.S.C.
§ 1324 ... 54
§ 1357 ... 14, 26
§ 1373 ... 13, 53–54

42 U.S.C.
§ 5122 ... 57
§ 5195a ... 57

46 U.S.C. § 70107 ... 5, 25

52 U.S.C.
§ 20501 ... 8
§ 20507 ... 36
§ 20508 ... 9, 35
§ 20902 ... 9
§ 21081 ... 9, 36
§ 21082 ... 9
§ 21083 ... 9
§ 21084 ... 9, 35
§ 21085 ... 9, 35–36

A.R.S. § 16-602 ... 40

Cal. Elections Code § 2194 ... 40

Md. Code, Gen. Provisions § 4-330 ... 40

Code of Md. Reg.
§ 33.04.01.02 ... 40
§ 33.04.01.07 ... 40

Minn. Stat.
§ 5B.05 ... 40
§ 5B.07 ... 40
§ 5B.11 ... 40

Nev. Rev. Stat. § 293.558 ... 40

Va. Code § 24.2-404 ... 40

Wash. Rev. Code § 29A.84.150 ... 40

**Other Authorities**

DHS Sec'y Mullin, Press Conference (July 17, 2026), https://tinyurl.com/2dbz38wb ....................17

Exec. Order No. 14159, *Protecting the American People Against Invasion*, 90 Fed. Reg. 8443 (Jan. 20, 2025) ....................6, 14, 55

Exec. Order No. 14218, *Ending Taxpayer Subsidization of Open Borders*, 90 Fed. Reg. 10581 (Feb. 19, 2025) ....................6

Exec. Order No. 14248, *Preserving and Protecting the Integrity of American Elections,* 90 Fed. Reg. 14005 (Mar. 25, 2025) ....................9

Exec. Order No. 14332, *Improving Oversight of Federal Grantmaking*, 90 Fed. Reg. 38929 (Aug. 7, 2025)....................11, 19

*Guidance for Grants and Agreements*, 85 Fed. Reg. 49506 (Aug. 13, 2020)....................10, 46

H.R. 7296, 119th Cong. (2026)....................35

*Regulation for Federal Financial Assistance*, 91 Fed. Reg. 32198 (May 29, 2026) ....................11, 47

S. 4155, 119th Cong. (2026) ....................35

S. 5271, 119th Cong. (2026) ....................35

*Simplifying FEMA Preparedness Grants* 88 Fed. Reg. 62098 (Sept. 8, 2023) ....................63

U.S. Elections Assistance Commission, *Voluntary Voting Systems Guidelines VVSG 2.0* (Feb. 10, 2021), *available at*: https://tinyurl.com/4vhbxptr....................42

## INTRODUCTION

For over two decades—since the aftermath of the September 11, 2001 terrorist attacks—Congress has appropriated billions of dollars annually to support efforts to strengthen the Nation's preparedness and its ability to respond to disasters and emergencies. Those funds support the work of bomb squads, firefighters, and terrorism watch desks in all 50 States. And throughout this time, the Federal Emergency Management Agency ("FEMA"), which administers these grant programs and oversees the distribution of the appropriated funds to the States, has acted evenhandedly to ensure that States receive the funding that Congress allocated—on the terms Congress set out—regardless of any political or policy disagreement between the federal government and the States.

The current administration, however, has taken a different approach. Last year, for the first time, FEMA and the Department of Homeland Security ("DHS") attempted to use the billions of dollars in federal funds that they oversee to coerce the States into agreeing to help enforce federal immigration law. This Court vacated and enjoined the conditions in question, *see Illinois v. FEMA*, 801 F. Supp. 3d 75 (D.R.I. 2025), and defendants declined to pursue an appeal. Only days after the Court's decision, however, defendants tried to achieve the same result in another way, cutting funds dramatically to jurisdictions whose immigration policies they disliked. This Court again vacated and enjoined that decision, *see Illinois v. Noem*, 813 F. Supp. 3d 282 (D.R.I. 2025), and, once more, defendants declined to pursue an appeal.

Undeterred, defendants have tried again. They have imposed many of the same immigration conditions as the Court enjoined last year on a range of critical homeland-security grant programs, holding hostage hundreds of millions of dollars that Congress appropriated for the States unless the States agree to assist the federal government in enforcing civil immigration law. They have imposed a radical new set of election conditions on one program, the Homeland Security Grant Program ("HSGP"), that would require the States to rewrite their election laws to

align with the President's stated policy priorities. Another court has already held those election conditions unlawful and set them aside. *See Metro. Gov't of Nashville & Davidson Cnty. v. DHS*, __ F. Supp. 3d __, 2026 WL 2905123 (D.D.C. Sept. 28, 2026). And defendants have attempted to give themselves the power to terminate all FEMA grants at will, for any reason or for no reason whatsoever—thus allowing themselves to punish States on the back end for failure to take steps defendants could not require on the front end.

The Court should again reject these efforts to weaponize the billions of dollars that Congress appropriated to strengthen homeland security across the Nation. A federal agency "has no power to act . . . unless and until Congress confers power upon it," *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), and Congress gave FEMA no power to condition homeland-security funding on States' agreement to either assist DHS in enforcing federal immigration law or to alter state election law to suit the President's demands—nor did it give FEMA untrammeled power to terminate federal grants. FEMA likewise acted arbitrarily and capriciously in imposing each of the conditions at issue here, failing to adequately justify its decision and to consider the States' reliance interests or the impact of the conditions on public safety. Finally, each condition violates the Constitution's Spending Clause, including because they are untethered to the purposes of the federal grants to which they are attached and because they are hopelessly vague. The Court should vacate the challenged conditions and enjoin DHS and FEMA from enforcing them.

## BACKGROUND

### A. Congress's Longstanding Support for State Emergency Preparation and Response.

For decades, Congress has addressed the threat of unpredictable emergencies and disasters by providing robust and unflagging financial support—today totaling tens of billions of dollars annually—for a complex infrastructure of emergency preparedness and response, anchored by

FEMA but administered in the first instance by the States. FEMA has long supplied relief after presidential disaster declarations under the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"). Pub. L. No. 100-707, 102 Stat. 4689. Since 2017, according to its own data, and excluding the COVID-19 disaster declarations, FEMA has obligated nearly $40 billion from the Disaster Relief Fund to Plaintiff States. *See* Ex. 78 (Tresnowski Decl.), ¶ 12.

Congress established today's federal emergency-management infrastructure during the Bush Administration, in the wake of multiple significant disasters on American soil. First, after the September 11, 2001 terrorist attacks, Congress enacted funding programs to support States and localities in counterterrorism measures, with the goal of ensuring that a disaster of that sort never happens again. In October 2001, Congress passed the USA PATRIOT Act, establishing grant programs to States "to prepare for and respond to terrorist acts." Pub. L. No. 107-56, § 1014, 115 Stat. 272, 399. Congress went on to pass the Homeland Security Act of 2002 and the Maritime Transportation Security Act of 2002, which likewise increased support for state preparedness measures in areas of vulnerability. Finally, in the wake of Hurricane Katrina, Congress passed—and President Bush signed into law—the Post-Katrina Emergency Management Reform Act of 2006, Pub. L. No. 109-295, tit. VI, 120 Stat. 1355, which comprehensively overhauled all federal emergency assistance grant programs and granted FEMA the authority to administer them.

Today, the States receive almost $2 billion in funding annually in "preparedness" grants—grants meant to "protect communities across the country from terrorism and other urgent threats." Press Release, FEMA, *FEMA Announces $1.5 Billion to Empower Communities to Prevent Terrorism and Protect American Infrastructure* (June 24, 2026) (Ex. 11).[1] These grants vary in

[1] *See also* Press Release, FEMA, *Trump Administration Delivers More Than $1.6 Billion to Strengthen Preparedness and Resilience Across America* (Sept. 23, 2026) (Ex. 16).

scope and purpose, but they are united by a common theme: They provide support to States and localities based on objective criteria that center on States' actual need to prepare for and respond to emergencies and similar threats to their residents' safety and security. Congress did not, in authorizing these programs and appropriating funds to support them, confer on FEMA any freestanding authority to pick and choose among funding recipients according to the political priorities of the administration in office. Nor did Congress authorize FEMA to attach conditions to funds unrelated to the primary purpose of the funding programs: supporting States in preparing for and responding to emergencies and similar hazards.

The most substantial sources of preparedness funding for the States are the Homeland Security Grant Program ("HSGP") and the Emergency Management Performance Grant ("EMPG"). Congress established HSGP in response to the terrorist attacks of September 11, 2001. The USA PATRIOT Act created a grant program to allow States "to prepare for and respond to terrorist acts," Pub. L. No. 107-56, § 1014(a), 115 Stat. 272, 399—a program that became HSGP. Congress began appropriating funds for EMPG in 2003, *see* Pub. L. No. 108-7, 117 Stat. 11, 515–16, and made the program permanent in the wake of Hurricane Katrina. States have come to depend critically on these funding streams. As one example, HSGP supports the national network of fusion centers, which are state-operated facilities that facilitate information sharing about criminal and terrorist threats across law-enforcement agencies at all levels of government. Ex. 77 (Engle Decl.), ¶ 23; Ex. 41 (Quinn Decl.), ¶ 3; Ex. 47 (Stanton Decl.), ¶ 31; Ex. 49 (Sweeney Decl.), ¶ 24; *see also* U.S. Dep't of Homeland Sec., *Fusion Centers* (captured Oct. 13, 2026) (Ex. 19).

Congress has specified the factors that FEMA is permitted to consider when it distributes HSGP and EMPG funds to the States. EMPG funding—totaling over $300 million annually—is allocated on a fixed basis: 0.75% of the total appropriated amount to each State, with the remainder

apportioned strictly by population. *See* 6 U.S.C. § 762(b), (d) (FEMA Administrator "*shall* . . . make grants to States" based on this formula (emphasis added)). And HSGP funding—totaling over $1 billion annually—is likewise guaranteed to each State at a minimum threshold, *id.* § 605(e)(1), with the balance of HSGP's two largest subcomponents allocated among States and urban areas according to a risk-based formula that enumerates factors FEMA "shall consider," ranging from population density to likelihood of terrorism, *id.* § 608(a); *see Noem*, 813 F. Supp. 3d at 291 (describing allocation factors). Plaintiff States receive over $900 million pursuant to these two programs annually, forming the backbone of the States' emergency-preparedness budget.

Plaintiff States also receive substantial funding through other preparedness grant programs established by Congress and overseen by FEMA. Plaintiff States receive tens of millions of dollars annually though the Port Security Grant Program—funds allocated annually "based on risk," 46 U.S.C. § 70107(a)—to implement security measures at our Nation's ports. They receive tens of millions of dollars annually through the Transit Security Grant Program—again, allocated "based solely on risk," 6 U.S.C. § 1135(c)(2)—to protect critical transportation infrastructure and the traveling public from acts of terrorism. They receive funding through the Nonprofit Security Grant Program ("NSGP") to help nonprofits in their States, particularly religious institutions, increase the security of their facilities at risk of a terrorist or other extremist attack. *Id.* § 609a. And they receive millions of dollars annually through two smaller programs—BioWatch and Securing the Cities—to prevent the release of biological and radiological materials in jurisdictions throughout the country. *See* 6 U.S.C. §§ 591 note, 596(1), 596b(a). Congress established these programs to support the States in ensuring that their residents are protected from terrorist attacks and other emergencies, and the States have relied on them in carrying out that statutory purpose.

### B. FEMA's Failed Attempts to Use Grant Funds to Coerce States.

Until last year, over the decades that FEMA has overseen the administration of these grant programs, it has done so evenhandedly, ensuring that the funds Congress has allocated to protect the Nation are distributed to the States according to the terms that Congress specified. The current administration, however, has taken a different approach to the administration of these programs, seeking to use the hundreds of millions of dollars that Congress has appropriated for the Nation's safety to coerce States to carry out the administration's policy agenda.

"Since the beginning of the current administration, the executive branch has repeatedly sought to tie federal grant funding for programs like HSGP to state and local governments' assistance with federal immigration enforcement." *Noem*, 813 F. Supp. 3d at 291. On January 20, 2025, his first day in office, the President directed DHS to "ensure that so-called 'sanctuary' jurisdictions . . . do not receive access to Federal funds." Exec. Order No. 14159, *Protecting the American People Against Invasion* § 17, 90 Fed. Reg. 8443, 8446 (Jan. 20, 2025) ("Invasion EO"). This Invasion EO also directed DHS to create "Homeland Security Task Forces" "in all States nationwide," in part to "ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States." *Id.* § 6(c), 90 Fed. Reg. at 8444. Another executive order on February 19, 2025, directed all executive agencies to "ensure, consistent with applicable law, that Federal payments to States and localities do not . . . abet so-called 'sanctuary' policies." Exec. Order No. 14218, § 2(a)(ii), 90 Fed. Reg. 10581, 10581 (Feb. 19, 2025). That same day, the DHS Secretary issued a memorandum titled "Restricting Grant Funding for Sanctuary Jurisdictions," directing DHS agencies to cease all federal funding to sanctuary jurisdictions. *See* Memorandum from Kristi Noem, Sec'y, to All Agencies and Offices (Feb. 19, 2025) (Ex. 8).

Then, "[o]n March 27, [2025,] DHS revised the standard terms and conditions governing all federal grants it oversees, adding provisions requiring state and local recipients to certify that

they will assist in enforcing federal immigration law" in order to receive federal funds. *FEMA*, 801 F. Supp. 3d at 81–82 (emphasis in original). Twenty-one States sued, and this Court granted those States summary judgment, holding that DHS's imposition of the conditions was arbitrary and capricious as well as unconstitutional. To begin, "DHS made no attempt to claim that it examined the relevant data or articulated a fact-based reason for its actions." *Id.* at 93. Indeed, DHS "engaged in a wholly under-reasoned and arbitrary process," "did not meaningfully evaluate the [S]tates' reliance interests," and compounded these failures by using "vague and confusing language" that "ma[de] compliance a nearly impossible-to-achieve moving target." *Id.* at 93–94. To the extent DHS had any reasons at all, the Court explained, "the string of memoranda on which the [d]efendants rel[ied] were drafted in direct response to the Executive Order calling upon the agencies to terminate funding to 'sanctuary jurisdictions,'" and "DHS cannot avoid the arbitrary and capricious analysis simply by claiming it was acting at the instruction of the President." *Id.* at 94 (cleaned up). The Court likewise held that, because the conditions were not "reasonably related to the purposes of the grants to which they attach," were unlawfully ambiguous, and exerted significant "financial pressure" on the States, they violated the Spending Clause. *Id.* at 96. The Court thus vacated the conditions and enjoined defendants from enforcing them against the States that were plaintiffs in that suit. *Id.* at 98; *see also Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2908807 (D.R.I. Oct. 14, 2025) (order enforcing judgment).

But DHS and FEMA did not stop there. Three days after the Court's judgment, FEMA sent final award letters to the States under the HSGP program. *See Noem*, 813 F. Supp. 3d at 293. The awards reflected "massive funding reallocations" from States that were "either on DHS's list of sanctuary jurisdictions or contain[ed] cities that were on that list" and toward other jurisdictions. *Id.* The targeted States brought suit, challenging the reallocation, and this Court agreed, granting

the States summary judgment and holding that DHS and FEMA had "blatantly target[ed] sanctuary jurisdictions for funding cuts," despite the fact "[s]anctuary status was surely not among the factors that Congress considered when, in the aftermath of the September 11 attacks, it authorized HSGP to provide counterterrorism funding to state and local governments." *Id* at 305.

DHS and FEMA appealed both the *FEMA* and *Noem* judgments, but voluntarily dismissed both appeals. *See Illinois v. FEMA*, No. 25-2131 (1st Cir.) (dismissed Sept. 16, 2026); *Illinois v. Mullin*, No. 26-1182 (1st Cir.) (dismissed May 22, 2026).

### C. The President's Failed Attempts to Usurp Power Over Elections.

At the same time as the administration was attempting to use homeland-security funding to coerce the States into carrying out its policy agenda, it was also attempting to impose that agenda in a different context: States' regulation of federal elections.

The U.S. Constitution charges States with the responsibility for regulating and administering federal elections, unless Congress preempts those choices. U.S. Const. art. I, § 4, cl. 1; *id.* art. II, § 1, cl. 2; *see also Foster v. Love*, 522 U.S. 67, 69 (1997). States have the authority "to provide a complete code for [federal] elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, [and] prevention of fraud and corrupt practices." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8–9 (2013). States do just that, regulating nearly every aspect of election administration—including voter registration, voter roll maintenance, vote tabulation, certification, auditing, and much more—in accordance with local needs and preferences.

Congress has invoked its power to preempt state election laws only selectively. As relevant here, Congress in the National Voter Registration Act ("NVRA") set standards to reduce barriers to voter registration and improve the accuracy of voter rolls. *See* 52 U.S.C. § 20501(b). The NVRA addresses citizenship eligibility solely by providing that the federal mail voter registration form

must require the applicant to attest to their citizenship under penalty of perjury. *Id.* § 20508(b)(2). And, after the 2000 presidential election was contested due to flaws in the physical punch-card ballots cast, Congress passed the Help America Vote Act ("HAVA") to help upgrade States' voting infrastructure by setting forth new standards for voting systems. *See id.* §§ 20902, 21081–21085. But HAVA designates only "minimum requirements" and vests States with wide discretion on "methods of complying." *Id.* §§ 21084–21085.

Despite having no constitutional role in election administration, the President has launched an administration-wide effort to strongarm the States into adopting the President's preferred election policies. To begin with, on March 25, 2025, the President issued Executive Order 14248, titled *Preserving and Protecting the Integrity of American Elections* ("2025 Elections EO"), which directed the DHS Secretary and FEMA to "heavily prioritize" States' compliance with the Voluntary Voting Systems Guidelines 2.0 in awarding HSGP funding, and to "take all appropriate action . . . to prevent non-citizens from being involved in the administration of any Federal election." 2025 Elections EO §§ 4(d), 6(a). Several courts have permanently enjoined sections of the 2025 Elections EO as unlawful. *See California v. Trump*, 786 F. Supp. 3d 359, 380 (D. Mass. 2025) ("only Congress has the power to adjust state election rules"), *appeal docketed*, No. 25-1726 (1st Cir.); *LULAC v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 88 (D.D.C. 2026), *appeal docketed*, Nos. 25-5476 *et al.* (D.C. Cir.) (same).

Beginning in 2025, the administration, through the Justice Department, likewise began demanding complete and unredacted state voter registration lists, including voters' Social Security and driver's license numbers, from at least 48 states and the District of Columbia. It sued at least 30 States that refused to provide this information, stating the information is needed to find alleged noncitizens on the voter rolls. All the district courts that have ruled so far have dismissed the federal

government's lawsuits as improper and illegal, and the only Court of Appeals to have ruled so far has agreed. *See, e.g.*, *United States v. Benson*, 179 F.4th 470 (6th Cir. 2026); *United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026), *appeal docketed*, No. 26-1665 (1st Cir.); *United States v. Weber*, 816 F. Supp. 3d 1168, 1168 (C.D. Cal. 2026), *appeal docketed*, No. 26-1232 (9th Cir.).

### D. This Administration's Failed Attempts to Assert New Power to Terminate Grants for Any Reason.

Longstanding federal regulations generally permit grant award termination only under carefully cabined circumstances. *See* 2 C.F.R. §§ 200.339 to 200.343 (addressing "Remedies for Noncompliance"). This uniform guidance, promulgated by the Office of Management and Budget ("OMB"), has been expressly incorporated into DHS's applicable regulations as well. *See* 2 C.F.R. § 3002.10. Section 200.340(a) enumerates the specific grounds for which a federal grant award "may be terminated": (1) by the federal agency "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award"; (2) by the federal agency "with the consent of the recipient or subrecipient"; (3) by the recipient "upon sending . . . a written notification of the reasons for such termination"; and (4) by the federal agency "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." This last clause, § 200.340(a)(4), has long been understood to allow agencies to terminate grants for failing to meet agency priorities established at the time of the award. *See, e.g.*, *Guidance for Grants and Agreements*, 85 Fed. Reg. 49506, 49507–09 (Aug. 13, 2020) (the regulation does not permit "arbitrarily" terminating awards "without sufficient cause").

Shortly after the President's inauguration in January 2025, various federal agencies began terminating a broad range of awarded grants. These agencies asserted that § 200.340(a)(4) allowed them to terminate open grant awards based on new agency policies or priorities identified *after* an

award was made. Several States subsequently filed an action against a number of federal agencies challenging their interpretation of § 200.340(a)(4). Earlier this year, the district court granted summary judgment to the States, holding that "[a]fter review of the plain language, regulatory scheme, regulatory history, [and] the Spending Clause of the U.S. Constitution," "the Termination Clause [at 2 C.F.R. § 200.340] does not permit agencies to terminate grants based on program goals and agency priorities identified after grants [a]re awarded." *New Jersey v. OMB*, 837 F. Supp. 3d 258, 276 (D. Mass. 2026). The court emphasized that if—as defendants contended—awards could be terminated based on agency priorities that have changed *after* the issuance of a federal award to the States, such a rule would contravene the Spending Clause. *See id.* at 282.

Meanwhile, the Administration has continued its efforts to assert unfettered authority to terminate federal grants. In August 2025, the President instructed federal agencies to amend regulations or award terms to "permit immediate termination for convenience, or clarify that such termination is permitted, including if the award no longer advances agency priorities or the national interest"—as determined *after* an award has been made. *Improving Oversight of Federal Grantmaking*, Exec. Order No. 14332, § 6(b), 90 Fed. Reg. 38929, 38932 (Aug. 7, 2025). And in late May 2026, OMB and dozens of federal agencies (including DHS) issued a Notice of Proposed Rulemaking to try to revise existing guidance and regulation tied to § 200.340 to enumerate new proposed grounds for grant terminations. *See Regulation for Federal Financial Assistance*, 91 Fed. Reg. 32198 (May 29, 2026). The proposed rule would, among other things, add a new termination provision that would allow federal agencies to terminate certain grant awards if an agency "determines that a termination is in the interest of the Federal Agency . . . , including if a Federal award does not effectuate programs goals, Federal Agency priorities, or the national interest as they exist at the time of the termination." *Id.* at 32258. On September 3, 2026, before any Final

Rule was issued, President Trump signed a funding bill passed by Congress that expressly prohibits any finalization or issuance of the proposed rule through at least December 11, 2026. *See* Pub. L. No. 119-103, div. A, § 157, 140 Stat. 987, 999.

### E. FEMA's Present Attempt to Coerce the States.

Despite the failure of its efforts to coerce the States into adopting its policies across a range of contexts, the current federal administration has announced that it again intends to use the grant programs administered by FEMA—primarily, the "preparedness" programs that Congress enacted to support States' emergency-management and homeland-security infrastructures—to ensure that States fall in line with its policy priorities. It has done so by imposing three sets of conditions on Fiscal Year 2026 grants, as described below.[2]

#### 1. The Immigration Conditions

First, FEMA has decided to condition funding to the States under the primary preparedness grant programs on the States' agreement to assist in enforcing federal immigration law—just as it tried (and failed) to do last year. Indeed, seven of the eight relevant conditions, which are set out under the rubric "Communication and Cooperation with the Department of Homeland Security and Immigration Officials" in DHS's Fiscal Year 2026 Standard Terms and Conditions, *see* Department of Homeland Security (DHS) Standard Terms and Conditions 5–7 (Aug. 28, 2026) (hereinafter "2026 DHS Standard Terms") (Ex. 2),[3] are almost exactly the same terms that this

[2] FEMA has also imposed some of the Fiscal Year 2026 conditions on at least some Fiscal Year 2025 grants that have been issued during Fiscal Year 2026. *E.g.*, Ex. 15 art. 55 (Fiscal Year 2025 Assistance to Firefighters Grant Award Letter). Plaintiffs seek relief "as to any grant program administered by Defendants" with the challenged conditions, regardless of whether they are labeled Fiscal Year 2025 or 2026 grants. ECF 44 at 83.

[3] The DHS website claims that the operative Standard Conditions are "[d]ated August 28, 2026." U.S. Dep't of Homeland Sec., *DHS Standard Terms and Conditions* (captured Oct. 13, 2026), https://www.dhs.gov/publication/dhs-standard-terms-and-conditions (Ex. 18). The document

Court vacated and enjoined as to 21 States last year. *See FEMA*, 801 F. Supp. 3d at 81–82 (describing Fiscal Year 2025 conditions). They are:

1. **Information Sharing Condition:** Grant recipients "must comply with the requirements of 8 U.S.C. §§ 1373 and 1644," which prohibit restrictions on government entities or officials exchanging information with DHS concerning the citizenship or immigration status, lawful or unlawful, of any individual.

2. **Compliance Condition:** Grant recipients must comply with various criminal laws that prohibit, among other things, "encouraging or inducing" noncitizens to unlawfully enter the United States.

3. **Cooperation Condition:** Grant recipients must "honor requests for cooperation with immigration detainers, including requests for information regarding criminal history, expected release date, actual release date, detention location, nationality, residence, and employment; and requests for short-term detention of not more than 48 hours of an alien pursuant to a valid detainer to allow DHS to assume custody."

4. **Access Condition:** Grant recipients must provide federal immigration agents "access to detainees" in correctional facilities to inquire as to such individuals' right to be or remain in the United States.

5. **Publicization Condition:** Grant recipients must not "leak or otherwise publicize the existence of" any federal immigration enforcement operations.

6. **Benefits Condition:** Grant recipients must not "operate any program that benefits illegal immigrants or incentivizes illegal immigration by establishing or maintaining programs providing direct financial support or public benefits to illegal immigrants."

7. **Certification Condition:** Grant recipients must certify compliance with the above conditions and require subgrant recipients to do the same.

Ex. 2 at 5–7. The Fiscal Year 2026 conditions change the text of the Cooperation Condition and elaborate somewhat on the Benefits Condition, but the remaining conditions are word-for-word identical to the Fiscal Year 2025 conditions.

---

itself is erroneously dated April 16, 2026, the date when the *prior* version of the DHS standard terms issued. *See* Ex. 2 (footer). The latest version was posted on DHS's website not on August 28, 2026, but at some point after September 10. *See* U.S. Dep't of Homeland Sec., *DHS Standard Terms and Conditions* (captured September 10, 2026 8:59 PM UTC), https://www.dhs.gov/publication/dhs-standard-terms-and-conditions (Ex. 14) (DHS website on September 10 still showed only the April 2026 version of the standard terms).

The HSGP award letters that issued on or about September 23, 2026, contained an eighth immigration condition. An award term titled "Fusion Center Intelligence Support, Coordination, and Reporting Requirement," imposes new requirements for States to employ their state-owned fusion centers as tools of immigration enforcement. *See* Ex. 4 art. 63 (Illinois HSGP Award Letter); *see also* Ex. 5 (article reformatted for legibility). This Fusion Center Condition requires that States engage in "formal coordination with their local [Homeland Security Task Force]." *Id.* at 1. As FEMA's September 9, 2026, decision memo explains, this language refers to the task forces created by the Invasion EO "to faithfully execute the immigration laws of the United States." ECF 48-5 at 7. The Condition also requires that state fusion centers "maintain a permanent, formal seat for officials from U.S. Immigration and Customs Enforcement, Enforcement and Removal Operations" ("ERO") and provide quarterly "[c]onfirmation that the lead agency for the fusion center is an active 287(g) partner." Ex. 5 at 1–2. Both these requirements also entail state cooperation with civil immigration enforcement. ERO is the arm of DHS "primarily devoted to civil immigration enforcement." Memorandum from John Morton, Assistant Sec'y, to All ICE Emps. 1 (June 9, 2010) (Ex. 6); *see also* Ex. 41 (Quinn Decl.), ¶ 7. And the phrase "287(g) partner" refers to § 287(g) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1357(g), which governs the circumstances under which States assist in the enforcement of immigration law under federal "direction and supervision," *id.* § 1357(g)(3).[4]

Plaintiff States refer to the seven conditions found in the 2026 DHS Standard Terms, and the Fusion Center Condition, as the Immigration Conditions. The 2026 DHS Standard Terms stated

[4] A memorandum that FEMA has filed as part of the "administrative record"—though it is dated October 8, 2026, after the filing of the amended complaint and seven weeks after the memo asserts the decision was made to impose the Fusion Center Condition—states vaguely that the condition FEMA actually imposed was an "earlier, incorrect draft." ECF 48-8 at 3. The "correct" text is not provided.

that DHS would "analyze whether" to apply the Immigration Conditions in the Standard Terms to specific grant programs, and that it would "clarify in the grant documents whether and how the [Conditions] apply to each grant." Ex. 2 at 5. On September 18, 2026, however, FEMA issued Grant Programs Directorate Information Bulletin No. 582 (the "September 18 Directive"), which reflects the agency's final decision as to the applicability of the Immigration Conditions. *See* Ex. 3. The Directive explains that the Immigration Condition will apply to the following programs, for any grants awarded on or after August 28, 2026:

- Homeland Security Grant Program (State Homeland Security Program, Urban Area Security Initiative, and Operation Stonegarden)
- Emergency Management Performance Grant Program
- Transit Security Grant Program
- Port Security Grant Program
- Regional Catastrophic Preparedness Grant Program
- BioWatch
- Securing the Cities
- Homeland Security National Training Program – Continuing Training Grant – Competitive
- State Border Security Reinforcement Fund

*Id*. at 2. The Plaintiff States challenging the Immigration Conditions (including their subdivisions) have been awarded over $1 billion pursuant to these grant programs for Fiscal Year 2026.[5]

The September 18 Directive did not itself explain the decision to impose the Immigration Conditions on these programs. DHS and FEMA have now produced two memoranda, however, dated September 11 and 18, 2026, that attempt to provide reasons for the Directive. ECF 48-6, 48-7 (together, the "Immigration Conditions Memos"). The September 11 memo states that FEMA decided to apply the Conditions to programs whose "purpose" has a "nexus" to "immigration activities, law enforcement, or national security, including preventing or responding to acts of

[5] Arizona and North Carolina did not join in the fifth, sixth, seventh, and eighth causes of action, related to the Immigration Conditions. ECF 44 at 67 n.10. References to "Plaintiffs" or "Plaintiff States" in that context refer to all Plaintiff States except Arizona and North Carolina.

terrorism and extremism." ECF 48-6 at 2. The September 18 memo then attempts to flesh out this alleged "nexus" as to each of the targeted programs at greater length. ECF 48-7. The September 18 memo repeatedly claims that FEMA need only articulate a "rational relationship" between "the purpose" of each program and the Immigration Conditions. *Id.* at 3, 4, 6, 7, 8, 9, 11.

### 2. The Election Conditions

FEMA has also decided to condition funding to the States under the HSGP program—the single largest FEMA annual grant program—on States' willingness to rewrite state election law to mirror the administration's policy preferences. Specifically, the July 9, 2026, Notice of Funding Opportunity ("NOFO") for the Fiscal Year 2026 HSGP program requires States, as a condition of obtaining funding under that program, to certify their compliance with five Election Conditions:

1. **Hand-Marking Condition:** "Submit a plan for transitioning from electronic voting systems that utilize bar codes or QR codes to count votes to equipment that accepts hand-marked paper ballots," including "a timeline and, if necessary, a funding request to eliminate ballot marking devices and utilize hand-marked paper ballots."

2. **Audit Condition:** "Demonstrate proof of compliance with a post-election 5% manual audit, conducted according to the guidelines established by the Secretary, to ensure that electronic voting systems accurately count votes."

3. **Reconciliation Condition:** "Ensure that each election jurisdiction reconciles the number of voters who voted in each federal election to the number of ballots cast, using the methodology established by the Secretary."

4. **Voter Verification Condition:** "Utilize the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements (SAVE) system to verify the citizenship of all individuals in the state voter registration database within 120 days of accepting the grant award[]" and "take timely corrective action, consistent with applicable law, to remove verified non-U.S. citizens from the database."

5. **Election Worker Verification Condition:** Utilize the SAVE system or "another authorized government system" to verify U.S. citizenship for "any person working at a polling place in any capacity, or operating any election system in the jurisdiction, including temporary agency workers and vendors who work with election systems," and to "ensure verified non-U.S. citizens are prohibited from operating election systems or working at polling places."

U.S. Dep't of Homeland Sec., Notice of Funding Opportunity: Fiscal Year 2026 Homeland Security Grant Program (HSGP) at 15–16 (July 9, 2026) (Ex. 1).

The 2026 NOFO states that FEMA will withhold 20% of the recipient's total HSGP award "until the recipient submits proof of compliance with the [Fiscal Year] 2026 Election Security NPA requirements and the Department verifies/confirms that proof." *Id.* at 16. Plaintiff States have been allocated over $740 million in Fiscal Year 2026 HSGP funds, meaning DHS and FEMA will hold at least $148 million hostage to these demands. But the consequences for failure to comply with the conditions could be more significant still: On July 9, 2026, DHS issued guidance indicating that the *entire* HSGP award may be at risk—stating that "[s]ustained noncompliance" with the Election Conditions may result in "remedies for noncompliance under 2 C.F.R. § 200.339," Ex. 12 at 2, which include suspending or terminating the award "in part or in its entirety," 2 C.F.R. § 200.339(c). Indeed, on July 17, 2026, the DHS Secretary expressly stated his purpose in imposing the conditions: "we are going to make [the President's preferred] security enhancements mandatory. Meaning that, if these States want a grant . . . they're going to have to implement" the Election Conditions.[6] The final HSGP award letters contained articles specifically reproducing the Election Conditions' 20 percent funding hold. *See, e.g.*, Ex. 4 art. 59 (Illinois HSGP Award Letter).

On August 10, 2026, FEMA issued Grant Programs Directorate Information Bulletin 580, providing further guidance on the Election Conditions. Ex. 13. Among other things, Information Bulletin 580 states that the Election Conditions will require each jurisdiction to conduct a post-election manual audit "in time for results to inform certification decisions." *Id.* at 3. It also reiterates the requirement for States to use the SAVE system to verify the citizenship of all election workers and individuals on state voter rolls. *Id.* at 5–6. Information Bulletin 580 ends with the

---

[6] DHS Sec'y Mullin, Press Conference (July 17, 2026), https://tinyurl.com/4wv8rskm (from 9:15).

statement that it "will be reviewed, updated or rescinded as needed." *Id.* at 6. Thus, DHS has reserved the right to change or modify the additional guidance on the conditions at will.

The administrative record filed by DHS and FEMA contains no substantive discussion of the reasoning behind either the imposition of the Election Conditions in the HSGP NOFO or the elaboration of the Conditions in later guidance documents. The sole reference to the Conditions is found in a May 11, 2026 memorandum, which merely states that they are being imposed without discussion. *See* ECF 48-4 at 2; *see also* ECF 48-5 at 10 (postdecisional memorandum also merely noting the existence of the Elections Conditions).

**3. The Termination Conditions**

Finally, FEMA has also decided to impose novel termination conditions on substantially all FEMA grants, including even disaster funding. These Termination Conditions purport to allow federal assistance from DHS and FEMA to be canceled for any reason or no reason at all.

As discussed above, *supra* pp. 10–12, since the President took office in January 2025, his Administration has initiated a campaign to seize unchecked power to terminate existing federal grants or contracts to a wide variety of funding recipients, including Plaintiff States, and in service of that goal issued an executive order last year instructing federal agencies to amend regulations or award terms to "permit immediate termination for convenience, or clarify that such termination is permitted, including if the award no longer advances agency priorities or the national interest." 90 Fed. Reg. at 38932. DHS and FEMA have now complied with that instruction. The 2026 DHS Standard Terms include a new "for convenience" termination provision, which purports to allow DHS and its sub-agencies to terminate *any* award at the agency's convenience:

> DHS may terminate a federal award, in whole or in part, for the following reasons:

> (a) If the recipient fails to comply with the terms and conditions of the federal award;
>
> (b) With the consent of the recipient, in which case the parties must agree upon the termination conditions, including the effective date, and in the case of partial termination, the portion to be terminated;
>
> (c) Pursuant to the terms and conditions of the federal award; or
>
> (d) For convenience, pursuant to Executive Order 14332, Improving Oversight of Federal Grantmaking, including when the award no longer advances agency priorities or the national interest, but subject to appropriate exceptions, including agreements entered into in furtherance of international trade agreements or those awarded by the Department of Commerce under title XCIX of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116-283), the CHIPS and Science Act of 2022 (Public Law 117-167), or Division F of the Infrastructure Investment and Jobs Act (Public Law 117-58).

Ex. 2 at 16–17. FEMA is incorporating this termination provision from the 2026 DHS Standard Terms into FEMA-State agreements for relief after major disasters under the Stafford Act. *See* Ex. 77 (Engle Decl.), ¶ 91; Ex. 17 at 4 § 2(F)(3) (example recent FEMA-State agreement).

The September 18 Directive went further, imposing an even more aggressive termination provision on non-disaster grants awarded after August 28, 2026:

> i. FEMA, in its sole discretion, may terminate the federal award in whole or in part for one of the following reasons consistent with 2 C.F.R. § 200.340:
>
> 1. If the recipient or subrecipient fails to comply with the terms and conditions of the federal award.
>
> 2. With the consent of the recipient, in which case FEMA and the recipient must agree upon the termination conditions. These conditions include the effective date and, in the case of partial termination, the portion to be terminated.
>
> 3. If the federal award no longer effectuates the program goals or agency priorities. Under this provision, FEMA may terminate the award for these purposes if any of the following reasons apply:
>
> a. FEMA determines that a specific award objective is ineffective at achieving program goals as described in the Notice of Funding Opportunity;

> b. FEMA determines that an objective of the award as described in the Notice of Funding Opportunity will be ineffective at achieving program goals or agency priorities;
> c. FEMA determines that the design of the grant program is flawed relative to program goals or agency priorities;
> d. FEMA determines that the grant program is not aligned to either the DHS Strategic Plan, the FEMA Strategic Plan, or successor policies or documents;
> e. FEMA changes or re-evaluates the goals or priorities of the grant program and determines that the award will be ineffective at achieving the updated program goals or agency priorities; or
> f. For other reasons based on program goals or agency priorities described in the termination notice provided to the recipient pursuant to 2 C.F.R. § 200.341.
>
> 4. For convenience, including if the award no longer advances the national interest. Termination for convenience only applies to discretionary awards, as that term is defined at 2 C.F.R. § 200.1. The term "discretionary award" does not include grants where legislation establishes an entitlement to the funds on the part of the recipient, such as block grants or those awarded based on a statutory formula.

Ex. 3 at 4. The termination conditions imposed across non-disaster FEMA funds by the September 18 Directive are identical to the termination conditions FEMA had already included in Fiscal Year 2026 NOFOs. *See, e.g.*, Ex. 1 at 49. They would permit FEMA to terminate any federal grant to Plaintiff States at any time and for any reason, or for no reason at all.

Plaintiff States refer to both these clauses jointly as the "Termination Conditions." The administrative record filed in this matter provides no explanation for why the agency imposed novel and aggressive termination conditions on all the funding it administers. The sole reference to them is a bare citation to the grantmaking executive order. *See* ECF 48-3 at 5. At least one district court has already found the same or materially similar termination conditions likely unlawful and enjoined their imposition or enforcement by DHS or FEMA. *See City of Salem v. Mullin*, __ F. Supp. 3d __, 2026 WL 2445474, at *11 (D. Or. Aug. 20, 2026).

## ARGUMENT AS TO LIABILITY

"A grant of summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Garcia-Garcia v. Costco Wholesale Corp.*, 878 F.3d 411, 417 (1st Cir. 2017) (quotation omitted). "[T]he summary judgment rubric has a special twist in the administrative law context." *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (quotation omitted). "In such circumstances, the summary judgment motion merely serves to 'tee up' the case for decision on the administrative record." *Sasen v. Spencer*, 879 F.3d 354, 359 n.4 (1st Cir. 2018) (quoting *Bos. Redevelopment*, 838 F.3d at 47); *see also Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 852 F.3d 105, 110 (1st Cir. 2017) (same). Here, Plaintiff States are entitled to summary judgment on each of their claims against the challenged conditions—each of which is unlawful multiple times over.[7]

### I. The Immigration Conditions Are Unlawful.

DHS's re-promulgation of the Immigration Conditions was unlawful both because the agency lacked the statutory authority to impose the Conditions and because its decision to re-adopt the Conditions was arbitrary and capricious.[8]

---

[7] The States that were plaintiffs in *Illinois v. FEMA*, No. 25-cv-206, have separately filed a motion to enforce orders entered by the Court in that case. *See* No. 25-cv-206, ECF 83 (Oct. 7, 2026). Those orders permanently enjoined DHS and FEMA from enforcing the immigration conditions challenged there, or any "materially similar" condition, against those States. But FEMA has now imposed conditions identical to—or, at minimum, materially similar to—those imposed in 2025, without regard for the Court's injunction. Plaintiff States in No. 25-cv-206 are thus entitled to an order enforcing the injunction. But granting that relief would not eliminate the need to resolve the legality of the 2026 Immigration Conditions, including because several States here were not parties to No. 25-cv-206.

[8] Plaintiff States seek relief from the imposition of the Immigration Conditions on all programs identified in the September 18 Directive, *see supra* p. 15, except for the State Border Security Reinforcement Fund program, to which no Plaintiff State has applied, *see* ECF 44 ¶ 150 n.8.

### A. The Immigration Conditions exceed FEMA's statutory authority.

The September 18 Directive and the HSGP award letters imposed the Immigration Conditions on a range of programs that Congress has authorized through enabling legislation and funded through appropriations laws. But those statutes do not authorize FEMA to require grant recipients to assist DHS in enforcing federal immigration law. FEMA thus acted both "not in accordance with law" and "in excess of statutory . . . authority" in re-imposing the Immigration Conditions. 5 U.S.C. § 706(2)(A), (C).

#### 1. FEMA must identify a clear statement from Congress authorizing the Immigration Conditions but concedes that it cannot do so.

DHS and its sub-agency FEMA are "charged with administering congressional statutes," which means that "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the Administrative Procedure Act ['APA']." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (citations omitted); 5 U.S.C. § 706(2)(C). Federal agencies therefore have no inherent authority to condition funds in ways not specifically authorized by Congress. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 216 (2022) (emphasizing that it is Congress that "has broad power" to "set the terms on which it disburses federal funds"). "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

In the context of federal grants to States, moreover, defendants must identify *clear* statutory language where Congress *unambiguously* conferred the power that they claim. When Congress exercises its spending power, it "must clearly and unambiguously alert a grant recipient to any condition on federal funds." *Landor v. La. Dep't of Corr. & Pub. Safety*, 609 U.S. 59, 69 (2026).

That is because the Constitution's Spending Clause "does not expressly endow Congress with the power to regulate conduct," nor "'to issue direct orders to the governments of the States.'" *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 370 (2025) (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471 (2018)). Instead, "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). By analogy to contract law, "Congress must speak with a clear voice" as to all "conditions of the federal funding." *City of Chicago v. Barr*, 961 F.3d 882, 907 (7th Cir. 2020). That is doubly true where the funding recipient is a State because Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 622 (2020) (citing *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)). Courts thus "must employ a federalism-based clear-statement rule when construing spending legislation as a matter of *statutory* interpretation." *Kentucky v. Yellen*, 54 F.4th 325, 347 (6th Cir. 2022) (emphasis in original).

The re-promulgation of the Immigration Conditions fails under this demanding standard. No statute clearly authorizes imposing the Immigration Conditions on the programs in dispute. First, no overarching DHS or FEMA statute authorizes them to condition federal funds based on state participation in immigration enforcement. The Immigration Condition Memos point to only a single candidate, 6 U.S.C. § 481, and it comes nowhere close. *See* ECF 48-7 at 2. Section 481 does nothing more than express the sense of Congress that federal and state governments mutually benefit from sharing "homeland security information," 6 U.S.C. § 481(b), defined narrowly as information relating to terrorist threats, *id.* § 482(f)(1). The statute does not relate to immigration

enforcement, does not mandate information sharing, and does not provide any statutory authority for imposing funding conditions, let alone "unambiguous" authority.

In fact, the Immigration Conditions Memos effectively concede that DHS and FEMA lack the needed statutory authority by repeatedly invoking the premise that they need only show a "nexus" or a "rational relationship" between the targeted programs and the Immigration Conditions. The September 11 memo states that FEMA can impose the conditions if it can identify a "nexus" to immigration enforcement. ECF 48-6 at 2. The September 18 memo claims throughout that FEMA need only articulate a "rational relationship" between the purpose of the grant and immigration enforcement to justify the Immigration Conditions. ECF 48-7 at 3, 4, 6, 7, 8, 9, 11. But that is not the applicable legal standard: Congress must authorize a condition "unambiguously," *Landor*, 609 U.S. at 69, using "exceedingly clear language," *Cowpasture River*, 590 U.S. at 622, and an agency cannot impose conditions that Congress has not so authorized, *see Arlington*, 569 U.S. at 297; *Nashville*, 2026 WL 2905123, at *9 n.4. The Immigration Conditions Memos reflect FEMA's own tacit acceptance that it cannot meet that standard.

**2. The statutes at issue do not authorize the Immigration Conditions.**

The statutes authorizing the targeted grant programs—the only other statutes the September 18 memo also cites, *e.g.*, ECF 48-7 at 4–5—likewise reflect no congressional intent to authorize the Immigration Conditions. Start with the four major preparedness programs: the Emergency Management Performance Grant and the Homeland Security, Transit Security, and Port Security Grant Programs. These four comprise almost all the funding threatened by the September 18 Directive.[9] Their statutes do not direct FEMA to consider immigration policy in allocating funds

[9] Focusing on the fiscal year 2026 appropriation for *all* States, Congress appropriated nearly $1.6 billion for these four programs, and only about $145 million for the rest. *See* Pub. L. 119-56, div. A, tit. III, §§ (1)–(2), (4)–(5), (7), (9), (14)(F), (14)(H)–(I), 140 Stat. at 789–90. The four major

among the States; on the contrary, the laws mandate that FEMA allocate funds based on state population and relative risk. "EMPG funding to states is based on a population-based allocation formula as dictated by statute." *Noem*, 813 F. Supp. 3d at 295 (citing 6 U.S.C. § 762(d)). The Homeland Security Grant Program provides each State a minimum funding level, 6 U.S.C. § 605(e)(1), and allocates the remainder based on relative risk of acts of terrorism, *id.* § 608(a). As this Court has previously held, "[n]one of the statutory factors for evaluating relative risk encompass recipients' civil immigration priorities." *Noem*, 813 F. Supp. 3d at 305. The statutes creating the Port Security and Transit Security Grant Programs likewise direct that funds be allocated based on risk. *See* 46 U.S.C. § 70107(a); 6 U.S.C. § 1135(c)(2). "[S]tatutory formula[s]" of this sort "simply do[] not allow [DHS] to impose by brute force conditions on [federal funds] to further its own unrelated law enforcement priorities." *Providence*, 954 F.3d at 34–35. And the September 18 memo identifies no specific language in any of these statutes authorizing FEMA to impose the conditions.

As to the Fusion Center Condition, in particular, Congress has prohibited DHS from requiring the sorts of cooperation that it now seeks to impose as a funding condition. First, the statute that created the fusion center initiative expressly provides that "[n]othing in this section shall be construed to require a State, local, or regional government or entity to accept the assignment of officers or intelligence analysts of [DHS] into the fusion center of that State, locality, or region." 6 U.S.C. § 124h(h)(2). Yet DHS now attempts to require that fusion centers create "a permanent, formal seat" for officers from ERO, the civil immigration enforcement arm of DHS. Ex. 5 at 1. Second, Congress explicitly made the INA's § 287(g) program optional: "Nothing in

---

preparedness programs thus comprise approximately 92 percent of the appropriated funds that DHS and FEMA have subjected to the Immigration Conditions.

this subsection shall be construed to require any State or political subdivision of a State to enter into an agreement with the Attorney General under this subsection." 8 U.S.C. § 1357(g)(9). Yet DHS now attempts to require that fusion centers "[c]onfirm[] that the lead agency for the fusion center is an active 287(g) partner." Ex. 5 at 2. The Fusion Center Condition on HSGP, far from having clear authorization, appears to flatly contradict specific statutory prohibitions.[10]

DHS and FEMA also lack any clear authority to impose the Immigration Conditions on the four discretionary grant programs listed in the September 18 Directive: BioWatch, Securing the Cities, Continuing Training Grants, and the Regional Catastrophic Preparedness Grant Program. Although agencies retain more discretion in choosing which grants to fund under discretionary programs, they must still exercise that power within parameters set by Congress. "When Congress limits the purpose for which a grant can be made, it can be presumed that it intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985); *see also Planned Parenthood of Greater Wash. v. HHS*, 946 F.3d 1100, 1113 (9th Cir. 2020) (holding that an agency's grant criterion was contrary to law because it deviated from the purposes of the authorizing statute).

Congress has not authorized the Immigration Conditions on the discretionary programs, either. BioWatch and Securing the Cities are related programs that fund ongoing surveillance in the Nation's cities to detect and respond to worst-case scenarios: respectively, "a bioterrorism

---

[10] In a document that postdates the filing of the amended complaint—and that postdates by almost *two months* the date on which FEMA asserts the decision was made to impose the Fusion Center Condition, ECF 48-8 at 3—FEMA indicates that it intends to revise the condition's text, explaining that the condition actually imposed was "an earlier, incorrect draft," *id.* The Court need not credit such an obviously post-hoc, last-minute "protestation[] of repentance and reform." *United States v. Or. State Med. Soc.*, 343 U.S. 326, 333 (1952).

event," Pub. L. 115-31, § 302(5), 131 Stat. 135, 419 (2017), and "terrorist attacks and other high-consequence events utilizing nuclear or other radiological materials," 6 U.S.C. § 596b(a); *see also* Ex. 54 (Kreipke Decl.), ¶ 5 (BioWatch); Ex. 40 (Moore Decl.), ¶¶ 8–9 (Securing the Cities). The most recent appropriations bill for DHS funded both programs, but made no reference to immigration enforcement. *See* Pub. L. 119-56, div. A, tit. III, §§ (14)(H)–(I), 140 Stat. at 790. Congress authorizes the Continuing Training Grants and the Regional Catastrophic Preparedness Grant Program through annual appropriations bills, including the most recent one, *id.* §§ (9), (14)(F), 140 Stat. at 789–90, again with no reference to immigration enforcement. So nothing in any of the statutes at issue authorizes imposing the Immigration Conditions on these grant programs. Again, the Immigration Conditions Memos identify no statutory text to the contrary, instead simply explaining that (in FEMA's view) the policy goals advanced by the conditions are in some hazy sense aligned with the policy goals advanced by these programs. That is incorrect, *see infra* pp. 28–31, but even if it were not, it would not show that FEMA is *authorized* to impose the conditions.

In sum, DHS and FEMA "took an impermissible shortcut when [they] attempted to impose the challenged conditions . . . conditions that Congress had not vested [them] with authority to impose." *Providence*, 954 F.3d at 45. The Court "need go no further." *Id.* Indeed, given that DHS and FEMA have now for the second year in a row attempted to impose these Immigration Conditions, the Court should squarely hold that DHS and FEMA lack any congressionally delegated authority to impose such a policy—whether last year, this year, or in the years to come.

**B. The Immigration Conditions are arbitrary and capricious.**

DHS and FEMA's imposition of the Immigration Conditions was also arbitrary and capricious in violation of the APA. *See* 5 U.S.C. § 706(2)(A). An agency's action is arbitrary and capricious when it "has relied on factors which Congress has not intended it to consider, entirely

failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency, or [that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). When changing positions, an agency must also consider the "serious reliance interests" engendered by the status quo. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quotation omitted).

The re-promulgation of the Immigration Conditions bears all the hallmarks of unreasoned decisionmaking. The Immigration Conditions Memos rely on a factor Congress did not intend DHS and FEMA to consider—States' willingness to help with federal immigration enforcement—and fail to offer any evidence for FEMA's claim of a "nexus" between immigration enforcement and national security. The Immigration Conditions Memos also confirm that FEMA paid no heed to the States' reliance interests in billions of dollars of federal funding or the Conditions' negative effects on public safety.

**1. Congress has not drawn FEMA's posited "nexus" between immigration enforcement and national security, and FEMA fails to substantiate it.**

The Immigration Conditions would deprive Plaintiff States of funding appropriated by Congress for their benefit based on "factors which Congress has not intended [DHS] to consider" in allocating funds, *State Farm*, 463 U.S. at 43, namely, States' willingness to enforce federal immigration law. As a general matter, whether the agency "entirely failed to consider an important aspect of the problem" or "relied on factors which Congress has not intended it to consider," *id.*, necessarily "turns on what a relevant substantive statute makes important," *Or. Nat. Res. Council v. Thomas*, 92 F.3d 792, 799 (9th Cir. 1996) (internal quotation marks omitted). Put differently, the information an agency must (and must not) consider depends on "the scope of the duty imposed

on the agency by Congress in the relevant substantive statute." *Detroit Int'l Bridge Co. v. Gov't of Canada*, 192 F. Supp. 3d 54, 78 (D.D.C. 2016), *aff'd*, 883 F.3d 895 (D.C. Cir. 2018).

As explained, none of the substantive statutes at issue mention state participation in federal immigration enforcement or in any other way support the imposition of funding condition for that purpose, and so they cannot be read, as a matter of statutory interpretation, to authorize FEMA to require such participation as a condition of obtaining federal funds. *Supra* pp. 22–27. But FEMA's reasoning also fails on its own terms. The Immigration Condition Memos rest on the premise that FEMA's decision to impose immigration-enforcement conditions on these programs is somehow broadly consistent with Congress's judgment in authorizing the programs, in that the programs all have some a "nexus" to "immigration activities, law enforcement, or national security, including preventing or responding to acts of terrorism and extremism." ECF 48-6 at 2. Again, that is not the standard for determining whether Congress has *authorized* an agency to impose a condition on the use of federal funds: the agency must identify a clear statement from Congress authorizing it to do so. *Supra* pp. 22–23.

Regardless, FEMA cites no evidence for its casual assumption that there is a link between terrorism and a State's decision whether to participate in federal immigration enforcement. Indeed, Congress has never treated "terrorism" and "immigration" as cognates in this way. The mission statement Congress gave DHS after the September 11 attacks does not even specifically mention DHS's immigration-enforcement role. *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 101, 116 Stat. 2135, 2142 (codified as amended at 6 U.S.C. § 111). Clauses (A) through (C) address terrorism. 6 U.S.C. § 111(b)(A)–(C). Clause (D) directs DHS to "act[] as a focal point regarding natural and manmade crises and emergency planning," *id.* § 111(b)(D)—that is, the FEMA operations defendants are now holding hostage to the Immigration Conditions. The only

reference in the mission statement to international borders comes in Clause (H), which directs DHS to "monitor connections between illegal drug trafficking and terrorism." 6 U.S.C. § 111(b)(H). In specifically naming illegal drug trafficking's connection to terrorism, Congress signaled that civil immigration enforcement more generally *lacked* that connection. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general."). So Congress has not forged the "nexus" that DHS posits between immigration, law enforcement, and national security in the Immigration Conditions Memos. *Contra* ECF 48-6 at 2.

Neither do the Immigration Conditions Memos provide any meaningful evidence of such a nexus. Mere "conclusory statements do not reasonably explain agency action." *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 46 (D.R.I. 2025) (citing *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014)). Yet conclusory statements are all that FEMA offers to support its position. It repeatedly claims, in a concluding paragraph to each section of the September 18 memo, that the programs at issue will be less effective in "protect[ing] against threats to national security" if recipients "refuse to coordinate or share information with [DHS] regarding law enforcement matters, including immigration enforcement." *E.g.*, ECF 48-7 at 4. But FEMA provides no actual evidence to support this proposition—no concrete example of how more state enforcement of immigration law would enhance "[a]ll-hazards emergency preparedness." *Id.* at 2. FEMA's attempt to concoct an example for the BioWatch and Securing the Cities programs epitomizes this failure: These programs, FEMA says, "protect[] communities from the risk that an individual immigrating illegally would seek to import or use biological agents or nuclear materials for the purpose of terrorism." ECF 48-7 at 2, 12. But FEMA offers no evidence whatsoever that "individual[s] immigrating illegally" are prone to commit bioterrorist or radiological attacks. While the APA

requires analysis of the "relevant data," *State Farm*, 463 U.S. at 30, the Immigration Conditions Memos reveal FEMA conducted no such analysis here. Courts do not "uphold agency action based on speculation," *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013), and speculation is all that FEMA provides.

**2. FEMA failed to consider the States' reliance interests in billions of dollars in federal funding.**

DHS and FEMA also "failed to address whether there was legitimate reliance on" the existing funding landscape—which there was. *Regents*, 591 U.S. at 30 (quotation marks omitted). As the Supreme Court has explained, "[w]hen an agency changes course," it is "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Id.* at 30, 33. To "ignore" the "serious reliance interests" that "longstanding policies may have engendered" is arbitrary and capricious. *Id.* at 30 (quotation marks omitted). The Court held last year's Immigration Conditions unlawful because, among other reasons, "DHS did not meaningfully evaluate the [S]tates' reliance interests, even though the record shows that [S]tates have structured their budgets and emergency preparedness planning for decades around consistent federal support." *FEMA*, 801 F. Supp. 3d at 94. DHS and FEMA have repeated the same failure again this year. The Immigration Conditions Memos do not even *mention* the States' reliance interests. *See* ECF 48-6, 48-7.

Once again, the States rely heavily on the annual receipt of funds that the Immigration Conditions endanger. Plaintiff States rely on over a billion dollars in federal funding annually to support preparedness programs—programs that help prepare for the possibility of catastrophic events that range from natural disasters to acts of extremist violence. EMPG funds local emergency managers across the country, who are the frontline responders for coordinating responses to major emergencies like floods, storms, and earthquakes. Ex. 59 (Rye Decl.) ¶¶ 32–33; Ex. 49 (Sweeney

Decl.), ¶ 61; Ex. 75 (Ezelle Decl.), ¶ 45. HSGP is focused on preventing and responding to acts of extremist violence, including staffing the law enforcement agencies that conduct investigations to foil potential terrorist plots. Ex. 30 (Osborn Decl.), ¶ 30; Ex. 34 (Pace Decl.), ¶ 32; Ex. 47 (Stanton Decl.), ¶ 56. The Port Security Grant Program protects the Nation's critical port infrastructure against terrorist attacks and other emergencies. Ex. 56 (Hengemuhle Decl.), ¶ 36; Ex. 39 (Maulawin Decl.), ¶ 21. The States and their localities have structured their budgets and operations based on the reasonable expectation of continued funding via annual preparedness grants. Michigan's emergency-management agency, for instance, avers that even the *threat* of losing these funds "destabilizes every aspect of [the agency's] operations." Ex. 49 (Sweeney Decl.), ¶ 112. States cannot make up a loss of preparedness grant funding from other sources. Ex. 74 (Chapman-See Decl.), ¶ 9; Ex. 42 (Hess Decl.), ¶ 51; Ex. 66 (Padfield Decl.), ¶ 69.

Plaintiff States' "interest in planning future programs" is an "important" one, *Bowen v. Massachusetts*, 487 U.S. 879, 906–07 (1988), but DHS did not heed it. In imposing the Immigration Conditions, DHS not only failed to "weigh" these longstanding reliance interests "against competing policy concerns"; it "ignore[d]" them altogether. *Regents*, 591 U.S. at 30, 33 (internal quotation marks omitted). Because the Conditions were adopted "with no regard for the [States'] reliance interests," and DHS "did not acknowledge—much less justify—its adoption" of the new requirements, they must be vacated "for want of reasoned decision making." *Int'l Org. of Masters, Mates & Pilots v. NLRB*, 61 F.4th 169, 179–80 (D.C. Cir. 2023).

**3. FEMA failed to consider the Conditions' effects on public safety.**

Another "important aspect of the problem" that DHS "entirely failed to consider" is the adverse impact adhering to the Immigration Conditions would have on States' enforcement of criminal law and efforts to maintain public safety. *State Farm*, 463 U.S. at 43.

Under the Conditions, States "must agree that they will comply" with requirements "related to coordination and cooperation with [DHS] and immigration officials." Ex. 2 at 5. But many Plaintiff States limit their participation in immigration enforcement to preserve their resources for core public-safety missions and to "build trust between their law enforcement agencies and immigrant communities and ensure that noncitizens feel comfortable reporting crimes, cooperating with investigators, and serving as witnesses." *Providence*, 954 F.3d at 30. Senior law-enforcement officials in Plaintiff States testify that they can do their work most effectively when community members trust that they are focused on solving crimes, not enforcing federal immigration law. *See* Ex. 57 (Battavio Decl.) (Chief of Police of Bridgeton, New Jersey); Ex. 24 (Lew Decl.) (Chief of Police of San Francsico, California); Ex. 69 (Perez Decl.) (Chief of Police of Providence, Rhode Island); Ex. 23 (Rosen Decl.) (District Attorney of Santa Clara County, California). Indeed, Congress recognized the legitimacy of this interest in creating the U-visa program for immigrant crime victims. *See* Pub. L. No. 106-386, § 1513(a)(2), 114 Stat. 1464, 1533–34 (visas for crime victims serve to "strengthen the ability of law enforcement agencies to detect, investigate, and prosecute" crimes in part by "facilitat[ing] the reporting of crimes to law enforcement"). Even in Plaintiff States without categorical policies, DHS's requirement that state agencies devote scarce resources to federal civil immigration enforcement prevents States from exercising discretion on how best to allocate resources to protect the public. The Immigration Conditions therefore run up against the States' "strong sovereign interest in ensuring public safety and criminal justice." *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 651 (2022).

To be sure, defendants have made clear that they do not agree with Plaintiff States' judgments about how to promote public safety or respect Plaintiff States' sovereign autonomy in this area. *See supra* p. 6. The Court does not need to decide here who has the better of that dispute.

But DHS was required to at least consider the States' interest in maintaining public safety and "weigh" that interest "against competing policy concerns." *Regents*, 591 U.S. at 33. This was another failure of reasoning that the Court identified last year, *FEMA*, 801 F. Supp. 3d at 94 ("failure to consider public safety"), but once again the Immigration Conditions Memos do not even mention the topic. *See* ECF 48-6, 48-7. That failure is arbitrary and capricious.

## II. The Election Conditions Are Unlawful.

FEMA's Election Conditions—imposed on the Homeland Security Grant Program, the single largest annual grant program to the States—also exceed the agency's authority under the statute creating that program, run contrary to other statutes that actually govern the conduct of federal elections, and are arbitrary and capricious to boot. *See* 5 U.S.C. § 706(2).

### A. The Election Conditions exceed FEMA's statutory authority.

FEMA lacks the statutory authority to impose requirements dictating the operation of state election administration, and thus, acted "in excess of statutory . . . authority," 5 U.S.C. § 706(2)(C), in promulgating the Election Conditions.

FEMA's decision to impose the Election Conditions on HSGP funding exceeds its authority under the HSGP authorizing statute. As discussed, the HSGP is a formula grant program, and in its authorizing statute, Congress established a minimum amount of funds to which all States are entitled and directed FEMA to establish an objective, risk-based allocation of the remaining funds to the States annually. *See supra* pp. 5, 25. By "structur[ing] [HSGP] as a formula grant program," Congress foreclosed FEMA from imposing its own extraneous conditions and required FEMA "to distribute funding pursuant to [the] statutory formula." *Providence*, 954 F.3d at 27. Therefore, as another court has already held as to these Elections Conditions, "[t]he [HSGP] statute does *not* authorize FEMA to withhold counterterrorism grants until states and high-risk urban areas achieve policy objectives on their own dime." *Nashville*, 2026 WL 2905123, at *6.

Moreover, the statute establishes a comprehensive list of factors that "the [FEMA] Administrator *shall* consider" "[i]n allocating [HSGP] funds among States and high-risk urban areas." 6 U.S.C. § 608(a) (emphasis added). The two overall factors are (1) each State's or urban area's "relative threat, vulnerability, and consequences *from acts of terrorism*" and (2) "the anticipated effectiveness of the proposed use of the grant." *Id.* (emphasis added). The statute also enumerates multiple subsidiary "consideration[s]" for assessing terrorism risk—for example, population, population density, any history of threats, and the needs of neighboring jurisdictions. *Id.* § 608(a)(1). The listed factors are exclusive: "The allocation of grants authorized under [the HSGP statute] shall be governed by the terms of this part and not by any other provision of law." *Id.* § 603(c)(2). None of the HSGP factors, unsurprisingly, include the minutiae of state election administration, such as whether a State undertakes a 1% or 5% manual audit of election results. It is thus apparent that "Congress did not intend for the program to drive routine election administration decisions." *Nashville*, 2026 WL 2905123, at *7.

Nor do any other federal statutes authorize the Election Conditions. As described, *supra* pp. 8–9, the NVRA specifically addresses voter citizenship through attestation under penalty of perjury, rejecting further documentation or other requirements. 52 U.S.C. § 20508(b). And HAVA's requirements regarding voting systems are strictly "minimums" that protect States' decisions on "methods of complying." *Id.* §§ 21084–21085. No federal statute requires any type of audit or reconciliation procedure either. In fact, Congress has recently and repeatedly rejected legislation attempting to dictate state administration of elections, including documentary proof of citizenship requirements akin to the Voter Verification Condition. *See, e.g.*, S. 5271, 119th Cong. (2026); S. 4155, 119th Cong. (2026); SAVE America Act, H.R. 7296, 119th Cong. (2026); *see also West*

*Virginia v. EPA*, 597 U.S. 697, 724 (2022) (rejecting agency's adoption of "a regulatory program that Congress had conspicuously and repeatedly declined to enact itself").

Indeed, the Election Conditions affirmatively violate other federal statutes that regulate the conduct of federal elections, which is another reason that they are contrary to law. *See FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) (contrary to law "means, of course, *any* law, and not merely those laws that the agency itself is charged with administering"). For one, the Hand-Marking Condition's requirement that States submit a plan to use only hand-marked paper ballots conflicts with HAVA's provisions, which set the minimum requirements for voting systems, permit ballots that are not marked by hand, 52 U.S.C. § 21081(a)(1)(A), and command that "specific choices on the methods" of compliance "shall be left to the discretion of the State," *id.*, § 21085. And the Voter Verification Condition's required removal of certain individuals from voter rolls within 120 days of the award conflicts with the NVRA's "quiet period," which prohibits the systematic removal of voters from the rolls during the 90 days prior to a federal election,[11] subject to limited statutory exceptions, *id.* § 20507(c)(2).

**B. The Election Conditions are arbitrary and capricious.**

The Election Conditions are also arbitrary and capricious in violation of the APA. Even after filing its last-minute administrative record, FEMA has offered no contemporaneous explanation of why it imposed the Election Conditions, which alone requires vacatur. In failing to offer any explanation, FEMA also failed to consider numerous important aspects of the problem before it.

---

[11] The Plaintiff States' HSGP awards issued around September 23, 2026, *e.g.*, Ex. 4, which is within 90 days of the federal elections being held on November 3, 2026.

**1. FEMA has offered no explanation of the Election Conditions but instead has relied on factors that Congress did not intend it to consider.**

The Court must consider the explanation (or lack thereof) that FEMA gave when it again imposed the Conditions, not any statements made later in litigation. *Regents*, 591 U.S. at 20 ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'") (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). An agency must offer "a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *California v. Dep't of Ed.*, 132 F.4th 92, 98 (1st Cir. 2025) (quotation omitted); *see also Ohio v. EPA*, 603 U.S. 279, 294 (2024) (agency action subject to "reversal" if not "reasonably explained" alongside the final agency action) (alteration omitted).

This principle requires vacatur all on its own because defendants have given *no* substantive reasons for why they imposed the Elections Conditions on the Homeland Security Grant Program. The sole document in the administrative record that purportedly provides an explanation is a May 11, 2026 memorandum that recommended imposing them, ECF 48-4, about two months before they were promulgated in the July 9 HSGP NOFO, Ex. 1. The entire explanation provided in the memorandum is as follows: "**Recommendation:** … Implement a 20% holdback from drawdown for [HSGP] awards (inclusive of State Homeland Security Program, Urban Area Security Initiative, and Operation Stonegarden funds) until each state and high-risk urban area demonstrates proof of compliance with the Fiscal Year 2026 Election Security National Priority Area requirements." ECF 48-4 at 2. This brief passage summarizes FEMA's decision, but it does not even attempt to "reasonably explain[]" it. *Ohio v. EPA*, 603 U.S. at 294.

That failure led to another: It is arbitrary and capricious for an agency to neither "look to" nor "discuss" statutory "requirements." *Little Sisters of the Poor Saints Peter & Paul Home v.*

*Pennsylvania*, 591 U.S. 657, 682 (2020). DHS and FEMA must show that they made "reasoned assessments about . . . the scope of their legal authority." *New York v. Trump*, 171 F.4th 1, 21 (1st Cir. 2026). Yet FEMA here failed to consider *any* statutory requirements in promulgating the Election Conditions. Instead, FEMA "relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. As explained, *supra* pp. 5, 25, 35, in establishing HSGP, Congress required funding to be allocated based on a statutory risk formula based on terrorism threats, 6 U.S.C § 608, and did not authorize the imposition of comprehensive election-system reforms. Indeed, the HSGP statute enumerates the kinds of threats FEMA is permitted to consider in allocating HSGP funding, 6 U.S.C § 608(a)(1), and FEMA has made no effort to explain why election-related threats fall within the purview of the statute. The Conditions—which pertain to voting machine requirements; election audits and reconciliation; citizenship verification; and poll-worker qualifications—bear no coherent relationship to the factors or threats outlined in the statute. Nor can authority to impose election-policy conditions be implied from permitted uses of the funding: Congress identified permitted uses for HSGP, none of which mentions election integrity or accuracy. *See* 6 U.S.C. § 609(a).[12] FEMA thus acted arbitrarily and capriciously in promulgating the conditions.

**2. FEMA failed to consider several important aspects of the problem, including Plaintiff States' extensive reliance interests.**

FEMA also "entirely failed to consider" several "important aspect[s] of the problem." *State Farm*, 463 U.S. at 43.

[12] DHS's 2017 designation of election systems as "critical infrastructure," which is cited in the Fiscal Year 2026 HSGP NOFO, cannot justify the Election Conditions. Although the authorizing statute requires FEMA to consider the relative vulnerability of each recipient's critical infrastructure, 6 U.S.C. § 608(a)(1)(D), the Conditions bear no relationship to the types of threats that FEMA may consider, such as biological, nuclear, or suicide bombers, *see id.* § 608(b).

*First*, FEMA "failed to address whether there was 'legitimate reliance' on" the existing federal framework governing voting systems. *See Regents*, 591 U.S. at 30. Plaintiff States have exercised their constitutional obligations to adopt myriad statutes and policies governing all facets of elections administration, including: the verification of voter qualifications and citizenship; voter roll maintenance, including removal of ineligible voters; tabulation of votes, certification, and audit of election results; and voting machine standards. Indeed, many of the systems impacted by the Conditions have been in place for years, if not decades. *See, e.g.*, Ex. 76 (Holmes Decl.), ¶ 22 (current audit procedures in Washington in place since 2005); Ex. 26 (Lean Decl.), ¶ 16 (California has permitted legal permanent residents to work as poll workers since 2013); Ex. 52 (Linnell Decl.), ¶ 9 (current audit procedures in Minnesota in place since 2006); Ex. 35 (Marks Decl.), ¶ 25 (current audit procedures in Pennsylvania in place since 1980); Ex. 21 (Marra Decl.), ¶ 15 (Arizona has used current ballot-marking devices for more than a decade); Ex. 25 (Robinson Decl.), ¶¶ 20–21, 25 (California's audit procedures have been in place for over 60 years); Ex. 62 (Stavisky Decl.), ¶ 44 (current audit procedures in New York in place since 2005). Yet in imposing the Election Conditions, FEMA disregarded these comprehensive statutory frameworks by imposing its own one-size-fit-all set of requirements for each State's election systems. Because FEMA imposed the Election Conditions "with no regard for the [States'] reliance interests" and did not consider the Conditions' "sweeping impact," they must be vacated "for want of reasoned decision making." *Int'l Org. of Masters*, 61 F.4th at 180.

*Second*, Defendants failed to consider how these Election Conditions would conflict with the Plaintiff States' laws enacted pursuant to their constitutional authority to administer elections. For example, compliance with the SAVE system requirement would violate several of Plaintiff States' laws prohibiting the disclosure of personally identifying information contained in voter

rolls. *See, e.g.*, Cal. Elections Code § 2194(b)(1); Va. Code § 24.2-404(E) (prohibiting providing entire voter list to DHS to run against the SAVE system); Wash. Rev. Code § 29A.84.150; Md. Code, Gen. Provisions § 4-330; Code of Md. Reg. §§ 33.04.01.02(6),(8); 33.04.01.07-1; Nev. Rev. Stat. § 293.558 (1)–(2)(a)(2), (4); Minn. Stat. § 5B.05; 5B.07, subd. 2; 5B.11. As another example, the Audit Condition violates Arizona law, which requires a hand count of ballots from 2% of voting locations and 1% of early ballots, but prohibits exceeding these percentages. A.R.S. § 16-602(B), (F); *see Ariz. All. for Retired Americans, Inc. v. Crosby*, 537 P.3d 818, 823 (Ariz. Ct. App. 2023). In issuing the Election Conditions, FEMA did not address or even acknowledge that its Conditions conflict with state laws, and thus ignored an important aspect of the problem.

*Third*, FEMA failed to consider that the state emergency agencies or local jurisdictions receiving HSGP funding cannot comply with the Election Conditions because they do not control the relevant election laws or systems, and in many States the entities that exercise such authority do not receive HSGP funding. *See, e.g.*, Ex. 58 (Barber Decl.), ¶ 9; Ex 71 (Hanzas Decl.), ¶ 7; Ex. 76 (Holmes Decl.), ¶ 7; Ex. 73 (Koski Decl.), ¶ 9; Ex. 52 (Linnell Decl.), ¶ 7; Ex. 35 (Marks Decl.), ¶ 7; Ex. 36 (Nago Decl.), ¶ 7; Ex. 28 (Rudy Decl.), ¶ 10; Ex. 62 (Stavisky Decl.), ¶ 12; Ex. 53 (Wlaschin Decl.), ¶ 7; *see All. for Cannabis Therapeutics v. DEA*, 930 F.2d 936, 940 (D.C. Cir. 1991) ("Impossible requirements imposed by an agency are perforce unreasonable."). Indeed, the Election Conditions refer multiple times to mandatory action by "the State's chief election official," conceding that it is that entity or its equivalent—and not the state emergency agencies party to the HSGP award agreements—that controls the relevant election systems. *See* Ex. 1 at 16.

*Fourth*, FEMA failed to consider the staggering potential cost of the Election Conditions. Plaintiff States have collectively spent billions of dollars on voting technology and election infrastructure. *See, e.g.*, Ex. 35 (Marks Decl.), ¶ 16 (Pennsylvania counties have invested

approximately $38 million on voting systems "all of which would go to waste if they were required to implemented the required transition plan"); Ex. 62 (Stavisky Decl.), ¶ 34 (New York has invested approximately $47 million to purchase current ExpressVote XL BMD voting system); Ex. 53 (Wlaschin Decl.), ¶ 16 (Nevada has invested approximately $20 million on voting systems that would be wasted). The Conditions would require Plaintiff States to abandon many of those investments and to spend hundreds of millions of dollars to implement new systems without providing any funding to cover these costs. For example, California has invested $500 million in voting machines that would need to be replaced to comply with the condition requiring a plan to transition away entirely from tabulation via barcode or QR code. Ex. 25 (Robinson Decl.), ¶ 15. Plaintiff States also estimate that the 5% manual audit condition will cost up to several million per State just for the upcoming general election. *See, e.g.*, Ex. 25 (Robinson Decl.), ¶ 23 (millions of dollars); Ex. 70 (Rock Decl.), ¶ 17 (would require hiring upwards of 50 additional personnel); Ex. 28 (Rudy Decl.), ¶ 15 (at least $2 million, including "exponential increase in . . . staff hours" and "as much as a 5000% increase in audit workload"). Nearly every condition will require new or revised public education materials, policy manuals, and training programs, all of which will cost millions of dollars across the Plaintiff States. *See, e.g.*, Ex. 46 (Berry Decl.), ¶¶ 39-40 (costs to implement Hand-Marking Condition would include approximately $1 million for voter education and $2 million to retrain election judges); Ex. 76 (Holmes Decl.), ¶ 48 (estimating implementation of Election Conditions cost an estimated $550,000); Ex. 28 (Rudy Decl.) (estimating cost of all conditions to be at least $3.25 million); Ex. 62 (Stavisky Decl.), ¶¶ 33, 56, 64 (at least $3 million for implementation of the SAVE verification condition alone); Ex. 53 (Wlaschin Decl.), ¶ 32 (implementation of Voter Verification Condition would cost approximately $2 million and require "hundreds of hours of staff time").

*Fifth*, FEMA failed to consider that the Conditions would undermine the objectives they purport to address. The elimination of tabulation via barcode or QR code, and of ballot-marking devices more generally, will reduce the efficiency and accuracy of elections and will pose obstacles for voters with physical, cognitive, or language barriers. *See, e.g.*, Ex. 33 (Albence Decl.), ¶¶ 17–19; Ex. 46 (Berry Decl.), ¶¶ 45–46; Ex. 76 (Holmes Decl.), ¶ 19; Ex. 62 (Stavisky Decl.), ¶¶ 37–38.[13] The audit and reconciliation conditions will require immense time and resources and are likely to delay certification decisions. *See, e.g.*, Ex. 76 (Holmes Decl.), ¶ 27 (discussing how under Washington law the manual audit would be "practically impossible" to complete before the certification deadline); Ex. 52 (Linnell Decl.), ¶ 19 (reconciliation obligation would require counties to "hire temporary staff en masse" and cost over $1 million); Ex. 21 (Marra Decl.), ¶ 31 (condition could "significantly delay" certification where failure to meet statutory certification deadlines is a felony); *see also* Ex. 46 (Berry Decl.), ¶ 57; Ex. 62 (Stavisky Decl.), ¶¶ 49–50. The well-documented error rates of the modified SAVE system are likely to disenfranchise qualified voters. *See, e.g.*, Ex. 76 (Holmes Decl.), ¶ 34 (discussing how errors in SAVE can lead to disenfranchisement); Ex. 62 (Stavisky Decl.), ¶ 65 (discussing how Utah's use of SAVE resulted in a non-citizen false positive rate of 99.4%). And the citizenship requirement for poll and election workers will likely cause staffing shortages and a reduction in bilingual poll workers who make voting accessible to those with limited English proficiency. *See, e.g.*, Ex. 46 (Berry Decl.), ¶ 71 (noting that polling places and election offices are "frequently understaffed," and that condition would "exacerbate these shortages"); Ex. 76 (Holmes Decl.), ¶ 37; Ex. 26 (Lean Decl.), ¶¶ 17–18

---

[13] Indeed, the condition contradicts the Voluntary Voter Systems Guidelines Version 2.0, which permits the use of barcodes or QR codes, and which the current administration has sought to impose through Executive Order. *See* 2025 Elections EO § 4(d); U.S. Elections Assistance Commission, *Voluntary Voting Systems Guidelines VVSG 2.0*, at 33, 118 (Feb. 10, 2021), *available at*: https://tinyurl.com/4vhbxptr.

(noting "critical role" that bilingual, noncitizen poll workers play in ensuring voter accessibility); Ex. 28 (Rudy Decl.), ¶ 26 (noting staffing shortages and "chilling effect on potential election workers" even if they are already citizens); Ex. 53 (Wlaschin Decl.), ¶ 39. More generally, the Conditions will divert scarce state resources away from Plaintiff States' critical preparations for the upcoming general election. *See, e.g.*, Ex. 46 (Berry Decl.), ¶ 87; Ex. 50 (Brater Decl.), ¶ 55; Ex. 76 (Holmes Decl.), ¶ 45; Ex. 26 (Lean Decl.), ¶ 24; Ex. 28 (Rudy Decl.), ¶ 33; Ex. 53 (Wlaschin Decl.), ¶¶ 44-47. Finally, these far-reaching and abrupt changes, issued just before a major election, will inevitably undermine public trust in Plaintiff States' elections. *See, e.g.*, Ex. 58 (Barber Decl.), ¶ 49; Ex. 65 (Dawson Decl.), ¶ 39; Ex. 44 (Flynn Decl.), ¶ 36; Ex. 31 (Holman Evans Decl.), ¶ 31; Ex. 76 (Holmes Decl.), ¶ 47; Ex. 52 (Linnell Decl.), ¶ 37; Ex. 60 (Vigil Decl.), ¶ 35. The agency's failure to recognize any one of these problems—let alone all of them—renders the Election Conditions arbitrary and capricious.

## III. The Termination Conditions Are Unlawful.

The Termination Conditions—which would effectively allow FEMA to terminate critical disaster and preparedness grants at will—are likewise contrary to law and arbitrary and capricious.

### A. The Termination Conditions are contrary to law.

The Termination Conditions are contrary to law for two reasons: Congress has not authorized at-will termination of the grants at issue, and DHS's own regulations foreclose it.

#### 1. The Termination Conditions are not authorized by statute.

To begin, none of the grantmaking statutes at issue gives DHS unfettered authority to terminate an already-issued grant award based on post-award policy choices, much less for mere "convenience." To the contrary, many of the relevant grantmaking statutes—including for EMPG, HSGP, and NSGP—mandate funding to the States based on defined formulas that consider, for example, each State's population, security risks, and other objective indicia. *See, e.g.*, 6 U.S.C.

§ 762(b), (d) (for EMPG, FEMA "*shall* apportion the amounts" in accordance with statutory formula (emphasis added)); *id.* §§ 604(d)(1), 605(e), 608(a) (for HSGP, FEMA "*shall* distribute" grant funds based on factors that "*shall*" be considered (emphases added)); *id.* § 609a(a) (for NSGP, FEMA "*shall* make grants to eligible nonprofit organizations . . . for target hardening and other security enhancements to protect against terror attacks or other threats" (emphasis added)). Accordingly, Fiscal Year 2026 NOFOs for these funding programs confirmed each State's entitlement to a specific allocation of funds based on the applicable statutory formula. *See, e.g.*, Ex. 1 at 69–73 (HSGP); Ex. 9 at 70 (EMPG); Ex. 10 at 67–69 (NSGP). Nowhere did Congress authorize DHS to claw back allocated funds based on post-award whims unrelated to the statutory formulas. *See City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) ("'[F]ormula' grants . . . are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula.").

Nor does DHS have statutory authority to terminate so-called "discretionary" grants based on post-award policy changes or for "convenience." Ex. 3 at 4, § (III)(B)(2)(a)(i)(4). As current regulations make clear, the "discretion" that agencies have over these grants relates to the agencies' ability to "exercise judgment" in "select[ing] the recipient or the amount of Federal funding awarded." 2 C.F.R. § 200.1. But DHS's discretion to decide who should receive a grant and how much does not confer authority to later terminate that grant on a whim. Indeed, in awarding discretionary grants, agencies "must design and execute a merit review process of applications . . . to select recipients most likely to be successful in delivering results based on the program objectives" defined *before* awards are made. *Id.* § 200.205. That "specific statutory authority," *id.* § 200.1, to select the recipient and amount does not constitute absolute discretion for the agency to then terminate for any reason or no reason at all. *See, e.g.*, *NAACP v. United States*, No. 25-

00965, 2026 WL 1265450, at *32 (D. Md. May 8, 2026) ("[T]he Secretary's broad discretion to determine recipients of grant award funding has no bearing on whether Defendants' termination of such grants (that have already been awarded) is committed to agency discretion . . . ."). To the contrary, where Congress appropriates funds for agencies to make grant awards, whether "discretionary" or otherwise, without authorizing agencies to later withhold those funds for "convenience," agencies lack authority to confer that power on themselves unilaterally. *See La. Pub. Serv. Comm'n*, 476 U.S. at 374 ("An agency may not confer power upon itself.").

**2. The Termination Conditions are contrary to DHS's regulations.**

The Termination Conditions are also contrary to law because DHS's own regulations do not permit termination based on post-award changes to agency goals or priorities or for convenience. It is a bedrock "principle of administrative law that agencies must comply with their own regulations." *Manguriu v. Lynch*, 794 F.3d 119, 122 (1st Cir. 2015); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004) ("law," under the APA, "includes, of course, agency regulation"). Agency action inconsistent with regulation is therefore "not in accord with law" under 5 U.S.C. § 706(2)(A)) and "must be held to be unlawful." *Robert E. Derecktor of R.I., Inc. v. Goldschmidt*, 506 F. Supp. 1059, 1063 (D.R.I. 1980); *see also Bradley v. Weinberger*, 483 F.2d 410, 414 n.2 (1st Cir. 1973) ("If an agency action violates a regulation, it is 'not in accordance with law[.]'").[14]

DHS appears to take the position that the Termination Conditions are "consistent with 2 C.F.R. § 200.340," which the agency has incorporated into its own regulations at 2 C.F.R. § 3002.10. *See* Ex. 3 at 4, § (III)(B)(2)(a)(i); *see also* Ex. 2 at 16 (citing § 200.340 as authority for

[14] An agency action that violates a regulation is also arbitrary and capricious. *See, e.g.*, *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1018 (D.C. Cir. 2016) ("[W]e will not hesitate to overturn agency action as arbitrary and capricious if the agency fails to 'comply with its own regulations.'").

the standard Termination Condition). But § 200.340 permits unilateral termination by the agency only if a grant recipient does not comply with the terms and conditions of the award, *id.* § 200.340(a)(1), or with the program goals and agency priorities that governed the award when it was made, *id.* § 200.340(a)(4). Nothing in § 200.340 authorizes termination authority based on *post hoc* changes in an agency's policy views. For example, the regulation does not empower an agency to terminate a federal award simply because the agency has announced "updated"—that is, new—"program goals or agency priorities" or has issued "successor policies or documents" *after* recipients have accepted their awards and begun performance. Ex. 3 at 4, § (III)(B)(2)(a)(i)(3)(d)–(e). Nor does the regulation authorize an agency to terminate so-called "discretionary" grant awards "[f]or convenience" whenever the agency so chooses, *id.* § (III)(B)(2)(a)(i)(4); indeed, the regulation draws no distinction between "discretionary" and other awards for purposes of termination. OMB itself explained during its 2020 rulemaking proposing the relevant provisions in § 200.340 that they do *not* empower agencies "to terminate grants arbitrarily" and "without sufficient cause." 85 Fed. Reg. at 49507. OMB emphasized that these provisions are merely intended to allow termination in limited circumstances, such as where "additional evidence reveals that a specific award objective is ineffective at achieving program goals, *id.*, or where "additional evidence may cause the Federal awarding agency to significantly question the feasibility of the intended objective of the award," *id.* at 49507–08.

Courts have likewise concluded that the regulation carefully cabins an agency's termination authority. Indeed, as noted above, the district court in *New Jersey v. OMB*—a case brought by many of the Plaintiff States here against OMB and various federal agencies (including both DHS and FEMA)— held just that, explaining that a "review of the plain language, regulatory scheme, [and] regulatory history" shows that § 200.340 "does not permit agencies to terminate grants based

on program goals and agency priorities identified after grants were awarded." 837 F. Supp. 3d at 276.[15] The court emphasized that a contrary reading would be *un*natural, render "the other grounds for termination superfluous," and run counter to the overall regulatory scheme, which "prioritize[s] ensuring that grantees are on notice, before applying, as to what the program goals and agency priorities are for any particular award." *Id.* at 277-80. Other courts agree. *See, e.g.*, *California v. U.S. Dep't of Educ.*, __ F. Supp. 3d __, 2026 WL 2754968, at *30–31 (D. Mass. Sept. 17, 2026) ("[T]he 'plain language, regulatory scheme, regulatory history, [and] the Spending Clause of the U.S. Constitution' do not authorize agencies to 'terminate grants based on program goals and agency priorities identified after grants were awarded.'").

If there were any doubt that DHS's existing regulation does *not* authorize termination for convenience or *post hoc* policy changes, it is erased by recent proposed regulatory action. OMB and 41 other federal agencies (including DHS) issued a new proposed rule in May 2026 to amend § 200.340 to permit termination of awards based on *new* agency goals and priorities identified "at the time of the termination" as well as for-convenience termination, which Congress has expressly barred from taking effect. *Supra* pp. 11–12. The proposed rule confirms that DHS does not believe that current regulations grant such authority. And although an agency may "amend or repeal its own regulations," it is "not free to ignore or violate its regulations while they remain in effect." *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014).

---

[15] In *OMB*, Defendants even admitted that as to formula grants, § 200.340 "does not permit the withholding of congressionally appropriated funds on account of changed agency priorities," and "fully agree[d] that the government must comply with federal statutes and regulations in terminating grants." *Id.* at *10.

### B. The Termination Conditions are arbitrary and capricious.

Defendants' imposition of the Termination Conditions is also "arbitrary, capricious, [and] an abuse of discretion" for several reasons. *See* 5 U.S.C. § 706(2)(A).

*First*, as with the Immigration and Election Conditions, DHS has failed to offer any affirmative explanation—much less a compelling one—for adopting the Termination Conditions in both the 2026 DHS Standard Terms and the September 18 Directive. *See* Ex. 2 at 16–17; Ex. 3 at 4, § (III)(B)(2)(a). The APA's reason-giving requirement is heightened when an agency embarks on a shift in policy: it cannot "depart from a prior policy *sub silentio*" and "must show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Here, DHS has failed to proffer *any* reason, much less a good one, to begin subjecting States and localities to the Termination Conditions. The administrative record contains no reasoning for the termination clause found in the 2026 DHS Standard Terms. The entire reasoning for the September 18 Directive's even more aggressive termination clause is an unadorned citation to the grantmaking executive order in a May 11, 2026, memorandum. *See* ECF 48-3 at 5. "[C]onclusory statements" that "merely defer to" an executive order are not "reasoned analysis." *Rhode Island*, 781 F. Supp. 3d at 46.

*Second*, DHS "failed to consider an important aspect of the problem": whether specific grantmaking statutes authorize the Termination Conditions. *State Farm*, 463 U.S. at 43. DHS broadly imposed these conditions across a wide range of grant programs, first through its 2026 DHS Standard Terms and then as a blanket matter in the September 18 Directive—without regard for whether the individual statutes at issue authorized such conditions. By imposing identical Termination Conditions across a "spectrum" of funding without considering whether they are "appropriate for particular programs," Defendants failed to "demonstrate[]" any "tailoring" in violation of the APA. *FEMA*, 801 F. Supp. 3d at 93–94.

*Third*, DHS failed to consider another vitally "important aspect of the problem": the need for States and localities to have a consistent, reliable stream of federal funding to support critical homeland security and disaster preparedness tasks. States and localities depend on billions of dollars in annual FEMA funding to protect their residents from terrorist attacks, natural disasters, and other life-threatening emergencies. Once these funds are allocated and distributed, States use them for ongoing programs that require consistent support over time. Indeed, many of the programs supported by FEMA grants have been in place for years. For example, Rhode Island has long used HSGP funding to pay for specialized disaster response teams—the only personnel in Rhode Island with the expertise and training to respond to incidents such as a wilderness search and rescue, attacks involving a weapon of mass destruction or an explosive device, or a terrorist attack at a polling place. Ex. 68 (Guthlein Decl.), ¶ 23; *see also* Ex. 59 (Rye Decl.), ¶ 23 (similar uses in New Mexico). Nearly all jurisdictions use HSGP funds to operate their state and local fusion centers, which facilitate communication among public safety officials regarding threats of targeted violence. *See* Ex. 38 (Evans Decl.), ¶ 23 (Illinois Statewide Terrorism and Intelligence Center fills intelligence gaps "where local officials have no other immediate source of information"); *see also, e.g.*, Ex. 51 (Farole Decl.), ¶ 21 (Minnesota); Ex. 29 (Higgins Decl), ¶ 20 (Connecticut); Ex 63 (Ray Decl.), ¶ 25 (North Carolina); Ex. 32 (Schall Decl.), ¶ 21 (Delaware).

If funding can be terminated for reasons that are entirely unknown to the States at the time they accepted the funding—based on newly-identified political priorities or the shifting whims of administration officials—States and localities cannot not reliably plan to use their funds for these kinds of ongoing operations. And the potential elimination of such vital, life-saving services at the drop of a hat would pose significant national security and public safety risks. At best, States would have to maintain costly contingencies against the loss of funding that would likely lead to higher

project expenses, delayed implementation, and reduced program effectiveness. Ex. 68 (Guthlein Decl.), ¶¶ 82–83; Ex. 42 (Hess Decl.), ¶¶ 66–67; Ex. 47 (Stanton Decl.) ¶¶ 70–71.[16] Increased termination risk makes it more difficult to keep and retain well-trained and competent personnel for public safety tasks. Ex. 27 (Haney Decl.), ¶ 83; Ex. 64 (McMahon Dec.), ¶ 82; Ex. 45 (Strickland Decl.) ¶ 104. It frustrates States' ability to make long-term commitments to contractors, service providers, and other vendors, which may lead to higher prices or shorter contract terms. Ex. 72 (Opett Dec.), ¶ 83. All this would undermine the purpose for which Congress authorized FEMA's grant programs in the first place: to protect Americans from homeland security and safety threats. Yet there is no evidence that DHS considered these obviously "important aspects of the problem" in broadly applying the new Termination Conditions. This failure to consider how the Termination Conditions are "likely to only harm disaster relief and mitigation by fostering greater uncertainty in funding for such projects . . . is counter to the intent of Congress" and renders the conditions arbitrary and capricious. *Salem*, 2026 WL 2445474, at *12.

*Fourth*, DHS's failure to consider these impacts is arbitrary and capricious because the Termination Conditions are an unexplained departure from longstanding policy. Since 2021, DHS standard terms and conditions have either restated 2 C.F.R. § 200.340(a) verbatim, incorporated it by reference, or omitted a termination provision entirely.[17] The 2026 terms and conditions are thus an unprecedented break from prior practice. Such a shift in policy requires an agency to provide

[16] States cannot simply conjure tens of millions of dollars to replace suddenly-terminated federal funding. *E.g.*, Ex.74 (Chapman-See Decl.), ¶ 9. And even if they could, that would risk precluding them from accessing FEMA funding in the future: FEMA grants typically have non-supplanting provisions that bar States from using the money for activities that are already supported with state funds. *See* Ex. 2 at 18–19 (non-supplanting term in 2026 DHS Standard Terms); Ex. 55 (Hauck Decl.), ¶¶ 55, 70; Ex. 56 (Hengemuhle Decl.), ¶¶ 45, 55.

[17] Prior versions of the standard terms and conditions are available on DHS's website, *see* Ex. 18, and subject to judicial notice, *see Lussier v. Runyon*, 50 F.3d 1103, 1114 (1st Cir. 1995).

"a reasoned explanation for the change," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016), in which it must "assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns," and consider any "alternatives that are within the ambit of [its] existing" policy. *Regents*, 591 U.S. at 30, 33.

Here, there is no indication that DHS considered the States' longstanding reliance on steady and reliable FEMA funding streams when it decided to subject that funding to sudden and precipitous terminations at any time and for any reason—a hallmark of arbitrary and capricious agency action. *See, e.g.*, *Woonasquatucket River Watershed Council v. USDA*, 186 F.4th 25, 47 (1st Cir. 2026) ("OMB Defendants disregarded the reliance interests of the grant recipients and so likely acted in an arbitrary and capricious manner."); *Kentucky v. EPA*, 123 F.4th 447, 471 (6th Cir. 2024) (similar); *see also Salem*, 2026 WL 2445474, at *13 ("If DHS wishes to alter longstanding funding conditions, it may not ignore Salem's serious reliance interests."). Nor is there any indication that DHS considered alternatives that would account for these interests and align more closely with existing policy. For example, while DHS may wish to have the flexibility to identify new policy priorities for the use of homeland security funding, it did not consider allowing grant recipients to modify their projects in response to such shifts. This alternative would have been well in line with existing policy and regulation, which directs agencies to "implement specific conditions" before opting for termination. *See* 2 C.F.R. § 200.339; *see also Washington v. U.S. Dep't of Educ.*, 167 F.4th 1241, 1247 (9th Cir. 2026) (finding discontinuation notices arbitrary and capricious where "the Department [did not] give the grantees an opportunity to learn about or address the Department's unpublished change in policy affecting its grant continuation process").

*Finally*, the Termination Conditions are arbitrary and capricious because they subject grant recipients to the risk of terminations based on vague and unknown future conditions. Agency

actions cannot be based on "factors which Congress has not intended [the agency] to consider." *State Farm*, 463 U.S. at 43. But by asserting the right to terminate a grant for any reason at all, FEMA has baked into these statutory grant programs an indeterminate set of potential conditions—including grounds for termination that have nothing to do with the statute or the Congressional policies animating it. The Termination Conditions enable, for example, the President or senior political appointees to cut off funding purely as an act of political retaliation or based on unrelated policy disagreements. Moreover, the "vague and confusing" nature of an open-ended right to terminate "cause[s] significant adverse effects" by precluding recipients from understanding their obligations as a grantee. *R.I. Coalition Against Dom. Violence v. Bondi*, 794 F. Supp. 3d 58, 70–71 (D.R.I. 2025). Where, as here, "states are left to guess at what conduct satisfies the requirements under threat of losing billions in essential funding," the agency imposing the condition violates its obligations under the APA. *FEMA*, 801 F. Supp. 3d at 94.

## IV. All the Conditions Additionally Violate the Spending Clause.

Finally, all of the conditions at issue violate the Constitution's Spending Clause in several respects. They are unlawfully ambiguous, impose requirements that are not reasonably related to the purposes of the grants themselves, and unconstitutionally coerce the States. The Conditions are unconstitutional and should, in the final alternative, be set aside on that basis. 5 U.S.C. § 706(2)(B).

### A. The Conditions are unlawfully ambiguous.

To begin, the Conditions are unconstitutionally ambiguous because they do not provide the clear notice required to allow the States to make informed choices before accepting awards. Under the Spending Clause, any "condition on the grant of federal moneys" must be "unambiguous[]" and "clear," enabling "the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17; *see Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (funding conditions "must be set out 'unambiguously'" as

viewed "from the perspective of a state official who is engaged in the process of deciding whether the State should accept [the] funds and the obligations that go with those funds").

All the Conditions suffer from fatal ambiguities. Starting with the Immigration Conditions, the Benefits Condition requires States to certify that "[t]hey do not, and will not during the term of this award, operate any program that benefits illegal immigrants or incentivizes illegal immigration *by establishing or maintaining programs providing direct financial support or public benefits to illegal immigrants*." Ex. 2 at 6–7 (new 2026 language emphasized). As this Court has already held once, this prohibition "provides no meaningful standards and is hopelessly vague." *FEMA*, 801 F. Supp. 3d at 95. This year, FEMA added the italicized language, but the term remains unconstitutionally ambiguous. Plaintiff States' agencies cannot possibly identify all the many individuals who might receive an undefined "public benefit" from any of the many programs they administer, let alone understand what DHS believes might "incentivize[] illegal immigration." *See, e.g.*, Ex. 38 (Evans Decl.), ¶ 81; Ex. 37 (Paller Decl.), ¶ 11; Ex. 47 (Stanton Decl.), ¶ 63.

The Information Sharing and Compliance Conditions are likewise ambiguous. Each asks grantees to certify compliance with various federal statutes, Ex. 2 at 5–6, but the current administration has taken extreme positions about the interpretation of these statutes, many of which have been rejected by courts. For instance, the current administration has taken the position that 8 U.S.C. § 1373 prohibits States from limiting state and local officials' authority to share not only "information regarding the *citizenship or immigration status*, lawful or unlawful, of any individual" with the federal government, but also officials' authority to share *any* information about noncitizens. *See, e.g.*, *United States v. Cnty. of Washtenaw*, __ F. Supp. 3d __, 2026 WL 2453724, at *10 (E.D. Mich. Aug. 21, 2026) (describing the government's "argument . . . that 'immigration status' is a far more capacious term than it reads at face value"). That interpretation

has been repeatedly rejected by courts, *see id.* (collecting cases), but Plaintiff States do not know whether defendants are asking them to certify compliance with that understanding of this provision or not, *see, e.g.*, *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 958 (N.D. Cal. 2018) (finding similar condition unconstitutional where "DOJ's evolving interpretations of the [§ 1373] certification condition further demonstrate ambiguities that prevent applicants from deciding whether to accept the funds cognizant of the consequences of their participation" (cleaned up)), *aff'd in part, vacated in part on other grounds*, 965 F.3d 753 (9th Cir. 2020). Similarly, although the Compliance Condition asks States to certify that they do not violate 8 U.S.C. § 1324 and other "laws related to immigration," it neither identifies what laws Plaintiff States would be obligated to certify compliance with nor states whether DHS is requiring Plaintiff States to certify compliance with a faulty interpretation of § 1324 under which their laws somehow have the effect of violating that statute.[18]

The newest Immigration Condition, the Fusion Center Condition, purports to require that state fusion centers "provide meaningful intelligence support to their closest Homeland Security Task Force." Ex. 5 at 1. States and localities are expected to report on the "number of personnel assigned to support" the Task Force. *Id.* It is left unclear what "meaningful" and "support" might mean, even as FEMA threatens "remedies for noncompliance." *Id.* at 3. *Cf. FEMA*, 801 F. Supp. 3d at 96 (holding immigration conditions unlawfully unambiguous because "DHS required states to provide 'cooperation' and participate in 'joint operations' and 'information sharing,' but without

[18] *Compare* U.S. Dep't of Just., *General Policy Regarding Charging, Plea Negotiations, and Sentencing* 3 (Feb. 5, 2025) (instructing Justice Department to investigate state actors for prosecution under § 1324 for "failing to comply with lawful immigration-related commands and requests") (Ex. 7), *with Kearns v. Cuomo*, 981 F.3d 200, 212 (2d Cir. 2020) ("Moreover, the Clerk's Office itself faces no threat of prosecution because § 1324 applies to 'person[s],' not government entities.").

defining what compliance entails"). Given that these Task Forces were created by the Invasion EO to "ensure the use of all available law enforcement tools to faithfully execute the immigration laws of the United States," 90 Fed. Reg. at 8444, the ambiguous phrases suggest cooperation with civil immigration enforcement. But they fail to put the States on constitutionally adequate notice of "the obligations that go with [HSGP] funds." *Arlington Central*, 548 U.S. at 296.

As for the Election Conditions, the manual audit and ballot reconciliation requirements mandate that States adhere to open-ended and undefined "guidelines" or "methodology" "established by the Secretary." Though FEMA has since issued Information Bulletin 580, which purports to define these "guidelines" and "methodology," Ex. 13, the Bulletin also specifies that it "will be reviewed, updated or rescinded as needed," allowing FEMA to change these rules at whim at any time, *id.* at 6. Such ever-changing requirements present the very type of open-ended, "post-acceptance" conditions that the Spending Clause forbids. *Pennhurst*, 451 U.S. at 25.

Even after Information Bulletin 580, moreover, the Election Conditions leave several key terms undefined. For instance, the Election Conditions require States to verify the citizenship of those on the States' voter rolls using the SAVE system and to "tak[e] timely corrective action consistent with applicable law." Ex. 1 at 15–16. But the Conditions do not define "timely corrective action," nor "applicable law." As another example, the Election Conditions require States to prohibit noncitizens from "working at a polling place in any capacity, or operating any election system in the jurisdiction, including temporary agency workers and vendors who work on or with election systems." *Id*. at 16. But the Conditions do not define an "election system" or what it means to "operat[e] any election system," again making it ambiguous how broadly this prohibition might sweep. *Cf. Republic of Iraq v. Beaty*, 556 U.S. 848, 856 (2009) ("Of course the word 'any' . . . has an 'expansive meaning,' . . . giving us no warrant to limit the class of" items described).

Last, the Termination Conditions are ambiguous because they open the door to imposing after-the-fact consequences for unspecified future policy decisions. It exceeds constitutional bounds to surprise "States with post acceptance or 'retroactive' conditions," because there can "be no knowing accepting acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Pennhurst*, 451 U.S. at 17, 25. Yet the Termination Conditions expressly permit DHS to terminate awards based on goals and priorities that are not disclosed to the States at the time of the award. The Termination Conditions therefore allow the retroactive imposition of surprise conditions that the States could not have known when they chose to accept federal funds and the obligations that come with them. As the court explained in *OMB*, "if the . . . program goals and agency priorities the grant is being measured against [are allowed] to change, the required notice is lacking" and "would run contrary to the requirements outlined in *Pennhurst*." *OMB*, 837 F. Supp. 3d at 282; *accord Salem*, 2026 WL 2445474, at *11 (Termination Conditions are "too ambiguous" because they "permit[] DHS to discontinue grants based on indiscernible terms like 'convenience,' changes to 'agency priorities,' or the 'national interest'"). The same is true here, and the Conditions are unlawfully ambiguous for that reason.

**B. The Conditions are not reasonably related to the funding programs to which they apply.**

All three Conditions are unconstitutional because they are too unrelated to the purposes of DHS's grants. The Constitution requires conditions imposed on federal grants to be "reasonably related to the federal interest in particular national projects or programs." *Massachusetts v. United States*, 435 U.S. 444, 461 (1978); *accord South Dakota v. Dole*, 483 U.S. 203, 207 (1987). None of the Conditions bear the necessary relationship to Congress's purpose in establishing the grants.

DHS imposed the Immigration Conditions principally on preparedness grants. *See supra* pp. 15, 24 & n.9. But there is no constitutionally sufficient connection between immigration

enforcement and emergency preparedness. For instance, EMPG assists States "in preparing for all hazards," 6 U.S.C. § 762(b), with "hazard" defined by cross-reference to the Stafford Act, *see id.* § 741(3)—a statute focused on *natural* disasters that does not have anything to do with immigration policy. *See* 42 U.S.C. §§ 5195a(1), 5122(1)–(2); *see also* 6 U.S.C. § 701(7) (similar). The Transit Security Grant Program statute lists 21 specific uses for the funds, only one of which mentions "counterterrorism duties," and none of which reference immigration. *See id.* § 1135(b). And, as this Court has already held, "[n]one of the statutory factors for evaluating relative risk" under HSGP "encompass recipients' civil immigration priorities." *Noem*, 813 F. Supp. 3d at 305.

The Election Conditions specifically target the Homeland Security Grant Program. Just as HSGP has nothing to do with immigration policy, it also has nothing to do with state administration of elections. HSGP's focus is "terrorism prevention activities," defined by a list of ten funding priorities that do not include immigration enforcement. 6 U.S.C. § 607(2)(A)–(J). The statute also enumerates the "types of threat" to govern funding allocation, which include "[e]xplosive[]," "[n]uclear," "[b]iological," "[c]hemical," and "[c]yber" attacks, among other things. *Id.* § 608(b). The Election Conditions, which address the verification of voter eligibility and how state and local officials tabulate votes, thus "are not reasonably related to the explicit statutory purpose of the funding." *Nashville*, 2026 WL 2905123, at *9 (applying the constitutional-avoidance canon).

Last, the Termination Conditions would allow Defendants to terminate grant awards whenever agencies—not Congress—choose to announce new or "updated" goals or priorities or, for discretionary grants, for "convenience." Defendants could terminate on these bases even when contrary to the grantmaking statutes and even when wholly disconnected from the purpose of the appropriations themselves. This is impermissible. *See Salem*, 2026 WL 2445474, at *12 ("[T]he Termination Condition is counter to the programs' purposes of providing orderly and reliable

funding to states and local governments."). Where, as here, conditions would "extend[] well beyond" the purpose of the grant statute and program at issue, they are "not reasonably related to the purpose of the" federal funding and violate the Spending Clause. *City of Chicago v. U.S. Dep't of Just.*, 822 F. Supp. 3d 873, 889 (N.D. Ill. 2026).

### C. The Conditions are coercive because they leave the States with "no real option" but to comply.

The Conditions are also unduly coercive. A condition is coercive if it exerts a "power akin to undue influence" and turns pressure "into compulsion." *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 577 (2012) (plurality opinion). "[T]hat bar on compulsion . . . serves to help ensure real consent exists." *Landor*, 609 U.S. at 72–73. To determine "where persuasion gives way to coercion," courts must examine all relevant facts and circumstances, including both "the programs at issue" and "the nature of the threat" posed by the condition. *NFIB*, 567 U.S. at 580, 585. For a spending condition to remain permissible, a State must be able to reject the condition and decline the funds "not merely in theory but in fact." *Dole*, 483 U.S. at 211–12.

Given the nature and magnitude of the programs here, all the Conditions have tremendous coercive force. The States receive over $1 billion dollars annually from just the subset of programs targeted by the Immigration Conditions, and the Termination Conditions sweep even more broadly than that. *Supra* pp. 2–3, 18–20. These grants provide essential funding to States to build and sustain the capabilities necessary to protect against acts of terrorism; to support first responders in providing emergency preparedness in urban areas; to implement FEMA's National Preparedness System and build continuity-of-government capabilities for essential functions in a catastrophic disaster; and to help nonprofits increase the security of facilities at risk of terrorist attack. *See, e.g.*, Ex. 20 (Dzbanko Decl.), ¶ 31; Ex. 75 (Ezelle Decl.), ¶ 44; Ex. 42 (Hess Decl.), ¶ 34; Ex. 61

(O'Leary Decl.), ¶¶ 20–27; Ex. 47 (Stanton Decl.), ¶¶ 40–43. In other words, States need these grants to protect Americans from terrorism and disaster and, ultimately, to save lives.

Holding this funding hostage, in light of both its amount and purpose, is not merely "mild encouragement," but "a gun to the head." *NFIB*, 567 U.S. at 581 (internal quotation marks omitted). Plaintiff States lack "a realistic option," *id.* at 681 (opinion of Scalia, J.), to turn down access to the federal funding that Congress has provided for emergency preparedness and disaster relief. As the First Circuit has recognized, "few interests are more central to a state government than protecting the safety and well-being of its citizens." *Worman v. Healey*, 922 F.3d 26, 39 (1st Cir. 2019). And as this Court already held: "The financial pressure here goes well beyond the 'relatively mild encouragement' approved in *Dole*, and amounts instead to 'economic dragooning' of the sort condemned in *NFIB*. The coercion is even more pronounced because the threatened funds involve essential public safety responsibilities rather than optional or peripheral programs." *FEMA*, 801 F. Supp. 3d at 96 (citations omitted).

The Termination Conditions, in particular, would effectively hand DHS a powerful tool to commandeer state policymaking going forward. With an ability to terminate grants whenever they decide to "change," "re-evaluate[]," or "update[]" their program goals or agency priorities, Ex. 3 at 4, DHS and FEMA could threaten to terminate essential funds unless Plaintiff States accede to federal policy demands, thereby disrupting "our system of limited and enumerated federal powers where all others are reserved to the States and the people." *Landor*, 609 U.S. at 75. Indeed, even if the Court were to find the Immigration and Election Conditions at issue in this case unlawful, Defendants could coerce compliance with those very same Conditions by threatening to terminate the States' awards. The Termination Conditions thus unconstitutionally transform federal funding from a means of supporting state programs that provide public benefits into "a means of pressuring

the States to accept policy changes" that they otherwise would reject, in violation of the Spending Clause. *NFIB*, 567 U.S. at 580.

## ARGUMENT AS TO REMEDY

Plaintiff States are entitled to declaratory relief, vacatur of the promulgation of the three sets of challenged Conditions, and a permanent injunction against any future implementation or enforcement of the Conditions against Plaintiff States and their subdivisions and instrumentalities.

### A. The Court Should Declare Unlawful and Vacate the Promulgation of the Conditions.

The APA directs that a "reviewing court shall . . . hold unlawful and set aside agency action" found to be unlawful. 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of the challenged agency action. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court." *Id.* at 830. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action."). Because the promulgation of all three sets of Conditions was in excess of statutory authority, arbitrary and capricious, and contrary to constitutional right, that agency action should be declared unlawful and vacated. *See FEMA*, 801 F. Supp. 3d at 97 ("[D]eclaratory relief provides the legal determination, and vacatur is the logical consequence of that determination.").

### B. The Court Should Permanently Enjoin Defendants Against Implementing or Enforcing the Conditions Against Plaintiff States.

Plaintiff States (including their subdivisions and instrumentalities) are also entitled to a permanent injunction against future implementation or enforcement of the Conditions. In general, courts issue permanent injunctive relief where "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Healey v. Spencer*, 765 F.3d 65, 74 (1st Cir. 2014) (quoting *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007)); *see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K–Mart Corp. v. Oriental Plaza, Inc*., 875 F.2d 907, 915 (1st Cir. 1989).

As an initial matter, the APA expressly authorizes "actions for . . . prohibitory or mandatory injunction" in addition to vacatur. 5 U.S.C. § 703. "[C]ourts use this broad remedial power to issue permanent injunctive relief for APA violations." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021). The D.C. Circuit has held that, in the APA context, "once the court reache[s] the conclusion that the rule was indeed illegal (i.e., not merely that the plaintiffs had a reasonable probability of success on the merits, as would be necessary for a preliminary injunction), there [is] no separate need to show irreparable injury, as that is merely one possible 'basis for showing the inadequacy of the legal remedy.'" *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting 11A Fed. Prac. & Proc. § 2944 (1995)). This principle alone suffices to support the issuance of permanent injunctive relief against future enforcement of the Civil Immigration Conditions against Plaintiff States.

Examining the equitable factors in greater detail leads to the same result. Plaintiff States face a choice between two stark alternatives: forgoing billions in federal funding to prepare for and respond to disasters or relinquishing their sovereign right to decide how to use their own law-enforcement officer and administer their own elections. This impossible choice inflicts irreparable harm. *See, e.g.*, *Colorado v. U.S. Dep't of Just.*, 455 F. Supp. 3d 1034, 1061 (D. Colo. 2020) (finding "irreparable harm" where "Colorado must either suffer constitutional injury or forgo Byrne JAG funds entirely"); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 878 (N.D. Ill. 2018) ("[T]he Hobson's choice that now confronts the City—whether to suffer this injury or else decline much-needed grant funds—is not a choice at all and is itself sufficient to establish irreparable harm.") (citing *Morales*, 504 U.S. at 381); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017) (similar).

So too would each option standing alone. Acceding to these conditions to preserve access to critical grant funds would intrude on Plaintiff States' sovereignty. The impact of an invasion of state sovereignty "cannot be economically quantified" and thus constitutes irreparable harm. *Tennessee v. U.S. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (alterations omitted). States suffer an "irreparable" injury when forced to abandon their "sovereign interests and public policies." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *see Ohio*, 603 U.S. at 291 (impairment of States' "sovereign interests in regulating their own industries and citizens" is irreparable harm). Forcing Plaintiff States to abandon specific public policies governing their limited law-enforcement resources is exactly what the Immigration Conditions require. *See California v. U.S. Dep't of Transp.*, 788 F. Supp. 3d 316, 323 (D.R.I. 2025) (finding irreparable harm because the States "are being put in a position of relinquishing their sovereign right to decide how to use their own police officers" or abandoning critical funding). And the Election Conditions

intrude on States' constitutionally guaranteed role as the primary administrators of all elections, including federal elections. *See Foster*, 522 U.S. at 69.

Courts viewed this same type of demand as a source of irreparable harm during the first Trump Administration. When presented with immigration-related grant conditions from the Department of Justice, multiple courts held that States and localities would "suffer an affront to their sovereignty" if the United States were "permitted to direct their behavior in an unauthorized way." *City of Evanston v. Barr*, 412 F. Supp. 3d 873, 888 (N.D. Ill. 2019). These "Tenth Amendment violations constitute[d] irreparable harm." *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 340 (E.D. Pa. 2018), *aff'd in part, vacated in part on other grounds*, 916 F.3d 276; *see also San Francisco*, 349 F. Supp. 3d at 970.

The other path left open by the Conditions—forgoing billions in federal funds—also leads to irreparable harm. The scale of the potential funding loss to Plaintiff States—billions of dollars annually, *see supra* pp. 2–3—makes the harm irreparable. Just as the risk of being "driven out of business" constitutes "irreparable harm" in the commercial context, a significant loss of funding for a government can also be catastrophic such that money damages are inadequate. *Commodity Futures Trading Comm'n v. Brit. Am. Commodity Options Corp.*, 434 U.S. 1316, 1320 (1977); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018).

The functions for which Plaintiff States use these funds can be matters of life and death. *See Philadelphia*, 280 F. Supp. 3d at 579 (likely "loss of human life" constitutes irreparable harm). Defendants' own words confirm as much: "For decades, FEMA has provided federal assistance to aid states in building and sustaining capabilities to measurably improve the nation's readiness in preventing, preparing for, protecting against, and responding to terrorist attacks and other hazards." *Simplifying FEMA Preparedness Grants*, 88 Fed. Reg. 62098, 62098–99 (Sept. 8, 2023). If

deprived of these funds, Plaintiff States would have to scale back or shut down efforts meant to protect and preserve human life. For example, Congress established the major programs at issue in this suit through legislation passed in direct response to the horrific events of September 11, 2001. *See supra* p. 3. Plaintiff States and their political subdivisions rely heavily on the anti-terrorism funding that DHS provides under that congressional mandate. FEMA funds support specialized teams like bomb squads and rescue teams across the country, including in Rhode Island, Michigan, and New Mexico. Ex. 68 (Guthlein Decl.), ¶ 23; Ex. 49 (Sweeney Decl.), ¶ 93; Ex. 59 (Rye Decl.), ¶ 23. They are "primary source of funding" for emergency responder training in Wisconsin. Ex. 77 (Engle Decl.), ¶ 24. They pay for active shooter response training for law enforcement in Maine. Ex. 43 (Rogers Decl.), ¶ 23. They support physical security at schools in Kentucky. Ex. 42 (Hess Decl.), ¶ 22. They sustain statewide alert and siren systems in Hawaii. Ex. 35 (Mark Decl.), ¶ 22. They support security planning for the 2027 Super Bowl and 2026 Summer Olympics in California. Ex. 22 (Hammett Decl.), ¶ 28. And the size of the funding at stake here is enormous, as Plaintiff States receive over $900 million under HSGP and EMPG alone annually.

For these same reasons, "the balance of equities tips in [Plaintiff States'] favor," and "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). As this Court held last year, considering the same funding streams, "protecting access to disaster and emergency relief is squarely aligned with the public interest." *FEMA*, 801 F. Supp. 3d at 98. And "enforcement of an unconstitutional law is always contrary to the public interest." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013).

On the other side of the ledger, defendants would suffer no harm by simply returning to the status quo, in which they allocate these congressionally mandated funds without the challenged conditions attached. *See City of Chicago v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018) (no harm

to the government where it can "distribute the funds without mandating the conditions—as has been done for over a decade"). "Continuation of [that] status quo will not work an irreparable harm" on defendants. *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 481 U.S. 1301, 1303 (1987) (Rehnquist, C.J., in chambers). Defendants have the "awesome statutory responsibility to prepare the nation for, and respond to, all national incidents, including natural disasters and terrorist attacks." *News-Press v. DHS*, 489 F.3d 1173, 1178 (11th Cir. 2007). They cannot complain of an injunction that merely obliges them to perform that duty without attaching sweeping funding conditions never contemplated by Congress.

Finally, DHS and FEMA's repeated attacks on these important grant programs demonstrate the necessity of clear and permanent injunctive relief in this case. "Injunctive relief is forward-looking, and a plaintiff injured by an unconstitutional or unlawful action in one year does not need to suffer injuries repeatedly in each ensuing year—and separately sue after each injury—to obtain relief from the unlawful actions." *Chicago*, 961 F.3d at 910. Yet DHS and FEMA's seriatim imposition of novel and unlawful conditions on these critical funding streams has created precisely that situation. Defendants should be permanently enjoined from implementing or enforcing all three sets of Conditions as to Plaintiff States (including their subdivisions and instrumentalities) in any form.

## CONCLUSION

The Court should enter judgment in Plaintiff States' favor, declare that the defendants' promulgation of the challenged conditions was contrary to the Constitution and laws of the United States, vacate the promulgation of the challenged conditions, and permanently enjoin defendants from implementing or enforcing the challenged conditions (or substantially similar conditions) against Plaintiff States, including their subdivisions and instrumentalities.

October 13, 2026

Respectfully submitted,

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
*Senior Assistant Attorney General*
Lee I. Sherman
James E. Stanley
*Supervising Deputy Attorneys General*
Jesse Basbaum
Lisa C. Ehrlich
Deylin Thrift-Viveros
*Deputy Attorneys General*

/s/ Delbert Tran
Delbert Tran
*Deputy Attorney General*
California Department of Justice
455 Golden Gate Ave.
San Francisco, CA 94102
(415) 229-0110
delbert.tran@doj.ca.gov

*Attorneys for the State of California*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

/s/ Alex Hemmer
Alex Hemmer
*Deputy Solicitor General*
R. Henry Weaver
*Public Interest Counsel*
Michael M. Tresnowski
*Assistant Attorney General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Attorneys for the State of Illinois*

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy
*Deputy Solicitor General*
Mayur P. Saxena
*Assistant Attorney General*
Yael Fisher
Bassam Gergi
Meghan Musso
*Deputy Attorneys General*
New Jersey Office of Attorney General
25 Market Street, PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

/s/ Kathryn M. Sabatini
Kathryn M. Sabatini (R.I. Bar No. 8486)
*Chief, Civil Division*
*Special Assistant Attorney General*
Paul Meosky (RI Bar No. 10742)
*Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
ksabatini@riag.ri.gov

*Attorneys for the State of Rhode Island*

**KRISTIN K. MAYES**
ATTORNEY GENERAL OF ARIZONA

/s/ Hayleigh S. Crawford
Hayleigh S. Crawford
*Deputy Solicitor General*
Office of the Arizona Attorney General
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov
ACL@azag.gov

*Attorneys for the State of Arizona*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

/s/ Sarah H. Weiss
David Moskowitz
*Deputy Solicitor General*
Sarah H. Weiss
*Senior Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
sarah.weiss@coag.gov

*Attorneys for the State of Colorado*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

/s/ Andrew M. Ammirati
Andrew M. Ammirati
*Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5090
andrew.ammirati@ct.gov

*Attorneys for the State of Connecticut*

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

/s/ Vanessa L. Kassab
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA

/s/ Nicole S. Hill
Nicole S. Hill
*Assistant Attorney General*
Office of the Attorney General
for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov

*Attorneys for the District of Columbia*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

/s/ Kalikoʻonālani D. Fernandes
Kalikoʻonālani D. Fernandes
*Solicitor General*
Department of the Hawaiʻi Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR EX REL. ANDY BESHEAR**, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF KENTUCKY

/s/ S. Travis Mayo
S. Travis Mayo
*General Counsel*
Sam Flynn
*Chief Deputy General Counsel*
Laura C. Tipton
*Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov

*Attorneys for Plaintiff Office of the Governor* ex rel. *Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

/s/ John E. Belisle
John E. Belisle
*Assistant Attorney General*
Office of Maine Attorney General
6 State House Station
Augusta, Maine 04333-006
(207)626-8800
john.belisle@maine.gov

*Attorneys for the State of Maine*

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

/s/ Robert N. Brewer
Robert N. Brewer
*Assistant Attorney General*
Office of the Maryland Attorney General
200 Saint Paul Place
20th Floor
Baltimore, MD 21202
(410) 576-6924
rbrewer@oag.maryland.gov

*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Nita Kumaraswami Klunder
Nita K. Klunder
Vanessa Arslanian
*State Trial Counsels*
Julia S. Canney
*Assistant Attorney General*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2394
nita.klunder@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

/s/ Neil Giovanatti
Neil Giovanatti
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Attorneys for the State of Michigan*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

/s/Katherine Bies
Katherine Bies
*Assistant Attorney General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

*Attorneys for the State of Minnesota*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

/s/ K. Brunetti Ireland
K. Brunetti Ireland
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Attorneys for the State of Nevada*

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

/s/ Mark Noferi
Mark Noferi
*Senior Litigation Counsel*
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 640-2891
mnoferi@nmdoj.gov

*Attorneys for the State of New Mexico*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

/s/ Stephen C. Thompson
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Stephen C. Thompson
*Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov

*Attorneys for the State of New York*

**JEFF JACKSON**
ATTORNEY GENERAL OF NORTH CAROLINA

Laura Howard
*Chief Deputy Attorney General*

/s/ Daniel P. Mosteller
Daniel P. Mosteller
*Associate Deputy Attorney General*
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov
dwilkes@ncdoj.gov

*Attorneys for the State of North Carolina*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

/s/ Thomas H. Castelli
Thomas H. Castelli
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

*Attorneys for the State of Oregon*

**JOSH SHAPIRO**
GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA

/s/ Jacob B. Boyer
Jennifer C. Selber
Jacob B. Boyer
*Governor's Office of General Counsel*
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
jacobboyer@pa.gov

*Attorneys for Governor Josh Shapiro*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Julio A. Thompson
*Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5519
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*

**JAY JONES**
ATTORNEY GENERAL FOR THE COMMONWEALTH OF VIRGINIA

/s/ Megan C. Keenan
Megan C. Keenan
*Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Attorneys for the Commonwealth of Virginia*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

/s/ Tyler Roberts
Tyler Roberts
*Assistant Attorney General*
Cristina Sepe
*Deputy Solicitor General*
Washington State Office of the Attorney General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Tyler.Roberts@atg.wa.gov
Cristina.Sepe@atg.wa.gov

*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

/s/ Frances Reyolds Colbert
Frances Reynolds Colbert
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-9226
frances.colbert@wisdoj.gov

*Attorneys for the State of Wisconsin*