**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

STATE OF ILLINOIS, *et al.*,

Plaintiffs,

v.

FEDERAL EMERGENCY MANAGEMENT AGENCY

Case No. 1:26-cv-00485-MSM-RLA

**BRIEF OF *AMICUS CURIAE***
**THE BIPARTISAN AMERICAN ELECTION PROJECT**

Elizabeth A. Wiens
Gursky Wiens & Shanley Law
20 Centerville Road
Warwick, Rhode Island 02886
(401) 294-4700
ewiens@rilaborlaw.com

*Attorney for Amicus Curiae*
*Bipartisan American Election Project*

# TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** ........ ii

INTEREST OF AMICUS CURIAE ........ 1

**STATEMENT OF THE CASE** ........ 3

**SUMMARY OF ARGUMENT** ........ 7

**ARGUMENT** ........ 9

**I. The Enactment And Repeal Of Federal Statutes That Directly Regulated State Administration Of Congressional Elections Foreclose Any Claim That FEMA Can Prescribe Election-Integrity Measures.** ........ 9

**II. More Recent Exercises Of Congress's Power To Regulate State Administration Of Congressional Elections Confirm That FEMA Cannot Use HSGP Funds To Promote Election-Integrity Measures.** ........ 12

**III. Defendants Cannot Invoke Anti-Terrorism Rationales To Justify Requirements That Supplement Or Contradict The Methods Congress Has Chosen To Regulate State Election Procedures.** ........ 17

**A. FEMA's Actions and Statements Show That the New Funding Conditions Were Adopted to Promote Election Integrity.** ........ 18

**B. FEMA Cannot Use its Authority to Protect Critical Infrastructure to Regulate State Election Procedures That Congress Has Chosen to Regulate in a Different Manner.** ........ 20

**CONCLUSION** ........ 26

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ex parte Siebold*, 100 U.S. 371 (1880) .......... passim

*Metro. Gov't of Nashville & Davidson Cnty. v. Dep't of Homeland Sec.*, No. 26-02886 (AHA) (D.D.C. Sept. 28, 2026) .......... 2

*United States v. Gradwell*, 243 U.S. 476 (1917) .......... passim

*West Virginia v. EPA*, 597 U.S. 697 (2022) .......... 11

## Constitutional Provisions

U.S. Const. art. I, § 4, cl. 1 .......... 3

## Statutes

6 U.S.C. § 111 .......... 3, 20

6 U.S.C. § 313 .......... 20, 22, 23, 25

6 U.S.C. § 603 .......... 4

6 U.S.C. § 608 .......... 9, 11

6 U.S.C. § 652 .......... 4, 20, 25

42 U.S.C. § 5195c .......... 4

52 U.S.C. § 20301 .......... 13, 14

52 U.S.C. § 20302 .......... 13

52 U.S.C. § 20501 .......... 14, 16

52 U.S.C. § 20503 .......... 14

52 U.S.C. § 20505 .......... 14

52 U.S.C. § 20507 .......... 15,

2252 U.S.C. § 20508 .......... 14

52 U.S.C. § 20923 .......... 16, 17

52 U.S.C. § 20928 .......... 17

52 U.S.C. § 20971 .......... 24

52 U.S.C. § 21081 .......... 16, 23, 25

52 U.S.C. § 21083 .......... 15, 22

52 U.S.C. § 21085 .......... 16, 22, 23

52 U.S.C. § 21101 .......... 16, 23

Act of Feb. 28, 1871, ch. 99, 16 Stat. 433 ........ 10, 17

Act of Feb. 8, 1894, ch. 25, 28 Stat. 36 ........ 10

Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 437 ........ 13

National Voter Registration Act of 1993, Pub. L. No. 103-31, 107 Stat. 77 ........ 14

USA PATRIOT Act, Pub. L. No. 107-56, 115 Stat. 272 (2001) ........ 4

Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat. 577 ........ 13

Cybersecurity and Infrastructure Security Agency Act of 2018, Pub. L. No. 115-278, 132 Stat. 4168 ........ 4

National Defense Authorization Act for Fiscal Year 2026, Pub. L. No. 119-60, § 6805, 139 Stat. 1657 (2025) ........ 24

**Other Authorities**

Cong. Rsch. Serv., IF10677, *The Designation of Election Systems as Critical Infrastructure* (updated Sept. 18, 2019) ........ 4, 12

Cybersecurity & Infrastructure Sec. Agency, *Election Report* (July 13, 2026) ........ 18, 23, 25

Dep't of Homeland Sec., Off. of Intel. & Analysis, *Homeland Threat Assessment 2024* (2023) ........ 18

Dep't of Homeland Sec., Off. of Strategy, Pol'y & Plans, *Organizational Chart* (Aug. 2025) ........ 19

Dep't of Justice, Civil Rights Div., *The Uniformed and Overseas Citizen Absentee Voting Act* (last viewed Oct. 15, 2026) ........ 14

Exec. Order No. 14,248, 90 Fed. Reg. 14,005 (Mar. 28, 2025) ........ 5, 6, 19, 20

Fed. Emergency Mgmt. Agency, *Notice of Funding Opportunity, Fiscal Year 2024 Homeland Security Grant Program* (2024) ........ 5, 21

Fed. Emergency Mgmt. Agency, *Notice of Funding Opportunity, Fiscal Year 2026 Homeland Security Grant Program* (updated July 9, 2026) ........ passim

Press Release, Dep't of Homeland Sec., *Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector* (Jan. 6, 2017) ........ 5, 12

Press Release, Sen. Susan Collins, *Bipartisan Election Security Provision Co-authored by Senator Susan Collins Signed into Law* (Dec. 23, 2025) ........ 24

*Trump Fires Election Assistance Commission Members Ahead of Midterms*, Reuters (July 9, 2026) ........ 24

U.S. Gov't Accountability Off., GAO-24-106327, *Homeland Security Grants: DHS Implemented National Priority Areas but Could Better Document and Communicate Changes* (2024) ........ 4

## INTEREST OF AMICUS CURIAE

Lawyers affiliated with both the Democratic and Republican parties have formed *amicus curiae* The Bipartisan American Election Project (BAEP).[1] BAEP is led by Bob Bauer and Ben Ginsberg, veteran election lawyers and the former co-chairs of the bipartisan Presidential Commission on Election Administration. BAEP is committed to reinforcing principled constitutional positions, defending democratic norms, and countering efforts to obstruct the lawful casting and tallying of votes or to undermine public confidence in election outcomes. BAEP's efforts and goals are supported by attorneys from both major parties, including Dana Remus, who served as White House Counsel in the Biden Administration; Peter Keisler, who served as Assistant Attorney General for the Civil Division and as Acting Attorney General during the George W. Bush Administration; Donald Verrilli, former Solicitor General of the United States in the Obama Administration and a senior litigation adviser to the Obama–Biden and Harris–Walz presidential campaigns; Michael Carvin, who has represented conservative and Republican Party organizations in election-law litigation, including voting rights, recount, and redistricting matters; John Devaney, who has tried election-law cases on behalf of Democratic presidential campaigns and the Democratic National Committee; Daniel Troy, whose background includes appellate litigation in private practice and service as Chief Counsel to the Food and Drug Administration in the George W. Bush Administration; and Joseph Guerra, who served as a Deputy Assistant Attorney General, Office of Legal Counsel, during the Clinton Administration and as Principal Deputy Associate Attorney General during the Obama

[1] No counsel for any party authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation or submission of the brief. No person other than BAEP, its members, or its counsel made such a monetary contribution.

Administration. Mr. Verrilli, Mr. Devaney, and Ms. Remus are also members of the BAEP Board of Directors.

Our country is experiencing extraordinary conflict over the administration of elections and the acceptance of election outcomes. The foundational principles on which free and fair elections have been based are now the subject of a flood of litigation in federal and state courts, intense regulatory battles, and polarizing rhetoric about the reliability of elections. The major political parties have long brought sharply differing perspectives on how best to administer a fair electoral process. Yet the intensity of the current partisan conflict threatens to undermine the lawful conduct of elections and weaken public trust in our voting systems.

The line between legitimate disagreements over election laws and anti-democratic challenges to longstanding constitutional principles and norms has too often been lost in these conflicts. To assist the judiciary in drawing and upholding that line, BAEP focuses exclusively on frontal challenges to constitutional protections and democratic norms. As a bipartisan group of veteran attorneys, BAEP seeks to highlight for the Court paths to a principled resolution of the legal issues that these partisan conflicts are now generating.

In doing so, we recognize that the plaintiffs in this case are ably represented, and that the Court also has the benefit of the decision in *Metropolitan Government of Nashville and Davidson County, Tennessee, et al. v. Department of Homeland Security, et al.*, No. 26-02886 (AHA) (D.D.C. Sept. 28, 2026) (hereafter *Nashville v. DHS*), which recently invalidated the same election-related funding conditions at issue here. To avoid undue repetition, we wish to place the validity of these conditions in the larger context of how Congress has regulated state-administered congressional elections, both in the wake of the Civil War and more recently. This history illustrates the untenable nature of defendants' contention that the Federal Emergency

Management Agency (FEMA) has the authority to condition the receipt of Homeland Security Grant Program funds on compliance with measures assertedly designed to promote election integrity.

## STATEMENT OF THE CASE

Under our constitutional scheme, States have primary responsibility for regulating the time, place, and manner of congressional elections, subject to Congress's power to override or modify such state regulations.[2] In the 1870s, Congress authorized robust federal intervention in congressional elections to ensure that recently emancipated slaves were not denied the franchise through fraudulent and corrupt practices. *See infra* I.A. More recently, Congress has adopted a series of limited and carefully circumscribed measures to enhance voter registration, facilitate absentee voting, and to prescribe standards for state voting and voter-registration systems. *See infra* I.B. To assist with some of these efforts, it created the Federal Election Commission (FEC) and later the Election Assistance Commission (EAC). *See id.* Congress has never assigned any duties under these statutes to the Department of Homeland Security (DHS) or its component agency, FEMA.

Created in the wake of the terrorist attacks of September 11, 2001, DHS's "primary" missions are to "prevent terrorist attacks," "reduce the vulnerability of the United States to terrorism," and "minimize the damage, and assist in the recovery, from terrorist attacks that do occur." 6 U.S.C. § 111(b)(1)(A)-(C). Congress also enacted the Critical Infrastructures Protection Act of 2001 to promote "national competence for critical infrastructure protection"

[2] *See* U.S. Const., Art. I, § 4, cl. 1 ("The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators").

and to "address critical infrastructure protection and continuity through support for activities related to counterterrorism, threat assessment, and risk mitigation." Pub. L. 107-56, § 5195c(d)(1) (now codified at 42 U.S.C. § 5195c(d)(1)). Critical infrastructure is defined as "systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters." *Id.* § 5195c(e).[3]

Congress also created the Homeland Security Grant Program (HSGP) to help States "prepare for and respond to terrorist acts." Pub. L. No. 107-56, § 1014(a), 115 Stat. 272, 399 (2001); *see also* 6 U.S.C.§ 603(a) (codifying DHS's authority to award HSGP grants). These programs are administered by FEMA, which must publish, within 60 days of the enactment of DHS's annual appropriations, a Notice of Funding Opportunity (NoFO) specifying the purposes for which HSGP grants may be spent, and allocating grant funding to state and local governments. *See* U.S. Government Accountability Office, *Homeland Security Grants: DHS Implemented National Priority Areas But Could Better Document and Communicate Changes*, GAO-24-106327 (Jan. 9, 2024), at 8.[4]

"Prior to the 2016 federal election, a series of cyberattacks occurred on information systems of state and local election jurisdictions." Congressional Research Service, The Designation of Elections Systems as Critical Infrastructure, at 1 (updated Sept. 18, 2019).[5] DHS

---

[3] In 2018, Congress established the Cybersecurity and Infrastructure Security Agency (CISA) within DHS, designating this agency as the operational lead regarding physical and cyber critical infrastructure security and resilience. Pub. L. 115-278, 132 Stat. 4184 (codified at 6 U.S.C. § 652).

[4] *Available at* https://www.gao.gov/assets/870/864851.pdf.

[5] *Available at* https://www.congress.gov/crs-product/IF10677.

responded by designating elections systems as a critical infrastructure subsector. *See* DHS, *Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector*, News release (Jan. 6, 2017) (Secretary Johnson Statement).[6] This action was controversial, and "many state and local election officials . . . opposed this designation." *Id.* at 1. In response, then-Secretary Johnson stressed that the designation did "*not* mean a federal takeover, regulation, oversight or intrusion concerning elections in this country," and did "nothing to change the role state and local governments have in administering and running elections." *Id.* at 1-2. Instead, it would "enable[] this Department to prioritize our cybersecurity assistance to state and local election officials, but only for those who request it." *Id.* at 2.

In accordance with those assurances, FEMA did not purport to dictate how state and local officials conduct elections. In its NoFO for fiscal year 2024, for example, FEMA explained that "*[s]ecuring* election infrastructure, ensuring *its continued operation* in the face of threats and harassment, advancing the *safety of election officials*, and ensuring an election free from *foreign interference* are national security priorities." Notice of Funding Opportunity, Fiscal Year 2024 Homeland Security Grant Program (FY 2024 NoFO), at 33 (emphases added).[7] *See also id.* (requiring at least one investment to support the state's and high-risk urban area's efforts "to enhance *physical* election security and/or *cyber* election security") (emphases added).

In March, 2025, President Trump issued Executive Order 14248, entitled "Preserving and Protecting the Integrity of American Elections." 90 Fed. Reg. 14005 (Mar. 25, 2025). After offering unfavorable comparisons between the decentralized administration of federal elections

---

[6] *Available at* https://www.dhs.gov/archive/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical.

[7] *Available at* https://www.fema.gov/sites/default/files/documents/fema_fy2024_hsgp_nofo.pdf.

prescribed by our constitution and election schemes employed in Germany, Canada, Sweden, and Denmark, *see id.*, Executive Order 14248 required a variety of actions by different federal entities. Of relevance here, it directed the EAC to issue "amended guidelines and other guidance" that would "provide that voting systems should not use a ballot in which a vote is contained within a barcode or quick-response code in the vote counting process except where necessary to accommodate individuals with disabilities." *Id.* at 14008. It then directed that, in awarding HSGP funds, DHS should "heavily prioritize compliance with" the new guidelines that the EAC was to issue. *Id.* The Order also required DHS to give state and local officials free access "to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered," and ordered DHS, in coordination with the DOGE Administrator to "review each State's publicly available voter registration list and available records concerning voter list maintenance activities . . . alongside Federal immigration databases and State records requested . . . for consistency with Federal requirements." *Id.* at 14006-07. Finally, the Order instructed DHS "to prevent all non-citizens from being involved in the administration of any Federal election," as long as DHS "maintains the designation of election infrastructure as critical infrastructure." *Id.* at 14009.

This past July, FEMA issued an updated NoFO for fiscal year 2026 that incorporated these directives. FEMA stated that, "[t]o strengthen the integrity of U.S. elections, each state and high-risk urban area election jurisdiction must"

> (1) submit a plan "for transitioning from electronic voting systems that utilize bar codes or QR codes to count votes to equipment that accepts hand-marked paper ballots";
>
> (2) comply "with a post-election 5% manual audit, conducted according to the guidelines established by the Secretary, to ensure that electronic voting systems accurately count votes";

> (3) ensure "that each election jurisdiction reconciles the number of voters who voted in each federal election to the number of ballots cast, using the methodology established by the Secretary";
>
> (4) use "the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements (SAVE) system to verify the citizenship of all individuals in the state voter registration database within 120 days of accepting the grant award": and
>
> (5) use "the SAVE system, or another authorized government system, to verify U.S. citizenship for any person working at a polling place in any capacity, or operating any election system in the jurisdiction."

Notice of Funding Opportunity, Fiscal Year 2026 Homeland Security Grant Program (FY 2026 NoFO) (Pls. Ex. 1), at 15-16. FEMA stated that it will withhold an "amount equal to 20% of the recipient's total HSGP award . . . until the recipient submits proof of compliance with the FY 2026 Election Security . . . requirements, and such proof is verified/confirmed by the Department." Pls. Ex. 1, at 8.

FEMA asserted that verifying the citizenship of registered voters was necessary to "mitigate operational vulnerabilities exploitable by terrorist or foreign actors." *Id.* at 16. But it offered no explanation and cited no evidence for why this is so. Instead, it stated that, "[b]y integrating the directives of Executive Order 14248, . . . HSGP recipients can ensure that their efforts contribute to a secure, transparent, and resilient electoral process, thereby reinforcing public trust and the integrity of democratic institutions." *Id.* at 15.

## SUMMARY OF ARGUMENT

In promulgating its new funding conditions, FEMA asserted that they are necessary to ensure the integrity of congressional elections. Under settled Supreme Court law, however, neither DHS's nor FEMA's enabling statutes can be construed to authorize such efforts. Over a century ago, the Supreme Court held that, because Congress has generally left the administration of congressional elections to the States, statutes addressing other matters should not be construed to apply to the conduct of such elections absent "clear" and "positive" language demonstrating

that Congress intended such a result. *United States v. Gradwell*, 243 U.S. 476, 485 (1917). The holding in that case underscored the stringency of this test: the Court ruled that a criminal statute that prohibited acts to defraud the United States in "*any manner* for *any purpose*" could not be applied to voter fraud. *Id.* at 479. Here, the relevant statutes do not even mention fraud, much less elections. Instead, they authorize DHS and FEMA to protect and secure "critical infrastructure"—a term that encompasses many types of infrastructure beyond election systems. This language does not provide the necessary "clear" and "positive" mandate for FEMA to prescribe election-integrity measures.

More recent legislation reinforces—and indeed, independently compels—this conclusion. In a series of laws, Congress has prescribed requirements to ensure the accuracy of state voter registration databases and the reliability of voting equipment. But it has not empowered DHS or FEMA to administer or enforce these laws. Indeed, the expert and bipartisan Election Assistance Commission that Congress created cannot even issue binding guidance with respect to any of these requirements, much less supplement them. These laws foreclose any claim that FEMA's authority to protect critical infrastructure includes the power to prescribe election-integrity measures beyond those Congress itself has chosen.

Finally, in earlier litigation, defendants cited a CISA report on election security and argued that FEMA's new funding conditions are legitimate anti-terrorism measures. But FEMA's updated FY 2026 NoFO did not cite CISA's report (which was issued after that NoFO was updated on July 9th). Nor did it attempt to explain how including non-citizens in a voter-registration database created any "operational vulnerabilities" for state election systems. More fundamentally, defendants cannot invoke the specter of potential foreign interference with U.S.

elections to supplement, much less contradict, the manner in which Congress has chosen to regulate state administration of congressional elections.

## ARGUMENT

### I. The Enactment And Repeal Of Federal Statutes That Directly Regulated State Administration Of Congressional Elections Foreclose Any Claim That FEMA Can Prescribe Election-Integrity Measures.

In defending measures that FEMA adopted "[t]o strengthen the integrity of U.S. elections," Pls. Ex. 1, at 15, defendants have cited FEMA's authority to consider threats to "critical infrastructure" when establishing HSGP funding priorities, and DHS's 2017 designation of election systems as part of the Nation's critical infrastructure. *See* Doc. 36-1 in *Nashville v. DHS*, at 13 (citing 6 U.S.C. § 608(a)(1)(D)-(E)). Reliance on this authority is misplaced. When Congress has intended to regulate the conduct of congressional elections, it has done so directly and unambiguously. The Supreme Court, in turn, has held that, in light of Congress's adoption and subsequent repeal of such election laws, federal agencies cannot rely upon broad readings of their organic statutes to assert authority to regulate or oversee state management of congressional elections. That is precisely what FEMA impermissibly seeks to do here.

During Reconstruction, Congress authorized significant federal oversight of congressional elections. The Enforcement Act of May 1870 authorized the appointment of supervisors who were to attend the places fixed for voter registration and "to challenge such as they deem proper; to cause such names to be registered as they may think proper to be so marked; [and] to inspect and scrutinize such register of voters." *Ex parte Siebold*, 100 U.S. 371, 380 (1880) (describing the Act). These supervisors were also required to attend the times and places both for voting and counting votes and were authorized "to challenge any vote the legality of which they may doubt; to be present continually where the ballot-boxes are kept, until every

vote cast has been counted, . . . and to personally inspect and scrutinize . . . the manner in which the poll-books, registry lists, and tallies are kept." *Id.*

The Second Enforcement Act, adopted a year later, included many similar provisions. Supervisors appointed by courts under the Act were to provide a "list of persons who may register and vote," to "verify" and decide who may be on such lists, and to "scrutinize, count, and canvass, each and every ballot." 16 Stat. at 433-35, 438 (1871). They were also required to "inspect and scrutinize" the voter registration lists compiled by local officials, *id.* at 434-35, and authorized "to prevent fraudulent registration." *Id.* at 436.

Years after the repeal of these Acts,[8] the Department of Justice sought to prosecute individuals for various types of voter fraud under a federal law that made it a crime to "'defraud the United States in any manner for any purpose.'" *United States v. Gradwell*, 243 U.S. 476, 479 (1917) (quoting § 37 of the U.S. Criminal Code). Despite the breadth of this statutory language, the Supreme Court concluded that, in light of the enactment and later repeal of statutes specifically addressing voter fraud, the Department could not apply a general fraud statute to such conduct. After describing the requirements of the 1870 and 1871 statutes and their subsequent repeal, the Court explained (*id.* at 485) that because

> the policy of Congress for so great a part of our constitutional life has been, and now is, to leave the conduct of the election of its members to state laws, administered by state officers, and that, whenever it has assumed to regulate such elections, it has done so by positive and clear statutes, . . . it would be a strained and unreasonable construction to apply to such elections this § 37, originally a law for the protection of the revenue, and for now fifty years confined in its application to "Offenses against the Operations of the government," as distinguished from the processes by which men are selected to conduct such operations.

---

[8] *See* Civil Rights Repeal Act of 1894, 28 Stat. 36 (1894).

In so ruling, *Gradwell* effectively anticipated the logic of the Major Questions Doctrine. *See West Virginia v. EPA*, 597 U.S. 697, 724–25 (2022) (when an agency claims to "discover in a long-extant statute an unheralded power" that would mark a "transformative expansion" of its regulatory authority, courts must "hesitate before concluding that Congress meant to confer" such power) (internal quotation marks and citations omitted). But *Gradwell* represents a unique and particularly powerful version of this concept. It reasoned that Congress's sparing and explicit use of its constitutional power to override state election procedures reflected a recognition by Congress itself that exercises of this power are a significant and dramatic intrusion on the States' primary responsibility to administer congressional elections. Accordingly, under *Gradwell*, both courts and federal agencies must be highly reluctant to conclude that Congress has exercised this power in statutes that are not explicitly directed at the conduct of congressional elections.

This principle is fatal to FEMA's assertion of authority here. Indeed, the statute at issue in *Gradwell* specifically pertained to fraud and was sweepingly broad in its scope, proscribing acts that "'defraud the United States in *any manner* for *any purpose*.'" *Gradwell*, 243 U.S. at 479-80 (emphases added). On its face, that text appeared to reach election-related fraud, yet the Court deemed it insufficiently clear to justify such a conclusion. Here, the statutory text FEMA invokes refers only to "critical infrastructure," 6 U.S.C. § 608(a)(1)(D)-(E); it does not even mention "elections" or "fraud," much less "election integrity." Under *Gradwell*, FEMA's statutory power to award grants to protect "critical infrastructure" from terrorist attacks cannot plausibly be understood to include the power to condition HSGP funds on requirements pertaining to voter registration, the types of vote-counting technology States use in federal elections, or guidelines for post-election audits and voter/ballot reconciliations.

In fact, when it first designated election systems as critical infrastructure, DHS itself disavowed any such power. That designation, it stressed, did "*not* mean a federal takeover, regulation, oversight or intrusion concerning elections in this country," and did "nothing to change the role state and local governments have in administering and running elections." Secretary Johnson Statement at 1-2. Instead, as noted earlier, the designation grew out of cyberattacks prior to the 2016 federal election, *see supra* at 4-5, and was made so that DHS could prioritize cybersecurity assistance to state and local election officials, *id.* at 5—not to prescribe election-integrity measures.[9]

In short, under *Gradwell*, FEMA's authority to protect "critical infrastructure" does not empower it to establish requirements pertaining to the conduct of congressional elections, and to then use its grant-making powers to seek state compliance with those standards. DHS itself effectively conceded as much nearly a decade ago. The agencies' contrary claims should be rejected.

## II. More Recent Exercises Of Congress's Power To Regulate State Administration Of Congressional Elections Confirm That FEMA Cannot Use HSGP Funds To Promote Election-Integrity Measures.

Over the past 50 years, Congress has returned to the subject of state administration of congressional elections. Its various enactments serve only to underscore that it did not empower

[9] The Congressional Research Service subsequently reached the same conclusion, stating that the critical infrastructure designation "does not . . . create DHS regulatory authority for the [election infrastructure subsector]," and that DHS instead "provides assistance to election jurisdictions only on a voluntary basis." Congressional Research Service, "The Designation of Election Systems as Critical Infrastructure," at 2 (Updated September 18, 2019), *available at* https://crsreports.congress.gov | IF10677. The report went on to note that, in "the 115th Congress, a few bills would have established mandatory standards or federal rule-making authority, but none received committee or floor action." *Id.*

DHS or FEMA to condition receipt of HSGP funds on compliance with agency-prescribed measures to promote election integrity.

In the Voting Rights Act of 1965, Congress authorized the appointment of federal examiners to decide whether individuals in certain jurisdictions were eligible to vote. 79 Stat. 437, 440 (1965). Those found to be eligible were to "be placed on a list of eligible voters," and examiners were to "transmit" that list to state officials. *Id.* State officials, in turn, were required to include the identified individuals "on the official voting list." *Id.* These provisions were repealed in 2006, and federal examiners were replaced by observers, who could only watch and report on the conduct of elections. *See generally* Public Law No. 109-246, § 3.

In 1986, Congress enacted the Uniformed and Overseas Citizen Absentee Voting Act (UOCAVA), 52 U.S.C. § 20301, which imposes certain duties and prohibitions on States with respect to absentee voting. The UOCAVA prescribes a number of detailed requirements concerning absentee ballots,[10] and expressly overrides a limited number of state laws that might impair the use of such ballots.[11] It also directs the President to designate the head of an executive department who is to have primary responsibility for performing the administrative

---

[10] States must allow servicemembers and citizens living abroad to register and vote absentee in all federal elections, 52 U.S.C. § 20302(a)(1), must process valid registration and absentee-ballot applications received at least 30 days before an election, *id.* § 20302(a)(2), and must transmit timely and validly requested absentee ballots no later than 45 days before the election, *id.* § 20302(a)(8)(A).

[11] For example, States cannot refuse to accept "any otherwise valid voter registration application or absentee ballot application . . . or marked absentee ballot submitted . . . by an absent uniformed services voter or overseas voter solely on the basis of" a State's "[n]otarization requirements," "[r]estrictions on paper type," or "[r]estrictions on envelope type." 52 U.S.C. § 20302(i)(1)–(3).

functions under the Act. *See id.* § 20301(a). The President designated the Department of Defense,[12] not DHS.

In 1993, Congress adopted the National Voter Registration Act (NVRA) to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," "protect the integrity of the electoral process," and ensure maintenance of "accurate and correct voter registration rolls." *Id.* § 20501(b). The NVRA established three baseline methods of voter registration procedures that every State must provide: in person, by mail, or when individuals apply for drivers' licenses. *See id.* § 20503(a)(1)-(3). For the mail-in option, the NVRA requires States to "accept and use" a standard federal "mail voter registration form," *id.* § 20505(a)(1), and sets strict limits on the form's contents.[13] Congress initially assigned responsibility for maintaining the mail voter registration form and developing regulations for its use to the FEC. *See* Pub. L. No. 103-31 § 6(a), 107 Stat. 77, 79 (1993). In 2002, it re-assigned those responsibilities to the EAC. *See* 52 U.S.C. § 20508(a). None of these responsibilities has been assigned to DHS or FEMA.

In addition to mandating the foregoing registration efforts, the NVRA provides that a registrant "may not be removed" from a State's list of eligible voters except (1) "at the request of

[12] *See* United States Department of Justice, Civil Rights Division, *The Uniformed and Overseas Citizen Absentee Voting Act*, available at https://www.justice.gov/crt/uniformed-and-overseas-citizens-absentee-voting-act.

[13] The application section may require "only such identifying information and other information (including data relating to previous registration by the applicant), as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process." 52 U.S.C. § 20508(b)(1). The state-specific instructions must "specif[y] each eligibility requirement (including citizenship)" set by state law. *Id.* § 20508(b)(2)(A). And applicants must verify that they satisfy the eligibility requirements by signing an "attestation" that is made "under penalty of perjury." *Id.* § 20508(b)(2)(B)–(C). The form "may not include any requirement for notarization or other formal authentication." *Id.* § 20508(b)(3).

the registrant"; (2) "as provided by State law, by reason of criminal conviction or mental incapacity"; or (3) "as provided under paragraph (4)." *Id.* § 20507(a)(3). The latter paragraph requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . death . . . or . . . a change in the residence of the registrant." *Id.* § 20507(a)(4). In the case of a residence change, the State may not remove a registrant without first providing notice and then determining that certain other conditions are satisfied. *Id.* § 20507(d)(1).[14] Any state "program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . . shall be uniform, nondiscriminatory, and in compliance with the Voting Rights Act of 1965," *id.* § 20507(b)(1), and must be completed "not later than 90 days prior to the date of a primary or general election for Federal office," *id.* § 20507(c)(2)(A).[15]

Finally, the Help America Vote Act of 2002 (HAVA) prescribes certain standards for state administration of federal elections, but it expressly allows States to decide how to comply with these standards. HAVA requires "a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the

[14] After providing the necessary notice, the State can remove a registrant if it receives written confirmation "that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered" or, if the registrant fails to respond, the State determines "that the registrant has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election" during a specified period. 52 U.S.C. § 20507(d)(1)(A)-(B).

[15] This 90-day requirement does not bar the removal of names from official lists of voters based on a registrant's request or death, or a disqualifying criminal conviction or mental incapacity under state law. *See* 52 U.S.C. § 20507(c)(2)(B).

State." 52 U.S.C. § 21083(a)(1)(A). It also includes certain minimum standards for state voting equipment. *Id.* §§ 21081(a)(1)(A)–(B), (2). HAVA authorizes the EAC—not DHS or FEMA—to provide "guidance" to "assist" the States in complying with these standards. *Id.* § 21101(a). But that guidance is "*voluntary*," *id.* (emphasis added), and HAVA ultimately leaves the "specific choices on the methods of complying . . . to the *discretion of the State*," *id.* § 21085 (emphasis added).

Collectively, these laws demonstrate that, after leaving the conduct of federal elections "for so great a part of our constitutional life . . . to state laws, administered by state officers," *Gradwell*, 243 U.S. at 485, Congress has authorized federal involvement in such elections in a limited and "judicious manner," and "has endeavored to guard as far as possible against any unnecessary interference with State laws and regulations." *Siebold*, 100 U.S. at 393. In light of these highly detailed and carefully circumscribed measures—including measures specifically designed to "protect the integrity of the electoral process," 52 U.S.C. § 20501(b)—it is utterly implausible that Congress authorized either DHS or FEMA to adopt additional election-integrity measures. Indeed, Congress required that every member of the EAC "shall have experience with or expertise in election administration or the study of elections," *id.* § 20923(a)(3), yet Congress did not authorize that expert body to prescribe binding guidance concerning the scope or meaning of election requirements that Congress itself has prescribed, much less empower the Commission to *supplement* those requirements. *See id.* § 21101(a) (EAC guidance is "voluntary"); *id.* § 21085 (methods of complying with HAVA's requirement are left "to the discretion of the State"). It is inconceivable that, simply by authorizing FEMA to administer federal grants to protect "critical infrastructure," Congress empowered FEMA—which has no experience with or expertise in election administration—to prescribe entirely new election

procedures, and to be able to strip States of critical anti-terrorism funding if they do not comply with those procedures.

Indeed, Congress's various enactments demonstrate that it has long had a different—and more sophisticated—understanding of the types of threats that can undermine public confidence in our elections. HAVA not only requires that the members of the EAC have experience or expertise in election administration,52 U.S.C. § 20923(a)(3), it also requires that the Commission be bipartisan, *id.* 52 U.S.C. § 20923(b)(2)(A), (3)(A), and that "[a]ny action" it takes must have "the approval of at least three of its members," *id.* § 20928. The Second Enforcement Act likewise authorized the appointment of two election supervisors, who had to be "of *different political parties*." 16 Stat. at 434 (emphasis added). Thus, Congress has consistently recognized that federal intervention in the administration of federal elections can itself undermine public confidence in elections unless that intervention is bipartisan in nature. DHS and FEMA, however, are always under the control of a President from one party. Efforts by these agencies to influence how States administer elections thus raise the very kind of threat to the integrity of federal elections that Congress has repeatedly sought to avoid. This fact simply underscores why the Court should presume that these agencies' authority to combat terrorism does not include the power to try to prescribe election-integrity measures for congressional elections.

### III. Defendants Cannot Invoke Anti-Terrorism Rationales To Justify Requirements That Supplement Or Contradict The Methods Congress Has Chosen To Regulate State Election Procedures.

Evidently recognizing that FEMA has no authority to prescribe election-integrity measures, defendants have argued in recent litigation that the new funding conditions are designed to prevent foreign interference with U.S. elections. Citing a CISA report, defendants contend that these funding conditions were "selected to address the well documented

vulnerabilities in our election system," and that each condition "contributes toward mitigating operational vulnerabilities exploitable by bad actors and prevents the potential for sabotage, infiltration, and foreign interference." Doc. 36-1 in *Nashville v. DHS*, at 14.[16] This argument appears to be a post-hoc rationalization. In all events, it cannot justify FEMA's attempt to coerce changes in state election procedures that Congress has specifically addressed, and chosen to regulate in a different manner.

**A. FEMA's Actions and Statements Show That the New Funding Conditions Were Adopted to Promote Election Integrity.**

First, it does not appear that FEMA actually relied on CISA's Election Report when it promulgated its new election-related funding conditions. Those conditions are set forth in the FY 2026 NoFO, which states on its cover page that it was "Updated: July 9, 2026." *See* Pls. Ex. 1. CISA's Election Report is dated "as of July 13, 2026"—four days *after* the FY 2026 NoFO was updated. Nor is there any citation in the FY 2026 NoFO to CISA's "Election Report" or to the specific recommendations to which defendants now point.[17] Instead, in discussing its new election-related funding conditions, the FY 2026 NoFO cited a 2024 threat assessment by DHS. *See* Pls. Ex. 1, at 15. But that assessment simply describes threats to elections; it does not mention any of the measures FEMA announced. *See* Department of Homeland Security, Office of Intelligence and Analysis, *Homeland Threat Assessment 2024*, at 19.[18] FEMA also relied on a 2025 Executive Order that, as its title makes clear, is concerned with election integrity. *See* Pls.

[16] CISA's report, entitled "Election Report," was submitted as Exhibit 5 to defendants' motion for partial summary judgment. *See* Doc. 36-5 in *Nashville v. DHS*. It bears the legend "as of July 13, 2026" at the bottom of each page.

[17] Instead, there are citations to other CISA reports, as well as to CISA's website. *See* Pls. Ex. 1, at 13, 18, 54, 82.

[18] *Available at* https://www.dhs.gov/sites/default/files/2023-09/23_0913_ia_23-333-ia_u_homeland-threat-assessment-2024_508C_V6_13Sep23.pdf

Ex. 1, at 15 (citing Executive Order 14248, *Preserving and Protection the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 28, 2025)).

In fact, FEMA essentially acknowledged that its new funding conditions seek to promote election integrity, not the physical or cyber security of election infrastructure. In the FY 2026 NoFO itself, FEMA asserted that, "[b]y *integrating the directives of Executive Order 14248* . . . , HSGP recipients can ensure that their efforts contribute to a secure, transparent, and resilient *electoral process*, thereby reinforcing public trust and *the integrity* of democratic institutions." *Id.* (emphases added). Three of FEMA's five election-related funding conditions, moreover, come from Executive Order 14248,[19] which, as just noted, is intended to "[p]reserv[e] and [p]rotect[] *the Integrity of American Elections*," 90 Fed. Reg. 14005 (emphases altered). The administrative record indicates that all of the conditions were "recommended by the Deputy Secretary for *Election Integrity*," Doc. 48-4, at 1 (emphasis added), a position that does not oversee CISA.[20] And FEMA's FY 2026 NoFO itself states that "each state and high-risk urban

[19] *Compare id.*, 90 Fed. Reg. at 14006, 08-09 ([1] requiring DHS to "ensure that State and local officials have [free] access to appropriate systems for verifying the citizenship or immigration status of individuals registering to vote or who are already registered"; [2] asserting that "voting systems should not use a ballot in which a vote is contained within a barcode or quick-response code"; and [3] requiring appropriate actions "to prevent all non-citizens from being involved in the administration of any Federal election") *with* Pls. Ex. 1, at 15-16 ([1] requiring use of U.S. Citizenship and Immigration Services' database system "to verify the citizenship of all individuals in the state voter registration database"; [2] requiring States to transition "from electronic voting systems that utilize bar codes or QR codes to count votes to equipment that accepts hand-marked paper ballots"; and [3] requiring States to "verify U.S. citizenship for any person working at a polling place in any capacity, or operating any election system in the jurisdiction").

[20] This (apparently new) position is housed in the Office of Strategy, Policy, & Plans (OSP&P), *see* https://www.dhs.gov/sites/default/files/2025-08/25_0818_plcy_office-strategy-policy-and-plans-org-chart.pdf, which, according to the DHS organizational chart, does not oversee CISA. *See* https://www.dhs.gov/sites/default/files/2025-08/25_0818_plcy_office-strategy-policy-and-plans-org-chart.pdf (showing CISA and OSP&P reporting directly and separately to the DHS Secretary through the Deputy Secretary).

area election jurisdiction must" comply with the five new funding conditions in order to "strengthen *the integrity of U.S. elections*." FY 2026 NoFO at 15 (emphasis added).

It thus appears that FEMA integrated the directives of Executive Order 14248 to achieve that Order's election-integrity objectives. Because, as we have shown, DHS and FEMA have no authority to seek to promote election integrity, *supra* §§ I-II, funding conditions adopted for such purposes are invalid.

### B. FEMA Cannot Use its Authority to Protect Critical Infrastructure to Regulate State Election Procedures That Congress Has Chosen to Regulate in a Different Manner.

Even assuming—contrary to the foregoing evidence—that FEMA's new funding conditions were prompted by, and designed to address, cybersecurity concerns, neither FEMA nor DHS has the authority to prescribe standards that are inconsistent with those that Congress has adopted (or declined to adopt) for state election systems.

DHS's "primary" missions are to "*prevent* terrorist attacks," "reduce the vulnerability of the United States to terrorism," and "minimize the damage, and assist in the recovery, from terrorist attacks that do occur." 6 U.S.C. § 111(b)(1)(A)-(C) (emphasis added); *see also id.* § 652(e)(1)(E) (authorizing DHS to develop "a comprehensive national plan for *securing* the key resources and critical infrastructure of the United States") (emphasis added). To help achieve these goals, Congress created CISA and empowered it to "coordinate a national effort to *secure and protect* against critical infrastructure risks." *Id.* § 652(c)(4) (emphasis added). And Congress created FEMA to "lead the Nation's efforts to prepare for, *protect against*, respond to, recover from, and mitigate against the risk of natural disasters, acts of terrorism, and other man-made disasters." 6 U.S.C. § 313(b)(2)(A) (emphasis added).

Collectively, these provisions empower DHS and FEMA to protect the safety and security of (1) the physical systems and technologies that comprise the Nation's critical infrastructure, (2) the physical plant or facilities that house those systems and technologies, (3) the personnel who operate those systems and technologies, and (4) associated physical or virtual assets. These provisions do not authorize DHS or FEMA to regulate the *operation* of critical infrastructure, whether that infrastructure involves power plants or election systems.

Prior to this year, FEMA acted in accordance with these clear statutory mandates. Its FY 2024 NoFO required at least one investment to support state and high-risk urban area efforts "to enhance *physical* election security and/or *cyber* election security." FY 2024 NoFO, at 33 (emphases added). It did not require investments to alter the equipment or quality controls used to conduct elections. FEMA cannot now invoke the specter of "sabotage, infiltration, and foreign interference," Doc. 36-1 in *Nashville v. DHS*, at 14, to justify funding conditions that seek to alter the ways in which States administer elections, and thereby override the more limited and "judicious" steps Congress has taken to regulate those activities. *Siebold*, 100 U.S. at 393.

**FEMA's Voter Roll Citizenship Verification Condition.** FEMA has not explained why using "the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements (SAVE) system to verify the citizenship of all individuals in the state voter registration database" is relevant to "mitigating operational vulnerabilities exploitable by terrorist or foreign actors." Pls. Ex. 1, at 15-16. Indeed, neither CISA's Election Report nor DHS's "Homeland Threat Assessment 2024" says anything about the inclusion of non-citizens in state voter registration databases, much less identifies their inclusion as a "well documented vulnerabilit[y] in our election system." Doc. 36-1 in *Nashville v. DHS*, at 14.

In all events, requiring use of this federal database contradicts provisions in HAVA. There, Congress required each State to implement "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State." 532 U.S.C. § 21083(a)(1)(A). But, as noted earlier, Congress left "choices on the methods of complying with" this and other HAVA requirements "to the discretion of the State." *Id.* § 21085.[21]

Defendants might argue that conditions on HSGP funds do not interfere with the States' discretion to decide how to maintain their voter registration rolls, because the States remain free simply to forgo such funding. *See* Doc. 36-1 in *Nashville v. DHS*, at 21. But the relevant question is whether Congress intended to give FEMA the power to *constrain* the States' discretion by imposing election-related conditions on federal grants designed to help States protect against acts of terrorism. Both under *Gradwell*—and as a matter of common sense—only "clear" and "positive" statutory language could justify such a counter-intuitive conclusion. FEMA's mandate to "protect against, respond to, recover from, and mitigate against the risk of . . . acts of terrorism." 6 U.S.C. § 313(b)(2)(A), falls far short of satisfying that test.

**Post-election manual audit/Voter-ballot reconciliation.** The only explanation FEMA offered for its post-election manual audit and voter-ballot reconciliation requirements is that they would "strengthen the integrity of U.S. elections." Pls. Ex. 1, at 15. It offered no counter-

[21] As noted earlier, the NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters *by reason of . . . death . . . or . . . a change in the residence of the registrant*." *Id.* § 20507(a)(4) (emphasis added). This provision, however, does not dictate what steps States must take to identify and remove such individuals.

terrorism rationale. Nor, as noted above, did it cite CISA's Election Report to justify these requirements.

Even if it had, CISA's report only recommended the 5% manual audit, not the ballot-voter reconciliation process. And CISA did not claim that 5% manual audits will "protect against" or "mitigate against the risk of" acts of "*terrorism*," 6 U.S.C. § 313(b)(2)(A) (emphases added), or acts of "*sabotage, infiltration, and foreign interference*" in U.S. elections. Doc. 36-1 in *Nashville v. DHS*, at 14. Instead, CISA asserted only that such audits would "confirm that voting systems *function as intended*" and would "*identify errors* prior to certification of results." CISA Election Report at 7 (emphases added). Like FEMA's own description, *see* Pls. Ex. 1, at 15 (post-election 5% manual audit will "ensure that electronic voting systems *accurately count* votes") (emphasis added), this is a description of a quality-control measure which, once again, pertains to election integrity.

In all events, Congress has already prescribed detailed standards that state voting equipment must satisfy. Among other things, HAVA provides that voting systems must "produce a record with an audit capacity for such system," "produce a permanent paper record with a manual audit capacity for such system," and "provide the voter with an opportunity to change the ballot or correct any error before the permanent paper record is produced." 52 U.S.C. § 21081(a)(2)(i)-(ii). HAVA further provides that the "error rate of the voting system in counting ballots (determined by taking into account only those errors which are attributable to the voting system not attributable to an act of the voter) shall comply with the error rate standards established under section 3.2.1 of the voting system standards" issued by the Federal Election Commission that were in effect on October 29, 2002. *Id.* § 21081(a)(5).[22] And, as noted earlier,

[22] As noted earlier, the responsibilities of the FEC were later re-assigned to the EAC.

HAVA authorizes the EAC to issue guidance with respect to these requirements, but leaves compliance to the discretion of the State. *See id.* § 21101(a); *id.* § 21085.

In addition, the 2026 National Defense Authorization Act amended HAVA to require that, "[n]ot later than 180 days after December 18, 2025, the [EAC] shall provide for the conduct of penetration testing as part of the testing, certification, decertification, and recertification of voting system hardware and software," and that such testing "shall be required for [EAC] certification." Pub. L. 119–60, div. F, title LXVIII, § 6805, (Dec. 18, 2025), 139 Stat. 1657, codified at 52 U.S.C. § 20971(e)). As a Senate sponsor explained, "penetration testing" allows researchers to "search for vulnerabilities by attempting to attack a system with the same tools and techniques used by cybercriminals, thus better protecting our election systems from legitimate attacks." "Bipartisan Election Security Provision Co-authored by Senator Susan Collins Signed into Law" (Dec. 23, 2025).[23] Thus, Congress has sought to protect against the threat of cyberattacks on election systems using means (penetration testing) that do not interfere with the conduct and certification of elections results, as the post-election audits and ballot reconciliation methods chosen by FEMA—an agency with no expertise in the administration of elections—clearly would.

Once again, FEMA lacks authority to supplement or contradict the carefully calibrated means Congress has chosen to govern manual audits, error rates, and safeguards against malicious interference with state voting equipment. Because Congress has addressed the same

[23] *Available at* https://www.collins.senate.gov/newsroom/bipartisan-election-security-provision-co-authored-by-senator-collins-signed-into-law. Ironically, the President effectively disbanded the EAC on July 9, 2026, the same day FEMA issued its updated FY 2026 NoFO. *See* "Trump fires Election Assistance Commission members ahead of midterms," Reuters (July 9, 2026) (updated July 10, 2026), available at https://www.reuters.com/legal/government/trump-terminates-election-assistance-commission-members-2026-07-10.

aspects of state election administration, this Court must "presume that Congress has done so in a judicious manner; that it has endeavored to guard as far as possible against any unnecessary interference with State laws and regulations." *Siebold*, 100 U.S. at 393. That presumption is plainly not overborne by general statutory provisions that empower DHS to develop "a comprehensive national plan for securing the key resources and critical infrastructure of the United States," 6 U.S.C. § 652(c)(4), or authorize FEMA "to prepare for, protect against, respond to, recover from, and mitigate against the risk of . . . acts of terrorism," *id.* § 313(b)(2)(A).

**Transitioning from voting equipment that uses bar or QR codes to those that use paper ballots.** FEMA did not cite CISA's Election Report or any other evidence to justify its requirement that States transition "from electronic voting systems that utilize bar codes or QR codes to count votes to equipment that accepts hand-marked paper ballots." Instead, it simply asserted that this, too, would "strengthen the integrity of U.S. elections." Pls. Ex. 1, at 15. In its Election Report, CISA advocated use of paper ballots. CISA, Election Report at 6-7. But it did not base this recommendation on any studies that *it* had conducted, applying its expertise in cybersecurity. Instead, CISA cited a report submitted by the plaintiffs in an unsuccessful challenge to the 2020 election results in Georgia, and a preliminary assessment commissioned by the Office of the Director of National Intelligence of Dominion Voting System devices used in the 2024 election in Puerto Rico. *Id* at 5 nn.3&4.

Whatever the validity of these third-party studies (which FEMA itself did not cite), they likewise cannot justify FEMA's efforts to require election-related changes that Congress itself has not mandated. In establishing the standards that state voting systems must satisfy, Congress expressly acknowledged that some States use "optical scanning" systems or "direct recording electronic system[s]." 52 U.S.C. § 21081. Congress has not required the phase-out of such

systems, but instead has subjected them to the same standards for manual audits, error rates, and safeguards against malicious penetration. For all of the reasons noted above, therefore, DHS and FEMA cannot use HSGP funds to try to coerce States to eliminate voting systems that Congress has not deemed unacceptable.[24]

## CONCLUSION

For the foregoing reasons, the Court should rule that DHS and FEMA have no authority to condition receipt of HSGP funds on compliance with measures that are designed to promote election-integrity and/or that are inconsistent with election-integrity measures that Congress itself has prescribed.

Dated: October 15, 2026

Respectfully submitted,

*/s/*Elizabeth A. Wiens
Elizabeth A. Wiens #6827
Gursky Wiens & Shanley Law
20 Centerville Road
Warwick, RI 02886
(401) 294-4700
ewiens@rilaborlaw.com

*Attorney for Amicus Curiae Bipartisan American Election Project*

[24] FEMA's fifth condition—requiring States to verify the citizenship "for any person working at a polling place in any capacity, or operating any election system in the jurisdiction," Pls. Ex. 1, at 16—does not appear to prescribe an election standard in an area that Congress has specifically addressed. This condition, however, is invalid for all of the other reasons plaintiffs identify. *See* Pls' Mot. for Summ. J., at 34-43, 52-58.