**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF ILLINOIS, et al.,<br>Plaintiffs.<br><br>v.<br><br>FEDERAL EMERGENCY MANAGEMENT AGENCY, et al.,<br>Defendants. | Case No: 1:26-cv-485-MSM-RLA |

**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' SUMMARY JUDGMENT MOTION**

# Table of Contents

**INTRODUCTION** .......... **1**

**BACKGROUND** .......... **4**

**I. DHS AND FEMA GRANT ADMINISTRATION** .......... **4**

**II. THE CHALLENGED CONDITIONS** .......... **6**

A. Homeland Security Grant Program and the Election Security Conditions .......... 6

B. Immigration Conditions and the Fusion Center Term .......... 9

C. Termination Conditions .......... 14

**STANDARD OF REVIEW** .......... **16**

**I. SUBJECT MATTER JURISDICTION** .......... **16**

**II. SUMMARY JUDGMENT** .......... **17**

**ARGUMENT** .......... **17**

**I. THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS.** .......... **17**

A. The Court should dismiss, or in the alternative, stay, Plaintiffs' claims regarding the Election Security Conditions because the *Nashville* Order already supplies the principal relief Plaintiffs seek. .......... 17

B. Plaintiffs' challenges to the superseded Fusion Center Term are moot. .......... 21

C. Plaintiffs' challenges to hypothetical applications of the Termination Conditions are not ripe. .......... 23

D. The Court lacks subject matter jurisdiction where Plaintiffs seek to modify the terms of federal grants. .......... 24

E. The APA does not permit review of discretionary grant funding decisions statutorily committed to the agency's discretion. .......... 28

**II. DEFENDANTS HAVE NOT VIOLATED THE LAW.** .......... **31**

A. Congress has granted DHS broad authority to set terms and conditions for discretionary grants .......... 31

B. The Constitution permits agencies to set terms and conditions. .......... 33

C. The Election Security Conditions are lawful. .......... 38

*1. The Election Security Conditions fall within FEMA's broad statutory authority.* .......... *38*

*2. The Election Security Conditions are lawful under the Constitution.* .......... *43*

*3. The Election Security Conditions are not arbitrary or capricious.* .......... *46*

D. The FY2026 Immigration Conditions are lawful .......... 48

*1. The FY2026 Immigration Conditions are not contrary to law and do not violate the Spending Clause or the Constitution* .......... *49*

2. *The FY2026 Immigration Conditions Are Not Arbitrary or Capricious* ....... *57*

E. The Termination Conditions are lawful. ............................................................... 62

1. *The Termination Conditions are not contrary to law.* ................................... *63*
2. *The Termination Conditions do not violate the Spending Clause* ................. *68*
3. *The Termination Conditions are not arbitrary or capricious.* ...................... *72*

**III. THE COURT SHOULD LIMIT ANY RELIEF TO THE PLAINTIFF STATES, GRANT PROGRAMS, AND CONDITIONS FOR WHICH PLAINTIFFS HAVE ESTABLISHED AN ENTITLEMENT TO RELIEF.** ........................................................ **73**

**CONCLUSION** ........................................................................................................... **77**

## INTRODUCTION

Twenty-three States, the District of Columbia, the Office of the Governor of Kentucky, and the Governor of Pennsylvania (collectively, "Plaintiffs" or "Plaintiff States") bring this suit challenging conditions that the Department of Homeland Security ("DHS") and the Federal Emergency Management Agency ("FEMA") (collectively, "Defendants") have placed on certain Fiscal Year 2026 federal grants. The Amended Complaint, ECF 44, challenges four distinct sets of provisions: conditions concerning election security ("Election Security Conditions"), immigration-related cooperation ("Immigration Conditions"), fusion centers funded through the Homeland Security Grant Program ("Fusion Center Term") (which Plaintiffs treat as part of their broader Immigration Conditions challenge), and termination of federal awards ("Termination Conditions") (collectively, the "Challenged Conditions"). Although Plaintiffs seek broad relief against all of these provisions, the Challenged Conditions arise under different statutory authorities, apply to different grant programs, operate in materially different ways, and are consistent with statutes delegating authority to DHS and its components to operate the affected programs.

The Election Security Conditions applied only to the Homeland Security Grant Program ("HSGP") and have since been rescinded from the reissued FY2026 HSGP awards. The Immigration Conditions apply to a discrete group of non-disaster preparedness and security programs identified by FEMA after a program-specific review that separately considered the statutory authority, purposes, award criteria, and asserted immigration, law enforcement, or national security nexus of the programs evaluated. The Fusion Center Term applies only to HSGP awards, which FEMA has since reissued with the corrected term, yet Plaintiffs continue to challenge the superseded language. Finally, the Termination Conditions govern FEMA's non-disaster awards, with termination-for-convenience further limited to discretionary awards.

Plaintiffs filed their Complaint on July 23, 2026, ECF 1, and an Amended Complaint on October 2, 2026, ECF 44. On October 13, 2026, Plaintiffs moved for summary judgment on all

of their claims, ECF 50. Plaintiffs contend that Defendants lack statutory authority to impose the Challenged Conditions, that the conditions violate the Spending Clause, and that their adoption or application violates the Administrative Procedure Act ("APA"). They seek declarations that the conditions are unlawful, vacatur of the conditions and actions implementing them, and broad injunctive relief requiring Defendants to administer FY2026 grants on Plaintiffs' preferred terms. *See* ECF 44 at 82-83; ECF 50 at 60-65. The requested relief extends beyond the particular applications of the Challenged Conditions properly at issue. Most notably, Plaintiffs expressly disclaim any challenge to application of the Immigration Conditions to the State Border Security Reinforcement Fund, yet nevertheless seek vacatur of the Immigration Conditions wholesale.

Another district court has already vacated the Election Security Conditions challenged here, and that Order is presently in full force. *See Metro. Gov't of Nashville & Davidson Cnty. v. U.S. Dep't of Homeland Sec.* (hereinafter, "*Nashville*"), No. 1:26-cv-02886-AHA, 2026 WL 2905123 (D.D.C. Sept. 28, 2026). While the Agency's position remains that it has the lawful authority to enforce the Election Security Conditions, it has respected and followed the *Nashville* Order. On October 7, 2026, FEMA issued Information Bulletin No. 587 ("Bulletin 587"), attached as Ex. A, which, "[e]ffective immediately," rescinded the challenged conditions, FEMA's implementing guidance, and the corresponding award article from FY2026 HSGP awards. By October 19, FEMA had reissued all FY2026 HSGP awards and made them available for acceptance through FEMA's grants-management platform ("FEMA GO"). *See* Ex. P (emails from FEMA to State Administrative Agencies ("SAAs")). The reissued awards expressly provide that the challenged election administration conditions and 20% holdback "are rescinded and do not apply to this award." *See, e.g.*, Ex. Q (sample revised FY2026 HSGP award) at 42 (Art. 65).[1] Based on the plain language of the award documents, Plaintiffs are not currently required to comply with the Election Security Conditions. Defendants nevertheless incorporate herein their

---

[1] Citations to pages of exhibits attached hereto refer to the internal pagination of the underlying document, where available. Where a document lacks internal pagination, citations refer to the page numbers of the PDF file. Citations to the administrative record, ECF 48-1 through 48-8, refer to the page numbers in the ECF header.

arguments in support of the lawfulness of the Election Security Conditions for completeness and to preserve their position should the *Nashville* Order be stayed, reversed, vacated, or otherwise modified in subsequent proceedings, thereby permitting the Agency to resume enforcement of those conditions.

Notwithstanding that changed posture, Plaintiffs informed counsel for Defendants that they intend to continue pursuing their Election Security claims. Plaintiffs' Motion seeks merits rulings on the Election Security Conditions while relying extensively on the *Nashville* decision that prompted their rescission, and continues to challenge provisions of an outdated Fusion Center Term that FEMA has since revised in the reissued FY2026 HSGP awards, an example of which is attached as Ex. Q. *See* Ex. P (emails from FEMA to SAAs); Ex. Q (sample revised FY2026 HSGP award) at 42 (Art. 65). More generally, Plaintiffs incorrectly suggest that Defendants are "holding hostage hundreds of millions of dollars," ECF 50 at 1, despite no grant funds presently being withheld on account of the Challenged Conditions. The Court should evaluate the Agency action that presently governs Plaintiffs' awards, rather than superseded provisions or hypothetical applications of the operative terms.

As explained below, Plaintiffs' claims fail at the threshold and on the merits. Their challenges to the Election Security Conditions and certain provisions of the Fusion Center Term are moot. If the Court concludes that the Election Security claims remain live, it should at a minimum stay those claims while the *Nashville* Order remains operative, pending resolution of any motion for a stay or appeal pursued by Defendants in that case (subject to any necessary authorization by the Solicitor General).

Additionally, several of Plaintiffs' theories, particularly their objections to hypothetical future exercises of FEMA's termination authority, remain premature and are therefore not ripe for adjudication; their requested relief sounds in contract and falls outside this Court's jurisdiction; and other claims seek review of matters committed to agency discretion by law. On the merits, Congress afforded DHS and FEMA substantial authority to administer the grant programs at issue; and the operative terms Plaintiffs challenge fall within that statutory framework, provide

clear notice to recipients, and were sufficiently supported by reasoned decision-making. The Court should deny Plaintiffs' Motion, grant Defendants' Cross-Motion, and enter judgment for Defendants. Any relief the Court does grant should be confined to the particular Plaintiffs, claims, and grant programs for which Plaintiff States are properly entitled to relief.

Defendants rest on the briefing in this case and defer to the Court on whether a hearing is necessary on the parties' cross-motions.

## BACKGROUND

### I. DHS AND FEMA GRANT ADMINISTRATION

Congress has authorized DHS to "make contracts, grants, and cooperative agreements" as necessary and proper to carry out the Secretary's statutory responsibilities. 6 U.S.C. § 112(b)(2). FEMA, a component of DHS, administers numerous federal financial-assistance programs supporting emergency preparedness, terrorism prevention, border security, transportation security, and related homeland-security objectives. *See generally* 6 U.S.C. § 313. Those awards are governed by the statutes and appropriations establishing the particular grant programs, government-wide regulations governing federal financial assistance, and the terms and conditions incorporated into individual awards. *E.g.*, 2 C.F.R. §§ 200.101 (applicability of Part 200 to federal awards), 200.204 (notices of funding opportunities), 200.211 (information and terms contained in federal awards), 200.300 (statutory and national policy requirements).

FEMA administers both discretionary and non-discretionary grant programs. A "discretionary award" is one in which an agency, pursuant to statutory authority permitting it to exercise judgment, selects the recipient or determines the amount of funding through a competitive process or based on the merits of proposals. 2 C.F.R. § 200.1. By contrast, a "non-discretionary" award is one made to specified recipients pursuant to statutory, eligibility, and compliance requirements and where the amount may be fixed by statute or determined by formula. *Id*. Federal agencies, including FEMA, announce the availability of funding through Notices of Funding Opportunity ("NOFOs"), which identify, among other things, eligible

applicants, anticipated funding levels, program goals and objectives, and application requirements. *See id.*; *see also id.* §§ 200.204(a), (c); *e.g.*, ECF 51-1. The resulting award identifies the amount awarded and incorporates the terms and conditions governing the recipient's use of the funds, including applicable general and award-specific conditions. *See* 2 C.F.R. § 200.211(b)-(d).

Consistent with these regulations, DHS issues Standard Terms and Conditions applicable to its federal financial assistance awards, subject to any program-specific terms or modifications. *E.g.*, ECF 51-2; ECF 51-9 at 28 (providing that recipients must comply with the DHS Standard Terms and Conditions in effect as of the award "unless a term and condition specifically indicates otherwise"). Together, the governing statutes, regulations, NOFOs, DHS Standard Terms and Conditions, and award-specific terms establish the conditions governing the federal funds made available to recipients.

For FY2026, DHS issued its Standard Terms and Conditions on April 16, 2026, ECF 45-3, and subsequently updated them on August 28, 2026. *See* ECF 51-2; ECF 51-18.[2] FEMA separately issued program-specific NOFOs and other guidance governing individual grant programs. *E.g.*, ECF 51-1; ECF 51-9; ECF 51-10. On September 18, 2026, FEMA issued Information Bulletin No. 582 ("Bulletin 582"), identifying the programs and awards to which certain FY2026 terms, including the Immigration Conditions and Termination Conditions challenged here, apply. *See* ECF 51-3. The award documents issued to Plaintiffs have incorporated by reference Bulletin 582. *E.g.*, ECF 51-4 at 73 (Art. 56). The administrative record further reflects that FEMA separately sought and obtained approval for deviations from the DHS FY2026 Standard Terms and Conditions and for program-specific terms applicable to its FY2026 grants, including the conditions Plaintiffs now challenge, as early as May 2026. *See* ECF 48-3.

---

2 Unless otherwise noted, references in this brief to the FY2026 Standard Terms and Conditions are to that operative version, found at ECF 51-2.

## II. THE CHALLENGED CONDITIONS

### A. Homeland Security Grant Program and the Election Security Conditions

The FY2026 Election Security Conditions applied to the Homeland Security Grant Program ("HSGP"), a FEMA-administered grant program designed to strengthen state and local capabilities to prevent, prepare for, protect against, and respond to acts of terrorism. *See* 6 U.S.C. §§ 603-609; ECF 51-1 at 9-10. HSGP consists of three principal components: the State Homeland Security Program ("SHSP"), which supports statewide and state, local, tribal, and territorial preparedness capabilities; the Urban Area Security Initiative ("UASI"), which supports similar capabilities in high-risk urban areas; and Operation Stonegarden ("OPSG"), which supports coordination among federal, state, local, tribal, and territorial law-enforcement agencies to strengthen border security. ECF 51-1 at 9-10, 22-23.

Congress has authorized HSGP funds to support a broad range of homeland security activities, including protection of critical infrastructure, information sharing, cybersecurity, emergency communications, training and exercises, and law enforcement terrorism prevention activities. *See* 6 U.S.C. §§ 607-609. Consistent with those purposes, FEMA has long required SHSP and UASI recipients to devote portions of their awards to designated National Priority Areas ("NPAs") reflecting current homeland security priorities, including election security. *See* ECF 51-1 at 11; Ex. B (FY2024 HSGP NOFO) at 7, 27-28, 29-34; Ex. C (FY2025 HSGP NOFO) at 9-10, 13-18. That longstanding framework has also included funding holds tied to compliance with NPA and law enforcement terrorism prevention requirements. *See* ECF 48-3 at 17. Plaintiffs did not challenge the validity of the FY2024 allocations or withholding provision.[3]

---

[3] Plaintiffs first challenged FEMA's NPA allocation requirements in their reply in support of summary judgment in *State of Illinois v. FEMA* ("*FEMA I*"), No. 1:25-cv-206-MSM-RLA (Smith, J.), in connection with the FY2025 HSGP NOFO. *See* Pls.' Reply in Supp. of Mot. for Summ. J. at 5-6, *id.*, ECF 65 (D.R.I. Aug. 4, 2025). The Court in that 2025 litigation did not address that separate NPA-allocation issue. *See generally* Mem. & Order, *id.*, ECF 71 (D.R.I. Sept. 24, 2025), attached here as Ex. D. To the extent Plaintiffs purport to renew that challenge here, Defendants preserve and incorporate by reference their prior arguments that HSGP's NPA allocation framework is independently lawful. *See* Defs.' Reply in Supp. of MSJ at 1-5, *id.*, ECF 69 (D.R.I. Aug. 12, 2025), attached here as Ex. E.

For FY2026, FEMA identified five NPAs: protection of soft targets and crowded places; support for Homeland Security Task Forces ("HSTFs") and fusion centers; cybersecurity resiliency; election security; and border-crisis response and enforcement. ECF 51-1 at 11. SHSP and UASI recipients must allocate at least 30% of their awards among those NPAs, including at least 3% for election security and at least 10% for border-crisis response and enforcement. *Id.*

FEMA's inclusion of election security among those priorities also reflects DHS's longstanding treatment of election infrastructure as a homeland security concern. In 2017, DHS designated election infrastructure as part of the Nation's critical infrastructure, encompassing physical and technological systems used to administer elections, including polling places, vote-tabulation facilities, voter registration databases, voting machines, and related information systems. ECF 51-1 at 15; Ex. F (January 6, 2017 Statement by Secretary Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector ("2017 Designation")). DHS has continued to identify threats to election infrastructure in subsequent homeland security assessments. *See, e.g.*, Ex. G (2024 Homeland Threat Assessment) at 19.

Against that backdrop, FEMA continued its practice from prior fiscal years of identifying "Enhancing Election Security" as one of HSGP's NPAs for FY2026. *See* ECF 51-1 at 11, 15-16; *see also* Ex. B (FY2024 HSGP NOFO) at 7, 27-34; Ex. C (FY2025 HSGP NOFO) at 9-10, 13-18. As with prior years, the FY2026 HSGP NOFO requires each State and high-risk urban area to devote at least 3% of its SHSP and UASI award to eligible physical or cyber election security investments. *See* ECF 51-1 at 15. That 3% allocation is not part of the Election Security Conditions challenged here. Rather, Plaintiffs challenge five specific election administration requirements that FEMA added for FY2026. *See* ECF 50 at 16-17.

Those five requirements, referred to herein as the "Election Security Conditions," would have required States to submit evidence of: (1) a plan to transition from electronic voting systems that utilize barcodes or QR codes to count votes to equipment that accepts hand-marked paper ballots; (2) a post-election 5% manual audit of paper ballots to verify the accuracy of electronic vote counts; (3) confirmation that the number of voters who voted in each federal

election matches the number of ballots cast, using methodology established by the Secretary; (4) utilization of the U.S. Citizenship and Immigration Services' Systematic Alien Verification for Entitlements ("SAVE") system to verify the citizenship of individuals in the State voter registration database within 120 days of accepting the grant award, with the State's chief election official taking timely corrective action, consistent with applicable law, to remove verified non-U.S. citizens from the database; and (5) utilization of the SAVE system or another authorized government system to verify U.S. citizenship of any person working at a polling place in any capacity, or operating any election system in the jurisdiction. ECF 51-1 at 15-16; ECF 51-13.

Until the State submitted evidence of compliance with these five Election Security Conditions and DHS had verified the required compliance, FEMA would have withheld from drawdown an amount equal to 20% of a recipient State's total HSGP award. ECF 51-1 at 16; ECF 51-13 at 2. The administrative record further describes the mechanics of that withholding. The 20% amount was calculated against the recipient's total HSGP award, was not tied to any particular project, and was unavailable for obligation, expenditure, or drawdown until release. ECF 48-5 at 10. Within the remaining available balance, however, the recipient could fund any approved project. *Id*.

On September 28, 2026, the U.S. District Court for the District of Columbia concluded that FEMA lacked statutory authority to impose the FY2026 Election Security Conditions and vacated those conditions, the associated 20% holdback, and FEMA's August 10, 2026 implementing guidance (Information Bulletin No. 580, reproduced here at ECF 51-13). *Nashville*, 2026 WL 2905123, at *10. On October 7, 2026, FEMA issued Bulletin 587, which states, "[e]ffective immediately and as required by the Court's Order issued September 28, 2026, FEMA is amending all Fiscal Year 2026 [HSGP] awards by rescinding": (1) the election administration conditions and 20% holdback requirements appearing at pages 15-16 of the FY2026 HSGP NOFO; (2) Information Bulletin No. 580, *Fiscal Year 2026 Election Security Guidance*, issued August 10, 2026; and (3) the "Election Security Compliance Withhold" Agreement Article. Ex. A (Bulletin 587) at 3.

FEMA subsequently completed those amendments at the award level. On October 15, FEMA informed SAAs that it would update and reissue the affected HSGP awards; on October 19, FEMA informed recipients that the revised award packages were available in FEMA GO. *See* Ex. P (emails from FEMA to SAAs). The revised award terms expressly incorporate Bulletin 587 and provide that the challenged election administration conditions and 20% holdback "are rescinded and do not apply to this award." *See, e.g.*, Ex. Q (sample revised FY2026 HSGP award) at 42 (Art. 65). They also confirm that the separate requirement to devote at least 3% of HSGP funds to physical and cyber election security remains in effect. *Id.*

**B. Immigration Conditions and the Fusion Center Term**

DHS's FY2026 Standard Terms and Conditions include a set of provisions addressing communication and cooperation with DHS and federal immigration officials. *See* ECF 51-2 at 5-7. In relevant part, the terms address information sharing; compliance with federal immigration laws; cooperation with certain DHS requests, including specified requests for information and short-term detention pursuant to a valid detainer; access to detained individuals; and public disclosure of immigration-enforcement operations. *Id.*

The FY2026 terms also include a revised version of what Plaintiffs refer to as the "Benefits Condition," *see* ECF 50 at 13, which concerns programs that benefit or incentivize illegal immigration through the provision of direct financial support or public benefits. ECF 51-2 at 6-7. A broader version of that condition appeared in the FY2025 Standard Terms and Conditions under the Anti-Discrimination term. *See* Ex. H (DHS FY2025 Standard Terms & Conditions (April 18, 2025)) at 7 (§ C.XVII(2)(a)(iii)). These provisions are referred to collectively here as the "Immigration Conditions."[4]

[4] Plaintiffs also include the HSGP-specific Fusion Center Term, discussed in more detail below, within their definition of the "Immigration Conditions." ECF 50 at 14. Defendants regard the Fusion Center Term as a separate, program-specific requirement, but nonetheless address it alongside the Immigration Conditions in this brief for ease of reference and because Plaintiffs challenge it as part of the same broader theory.

The FY2026 Standard Terms and Conditions provide that the Immigration Conditions apply to selected DHS grant programs. ECF 51-2 at 5. They add that DHS will determine their applicability on a program-by-program basis, consistent with the statutes governing each program, based on whether the program has a nexus to "immigration activities, law enforcement, or national security, including preventing and responding to acts of terrorism and extremism." *Id*. The terms further provide that DHS may tailor the conditions to individual programs and will identify in the applicable grant documents "whether and how" they apply. *Id.*

FEMA thereafter undertook the program-specific review contemplated by the FY2026 Standard Terms and Conditions. In its September 9, 2026 decision memorandum (the "Sept. 9 Memo"), FEMA addressed deviations from DHS's Standard Terms and Conditions and other program-specific conditions for FEMA's non-disaster grants. *See* ECF 48-5. FEMA reiterated that the Immigration Conditions would not apply where DHS had not approved their application and expressly left the program-specific applicability determination to a separate immigration conditions memorandum. *Id*. at 4-5. FEMA then separately examined the programs under consideration by reference to, among other things, their authorizing authorities, purposes, award criteria, and asserted nexus to immigration activities, law enforcement, border security, terrorism prevention, or national security. *See* ECF 48-6 at 4-11; ECF 48-7. Its September 11, 2026 memorandum (the "Sept. 11 Memo"), ECF 48-6, identified the programs recommended for application of the Immigration Conditions based on those program-specific analyses; a September 18, 2026 memorandum (the "Sept. 18 Memo") provided further reasoning concerning those determinations. ECF 48-7. That process culminated in FEMA's issuance of Bulletin 582, ECF 51-3, which identified the discrete set of programs to which the Immigration Conditions would apply. Those programs comprise:

- BioWatch;
- Emergency Management Performance Grant Program ("EMPG");
- HSGP (SHSP, UASI, and OPSG);
- Homeland Security National Training Program ("HSNTP") – Continuing Training Grant – Competitive;

- Port Security Grant Program ("PSGP");
- Regional Catastrophic Preparedness Grant Program ("RCPGP");
- Securing the Cities;
- State Border Security Reinforcement Fund ("SBSRF");[5] and
- Transit Security Grant Program ("TSGP").

*Id*. at 2. The administrative record further reflects differentiated treatment within RCPGP as DHS directed that the Immigration Conditions not apply to the New Jersey RCPGP award and limited their application to the Miami-Dade RCPGP award. *See* ECF 48-6 at 5.

The FY2026 Immigration Conditions materially modify the immigration-related terms imposed on certain DHS and FEMA awards in FY2025. In *State of Illinois v. FEMA* (hereinafter, "*FEMA I*"), No. 1:25-cv-206-MSM-RLA (Smith, J.), this Court concluded, on September 24, 2025, that the FY2025 Immigration Conditions were unlawful and enjoined and vacated those terms. *See* Mem. & Order on Cross-Mot. for Summ. J., *id*., ECF 71 (D.R.I. Sept. 24, 2025), attached as Ex. D. The FY2026 provisions differ from the FY2025 terms both in their text and the process by which FEMA determined their application.[6]

Most significantly, the FY2026 terms expressly require a program-specific determination as to whether and how the conditions apply, and the administrative record reflects that FEMA carried out that inquiry by separately examining the statutory and programmatic characteristics of the programs under consideration. *See* ECF 51-2 at 5; ECF 48-6; ECF 48-7. The FY2026 terms also provide greater specificity concerning the information and cooperation required of recipients and narrow the provision concerning programs that benefit or incentivize illegal

---

[5] Plaintiffs expressly disclaim any challenge to application of the Immigration Conditions to SBSRF because no Plaintiff seeking relief from those conditions applied for funding under that program. *See* ECF 44 ¶ 150 n.8; ECF 50 at 21 n.8.

[6] The Plaintiffs in *FEMA I* have separately moved to enforce the Court's prior Orders regarding the FY2025 terms against the FY2026 Immigration Conditions. *See* Pls.' Second Mot. to Enforce, *FEMA I*, No. 1:25-cv-206, ECF 83 (D.R.I. Oct. 7, 2026). Defendants have opposed that Motion, explaining, among other things, that the FY2026 conditions reflect distinct agency action based on revised terms, a program-specific applicability process, and a separate administrative record, and therefore do not fall within the scope of the Court's prior injunction. *See* Defs.' Opp. to Second Mot. to Enforce, *id*., ECF 87 (D.R.I. Oct. 21, 2026), attached as Ex. I. Defendants incorporate that response by reference to the extent Plaintiffs rely here on the prior *FEMA I* Orders as independently resolving the validity of the FY2026 conditions.

immigration. *See* ECF 51-2 at 6-7. FEMA also applied the FY2026 terms to a more limited group of programs than those to which the FY2025 terms applied. *Compare* ECF 51-3 at 2, *with* Defs.' Mot. for Summ. J. ("MSJ") at 7, *FEMA I*, No. 1:25-cv-206, ECF 61 (D.R.I. July 23, 2025), attached here as Ex. J.

Plaintiffs also sweep into their Immigration Conditions challenge particular provisions of a separate term regarding fusion centers specific to HSGP awards. *See* ECF 44 ¶¶ 157-59; ECF 50 at 14. Congress defines a fusion center as a collaborative effort among Federal, State, local, or tribal agencies that combines resources, expertise, or information to enhance their ability to "detect, prevent, investigate, apprehend, and respond to criminal or terrorist activity." 6 U.S.C. § 124h(k)(1). Consistent with that role, Congress expressly identifies the establishment, enhancement, and staffing of State, local, and regional fusion centers as an authorized law enforcement terrorism prevention activity under HSGP. *See id.* § 607(a)(2)(G); *id.* § 609(a)(7).

In the HSGP award documents attached to the Amended Complaint and Plaintiffs' Motion for Summary Judgment, those requirements appear in Art. 63, titled "Fusion Center Intelligence Support, Coordination, and Reporting Requirement." *See* ECF 45-7 at 76-77; ECF 51-4 at 76-77. Plaintiffs challenge three provisions that required fusion centers to: (1) coordinate with their "local HSTF"; (2) maintain a "permanent, formal seat" for officials from U.S. Immigration and Customs Enforcement's ("ICE") Enforcement and Removal Operations ("ERO"); and (3) confirm that their lead agency maintained an active agreement under section 287(g) of the Immigration and Nationality Act (8 U.S.C. § 1357(g)).[7] *See* ECF 44 ¶¶ 157-59; ECF 50 at 25-26. (Section 1357(g) authorizes DHS to enter into written agreements with State or local law enforcement agencies under which designated officers may perform specified immigration enforcement functions under federal supervision. *See* 8 U.S.C. § 1357(g).)

As the administrative record explains, however, the version included in the initial HSGP award packages was an earlier, incorrect draft. *See* ECF 48-8. FEMA clarified in its October 8,

---

[7] For consistency with the United States Code citations used throughout this brief, Defendants cite the codified provision at 8 U.S.C. § 1357(g).

2026 memorandum (the "Oct. 8 Memo") that the Agency was amending the affected awards to substitute the version that had been finalized on August 20, 2026 after consultation with DHS's Office of Intelligence and Analysis and other appropriate officials. *See id*. at 1, 3-4. FEMA implemented that correction the next day by publishing on its website Information Bulletin No. 589 ("Bulletin 589"), which, "[e]ffective immediately," replaced the Fusion Center Term "in its entirety" in all FY2026 HSGP awards. *See* Ex. K (Bulletin 589) at 2-3.[8]

FEMA thereafter implemented that correction in the award documents themselves. On October 15, FEMA notified SAAs that their HSGP awards would be reissued with the corrected Fusion Center Term, which was completed by October 19. *See* Ex. P (emails from FEMA to SAAs). The reissued award contains the corrected Fusion Center Term, expressly incorporates Bulletin 589, and states that the prior "Fusion Center Intelligence Support, Coordination, and Reporting Requirement" is "replaced in its entirety as provided in Information Bulletin No. 589." *See, e.g.*, Ex. Q (sample revised FY2026 HSGP award) at 41-42 (Arts. 64-65). The operative term does not require a fusion center to maintain a permanent, formal ERO seat; instead, quarterly reports are expected to identify the number of ERO seats, if any, maintained at the fusion center. *Id.* at 41 (Art. 64). Nor does it mandate confirmation that the fusion center's lead agency is an active § 1357(g) partner; rather, the reports request updates concerning participation in DHS § 1357(g) programs and whether the lead agency maintains such an agreement. *Id.* The corrected term also affords greater flexibility with respect to HSTF coordination by requiring support for the "appropriate regional" HSTF rather than prescribing coordination strictly with the fusion center's local HSTF. *Id.* The corrected term materially changes the provisions Plaintiffs specifically challenge. Defendants therefore address the Fusion Center Term in the form now contained in the reissued FY2026 awards.

---

8 *See* FEMA, Grant Programs Directorate Information Bulletin No. 589 (Oct. 9, 2026), https://www.fema.gov/sites/default/files/documents/fema_rsl_gpd_ib-589-20261009-fusion-center-requirement_10092026.pdf (last accessed Oct. 21, 2026).

### C. Termination Conditions

FEMA's FY2026 non-disaster awards are also subject to provisions governing termination of federal awards. On August 7, 2025, the President issued Executive Order ("EO") 14332, *Improving Oversight of Federal Grantmaking*. Exec. Order No. 14332, 90 Fed. Reg. 38929 (Aug. 7, 2025). Among other things, the EO directs the Office of Management and Budget ("OMB") to revise the Uniform Guidance to require discretionary grants to permit termination for convenience, including where an award no longer advances agency priorities or the national interest. *Id.* §§ 5, 6. The EO defines "discretionary award" by reference to 2 C.F.R. § 200.1 and expressly excludes programs in which legislation creates an entitlement to funds, such as block grants, grants awarded based on a statutory formula, and disaster recovery grants. *Id.* § 2(d). It further directs agency heads, to the maximum extent permitted by law, to revise the terms and conditions of existing and future discretionary grants to permit termination for convenience, including when an award no longer advances agency priorities or the national interest. *Id.* § 6(b).

Plaintiffs overread EO 14332. They characterize it as authorizing termination based on agency priorities "as determined *after* an award has been made." *See* ECF 50 at 11 (emphasis in original). The EO says no such thing. It authorizes termination for convenience when an award no longer advances agency priorities or the national interest; it does not state that an agency may invent a new priority after award and then apply it retroactively.

FEMA's revised Termination Conditions reflect that distinction. In a May 11, 2026 decision memorandum (the "May 11 Memo"), FEMA proposed a more comprehensive termination provision addressing matters not covered by the DHS Standard Term and designed, among other things, to account for EO 14332. *See* ECF 48-3 at 5. The May 11 Memo expressly noted the EO's limitation of termination-for-convenience requirements to discretionary awards and its exclusion of block grants, statutory formula awards, and disaster recovery grants. *Id.* FEMA also explained that its provision would address termination of subawards by pass-through entities. *Id.* On May 14, 2026, the Senior Official Performing the Duties of the DHS Under

Secretary for Management approved FEMA's recommendation to apply that more comprehensive termination term. *See id.* at 2.

As Bulletin 582 explains, for affected FEMA non-disaster awards, a FEMA-specific termination condition applies in place of the general "Termination of a Federal Award" provision in the FY2026 DHS Standard Terms and Conditions. *See* ECF 51-3 at 3-4 (§ III.B). Section III.B(2)(a)(i) of that FEMA-specific Termination Condition identifies four grounds on which the Agency may terminate an award. *Id*. at 4. The first two, §§ III.B(2)(a)(i)(1) and (2), permit termination for noncompliance or with the recipient's consent, respectively. *Id*. Plaintiffs' challenge is directed towards the latter two, §§ III.B(2)(a)(i)(3) and (4). *See* ECF 50 at 18-20.

Subsection (2)(a)(i)(3) (hereinafter referred to as the "Agency Priorities" provision) provides that FEMA may terminate a non-disaster award if "the federal award no longer effectuates the program goals or agency priorities." ECF 51-3 at 4. This provision tracks the terminology of 2 C.F.R. § 200.340(a)(4), which contemplates termination pursuant to an award's terms and conditions, "including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). Bulletin 582 identifies six circumstances in which that determination may be made: (a) where a particular award objective is ineffective at achieving program goals described in the NOFO; (b) an award objective as described in the NOFO will be ineffective at achieving program goals or agency priorities; (c) the grant program's design is flawed relative to program goals or priorities; (d) the program is not aligned with DHS or FEMA strategic plans or successor policies; (e) FEMA changes or reevaluates the program's goals or priorities and determines that the award will be ineffective at achieving those updated goals; or (f) another reason based on program goals or agency priorities identified in the termination notice provided to the recipient pursuant to 2 C.F.R. § 200.341. ECF 51-3 at 4.

Subsection (2)(a)(i)(4), meanwhile, permits FEMA to terminate an award "[f]or convenience, including if the award no longer advances the national interest." *Id*. That termination-for-convenience provision is expressly limited to "discretionary awards," as defined

in 2 C.F.R. § 200.1, and does not apply to grants for which legislation creates an entitlement to funds, such as block grants, or grants awarded pursuant to a statutory formula. *Id.*

## STANDARD OF REVIEW

### I. SUBJECT MATTER JURISDICTION

To proceed on their claims, the Plaintiff States must first establish subject matter jurisdiction in this Court, specifically, by showing that Congress has waived sovereign immunity and that this Court may hear their claims. *See, e.g.*, *Davallou v. United States*, 998 F.3d 502, 504 (1st Cir. 2021) (affirming R. 12(b)(1) dismissal). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994); *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction.").

Federal courts "presume [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (quotation marks and citations omitted). The test for deciding whether sovereign immunity has been waived is "stringent," the waiver must be "unmistakably clear," and the Court must "indulge every reasonable presumption against waiver." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675, 678, 682 (1999); *Fed. Aviation Admin. v. Cooper*, 566 U.S. 284, 290 (2012) ("A waiver of sovereign immunity must be 'unequivocally expressed' in statutory text." (citations omitted)).

Plaintiff States have the burden of alleging facts sufficient to establish the Court's subject matter jurisdiction. *See Aversa v. United States*, 99 F.3d 1200, 1209 (1st Cir. 1996); *see also Padilla-Mangual v. Pavía Hosp.*, 516 F.3d 29, 31 (1st Cir. 2008) ("Once challenged, 'the party invoking subject matter jurisdiction . . . has the burden of proving by a preponderance of the evidence the facts supporting jurisdiction.'" (citation omitted)).

## II. SUMMARY JUDGMENT

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review." *Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006). And "the summary judgment rubric has a 'special twist in the administrative law context,'" where "summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action was arbitrary and capricious." *Boston Redev. Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (citation omitted).

# ARGUMENT

## I. THE COURT LACKS JURISDICTION OVER PLAINTIFFS' CLAIMS.

Federal courts must assure themselves of jurisdiction before reaching the merits. *See Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94-95 (1998). Plaintiffs' challenge to the Election Security Conditions and certain superseded provisions of the Fusion Center Term are moot,[9] and additional jurisdictional limitations independently foreclose review of the remaining claims. Because these threshold issues do not require resolution of the merits, the Court should address them first, dismiss Plaintiffs' claims, and grant summary judgment to Defendants.

### A. The Court should dismiss, or in the alternative, stay, Plaintiffs' claims regarding the Election Security Conditions because the *Nashville* Order already supplies the principal relief Plaintiffs seek.

Article III limits federal courts to resolving live "Cases" and "Controversies." U.S. Const. art. III, § 2. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for

---

[9] Defendants advance this mootness argument as to the Election Security Conditions based on the *Nashville* Order's present operative effect, pending resolution of any motion to stay that Order that Defendants may seek to file or disposition of any appeal authorized by the Solicitor General. This argument is without prejudice to Defendants' position should the *Nashville* Order be stayed, reversed, vacated, or otherwise modified, or should subsequent legal proceedings otherwise affect its operative effect.

purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (cleaned up). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'" *Id.* (citation omitted). "Sometimes, events in the world overtake those in the courtroom, and a complaining party manages to secure outside of litigation all the relief he might have won in it. When that happens, a federal court must dismiss the case as moot." *FBI v. Fikre*, 601 U.S. 234, 240 (2024).

That is what has occurred here concerning the Election Security Conditions. On September 28, 2026, the U.S. District Court for the District of Columbia entered summary judgment in *Nashville*, 2026 WL 2905123, concluding that FEMA lacked statutory authority to impose the FY2026 Election Security Conditions and vacating those conditions, the associated 20% holdback, and FEMA's August 10, 2026 implementing guidance. *Id.* at *10. FEMA formally implemented that Order on October 7, 2026, through Bulletin 587. Ex. A (Bulletin 587). The Bulletin states, "[e]ffective immediately," FEMA was rescinding the challenged election administration requirements and associated withholding provisions from the affected awards. *Id.* at 3. It further provides that FEMA would amend the affected award files to reflect those changes. *Id.* at 4.

FEMA has now completed that award-level implementation. *See* Ex. P (emails from FEMA to SAAs). On October 19, FEMA informed recipients that the updates were complete and that the reissued awards were available for acceptance. *Id.* The reissued HSGP award removes the Election Security Compliance Withhold and expressly provides that the challenged election administration conditions, 20% holdback, and Information Bulletin No. 580 "are rescinded and do not apply to this award." *See, e.g.*, Ex. Q (sample revised FY2026 HSGP award) at 42 (Art. 65). It separately confirms that the longstanding 3% minimum election-security investment remains in effect. *Id.*

Those developments eliminate Plaintiffs' alleged injury from the Election Security Conditions. The salient relief Plaintiffs seek as to those conditions is vacatur. *See* ECF 44 ¶¶ 200, 210, 219, 221 & at 83 (Prayer for Relief ¶ d); ECF 50 at 60. That relief has already been obtained through *Nashville*, where the District of Columbia's Order vacated the Election Security Conditions and associated 20% holdback. *See* 2026 WL 2905123, at *10. FEMA has publicly confirmed that the conditions are no longer operative and has since reissued the affected awards stating that it was not enforcing the Election Security Conditions. *See* Ex. A (Bulletin 587); Ex. P (emails from FEMA to SAAs); Ex. Q (sample revised FY2026 HSGP award) at 42 (Art. 65). The *Nashville* Order currently remains in full effect, and so long as it does, *see supra* note 9, Plaintiffs receive the protection from the Election Security Conditions that they ask this Court to provide. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting) (explaining that where a rule of "broad applicability" is invalidated under the APA, a "single plaintiff" obtains "programmatic" relief that affects the rights of parties not before the court). There is no present Election Security Compliance Withhold to enforce and no operative election-administration condition to enjoin.

Yet Plaintiffs persist with their claims notwithstanding FEMA's completed reissuance of the awards. Article III does not permit the advisory determination Plaintiffs now effectively seek. *See Fikre*, 601 U.S. at 241 (noting federal courts "are not free to take up hypothetical questions that pique a party's curiosity or their own"). There is no ongoing conduct to enjoin, vacate, or declare unlawful. *See Boston Bit Labs, Inc. v. Baker*, 11 F.4th 3, 9 (1st Cir. 2021) (claim for injunctive relief was moot where executive order imposing challenged COVID-19 restriction was no longer in effect). An additional order from this Court vacating or enjoining the same conditions already vacated in *Nashville*, 2026 WL 2905123, and removed from Plaintiffs' awards would afford no additional effective relief. Plaintiffs' claims concerning the Election Security Conditions should therefore be dismissed as moot under Federal Rule of Civil Procedure 12(b)(1).

At a minimum, if the Court concludes that those claims remain live, it should stay their adjudication while the *Nashville* Order remains in effect. "It is beyond cavil that . . . federal district courts possess the inherent power to stay pending litigation when the efficacious management of court dockets reasonably requires such intervention." *Marquis v. F.D.I.C.*, 965 F.2d 1148, 1154 (1st Cir. 1992). A stay would promote judicial economy by avoiding duplicative adjudication of conditions another federal court has already vacated and that FEMA has removed from the affected awards. Plaintiffs cannot demonstrate that the Agency is currently enforcing those conditions in contravention of that Order. If the *Nashville* Order remains undisturbed following exhaustion of appellate review (if any such appeal is authorized by the Solicitor General), the status quo will persist. If the Order is later stayed or otherwise loses its operative effect, this Court can promptly revisit the stay.[10]

---

[10] Recognizing that the Agency may choose to appeal the *Nashville* Order, Defendants have sought to preserve their ability to enforce the Election Security Conditions with respect to HSGP in the event that the Order is later stayed or vacated on appeal. The Agency has preserved this option by providing the grant recipients with notice of the Election Conditions – including through the article titled "Incorporation of Information Bulletins No. 587 and No. 589" and by making clear that the Agency intends to enforce the rescinded Election Security Conditions if, and only if, a court later determines on appeal that it is within the Agency's lawful authority to do so. *See, e.g.*, Ex. Q (sample revised FY2026 HSGP award) at 42 (Art. 65).

That contingent possibility does not create a live controversy over conditions that presently do not govern Plaintiffs' awards. Article III does not permit adjudication based on contingent future events that may never occur. *See Fikre*, 601 U.S. at 241; *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (cleaned up)); *City of Fall River v. Fed. Energy Regul. Comm'n*, 507 F.3d 1, 6 (1st Cir. 2007). If the governing legal landscape changes and the challenged conditions again become operative, any challenge may be assessed on the facts and law then existing. *See, e.g.*, Ex. L (filings in *State of California ex rel. Becerra v. Sessions*, No. 17-cv-04701-WHO, ECF 138, 139, 148, and 154 (N.D. Cal. Oct. 5, 12, 20, and 29, 2018) (highlighting added)) (permitting challenged grant conditions to remain in award documents so they could be enforced if the government prevailed on appeal).

The voluntary cessation doctrine does not alter that conclusion. FEMA rescinded the Election Security Conditions and reissued the affected awards in compliance with a federal order vacating them. *See Lowe v. Gagné-Holmes*, 126 F.4th 747, 756 (1st Cir. 2025) (explaining that the voluntary cessation doctrine creates a mootness exception only where the defendant *voluntarily* ceased the challenged practice in order to moot the plaintiff's case).

Finally, to the extent Plaintiffs take issue with FEMA's implementation of the *Nashville* Order, any such dispute concerns compliance with that specific Order and is properly directed to

**B. Plaintiffs' challenges to the superseded Fusion Center Term are moot.**

Article III requires a live controversy throughout the litigation. When intervening events eliminate the challenged conduct and leave the Court unable to grant meaningful relief, the claim is moot. *See Boston Bit Labs*, 11 F.4th at 8; *Lowe*, 126 F.4th at 755. And where subsequent events would render a ruling merely advisory, dismissal is required. *See ACLU of Mass. v. U.S. Conf. of Catholic Bishops*, 705 F.3d 44, 52-53 (1st Cir. 2013).

That principle resolves Plaintiffs' challenge to the provisions of the original Fusion Center Term that no longer govern their awards. Plaintiffs principally object to requirements that fusion centers maintain a permanent formal seat for ICE ERO officials, confirm that the lead agency is an active § 1357(g) partner, and coordinate with their local HSTF. *See* ECF 44 ¶¶ 157-59; ECF 50 at 25-26. But on October 9, 2026, FEMA issued Bulletin 589, which, effective immediately, replaced Art. 63 "in its entirety" with the correct, DHS-approved Fusion Center Term. *See* Ex. K (Bulletin 589).

FEMA has since implemented that replacement in the HSGP award documents themselves. *See, e.g.*, Ex. Q (sample revised FY2026 HSGP award) at 41-42 (Arts. 64-65). FEMA advised SAAs on October 15 that their awards would be reissued with the corrected Fusion Center Term and confirmed on October 19 that the revised awards were available in FEMA GO. *See* Ex. P (emails from FEMA to SAAs). The reissued award expressly provides that the former Fusion Center article "is replaced in its entirety as provided in Information Bulletin No. 589." *See, e.g.*, Ex. Q (sample revised FY2026 HSGP award) at 41-42 (Arts. 64-65). The operative award thus no longer requires a permanent ERO seat or confirmation that a lead agency is an active § 1357(g) partner, and it revises the HSTF provision to require coordination with the "appropriate regional" HSTF as opposed to a designated local HSTF. *Id.* A declaration

---

the U.S. District Court for the District of Columbia, which issued it and retains authority to enforce it. *See, e.g.*, *In re Pearson*, 990 F.2d 653, 657 (1st Cir. 1993) ("[T]he issuing court retains authority to enforce [an injunction]" and "modify or interpret such [consent] decrees.").

concerning the validity of those superseded requirements, or an injunction against enforcing them, would provide no present relief.

The voluntary-cessation doctrine does not alter that conclusion. That doctrine applies where a defendant voluntarily ceases challenged conduct to moot the litigation and there remains a reasonable expectation that the conduct will recur. *See Lowe*, 126 F.4th at 756. Here, the administrative record explains that FEMA had finalized the decision to include this term on August 20, 2026, and that the initial HSGP award packages inadvertently contained an earlier draft. *See* ECF 48-8 at 1, 3-4. FEMA's continued authority to amend award terms in the future does not itself create a live controversy over provisions that are no longer operative. *See Boston Bit Labs*, 11 F.4th at 10-11 ("That the Governor has the power to issue executive orders cannot itself be enough to skirt mootness, because then no suit against the government would ever be moot. And we know some are."); *Lowe*, 126 F.4th at 758; *Calvary Chapel of Bangor v. Mills*, 52 F.4th 40, 49 (1st Cir. 2022) (rejecting argument that voluntary cessation exception applied because appellant "face[d] a constant threat" that the Governor would use her power to restore allegedly discriminatory COVID-19 restrictions). Otherwise, government action could rarely become moot simply because the government retains authority to act again.

To be sure, Plaintiffs remain free to challenge the requirements that Bulletin 589 actually makes operative. Defendants' mootness point is narrower: Plaintiffs cannot obtain relief directed at provisions of the superseded Article 63 that no longer govern their FY2026 awards. Any challenge to the revised Fusion Center Term must instead be evaluated based on the obligations now contained in the reissued awards. And, for the reasons explained in Argument II.D, *infra*, any such challenge fails on the merits.

Plaintiffs' claims should therefore be dismissed as moot to the extent they seek relief from the superseded permanent-ERO-seat, active-§ 1357(g)-partner, or former HSTF-coordination requirements.

### C. Plaintiffs' challenges to hypothetical applications of the Termination Conditions are not ripe.

To the extent Plaintiffs challenge the Termination Conditions based on how FEMA might exercise them in the future, those claims are not ripe. "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (citation omitted). A claim resting on "contingent future events that may not occur as anticipated, or indeed may not occur at all" is not fit for adjudication. *Texas*, 523 U.S. at 300 (citation omitted).

Plaintiffs do not allege that FEMA has terminated any FY2026 award for convenience or because of a post-award change in program goals or agency priorities. Yet several of their theories depend on precisely such hypothetical applications—for example, that FEMA could invoke the provisions to terminate an award based on a newly announced priority, for reasons untethered to the governing program, or without adequate justification. *E.g.*, ECF 50 at 56-58. Whether FEMA will ever do so, with respect to which award, on what grounds, and under what statutory and contractual circumstances are presently unknown.

The Supreme Court rejected a comparable pre-enforcement challenge of a regulation in *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158 (1967). There, a regulation authorized, but did not require, the agency to suspend certification services if a regulated party refused to permit inspections. *Id.* at 161-62. The Court held the challenge unripe because it was unknown "whether or when" the agency would exercise that authority and, if it did, "what reasons" it would provide. *Id.* at 163. The Court further explained that the regulation's validity depended on the governing statutory scheme and the circumstances in which the agency exercised its authority—matters that could be assessed "on a much surer footing in the context of a specific application" than through a "generalized challenge." *Id.* at 163-64.

The same reasoning applies here. Plaintiffs raise purely facial objections to the Termination Conditions and expect the Court to invalidate those provisions based on whether some future termination would exceed that authority before FEMA has even invoked the provision. Article III does not permit that. A particular termination remains subject to challenge under the governing statutes, regulations, award terms, and other applicable law if and when it occurs. *See id.* at 166.

Accordingly, Plaintiffs' challenges to the Termination Conditions should be dismissed as unripe because they depend on hypothetical future exercises of FEMA's termination authority.

### D. The Court lacks subject matter jurisdiction where Plaintiffs seek to modify the terms of federal grants.

The gravamen of Plaintiffs' claims is that Defendants have unfairly and unilaterally changed the standard terms of their grant agreements, and they seek an order that Defendants must provide grant funding regardless of each State's compliance with the grant conditions. These claims are based on the Plaintiffs' contractual relationships with the federal government, including the government's ability to alter the terms of those contractual relationships, and thus this Court lacks jurisdiction to provide the relief that Plaintiffs seek.

The Tucker Act grants exclusive jurisdiction to the Court of Federal Claims over "any claim against the United States founded" on "any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Where a party seeks funding that it believes the government is obligated to pay under a contract, the proper remedy is suit under the Tucker Act, not the APA, and that suit must proceed only in the Court of Federal Claims. *See, e.g.*, *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1983) (vacating district court judgment; concluding district court lacked jurisdiction under 5 U.S.C. § 702 to award money judgment); *id.* ("[E]ven if we agreed with [claimant] that the award was equitable and did not constitute 'money damages,' we would still find that section 702 did not remove the defense of sovereign immunity."); *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 62-63 (1st Cir. 1978) (no district court jurisdiction under APA even where plaintiff

alleged violations of the agency's regulations and due process of law because the Court of Claims provided "an adequate remedy" for the claims, which were grounded in contract).

In determining whether "a particular action" is "'at its essence' a contract action" that is subject to the Tucker Act or, instead, is a challenge properly brought under the APA, courts have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see also, e.g.*, *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 403 (2d Cir. 2017) (applying *Megapulse* test); *Califano*, 571 F.2d at 63 (evaluating whether "the essence of the action is in contract").

A court "must look beyond the form of the pleadings to the substance of the claim. We have cautioned litigants that dressing up a claim for money as one for equitable relief will not remove the claim from Tucker Act jurisdiction to make it an APA case." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007); *see also Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1328 (Fed. Cir. 2004) ("[A] party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States." (citation omitted)); *Vill. W. Assocs. v. R.I. Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d 134, 139-40 (D.R.I. 2009) (rejecting as "without merit" the "familiar argument" that by seeking a prospective declaration regarding future agency actions, the Court of Federal Claims could not provide adequate relief in cases where the Tucker Act applies).

Under the first prong of the *Megapulse* test, any right that Plaintiffs would have to this funding is not in the various statutes that create the grant programs, but in the language of the grant agreements themselves. Those grant agreements define the terms on which Plaintiffs may retain and draw down the awarded funds, including compliance with the specified conditions. *See, e.g.*, ECF 51-4 at 59-77. Under the applicable regulations for federal grants, if a State "fails to comply with the U.S. Constitution, Federal statutes, regulations, *or terms and conditions of the Federal award*," DHS has the authority to "implement specific conditions," including

"[t]emporarily withhold[ing] payments until the recipient or subrecipient takes corrective action" and "suspend[ing] or terminat[ing] the Federal award in part or in its entirety." 2 C.F.R. § 200.339 (emphasis added). This is because Congress has given DHS broad authority to implement grant programs, and no statute provides any rights to an individual State to obtain those funds regardless of whether they meet DHS's terms and conditions for the grant.

A review of the statutory language with respect to the grants subject to one or more of the Challenged Conditions also shows that Congress did not entitle States to funding notwithstanding any agency-imposed conditions. Indeed, the annual appropriations for the grant programs at issue do not give States an unconditional right to federal funding.

For example, the HSNTP – Continuing Training Grants – Competitive Program is authorized by language approving funding "to sustain current operations for training, exercises, technical assistance, and other programs." *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, § 13, 138 Stat. 460, 608 (Mar. 23, 2024). The Congressional Joint Explanatory Statement for this program simply states: "Continuing Training Grants . . . to be competitively awarded for FEMA-certified rural and tribal training." Joint Explanatory Statement—Division C, DHS Appropriations Act, 2024, at 42, https://appropriations.house.gov/further-consolidated-appropriations-act-2024 (last accessed Oct. 21, 2026).

Similarly, Congress's FY2024 appropriation provided "$553,500,000 for the Urban Area Security Initiative under section 2003 of the Homeland Security Act of 2002 (6 U.S.C. 604)," and "$90,000,000 for Port Security Grants in accordance with section 70107 of title 46, United States Code." Pub. L. No. 118-47, 138 Stat. at 607, 608. Those provisions appropriate funds for the identified grant programs and incorporate their governing statutes, but do not direct that any particular State or other applicant receive an award regardless of the conditions imposed in administering those programs. To the contrary, HSGP's governing statute provides that the Secretary, acting through FEMA, "*may* award grants" under the program, 6 U.S.C. § 603(a) (emphasis added), while the PSGP statute directs the Secretary to award grants "based on risk"

and requires consideration of, among other things, the "most current risk assessments available," 46 U.S.C. § 70107(a). This language does not give any State the right to funding—that could only come, if at all, once DHS has actually awarded grant funds to a recipient, in its discretion.

By arguing that their right to funding comes from statutes, Plaintiffs contend they are entitled to funding even if they don't meet the qualifications that the Agency sets. But that cannot be the case. Congress intended for the Agency to set terms and conditions, *see generally* 2 C.F.R. §§ 200 *et seq*. (providing uniform requirements for federal awards, authorized by 31 U.S.C. §§ 503, 6101-6106, 6307, & 7501-7507), and this dispute is about a modification to those terms. That means the source of Plaintiffs' claims is contractual in nature, and this Court lacks subject matter jurisdiction. *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 894 (D.C. Cir. 1985) (court lacks subject matter jurisdiction because asserted right to payment "in no sense . . . exist[ed] independently of [its] contract").

The relief prong of the *Megapulse* test likewise weighs against district court jurisdiction. Although framed as vacatur, injunctive relief, or declaratory relief, Plaintiffs ultimately seek to amend the terms of their FY2026 grant awards. That relief is fundamentally contractual. A claim seeking to compel the government to "perform" under an agreement "must be resolved by the Claims Court." *U.S. Conf. of Catholic Bishops v. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025) (quoting *Ingersoll-Rand* Co. *v. United States*, 780 F.2d 74, 80 (D.C. Cir. 1985)); *see Dep't of Educ. v. California*, 604 U.S. 650, 650-51 (2025).

Whether Plaintiffs have yet executed their awards or style their requested relief as vacatur, declaratory relief, or an injunction, does not change the substance of the dispute. At bottom, they seek an order dictating the terms on which FEMA must offer FY2026 awards and, ultimately, provide funding under those awards. That is a dispute concerning the terms of the parties' grant relationship, not a freestanding regulatory command. *See Nat'l Inst. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658 (2025) (holding that the APA's limited waiver of sovereign immunity did not provide the district court with jurisdiction to adjudicate claims based

on termination of research-related grants, or to order relief designed to enforce any obligation to pay money pursuant to those grants).

The government acknowledges that courts are divided on whether the Tucker Act precludes claims in district court regarding changes to grant funding. *See, e.g.*, *Colorado v. U.S. Dep't of Health & Human Servs.*, 788 F. Supp. 3d 277, 294-96 (D.R.I. 2025) (holding that the Tucker Act did not apply to certain grant terminations); *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 39-41 (D.R.I. 2025); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 186 F.4th 25, 49-51 (1st Cir. 2026) (holding that APA relief may prohibit implementation of unlawful agency action even if doing so results in disbursement of grant funds, but may not compel payment of funds owed pursuant to already awarded grants). The government respectfully submits that in this case, because Plaintiff States' rights to funding depend on whether they are qualified to receive funding under the terms and conditions of the grants, and because the relief they seek is for the government to be compelled to remove certain contract conditions and provide funding to the Plaintiffs under the agreements amended to Plaintiffs' liking, their claims lie exclusively within the jurisdiction of the Court of Federal Claims.

### E. The APA does not permit review of discretionary grant funding decisions statutorily committed to the agency's discretion.

Claims brought under the APA, 5 U.S.C. § 706, are subject to the threshold limitations set forth in § 701, including where statutes preclude judicial review or where agency action is committed to agency discretion by law. *See* 5 U.S.C. §§ 701(a)(1), (2). Plaintiffs' APA claims fail because the challenged actions are "committed to agency discretion by law." *Id*. § 701(a)(2); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Agencies have broad discretion in creating, awarding, and terminating specific grants, and thus review of the terms and conditions set by agencies, as contemplated by Congress, is outside this Court's jurisdiction. At a minimum, the discretionary grants at issue in this case are, by their very nature, committed to Agency discretion, and DHS's determinations regarding the conditions of those grants are unreviewable under the APA.

In *Lincoln v. Vigil*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and redirect those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decision-making standards. 508 U.S. 182, 185-88 (1993). The Supreme Court explained that the "allocation of funds from a lump-sum appropriation" is an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192.

Indeed, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831). "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Id.* But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id.*; *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit.").

Although *Lincoln* involved lump-sum appropriations, its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751-52 (D.C. Cir. 2002) (extending *Lincoln*'s reasoning to agency decisions involving non-lump-sum appropriations as well). Such decisions—like those about how best to allocate lump-sum appropriations—"clearly require[] 'a complicated balancing of a number of factors which

are peculiarly within [the agency's] expertise.'" *Id.* at 752 (citation omitted); *see also Policy & Rsch., LLC* v. *U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018) (Jackson, J.); *Cmty. Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are 'notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget.'" (citation omitted)).

As another court recently held, although an agency "is required to use earmarked funds for their specified purpose, an agency may still exercise discretion *within* the earmark. If, for example, Congress earmarks funds for the Navy to build a certain type of ship, the Navy has discretion to use the money to complete construction of two less expensive ships or to spend the money on one more expensive ship." *Amica Ctr. for Immigr. Rights v. U.S. Dep't of Justice*, No. 25-cv-298 (RDM), 2025 WL 1852762, at *14 (D.D.C. July 6, 2025) (emphasis in original) (finding an agency's decision to terminate certain grant programs not subject to judicial review under the APA).

This case primarily involves discretionary grants that fit within *Lincoln*'s analytical framework for agency discretion. As discussed in Argument I.D, *supra* and II.A, *infra*, Congress deliberately afforded the Agency broad discretion in administering these grant programs, prescribing overarching statutory objectives while leaving the Agency substantial latitude to determine how best to allocate funding in furtherance of those objectives. Many of the grants at issue are authorized through annual appropriations or governing statutes that reflect Congress's deliberate choice to entrust the Agency with significant discretion over funding priorities, eligibility requirements, and award determinations. *See, e.g.*, Pub. L. No. 118-47, 138 Stat. at 608 ("$10,800,000 for Regional Catastrophic Preparedness Grants."); 46 U.S.C. § 70107(a) (broadly instructing the Agency to take into account "national economic, energy, and strategic defense concerns based upon the most current risk assessments available" when administering PSGP, without requiring funding to any particular state); 6 U.S.C. § 1135 (authorizing TSGP and directing the Secretary to, among other things, "determine the requirements for recipients of

grants under this section, including application requirements," "establish the priorities for which grant funds may be used under this section," and "act consistently with relevant State homeland security plans" in establishing security improvement priorities and in awarding grants).

For the discretionary grants to which the Challenged Conditions are applied, not only did Congress expressly provide for significant discretion by the executive branch, but it did not provide any "meaningful standard against which to judge the agency's exercise of discretion" in reviewing the Challenged Conditions. *See Lincoln*, 508 U.S. at 191. The Agency is left to determine whether any particular applicant is the best recipient for DHS funding within the purpose of each specific grant program, including through conditions set by the Agency in keeping with the Agency's purpose and mandate.[11] But with respect to the discretionary grant programs, Congress has not required that Plaintiffs receive this funding. Instead, the Agency has discretion as to how to use its funding within the purpose Congress prescribed. Thus, with respect to the discretionary grants at issue, the APA does not allow for judicial review of the Challenged Conditions.

## II. DEFENDANTS HAVE NOT VIOLATED THE LAW.

### A. Congress has granted DHS broad authority to set terms and conditions for discretionary grants.

Should the Court conclude that it has jurisdiction over any of Plaintiffs' claims, it should still enter summary judgment in favor of the Defendants. Plaintiffs focus much of their argument on the absence of specific statutory language from Congress listing the exact Challenged Conditions at issue within the broader authority given by Congress to the Agency to provide grant funding. However, Congress has given DHS "the authority to make contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's

---

[11] Plaintiffs do not argue that FEMA is refusing to spend the money allocated by Congress for the grant programs at issue. But even if they were, the First Circuit's recent ruling in *Woonasquatucket River Watershed Council* holds that a district court may not compel the agency to "release awarded funds previously withheld or rendered inaccessible." *See* 186 F.4th at 49. Such a claim would lie in the Court of Federal Claims. *Id.* at 49-50.

responsibilities under this chapter or otherwise provided by law[.]" 6 U.S.C. § 112(b)(2). In keeping with the Agency's general authority to make grants in order to carry out its responsibilities, many of the specific grant programs at issue come with broad grants of authority from Congress to implement each program, without specifying or limiting all the contours of those conditions. Implicit in those grants of authority is the discretion to implement appropriate standard terms and conditions to the Agency's grant programs that follow from the Agency's core purpose and goals, which include the promotion of national security.

For eight of the grant programs to which FEMA has applied the Immigration Conditions,[12] and for all the awards subject to the termination-for-convenience provision (namely, discretionary, non-disaster awards), specific recipients, the award amounts, and the conditions of grant funding are entirely within the Agency's discretion. *See* ECF 51-3 at 2, 4. In other words, for these programs, DHS may properly decide under its appropriation statutes not to award any grant funding to any of the Plaintiff States at all.

For example, the HSNTP – Continuing Training Grants – Competitive Program is authorized by language appropriating funding "to sustain current operations for training, exercises, technical assistance, and other programs." *See* Pub. L. No. 118-47, 138 Stat. at 608. The Congressional Joint Explanatory Statement for this program adds only: "Continuing

---

[12] The eight discretionary programs to which the Immigration Conditions apply are:

- BioWatch (6 U.S.C. §§ 591, 592, 596);
- HSGP – OPSG (authorized through annual appropriations acts; *e.g.*, An Act to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14, Pub. L. No. 119-21, § 90005(a)(1)(D), 139 Stat. 72, 360 (July 4, 2025));
- HSNTP – Continuing Training Grants – Competitive (authorized through annual appropriations acts; *e.g.*, Pub. L. No. 118-47, 138 Stat. at 608);
- PSGP (46 U.S.C. §§ 70101, 70103, 70107);
- RCPGP (authorized through annual appropriations acts, *e.g.*, Pub. L. No. 118-47, 138 Stat. at 608);
- Securing the Cities (6 U.S.C. § 596b);
- SBSRF (authorized through annual appropriations acts; *e.g.*, Pub. L. No. 119-21, § 90005(b), 139 Stat. at 360); and
- TSGP (6 U.S.C. § 1135).

*See* ECF 51-3 at 2.

Training Grants . . . to be competitively awarded for FEMA-certified rural and tribal training[.]" Joint Explanatory Statement—Division C, DHS Appropriations Act, 2024, at 42. Even where Congress has set certain minimum requirements, such as with the PSGP, *see* 46 U.S.C. § 70107(a), these programs are distinct from formula-based programs where Congress has provided specific direction for funding.

For discretionary grants, then, Congress intended to give broad discretion to the executive branch, and DHS's exercise of that broad discretion does not encroach on the Congressional spending authority that Congress chose to delegate. It is thus appropriate for DHS to allocate its federal funding in a way that is consistent with its view of the purposes of the Agency and the programs at issue. If the Agency were to apply the Challenged Conditions to each of these non-disaster, discretionary programs in order to ensure that its own funding is not spent in manner contrary to its efforts to fulfill its own mandates and law enforcement actions, that decision is squarely within its discretion.

**B. The Constitution permits agencies to set terms and conditions.**

To succeed in their facial challenge to the Challenged Conditions, Plaintiffs must show that the Challenged Conditions would be unconstitutional in all their applications. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (facial challenge must establish that "no set of circumstances exists under which [the enactment] would be valid"); *see also Am. Fed'n of State, Cnty. & Mun. Emps. v. Scott*, 717 F.3d 851, 857-58 (11th Cir. 2013); *Nat'l Treasury Emps. Union v. Bush*, 891 F.2d 99, 101 (5th Cir. 1989). Plaintiffs do not meet this standard because Congress frequently authorizes the executive branch to impose discretionary conditions on the receipt of federal grants.

As the Supreme Court has held, "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power to 'further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) (citation omitted).

The *Dole* Court outlined certain limitations, including that "the exercise of the spending power must be in pursuit of 'the general welfare'"; that conditions on the receipt of federal funds must be stated "unambiguously" so that recipients can "exercise their choice knowingly, cognizant of the consequences of their participation"; that conditions may be a concern if unrelated to the federal interest in particular national projects or programs; and that the conditions are otherwise constitutional. *Id.* at 207-08 (citations omitted).

Plaintiffs' assumption that the Constitution's Spending Clause requires Congress to set out by statute every requirement of a grant program in order for the requirement to be enforceable is not supported by Supreme Court precedent, including the Supreme Court's decision upholding agency-imposed conditions on the Medicare and Medicaid programs in *Biden v. Missouri*. 595 U.S. 87, 90, 94 (2022) (per curiam) (finding that a new condition of participation in Medicare and Medicaid requiring that facilities ensure that staff are vaccinated against COVID-19 did not exceed the applicable statutory authority, as the Department of Health and Human Services had "established long lists of detailed conditions with which facilities must comply to be eligible to receive Medicare and Medicaid funds" and is not limited to issuing "bureaucratic rules regarding the technical administration of" the programs); *see also Bennett v. Ky. Dep't of Educ.,* 470 U.S. 656, 669 (1985) (stating that Congress cannot "prospectively resolve every possible ambiguity concerning particular applications of the requirements"); *W. Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1148 (11th Cir. 2023) ("[W]e do not question an agency's authority to fill in gaps that may exist in a spending condition."); *Guardians Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629-30 (1983) (Marshall, J., dissenting) (noting that assurances of compliance with Title VI as part of applications for federal assistance are "given 'in consideration of' federal aid, and the federal government extends assistance 'in reliance on' the assurance of compliance" (citation omitted)). Disagreement with the type of requirement is not a sufficient basis to establish its unconstitutionality.

Plaintiffs contend that the Challenged Conditions cannot apply to DHS grants because those terms allegedly "coerce" the Plaintiffs' compliance. *See, e.g.*, ECF 44 ¶¶ 5, 101-114, 241,

277, 280; ECF 50 at 58-60. But under Plaintiffs' theory, any widely imposed conditions Plaintiffs disagree with would be unconstitutionally coercive, simply because so much of local governments' funding derives from the federal government. That is not the governing legal standard.

This is not the same situation that the Supreme Court considered in *National Federation of Independent Business v. Sebelius* ("*NFIB*"), 567 U.S. 519 (2012). There, the Court stressed—as Justice Ginsburg's concurrence observed—that the coercion at issue arose from the unexpected imposition on the states to accept a new, dramatically broadened, independent grant program at the risk of losing all federal assistance of longstanding, traditional Medicaid coverage. *Id*. at 579-81; *id.* at 624-26 (Ginsburg, J., concurring). Here, DHS is not creating new grant programs but instead has modified its existing standard terms and conditions that apply to selected, existing grant programs. *See id.* at  The Challenged Conditions, on their face, do not require States to expand any particular program broadly. To the contrary, the Immigration Conditions make clear that "[a] jurisdiction does not fail to comply with this requirement merely because it lacks the necessary resources to assist in a particular instance." ECF 51-2 at 6.

The Election Security Conditions—though vacated by another district court and rescinded by the Agency—illustrate this point. Those conditions imposed concrete, affirmative requirements on States, but they still operated within the existing HSGP framework; they did not require States to create or substantially expand a separate program as the price of retaining longstanding federal funding. Indeed, the mechanism through which those requirements operated—the allocation of HSGP funds to designated NPAs, coupled with funding holds to enforce those requirements—was itself a longstanding feature of the program. FEMA has long required recipients to devote a portion of their HSGP awards to designated NPAs, including a 30% NPA allocation and 3% minimum spend for election security in both FY2024 and FY2025. *See* Ex. B (FY2024 HSGP NOFO) at 7; Ex. C (FY2025 HSGP NOFO) at 14.

The federal government may, constitutionally, create incentives for States to act in accordance with federal law and policies. *See Dole*, 483 U.S. at 210 (rejecting the argument that

the Spending Clause imposes "a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly"). This principle would apply to the consequences HSGP recipients faced under the FY2026 Election Conditions before those conditions were vacated in *Nashville*, 2026 WL 2905123, and rescinded by FEMA. The conditions did not place existing HSGP awards, much less an independent stream of longstanding federal funding, at risk; instead, FEMA would have withheld 20% of a State's FY2026 HSGP award pending the State's compliance. FEMA has previously authorized holds on up to 30% of SHSP and UASI funds until recipients submitted projects sufficiently aligned with the NPAs. *See, e.g.*, Ex. B (FY2024 HSGP NOFO) at 7. Against that backdrop, the challenged 20% holdback was not unconstitutionally coercive and bears little resemblance to *NFIB*, where noncompliance with the Medicaid expansion placed at risk all existing Medicaid funding—and threatened loss of over ten percent of a State's overall budget. *See* 567 U.S. at 579-82. Here, the Agency conditioned access to only a portion of an existing grant award on satisfaction of program requirements. And States would have retained the choice whether to satisfy the Election Conditions and receive the withheld portion of their FY2026 HSGP awards. That was a permissible funding incentive, closer to the "relatively mild encouragement" in *Dole*, *see* 483 U.S. at 211, where Congress conditioned only a portion of the particular federal funding being offered on compliance with the challenged requirement, not the sort of coercive threat that leaves States with no genuine choice as in *NFIB*, *ss* 567 U.S. at 580-82.

Thus, neither directing a portion of HSGP funds toward national priorities nor conditioning access to that portion of funding on compliance with those requirements represents the sort of "shift in kind, not merely degree" that concerned the Court in *NFIB*. *See id.* at 583.

This case is also unlike *City of Providence v. Barr*, 954 F.3d 23 (1st Cir. 2020), where this Court ruled on a summary judgment motion by the plaintiffs, and the First Circuit affirmed, finding that a grant condition relating to immigration was not within the authority of the DOJ Assistant Attorney General administering Byrne grants to impose. The First Circuit's analysis focused on the statutory language at issue, which required grant applicants to comply with "all

other applicable Federal laws," and the duties and functions of the Assistant Attorney General as delegated by statute. *See generally id*. at 36-39.

Here, the grants at issue are authorized by different statutes, with different language, for administration by a different agency, and with a different purpose, and thus the questions in this case are distinct from the First Circuit's statute-specific analysis in *City of Providence*. The legislative history further distinguishes *City of Providence*. There, Congress had considered, but not enacted, legislation expressly conditioning federal funding on compliance with 8 U.S.C. § 1373. *Id*. at 29. Notwithstanding that legislative history, DOJ sought to impose such a requirement through its interpretation of the Byrne-JAG program's existing statutory language. *See id*. at 37-39. Here, by contrast, there is no comparable congressional rejection of the authority DHS and FEMA invoke to establish the Challenged Conditions. Rather, as discussed above, Congress expressly delegated broad authority to DHS and FEMA to establish grant requirements and funding priorities consistent with the governing statutes. Moreover, in *City of Providence*, the First Circuit endorsed language that Congress used in other circumstances to delegate the power to impose grant conditions, namely language stating that an agency "may impose reasonable conditions on grant award to ensure that the States meet statutory, regulatory, and other program requirements," or that tasked officials with "awarding and allocating funds on terms and conditions determined to be consistent" with the statute. *See id*. at 41-42 (cleaned up). This is similar to the language used by Congress in the statutes applicable to this case. Here, DHS and FEMA have explicit authority from Congress to decide the terms and conditions of their grants. *See* Argument I.D & II.A, *supra*.

Congress has given DHS the authority to fund many different projects, and by allowing DHS to administer federally funded programs, Congress has necessarily given the Agency the authority to apply standard terms and conditions in line with Agency and program goals. As discussed in more detail below, Defendants have articulated why the Challenged Conditions are related to the federal interest in the grant programs to which the conditions apply. The simple fact that Congress did not spell out every conceivable condition of DHS funding by statute is not

itself sufficient to declare the condition invalid or unconstitutional and thus is not a sufficient basis for the entry of summary judgment against the government.

**C. The Election Security Conditions are lawful.**

As explained above, the Agency has respected and followed the District of Columbia's Order in *Nashville*, 2026 WL 2905123, and has rescinded the Election Security Conditions and is not enforcing them. *See* Argument I.A, *supra*; *supra* note 9. The Agency's position remains that it has the lawful authority to enforce the Election Security Conditions and therefore preserves its disagreement with *Nashville*'s statutory analysis and addresses the merits below.[13] The district court in *Nashville* concluded that HSGP authorized FEMA to fund State-proposed projects addressing physical or cyber threats to election infrastructure, but not to impose the challenged requirements concerning election administration. 2026 WL 2905123, at *8. Defendants respectfully submit that 6 U.S.C. §§ 608(a)(1) and (b)(9), together with HSGP's overall risk-based structure and DHS's longstanding treatment of election infrastructure as critical infrastructure, support a different conclusion. The arguments below also address specifically how each of the challenged conditions relates to identified vulnerabilities in election infrastructure and the security interests Defendants sought to address.

**1. The Election Security Conditions fall within FEMA's broad statutory authority.**

Plaintiffs assert that FEMA lacks statutory authority to impose the Election Security Conditions. ECF 50 at 34-36. But Congress created FEMA to "lead the Nation's efforts to prepare for, protect against, respond to, recover from, and mitigate against the risk of natural disasters, acts of terrorism, and other man-made disasters." 6 U.S.C. § 313(b)(2)(A). And Congress vested the Secretary with substantial discretion in administering HSGP: the Secretary

[13] *Nashville* resolved the challenge to the Election Security Conditions on statutory grounds and did not resolve Plaintiffs' separate APA and constitutional theories in their favor. *See* 2026 WL 2905123, at *9, 10. Those theories therefore remain independently at issue if the Court reaches the merits here.

"*may* award grants" to States, *id.* § 603(a) (emphasis added), and Congress expressly directed FEMA, in allocating HSGP funding, to consider "threat, vulnerability, and consequences related to critical infrastructure (for all infrastructure sectors) or key resources identified by the Administrator or the State homeland security plan" and "the most current threat assessments available to the Department." *Id.* § 608(a)(1)(D), (E). Congress further directed FEMA to consider threats to critical infrastructure sectors, including "[s]uch other types of threat determined relevant by the Administrator [of FEMA]." *Id.* § 608(b)(9); *see also id*. § 601(1). Through these provisions, Congress both delegated considerable discretion to FEMA to effectuate the goals of its grant programs and directed the agency to account for evolving threats to critical infrastructure in doing so.

Election infrastructure falls within that statutory framework. The Critical Infrastructures Protection Act of 2001 defines "critical infrastructure" to include "systems and assets, whether physical or virtual, so vital to the United States that the incapacity or destruction of such systems and assets would have a debilitating impact on security, national economic security, national public health or safety, or any combination of those matters." 42 U.S.C. § 5195c(e). On January 6, 2017, then-Secretary of Homeland Security, Jeh Johnson, formally designated U.S. election systems as part of the Nation's critical infrastructure, including "storage facilities, polling places, and centralized vote tabulations locations used to support the election process, and information and communications technology to include voter registration databases, voting machines, and other systems to manage the election process and report and display results on behalf of state and local governments." Ex. F (2017 Designation) at 1. That designation placed election infrastructure within the "Government Facilities critical infrastructure sector," *id*., and DHS has continued to treat election infrastructure as critical infrastructure in the years since. *See* Ex. G (2024 Homeland Threat Assessment) at v, 1, 6, 18, 19; Ex. M (CISA 2026 Election Report). Thus, when FEMA considers vulnerabilities affecting election systems in setting HSGP funding priorities, it is not venturing beyond the subject matter Congress assigned it. It is applying the

risk-based criteria Congress prescribed to a designated component of the Nation's critical infrastructure.

The threat assessments before FEMA underscore why that infrastructure falls within the risk-based framework Congress established. As DHS's Office of Intelligence and Analysis found, the Nation's "electoral processes remain an attractive target for many adversaries," and there is a high likelihood of attempted influence and interference with U.S. elections. Ex. G (2024 Homeland Threat Assessment) at 19 ("Nation-state threat actors likely will seek to use novel technologies and cyber tools to enhance their capabilities and malign influence campaigns, ultimately to undermine our confidence in a free and fair election. Cyber actors likely will seek to exploit election-related networks and data, including state, local, and political parties' networks and election officials' personal devices and e-mail accounts.").

The Cybersecurity and Infrastructure Security Agency's ("CISA") analysis likewise identified concrete vulnerabilities within election systems based on "technical and operational activities" conducted from 2019 to 2024 "to evaluate the security of certain U.S. election systems." Ex. M (CISA 2026 Election Report) at 1. These activities included "penetration testing of state, local, tribal, and territorial [("SLTT")] networks." *Id.* "CISA's findings highlight the reality that election-related software, like all complex software, contains vulnerabilities" and "the IT networks operated by SLTT election offices lack cybersecurity hygiene." *Id.* CISA further found that "vulnerabilities persist for months or years on production election systems" due to constraints on conducting timely security updates to election software, thereby "increasing exposure to opportunistic and targeted threats." *Id.* at 3. In multiple instances, "CISA assessors gained full network control [of SLTT voting systems] within hours or days, demonstrating that many SLTT partners remain soft targets incapable of stopping even moderately skilled adversaries." *Id.* at 4. In response to those findings, CISA recommended, among other measures, that SLTT election officials "[u]se human-readable paper ballots" and "[c]onduct post-election manual audits of paper ballots to confirm that voting systems function as intended[.]" *Id.* at 5-6.

Consistent with Congress's direction in the HSGP statute to protect critical infrastructure and consider recent threat assessments, each requirement in the Election Security Conditions addressed these vulnerabilities. Submitting a transition plan would ensure that jurisdictions gradually phase out electronic voting systems vulnerable to manipulation, and transition to hand-marked paper ballots. Post-election manual audits and voter/ballot reconciliation allow for confirmation that electronic voting systems accurately count votes and have not been tampered with. Voter roll citizenship verification ensures that only U.S. citizens are voting in U.S. elections. And election worker citizenship verification ensures that only U.S. citizens control voting systems. Each requirement was directed at the security, resilience, or verification of election infrastructure. *See* ECF 51-13 at 2-4.

Plaintiffs' theory depends on characterizing these conditions as an effort by FEMA to rewrite state election codes. *See* ECF 44 ¶ 177; ECF 50 at 34. But FEMA was not asserting a freestanding power to prescribe state election law. It set forth the conditions under which federal homeland security funds were to be made available to address vulnerabilities in designated critical infrastructure. That distinction matters. The HSGP statute expressly directs FEMA to prioritize threats to "critical infrastructure (for all critical infrastructure sectors)," 6 U.S.C. § 608(a)(1)(D), to consider current threat assessments, *id.* § 608(a)(1)(E), and to account for other threats the Administrator determines relevant, *id.* § 608(b)(9). Election infrastructure does not cease to constitute critical infrastructure merely because States possess substantial authority over the administration of elections.

The voter verification condition also relied on an information-sharing mechanism that Congress has expressly authorized. In *Department of Homeland Security v. League of Women Voters*, No. 26A308, 2026 WL 2879700, 609 U.S. --- (Sept. 25, 2026) (per curiam), the Supreme Court recently concluded, in granting a stay pending appeal, that the Government was likely to succeed in defending the modified SAVE program against statutory and APA challenges. *Id*. at *2. The Court explained that, in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, codified at 8 U.S.C. § 1373, Congress "separately and expressly authorized DHS to

request and receive information relating to citizenship and immigration status from other agencies." *Id.* It also noted that 8 U.S.C. § 1373(a) and (b) prohibit restrictions on government entities' sending, requesting, or receiving citizenship and immigration-status information to or from DHS "[n]otwithstanding any other provision of Federal, State, or local law." *Id*. From that statutory language, the Court reasoned that Congress "necessarily authorized DHS to request and receive that information." *Id*. Otherwise, the Court found, government officials could be forced to choose between complying with § 1373 and complying with other statutory restrictions on disclosure. *Id*. The Court held that "section 1373 likely supersedes restrictions on disclosure elsewhere in the Code." *Id*. And § 1373(c), the Court explained, further requires DHS to respond to state and local agencies seeking to verify an individual's citizenship or immigration status. *Id.* at *3. Considered together, those provisions "appear[] to contemplate an information-sharing regime like the modified SAVE program." *Id.*

That statutory information-sharing framework also undercuts Plaintiffs' reliance on the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA"). *See* ECF 50 at 8-9, 34-36; ECF 44 ¶¶ 121, 122, 181, 198. HAVA establishes minimum voting system requirements, preserves State discretion over the methods of complying with those requirements, and provides for voluntary voting system guidelines promulgated by the Election Assistance Commission ("EAC"). *See* 52 U.S.C. §§ 20962, 21084, 21085, 21101. But those provisions govern compliance with HAVA itself; nothing in them prohibits another agency, acting under independent statutory authority, from attaching additional election security conditions to a separate federal grant program. The same is true of the NVRA. Although the NVRA requires the federal mail voter registration form to include an attestation that an applicant satisfies eligibility requirements, including citizenship, *see* 52 U.S.C. § 20508(b)(2), it does not purport to make that attestation the exclusive means of verifying voter eligibility. Nor does either statute displace the separate information-sharing authority Congress conferred through 8 U.S.C. § 1373. To the contrary, as the Supreme Court recently explained, those provisions "appear[] to contemplate an

information-sharing regime like the modified SAVE program." *See League of Women Voters*, 2026 WL 2879700, at *2-3.

The election security conditions therefore neither altered HAVA's or the NVRA's requirements nor required use of a citizenship verification mechanism incompatible with federal law. Rather, they conditioned receipt of HSGP funds on compliance with certain election security measures—including an information sharing mechanism Congress has authorized DHS to operate—pursuant to FEMA's independent authority to administer that program. And because Congress expressly directed FEMA to consider evolving threats and vulnerabilities affecting critical infrastructure, 6 U.S.C. § 608(a)(1)(D)-(E), (b)(9), FEMA acted within that statutory framework in conditioning HSGP funding on measures intended to mitigate identified vulnerabilities in election infrastructure. Defendants therefore maintain their position that the conditions were not contrary to law.

**2. The Election Security Conditions are lawful under the Constitution.**

Plaintiffs' constitutional challenge to the Election Security Conditions and accompanying APA challenge under 5 U.S.C. § 706(2)(B), *see* ECF 44 ¶¶ 220-22, also fails because imposition of the conditions was consistent with the Spending Clause. Plaintiffs contend that the Election Security Conditions are "unrelated" to the federal interest underlying HSGP and are "impermissibly vague and ambiguous." ECF 44 ¶¶ 215-216; ECF 50 at 55, 57. Neither contention withstands scrutiny.

A funding condition need only "bear *some* relationship to the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992) (emphasis added). At least one district court has read the Supreme Court's "some relationship" language to "not support a demanding reading of the relatedness requirement" but instead impose "a rather low-threshold relatedness test." *California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1034 (N.D. Cal. 2018). Indeed, the Supreme Court "has never struck down a condition on federal grants based on this relatedness prong." *City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 (9th Cir. 2019).

That requirement is readily satisfied here. Congress established the SHSP and UASI grant programs to assist "in preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. §§ 604(a), 605(a). Acts of terrorism include any acts "potentially destructive of critical infrastructure or key resources." *Id.* § 101(18)(A)(i). Congress further directed FEMA, in allocating HSGP funds, to consider the "degree of threat, vulnerability, and consequences related to critical infrastructure (for all critical infrastructure sectors)" and "the most current threat assessments available to the Department." *Id.* § 608(a)(1)(D)-(E).

The Election Security Conditions bear a direct relationship to those purposes. Election infrastructure has long been designated as critical infrastructure and FEMA has consistently treated election security as an HSGP homeland security priority. *See* Ex. F (2017 Designation) at 1. The FY2024 HSGP NOFO noted that electoral processes remain an attractive target for adversaries, while the FY2025 and FY2026 HSGP NOFOs explained that protecting a "secure, transparent, and resilient electoral process" advanced HSGP's homeland security objectives. Ex. B (FY2024 HSGP NOFO) at 33; Ex. C (FY2025 NOFO) at 17; ECF 51-1 at 15. The conditions are directed at identified vulnerabilities in that infrastructure: the transition plan requirement addresses vulnerabilities associated with specified electronic voting systems; manual audits and voter/ballot reconciliation provide mechanisms for detecting errors or manipulation in electronic tabulation; and the voter roll and election worker verification requirements address vulnerabilities FEMA has identified concerning voter registration databases and access to election systems. *See* ECF 51-13 at 2-4. The conditions readily satisfy the requirement that they bear "some relationship" to the federal interest underlying HSGP. *New York*, 505 U.S. at 167.

Plaintiffs' vagueness argument fares no better. *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981), requires that a State accepting federal funds be able to do so "voluntarily and knowingly," with notice of the conditions attached to those funds. *Id*. at 17. Here, Congress put recipients on notice that HSGP is a risk-based homeland security program directed at preventing and protecting against acts of terrorism, including threats and vulnerabilities affecting "critical infrastructure (for all critical infrastructure sectors)." 6 U.S.C.

§§ 604(a), 605(a), 608(a)(1)(D)-(E). Congress also authorized HSGP funds to be used for a broad range of activities directed at preventing, preparing for, protecting against, and responding to terrorism. *See id.* § 609(a).

Moreover, recipients had clear notice of the Election Security Conditions specifically before deciding whether to accept the funds. The HSGP NOFO specified what each condition requires: recipients were to submit a transition plan for specified voting systems; demonstrate compliance with a five-percent post-election manual audit; reconcile the number of voters who voted with the number of ballots cast; use SAVE to conduct the specified voter registration verification; and verify the citizenship of persons working at polling places or operating election systems. ECF 51-1 at 15-16. The NOFO thus identified the conduct expected of recipients before they accepted a FY2026 award.

The administrative record also places the 20% withholding in the context of FEMA's broader HSGP grant administration. HSGP already employed funding holds where recipients failed to demonstrate implementation of NPAs or compliance with other program requirements. *See* ECF 48-3 at 17 (addressing funding holds). And the Election-Security-compliance withholding provision did not render the entire award unavailable: FEMA treated the withheld 20% as unavailable pending compliance but permitted recipients to use the remaining balance for any approved projects. ECF 48-5 at 10. FEMA also addressed how that withholding interacted with the statutory pass-through requirements applicable to SHSP and UASI, including when the 45-day pass-through period would begin for amounts initially unavailable because of that withholding. *Id*. at 9-10.

That is materially different from imposing a new obligation after a State has already accepted federal funds. *Pennhurst* was concerned with whether a State could "knowingly accept[]" conditions attached to federal funding and cautioned against imposing "post acceptance or 'retroactive' conditions." 451 U.S. at 17, 25. Here, even before FEMA rescinded the Election Security Conditions, Plaintiffs had notice of them before the FY2026 HSGP awards issued. The conditions therefore did not present the retroactivity concern addressed in *Pennhurst*.

Plaintiffs' objection that Congress has not enumerated these particular requirements does not establish a constitutional violation. Congress expressly made HSGP administration dependent upon evolving threat assessments and vulnerabilities affecting all critical-infrastructure sectors. 6 U.S.C. § 608(a)(1)(D)-(E). And Plaintiffs do not challenge the separate requirement that recipients devote at least 3% of HSGP funding to physical or cyber election security measures, notwithstanding that Congress did not itself prescribe that precise percentage in the statute either. That requirement remains part of the reissued FY2026 HSGP awards even after removal of the challenged Election Security Conditions and 20% holdback. *See, e.g.*, Ex. Q (sample revised FY2026 HSGP award) at 42 (Art. 65). The Spending Clause does not require every particular application of a funding condition to be specifically identified in statutory text. *See Bennett*, 470 U.S. at 666, 669 (1985) (explaining that *Pennhurst* does not require "every improper expenditure [to be] specifically identified and proscribed in advance" and recognizing that grant requirements may be informed by regulations and administrative guidance in place when the grant is made).

In sum, although FEMA has rescinded the Election Security Conditions, Defendants preserve their position that the conditions were sufficiently related to the federal interest in protecting critical infrastructure and provided adequate notice to recipients before any FY2026 HSGP award was accepted. Accordingly, if the Court reaches the merits, it should find that Plaintiffs' Spending Clause claim fails, as does their related claim under 5 U.S.C. § 706(2)(B).

**3. The Election Security Conditions are not arbitrary or capricious.**

Plaintiffs also contend that the Election Security Conditions are arbitrary and capricious. Although that challenge is moot for the reasons explained above, *see supra* note 9, if the Court reaches the merits, Defendants incorporate the argument below that the conditions satisfy the APA's deferential standard of review. Under the APA's "narrow" standard, the Court asks whether the agency considered the relevant information and articulated a satisfactory explanation for its decision, including a "rational connection between the facts found and the choice made."

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Associated Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) ("Because the APA standard affords great deference to agency decisionmaking and because the Secretary's action is presumed valid, judicial review, even at the summary judgment stage, is narrow."). Agency action is arbitrary and capricious "if the agency lacks a rational basis for adopting it—for example, if the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise." *Associated Fisheries*, 127 F.3d at 109.

The Election Security Conditions satisfied that standard. The federal government routinely conditions the use of grant funding on compliance with federal security requirements. For example, Congress and the Executive Branch have restricted individuals from using federal funds to purchase certain foreign-manufactured drones because of documented cybersecurity risks. *See* 48 C.F.R. § 52.240-1 (Prohibition on Unmanned Aircraft Systems Manufactured or Assembled by American Security Drone Act-Covered Foreign Entities); Federal Acquisition Regulation: Prohibition on Unmanned Aircraft Systems From Covered Foreign Entities, 89 Fed. Reg. 89464, 89465 (Nov. 12, 2024). FEMA imposed election security requirements in response to identified cybersecurity vulnerabilities affecting election infrastructure. *See* Background II.A, *supra*; Argument II.C(1), (2), *supra*.

CISA's 2026 Election Report, for example, documented vulnerabilities in election software and state and local networks, including vulnerabilities that can remain unpatched for extended periods, and instances in which CISA assessors obtained control of state and local networks during penetration testing. Ex. M (CISA 2026 Election Report) at 1, 3-4. CISA specifically recommended human-readable paper ballots and post-election manual audits as measures to strengthen election infrastructure security. *Id.* at 5-6. The EAC likewise recognizes election audits—"before, during, and after an election"—as a means of confirming the accuracy of machine counts. Ex. N (2024 Federal Elections Insider Threats) at 4. The transition plan and

manual audit conditions in HSGP thus directly responded to those concerns by seeking to ensure an independently auditable paper record and a mechanism for checking electronic tabulation.

The remaining conditions similarly addressed identified risks involving voter registration systems and access to election infrastructure. Federal agencies, including the FBI, DHS, CISA, and EAC, have identified voter registration databases as potential targets for bad actors and warned that persons with authorized access—including employees, temporary workers, vendors, contractors, and volunteers—can present insider risks to election systems and information. *Id*. at 1, 4. FEMA could therefore reasonably conclude that measures directed at voter registration information, access to election systems, and verification of electronic results would further HSGP's election-security objectives. *See* ECF 51-13 at 2-4.

Plaintiffs may disagree with FEMA's assessment of those risks or contend that different measures would address them more effectively. But the arbitrary and capricious standard does not permit a court to substitute its preferred policy judgment for the agency's where the agency has identified a problem within its statutory domain and selected measures rationally connected to that problem. *State Farm*, 463 U.S. at 43. For those reasons, Plaintiffs' arbitrary and capricious challenge provides no basis for relief.

**D. The FY2026 Immigration Conditions are lawful.**

Contrary to Plaintiffs' contentions, this Court's decision in *FEMA I*, No. 1:25-cv-206-MSM-RLA (Smith, J.), does not resolve Plaintiffs' challenge to the FY2026 Immigration Conditions. *FEMA I* addressed the FY2025 terms then before the Court. *See* Ex. D (Mem. & Order, *id*., ECF 71) at 17-19. The FY2026 terms constitute a distinct agency action: DHS revised the governing terms, FEMA undertook a program-specific applicability analysis, and Bulletin 582 applies the conditions only to a defined subset of FEMA non-disaster programs. *See* ECF 51-2 at 5; ECF 48-6; ECF 48-7; ECF 51-3. The question here is therefore whether the FY2026 conditions, as applied through that process and supported by the FY2026 administrative record, are lawful. For the reasons explained below, they are.

**1. The FY2026 Immigration Conditions are not contrary to law and do not violate the Spending Clause or the Constitution.**

Plaintiffs' statutory authority argument regarding the FY2026 Immigration Conditions rests principally on the premise that Congress must have expressly identified the particular Immigration Conditions in the statutes authorizing each grant program. *See* ECF 50 at 22-27. But Congress has conferred on DHS general authority to "make contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's responsibilities under this chapter or otherwise provided by law." 6 U.S.C. § 112(b)(2). As discussed below, the governing statutes confer additional authority and define federal interests in terrorism prevention, law enforcement, border security, emergency preparedness, and coordination among Federal, State, and local authorities. Congress need not enumerate in statutory text every administrative condition an agency may impose in carrying out authority Congress has delegated. *See, e.g.*, *Biden*, 595 U.S. at 94-96 (per curiam); *Bennett*, 470 U.S. at 666, 669.

Plaintiffs mischaracterize FEMA's references to a programmatic "nexus" or "rational relationship" as an asserted substitute for statutory authority. *See* ECF 50 at 23-24. FEMA does not contend that identifying a policy connection to a grant program independently creates authority to impose a condition. That authority derives from Congress, namely, from DHS's general grantmaking authority, 6 U.S.C. § 112(b)(2), and the statutes and appropriations governing each particular program. FEMA's FY2026 "nexus" analysis in the administrative record served a different function: it examined whether applying the Immigration Conditions in the exercise of that delegated authority was consistent with the statutory purposes and federal interests Congress identified for that program. That inquiry thus served to cabin FEMA's exercise of discretion by requiring a program-specific justification for applying the conditions, rather than permitting their indiscriminate application based solely on DHS's general immigration or national security responsibilities. *See* ECF 48-6 at 4-11; ECF 48-7.

The Agency's review produced a narrower set of covered programs than in FY2025: several programs previously subject to the Immigration Conditions are excluded in FY2026,

while the only addition is SBSRF, a newly established program that Plaintiffs do not challenge here. *Compare* Ex. J (Defs.' MSJ, *FEMA I*, No. 1:25-cv-206, ECF 61) at 7, *with* ECF 51-3 at 2. The governing statutes confirm that FEMA's determinations were grounded in congressionally identified interests in law enforcement, border security, terrorism prevention, emergency preparedness, infrastructure, and Federal-State coordination:

| Program | Statutory authority and relevant federal interest |
|---|---|
| **BioWatch** | 6 U.S.C. §§ 596(1), 592(a): the Agency shall "operate extramural and intramural programs and distribute funds through grants, cooperative agreements, and other transactions and contracts" as part of carrying out the Agency's responsibilities to "coordinat[e] Federal efforts to detect and protect against the unauthorized importation, possession, storage, transportation, development, or use of [biological materials] in the United States, and to protect against attack using such devices or materials against the people, territory, or interests of the United States[.]" |
| **Emergency Management Performance Grant ("EMPG")** | 6 U.S.C. §§ 762, 701(7): to "continue implementation of an emergency management performance grants program" where "emergency management" means "the governmental function that coordinates and integrates all activities necessary to build, sustain, and improve the capability to prepare for, protect against, respond to, recover from, or mitigate against threatened or actual natural disasters, acts of terrorism, or other man-made disasters." |
| **Homeland Security Grant Program ("HSGP") – Operation Stonegarden ("OPSG")** | 6 U.S.C. § 605(a): "to assist . . . in preventing, preparing for, protecting against, and responding to acts of terrorism."<br><br>Annual appropriations acts, *e.g.*, Pub. L. No. 119-21, § 90005(a)(1)(D), 139 Stat. at 360: "$450,000,000 for the Operation Stonegarden Grant Program."<br><br>Report of the Committee on the Budget, House of Representatives, Report 119-106, § 60005, at 794 (May 20, 2025), https://www.congress.gov/119/crpt/hrpt106/CRPT-119hrpt106-pt1.pdf (last accessed Oct. 21, 2026): "This grant program provides cooperation and coordination among U.S. Customs and Border Protection's U.S. Border Patrol and federal, state, local, tribal, and territorial law enforcement agencies by providing funding to support joint efforts to secure the United States' borders[.]" |
| **HSGP – State Homeland Security Program ("SHSP")** | 6 U.S.C. § 605(a): "to assist . . . in preventing, preparing for, protecting against, and responding to acts of terrorism."<br><br>6 U.S.C. § 607(a)(1)-(2): requiring that at least 25% of combined SHSP and UASI funding support law enforcement terrorism prevention activities, including information sharing, threat recognition, support for Federal law enforcement operations, and increased border security and border crossing enforcement. |

| | |
|---|---|
| **HSGP – Urban Area Security Initiative (“UASI”)** | 6 U.S.C. § 604(a): “to assist high-risk urban areas in preventing, preparing for, protecting against, and responding to acts of terrorism.”<br>6 U.S.C. § 607(a)(1)-(2): requiring that at least 25% of combined SHSP and UASI funding support law enforcement terrorism prevention activities, including information sharing, threat recognition, support for Federal law enforcement operations, and increased border security and border crossing enforcement. |
| **Homeland Security National Training Program (“HSNTP”) – Continuing Training Grants – Competitive** | Annual appropriations acts; *e.g.*, Pub. L. No. 118-47, 138 Stat. at 608: “to sustain current operations for training, exercises, technical assistance, and other programs.”<br>Joint Explanatory Statement to the FY2024 DHS Appropriations Act: “Continuing Training Grants . . . to be competitively awarded for FEMA-certified rural and tribal training.” Joint Explanatory Statement—Division C, DHS Appropriations Act, 2024, at 42; *see also* DHS, FY2024 HSNTP Continuing Training Grants NOFO at 5, https://www.fema.gov/sites/default/files/documents/fema_hsntp-fy2024-ctg-nofo.pdf (last accessed Oct. 21, 2026). |
| **Port Security Grant Program (“PSGP”)** | 46 U.S.C. §§ 70103, 70101: for implementation of Area Maritime Transportation Security Plans, to deter “transportation security incidents” defined as a “security incident resulting in a significant loss of life, environmental damage, transportation system disruption, or economic disruption in a particular area.”<br>46 U.S.C. § 70107(a): directing the Secretary to “take into account national economic, energy, and strategic defense concerns based upon the most current risk assessments available.”<br>46 U.S.C. § 70107(i)(1): authorizing the Secretary to require State and local agencies to provide “such information and assurances as the Secretary may require.” |
| **Regional Catastrophic Preparedness Grant Program (“RCPGP”)** | Annual appropriations acts, *e.g.*, Pub. L. No. 118-47, 138 Stat. at 608: “$10,800,000 for Regional Catastrophic Preparedness Grants.”<br>*See also* DHS, FY2024 RCPGP NOFO at § A.10.A (May 23, 2024), https://www.fema.gov/grants/preparedness/regional-catastrophic/fy-24-nofo (last accessed Oct. 21, 2026): “The purpose of the RCPGP is to build state and local capacity to manage catastrophic incidents by improving and expanding regional collaboration . . . . The National Response Framework . . . defines a catastrophic incident as any natural or manmade incident, including terrorism, that results in extraordinary level of mass casualties, damage, or disruption[.]” |

| | |
|---|---|
| **Securing the Cities** | 6 U.S.C. §§ 596b(a), (b): "to enhance the ability of the United States to detect and prevent terrorist attacks and other high-consequence events utilizing nuclear or other radiological materials that pose a high risk to homeland security in high-risk urban areas" including to "provide resources to enhance detection, analysis, communication, and coordination to better integrate State, local, Tribal, and territorial assets into Federal operations." |
| **Transit Security Grant Program ("TSGP")** | 6 U.S.C. § 1135: "to eligible public transportation agencies for security improvements," such as "perimeter protection systems," "explosive detection systems," "capital costs associated with security awareness, security preparedness, and security response training," "other capital security improvements determined appropriate by the Secretary," costs for "personnel assigned to . . . counterterrorism duties related to public transportation," and "other operational security costs determined appropriate by the Secretary[.]" |

These authorities do not confer identical discretion or prescribe identical allocation mechanisms, and FEMA's FY2026 determination does not assume otherwise. Some programs employ statutory formulas or risk-based criteria, while others are competitive and discretionary. But those allocation provisions do not themselves establish an exclusive catalogue of permissible award terms. Rather, each program's statutory provisions must be considered together with DHS's general grantmaking authority and the substantive purposes Congress assigned to each program. For the discretionary programs in particular, Congress left FEMA substantial authority to design and administer the awards within those purposes. *See* 6 U.S.C. § 112(b)(2).

The relationship between the Immigration Conditions and the statutory purpose is especially direct in programs such as OPSG, which depends on Federal, State, and local law enforcement cooperation to secure the Nation's borders. *See* Report of the Committee on the Budget, House of Representatives, Report 119-106, § 60005, at 794.[14] Other programs reflect

[14] Specifically, the House Budget Committee Report stated, in connection with the passage of that budget legislation:

> Operation Stonegarden is part of FEMA's Homeland Security Grant Program, which provides funding to [SLTT] law enforcement agencies that are located along the borders of the United States to improve overall border security. . . . Operation Stonegarden is an essential part in the overall advancement of security along our borders . . . This grant program provides cooperation and coordination among U.S. Customs and Border Protection's U.S. Border Patrol and federal,

Congress's express reliance on information sharing, law enforcement coordination, terrorism prevention, infrastructure protection, and national preparedness. For example, the PSGP authorizing statute specifically states the Agency "shall require eligible port authorities, facility operators, and State and local agencies required to provide security services, to submit an application, at such time, in such form, and containing such information and assurances as the Secretary may require[.]" 46 U.S.C. § 70107(i)(1). Notably, the statute also provides that DHS must ensure that each grant awarded for multi-year plans is "coordinated with any applicable State or Urban Area Homeland Security Plan." *Id.* § 70107(f)(2). UASI is also intended "to assist high-risk urban areas in preventing, preparing for, protecting against, and responding to acts of terrorism." 6 U.S.C. § 604(a). The point of FEMA's program-specific inquiry was to determine where those statutory interests supported application of the FY2026 conditions—not, as Plaintiffs suggest, to posit a freestanding "nexus" as a source of authority.

Plaintiffs' contrary argument also blurs two related but distinct inquiries. Statutory authority must come from Congress; Spending Clause relatedness asks whether a condition imposed pursuant to that authority bears a sufficient relationship to the federal interest in the particular program. *See Dole*, 483 U.S. at 207-08. The latter does not independently create agency authority, but neither does it require Congress to recite the precise condition in each program statute. Here, Congress supplied the grantmaking authority described above, while FEMA's program-specific analysis examined whether application of the Immigration Conditions remained tied to the statutory purposes and federal interests of the programs to which FEMA applied them. FEMA's reasoning on that question is addressed further below in connection with Plaintiffs' arbitrary-and-capricious claim.

Plaintiffs' separate vagueness argument likewise fails to account for the additional notice and specificity provided by the FY2026 terms. Unlike the FY2025 conditions considered in

---

> state, local, tribal, and territorial law enforcement agencies by providing funding to support joint efforts to secure the United States' borders[.]

*Id.*

*FEMA I*, the FY2026 Standard Terms and Conditions expressly require DHS to determine, on a program-specific basis, whether and how the Immigration Conditions apply and to identify that applicability in the relevant grant documents. ECF 51-2 at 5. The operative requirements are also more specific. The cooperation provision replaces the broader FY2025 requirement to "honor requests for cooperation" with identified categories of information and limits requests for short-term detention to no more than 48 hours pursuant to a valid detainer. *Compare* Ex. H (DHS FY2025 Standard Terms & Conditions) at 5 (§ C.IX(1)(c)), *with* ECF 51-2 at 6. And the revised Benefits Condition narrows the former prohibition on operating any program that "benefits illegal immigrants or incentivizes illegal immigration" to programs providing "direct financial support or public benefits" to illegal immigrants. *Compare* Ex. H (DHS FY2025 Standard Terms & Conditions) at 7 (§ C.XVII(2)(a)(iii)), *with* ECF 51-2 at 6-7. Those revisions provide an additional measure of clarity as to the conditions' applicability to particular awards and the conduct required when they do apply. *See Pennhurst*, 451 U.S. at 17 ("There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it.").

Additionally, as explained already, the FY2026 conditions also do not present the kind of coercion at issue in *NFIB*, 567 U.S. 519. *See* Argument II.B, *supra*. There, States faced the loss of longstanding Medicaid funding if they declined to participate in a substantially expanded program. 567 U.S. at 579-82 (Roberts, C.J.). Here, by contrast, the Immigration Conditions govern the selected FY2026 awards to which FEMA determined they apply; they do not condition continued receipt of funding under a separate, entrenched federal program on acceptance of a new program.

Plaintiffs' distinct challenge to the HSGP-specific Fusion Center Term likewise fails. Their Amended Complaint and Motion for Summary Judgment principally attack three provisions of the superseded Art. 63 that had required fusion centers to: (1) maintain a permanent, formal seat for ICE ERO officials; (2) have their lead agencies participate in the 8 U.S.C. § 1357(g) program; and (3) coordinate with their local HSTFs. *See* ECF 44 ¶¶ 157-59;

ECF 50 at 14, 25-26. On that basis, Plaintiffs invoke 6 U.S.C. § 124h(h)(2), which provides that "[n]othing in this section shall be construed to require a State, local, or regional government or entity to accept the assignment of [DHS] officers or intelligence analysts . . . into [its] fusion center[,]" and 8 U.S.C. § 1357(g)(9), which similarly provides that nothing in § 1357(g) shall be construed to require a State or political subdivision to enter into an agreement under that subsection. *See* ECF 50 at 25-26.

But those arguments do not address the Fusion Center Term that presently governs FY2026 HSGP awards. On October 9, 2026, FEMA issued Bulletin 589, which set forth the corrected Fusion Center Term in full and replaced Art. 63 "in its entirety." Ex. K (Bulletin 589) at 2-3. As of October 19, FEMA has completed its reissuance of the affected HSGP awards with that corrected term incorporated into the award documents themselves. *See* Ex. P (emails from FEMA to SAAs). The reissued award expressly provides that the prior Fusion Center article "is replaced in its entirety as provided in Information Bulletin No. 589." *See, e.g.*, Ex. Q (sample revised FY2026 HSGP award) at 41-42 (Arts. 64-65). The operative term neither requires fusion centers to maintain an ERO seat nor mandates § 1357(g) participation by any State or locality. *See id*. Instead, recipients are expected to report on existing § 1357(g) participation and the number of ERO seats maintained by the fusion center, if any. *Id*. The revised term also affords fusion centers with more flexibility in determining the "appropriate regional" HSTF with which to coordinate. *Id*.

Those coordination and reporting obligations fall squarely within activities Congress expressly made part of HSGP. Specifically, Congress requires that at least 25% of combined SHSP and UASI funds support "law enforcement terrorism prevention activities," including "information sharing and analysis" and "State, local, and regional fusion centers." *See* 6 U.S.C. §§ 607(a)(1), (2)(A), (G), (H), 609(a)(7), (11).

For the same reason, the operative term satisfies the Spending Clause's relatedness requirement: its coordination and reporting obligations bear a direct relationship to the federal interest in supporting fusion center, information sharing, intelligence analysis, and law

enforcement terrorism prevention activities through HSGP. Nor is the operative term ambiguous as to what recipients must do. The corrected requirements were published online in Bulletin 589, itself incorporated into the reissued award. *See* Ex. K (Bulletin 589); *supra* note 8; Ex. Q (sample revised FY2026 HSGP award) at 41-42 (Arts. 64-65).[15] FEMA had also extended the deadline for recipients to accept all FY2026 FEMA non-disaster awards through December 15, 2026, thereby affording recipients additional time to review the corrected term. *See* FEMA Information Bulletin No. 586a (Oct. 16, 2026), https://www.fema.gov/sites/default/files/documents/fema_rsl_ib-586a-extending-award-acceptance-deadline_10262026.pdf (last accessed Oct. 21, 2026). Recipients therefore have the operative obligations before them, in the award documents they are asked to accept, and additional time to review those terms before acceptance. The term thus satisfies the Spending Clause requirement that funding conditions be stated unambiguously enough to permit recipients to make a knowing choice whether to accept federal funds. *See Dole*, 483 U.S. at 207.

Defendants also preserve and incorporate by reference, to the extent applicable, the arguments advanced in Ex. J (Defs.' MSJ, *FEMA I*, No. 1:25-cv-206, ECF 61) at 20-30.[16]

For those reasons, the FY2026 Immigration Conditions and operative Fusion Center Term fall within DHS's statutory grantmaking authority, satisfy the Spending Clause, and are not "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B). *See* ECF 44 ¶¶ 249-51.

---

[15] Plaintiffs assert that, although the administrative record identified the term included in the initial awards as an "earlier, incorrect draft," *see* ECF 48-8 at 1, the "'correct' text is not provided." ECF 50 at 14 n.4. That assertion was incorrect even when Plaintiffs filed their Motion because FEMA had published Bulletin 589 on its website on October 9, 2026—four days before Plaintiffs filed their Motion—and set forth the corrected term in full. *See* Ex. K (Bulletin 589).

[16] The Court in *FEMA I* invalidated the FY2025 Immigration Conditions on arbitrary-and-capricious and Spending Clause grounds and expressly declined to reach the separate question of statutory authority. *See* Ex. D (Mem. & Order, *FEMA I*, No. 1:25-cv-206, ECF 71) at 29-30 & 30 n.9. Defendants respectfully preserve their arguments in light of the revised conditions, FEMA's program-specific statutory determinations, and, as to the Fusion Center Term, requirements that were not before the Court in *FEMA I*. *See generally* Ex. I (Defs.' Opp. to Second Mot. to Enforce, *id.*, ECF 87).

### 2. The FY2026 Immigration Conditions Are Not Arbitrary or Capricious.

Plaintiffs' arbitrary and capricious challenge to the FY2026 Immigration Conditions fails under the APA's deferential standard of review. Review under 5 U.S.C. § 706(2)(A) is "narrow," and a court may not "substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43; *see also Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015). The APA requires only that agency action be "reasonable and reasonably explained." *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also Atieh*, 797 F.3d at 138 ("If the agency's decision is supported by *any* rational view of the record, a reviewing court must uphold it." (emphasis added)). The agency's explanation need not be one of "ideal clarity," so long as its "path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974).

The FY2026 Standard Terms and Conditions establish a new program-specific framework for determining whether and how the Immigration Conditions would apply. ECF 51-2; *see also* ECF 48-5 at 4-5. FEMA's subsequent memoranda identify the programs selected under that framework and explain the reasons for those determinations, thereby providing that reasonably discernible path. *See* ECF 48-6; ECF 48-7.

The FY2026 terms, and the manner in which they were implemented, directly address the specific deficiencies the Court identified in *FEMA I* as rendering the FY2025 Immigration Conditions arbitrary and capricious. *See* Ex. D (Mem. & Order, *FEMA I*, No. 1:25-cv-206, ECF 71) at 30-35. In particular, the Court faulted DHS for failing to adequately explain why a uniform set of immigration conditions should apply across grant programs serving apparently disparate purposes. *Id*. The FY2026 Standard Terms and Conditions mitigate that concern by requiring DHS to determine whether the Immigration Conditions are consistent with a grant program's governing statutes in light of the program's nexus to immigration activities, law enforcement, or national security. ECF 51-2 at 5. FEMA undertook that analysis rather than treating its grant portfolio as a single undifferentiated category, as reflected in the administrative record. Having remedied the very deficiencies the Court identified as rendering the FY2025

conditions arbitrary and capricious, the FY2026 conditions do not suffer from the same defect and cannot be invalidated on that basis.

FEMA's Sept. 11 Memo, for instance, identifies the programs recommended for application of the Immigration Conditions and sets out their authorizing authorities, purposes, award criteria, and identified nexus. *See* ECF 48-6 at 4-11. The Sept. 18 Memo provides additional program-specific reasoning. *See* ECF 48-7. Those analyses vary with the programs themselves: FEMA considered border security and joint law enforcement operations for OPSG, maritime critical infrastructure protection for PSGP, terrorism prevention and radiological security functions for Securing the Cities, all hazards preparedness and operational coordination for EMPG, and the distinct security and preparedness functions of the other programs selected. *See generally id.* That individualized analysis produced differentiated results. As Bulletin 582 identifies, only a subset of FEMA programs are subject to the Immigration Conditions, *see* ECF 51-3 at 2-3. Even within RCPGP, FEMA determined that the conditions would apply to the Miami-Dade RCPGP award but not to the New Jersey RCPGP award. *See* ECF 48-6 at 5.

Plaintiffs' contention that FEMA relied on factors Congress did not intend it to consider largely assumes the conclusion of their statutory authority argument. *See* ECF 50 at 27-31. As explained above, the statutes governing the affected programs expressly make relevant interests such as law enforcement, terrorism prevention, border security, information sharing, emergency preparedness, and Federal-State coordination. *See* Argument II.D(1), *supra*. FEMA did not simply identify immigration enforcement as an Administration priority and impose the same condition everywhere. It examined whether impaired cooperation or information sharing with DHS could affect the operation of programs serving those congressionally identified interests and limited the condition to programs for which it determined such a relationship existed.

The record also provides a rational explanation for those determinations. For OPSG, for example, FEMA identified the program's border security and joint law enforcement mission and explained that restrictions on cooperation with DHS could "impede information sharing, create operational gaps, undermine joint planning, and reduce the effectiveness of border security

operations." ECF 48-6 at 6-7. For SHSP and UASI, FEMA considered their terrorism prevention purposes, statutory law enforcement components, and the role of information sharing and coordination in achieving those objectives. *See* ECF 48-7 at 4-7. For PSGP, FEMA linked the conditions to protection of maritime infrastructure and coordination with Federal law enforcement at ports of entry. *Id.* at 8-9. And for Securing the Cities, FEMA tied the conditions to the program's counterterrorism mission of detecting and preventing radiological and nuclear threats, including the risk that an individual entering the country unlawfully could seek to import or use such materials for terrorism, and emphasized the importance of State and local information sharing and coordination with Federal authorities in identifying and disrupting those threats. *Id.* at 11-12.

Plaintiffs may disagree with FEMA's judgment that impaired cooperation in immigration enforcement efforts with DHS can diminish the effectiveness of those programs, but that disagreement does not render the judgment arbitrary. Agency policymaking frequently requires judgments about the likely operational consequences of competing approaches, and the APA does not require an agency to substantiate every such judgment with the kind of empirical proof Plaintiffs demand. *See Prometheus Radio Project*, 592 U.S. at 423. What matters is whether the agency considered the relevant issues and reasonably explained the connection between the facts before it and the decision made. *Id.*; *State Farm*, 463 U.S. at 43. FEMA did so here.

Plaintiffs' reliance-interest argument fares no better. *See* ECF 50 at 31-32. The reliance interests at issue in *Department of Homeland Security v. Regents of the University of California* arose from conduct undertaken in reliance on the agency policy being rescinded. 591 U.S. 1, 30-33 (2020). Plaintiffs identify something different here: a longstanding expectation that annual federal preparedness grants will remain available under their preferred terms comparable to those governing earlier fiscal years. The Immigration Conditions govern new FY2026 awards, with the applicable terms disclosed before recipients accepted those awards. *See* ECF 51-2 at 5-7. Plaintiffs do not identify a FY2026 award that FEMA induced them to accept under one set of terms and subsequently altered after they had structured their conduct in reliance on those terms.

Nor does *Regents* require agencies administering recurring annual grants to preserve prior fiscal years' terms merely because recipients have structured programs around an expectation of continuing federal support. The agency retains "considerable flexibility" in weighing reliance against competing policy concerns. *Regents*, 591 U.S. at 32-33. Here, FEMA did not disregard the nature of the programs it was administering: its program-specific review considered each program's statutory authority, funding structure, award criteria, and operational purpose before determining where the FY2026 conditions should apply. *See* ECF 48-6 at 4-11; ECF 48-7. Plaintiffs' reliance on prior years of funding does not itself make FEMA's different policy judgment for FY2026 unreasonable.

Plaintiffs' public-safety argument similarly reflects a disagreement with FEMA's policy judgment, not the Agency's failure to consider the problem. Plaintiffs contend that limiting state and local participation in federal immigration enforcement can promote community trust and allow scarce law enforcement resources to be directed elsewhere. *See* ECF 50 at 32-34. Those may be considerations States reasonably weigh in establishing their own policies. FEMA, however, was administering federal programs directed to border security, terrorism prevention, transportation security, emergency preparedness, and related homeland security functions, and it reached a different judgment about the consequences of diminished cooperation in that context. The administrative record expressly identifies information sharing, operational coordination, joint planning, and Federal-State law enforcement cooperation as relevant to the effectiveness of the selected programs. *See, e.g.*, ECF 48-6 at 6-9; ECF 48-7 at 4-12. FEMA therefore did not overlook public safety; it concluded that, for the programs to which it applied the Immigration Conditions, impaired coordination with DHS itself carried public safety and national security consequences. The APA does not authorize a court to choose between those competing policy judgments. *See Prometheus Radio Project*, 592 U.S. at 423. Nor must FEMA establish that its policy judgment is superior to the States' preferred approach. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009) ("[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better[.]"

(emphasis in original)). The question is whether FEMA reasonably considered matters relevant to the programs before it and supplied a rational explanation for its decision. The FY2026 record satisfies that standard.

Plaintiffs' arbitrary and capricious challenge to the Fusion Center Term likewise fails. Plaintiffs challenge the superseded version of Art. 63 and characterize FEMA's revisions as a "post-hoc" attempt to revise policy after litigation began. *See* ECF 50 at 26 n.10. As FEMA explained in the Oct. 8 Memo, the underlying policy decision was finalized on August 20, 2026, after consultation with DHS's Office of Intelligence and Analysis and other appropriate officials, and the initial award packages inadvertently included an earlier draft. ECF 48-8 at 1, 3. FEMA then did precisely what the Oct. 8 Memo stated it would do: it published Bulletin 589 on October 9, replacing the earlier term "in its entirety," and subsequently reissued the HSGP awards with the corrected term incorporated into the award itself. *See* Ex. K (Bulletin 589); Ex. P (emails from FEMA to SAAs). The reissued award contains the corrected Fusion Center Term, expressly incorporates Bulletin 589, and confirms that the former article is replaced in its entirety. *See, e.g.*, Ex. Q (sample revised FY2026 HSGP award) at 41-42 (Arts. 64-65).

The administrative record articulates a programmatic rationale for the operative Fusion Center Term. FEMA determined that it historically lacked sufficiently specific and measurable information about how HSGP-funded fusion centers used federal funds, limiting the agency's ability to assess whether funded activities advanced HSGP objectives. ECF 48-8 at 2. The operative term therefore requires more consistent reporting regarding grant-supported activities, operational outputs, partnerships, personnel, and resource allocation. *Id.* at 2-3. That rationale bears directly on Congress's requirement that FEMA consider "the anticipated effectiveness of the proposed use of the grant" in administering HSGP. 6 U.S.C. § 608(a)(2). And, as explained above, Congress expressly made information sharing, fusion centers, intelligence analysis, and law enforcement terrorism prevention activities part of HSGP's statutory framework. *See* 6 U.S.C. §§ 607(a)(1)-(2), 609(a)(7), (11).

The FY2026 record therefore presents more than a generalized policy preference or an unexplained decision to attach uniform conditions across disparate programs. FEMA applied a program-specific framework, examined the statutory and operational characteristics of the programs under consideration, reached differentiated applicability determinations, and documented why it concluded that cooperation and information sharing with DHS bear on the effectiveness of the programs selected. As to the Fusion Center Term, FEMA separately identified both the statutory basis for the HSGP-specific requirements and the grant-administration problem the reporting provisions are intended to address. Plaintiffs may dispute those judgments, but the APA asks whether the agency's decisions were "reasonable and reasonably explained," not whether the Court—or the Plaintiff States—would have made the same policy choices. *Prometheus Radio Project*, 592 U.S. at 423. On this record, Plaintiffs have not shown that FEMA acted arbitrarily or capriciously.[17]

### E. The Termination Conditions are lawful.

Plaintiffs challenge two provisions governing termination of FEMA's FY2026 non-disaster grants: the provisions addressing awards that no longer effectuate program goals or agency priorities and, for discretionary awards, termination "[f]or convenience, including if the award no longer advances the national interest." *See* ECF 51-3 at 4; ECF 44 ¶¶ 252-86; ECF 50 at 43-47. For the reasons set forth below, neither provision is contrary to law or arbitrary or capricious, nor does either violate the Spending Clause or otherwise contravene "constitutional right, power, privilege, or immunity" under 5 U.S.C. § 706(2)(B). *See* ECF 44 ¶¶ 284-86.

---

[17] Defendants also respectfully incorporate by reference the arguments they advanced in *FEMA I* concerning arbitrary-and-capricious review, to the extent applicable. *See* Ex. J (Defs.' MSJ, *FEMA I*, No. 1:25-cv-206, ECF 61) at 33-35. Although the Court rejected those arguments on the FY2025 record, *see* Ex. D (Mem & Order, *id.*, ECF 71), the FY2026 determinations rest on the materially different process and administrative record described above and therefore fall outside the scope of the Court's *FEMA I* Order. *See generally* Ex. I (Defs.' Opp. to Second Mot. to Enforce, *id.*, ECF 87). Thus, if the Court reaches the merits notwithstanding the dispositive jurisdictional issues addressed above, it should assess the FY2026 challenge on the present record.

Plaintiffs repeatedly characterize these FEMA-specific provisions as conferring authority to terminate FEMA grants "for any reason or for no reason whatsoever." *E.g.*, ECF 50 at 2. That is not what the operative terms provide. The Agency Priorities provision tracks the terminology of 2 C.F.R. § 200.340(a)(4) and identifies specified circumstances in which an award may cease to effectuate program goals or agency priorities. *See* 2 C.F.R. § 200.340(a)(4); ECF 51-3 at 4. The separate termination-for-convenience provision applies only to discretionary awards and expressly excludes block grants, statutory formula grants, and disaster recovery funds. ECF 51-3 at 4. Both provisions remain subject to governing law and the applicable notice requirements. Plaintiffs' challenge must therefore be assessed against those actual limitations rather than an asserted authority FEMA has not claimed.

### 1. The Termination Conditions are not contrary to law.

Plaintiffs contend that FEMA lacks statutory and regulatory authority to terminate awards based on program goals or agency priorities or, in the case of discretionary awards, for convenience. ECF 44 ¶¶ 252-60; ECF 50 at 43-47. Neither argument establishes that the challenged provisions are contrary to law. Federal regulations expressly contemplate termination pursuant to an award's terms where an award no longer effectuates program goals or agency priorities, subject to the limits of governing law. *See* 2 C.F.R. § 200.340(a)(4). And the termination-for-convenience provision is limited to discretionary awards, ECF 51-3, over which Congress has afforded the Agency broad discretion. *See* Argument II.A, B, *supra*.

#### *(i) Termination based on program goals or agency priorities is expressly contemplated by federal regulation.*

The language of the Agency Priorities provision comes directly from the federal regulation governing termination of federal awards, 2 C.F.R. § 200.340(a)(4). Section 200.340(a)(4) expressly provides that an award may be terminated "[b]y the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency

priorities." 2 C.F.R. § 200.340(a)(4). Section 200.340(b), in turn, requires a Federal agency to "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." *Id.* § 200.340(b).

FEMA's FY2026 materials employ that regulatory standard. Bulletin 582 states that a non-disaster award may be terminated "[i]f the federal award no longer effectuates the program goals or agency priorities." ECF 51-3 at 4. It then identifies the circumstances in which FEMA may make that determination, including where "a specific award objective is ineffective at achieving program goals as described in the [NOFO]," or where "an objective of the award as described in the [NOFO] will be ineffective at achieving program goals or agency priorities." *Id.* Thus, rather than creating a termination ground foreign to the regulations governing federal awards, Bulletin 582 elaborates upon a ground expressly recognized by § 200.340(a)(4).

The regulatory history confirms that termination based on program goals or agency priorities is not inherently inconsistent with § 200.340. The Agency Priorities language was added to § 200.340 in 2020 specifically "to strengthen the ability of the Federal awarding agency to terminate Federal awards" that no longer effectuate program goals or agency priorities. Guidance for Grants and Agreements, 85 Fed. Reg. 49506, 49507-08 (Aug. 13, 2020). OMB explained that the provision was intended to ensure that agencies "prioritize ongoing support to Federal awards that meet program goals," including where information obtained after an award demonstrates that "a specific award objective is ineffective at achieving program goals." *Id.* at 49507. OMB preserved that authority when it revised § 200.340 in 2024. *See* Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024). In its proposed revisions, OMB initially proposed removing the express language of the Agency Priorities provision (then appearing under subsection (a)(2)) as "unnecessary." *Id.* OMB reasoned that, because § 200.340 separately permitted agencies to terminate awards pursuant to their terms and conditions, agencies were already free to include, as a term of an award, failure to effectuate program goals or agency priorities as a ground for termination. *Id.* After considering public comments, however, OMB revised the final rule to make that authority explicit. *Id.* Accordingly,

the current subsection (a)(4) "continues to provide that a Federal award may be terminated by the Federal agency or pass-through entity pursuant to the terms and conditions of the Federal award." *Id*. As OMB explained, this "may include a term and condition allowing termination by the Federal agency or pass-through entity, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities," provided that such grounds are "clearly and unambiguously communicate[d] . . . in the terms and conditions of the award." *Id.*

FEMA's Agency Priorities provision follows that regulatory framework: it incorporates the terminology of § 200.340(a)(4) into the award terms and specifies circumstances in which FEMA may determine that an award no longer effectuates program goals or agency priorities. *See, e.g.*, ECF 51-4 at 73 (Art. 56) (incorporating Bulletin 582).

Plaintiffs' reliance on *New Jersey v. Office of Management & Budget*, 837 F. Supp. 3d 258 (D. Mass. 2026), does not establish that this provision is contrary to law. *New Jersey* addressed the scope of authority supplied by § 200.340(a)(4) itself. *Id*. at 275-76. The plaintiffs there sought declarations that § 200.340(a)(4): (1) did not permit agencies to withhold congressionally appropriated funds based on changed agency priorities; (2) could not be invoked unless the award's terms authorized termination on that basis; and (3) did not permit termination based on new agency priorities identified after an award was made. *Id*. The defendants did not dispute the first two propositions, leaving only whether § 200.340(a)(4) itself authorized termination based on agency priorities that changed after an award was made. *Id*. The court held that it did not and declared that § 200.340(a)(4) does not itself authorize termination "based on new program goals or agency priorities that an agency identifies after granting the award." *Id*. at 276, 283.

That holding, which remains subject to any further proceedings on a motion for stay or appeal that the government may pursue, does not render any reference to program goals or agency priorities per se unlawful. To the contrary, *New Jersey* recognized that the relevant goals and priorities may be ascertained from the terms governing the program when the award was made. *See id.* at 280. The court explained that, under its construction, "[a]ll that a court would

need to do is look to the agency priorities and program goals identified in the [NOFO] when the program was announced." *Id.* At best, then, *New Jersey* supplies a limiting principle rather than a basis for invalidating the Agency Priorities ground wholesale: namely, that § 200.340(a)(4) does not itself authorize termination based solely on a new priority first supplied after award.

The Agency Priorities term here provides, among other things, for termination where FEMA determines that "a specific award objective is ineffective at achieving program goals as described in the [NOFO]," or that "an objective of the award as described in the [NOFO] will be ineffective at achieving program goals or agency priorities." ECF 51-3 at 4. Those applications fall squarely within *New Jersey*'s construction of § 200.340(a)(4).

To be sure, subsection (e) of the Agency Priorities provision provides for termination where "FEMA changes or re-evaluates the goals or priorities of the grant program and determines that the award will be ineffective at achieving the updated program goals or agency priorities." ECF 51-3 at 4 (§ 2(a)(i)(3)(e)). To the extent that language were invoked to terminate an award solely because of an entirely new program goal or agency priority first identified after an award was made, that application could implicate the limitation recognized in *New Jersey*. But two points follow. First, *New Jersey* is not binding on this Court. Second, the provision is not necessarily inconsistent with *New Jersey* insofar as it permits FEMA to reassess whether an award continues effectively to advance an existing program goal or priority. Nor does any potential conflict presented by that particular subsection negate FEMA's authority to otherwise terminate an award "[i]f the federal award no longer effectuates the program goals or agency priorities," including under the other circumstances identified under the Agency Priorities provision that expressly tie termination to the program goals and objectives disclosed in an award's NOFO. *See* ECF 51-3 at 4.

Plaintiffs cannot transform a potential dispute over one hypothetical application of one subsection of the Agency Priorities term into a basis for invalidating the Agency Priorities ground altogether. *See* Argument I.C, *supra*. Section 200.340(a)(4) expressly contemplates termination where an award no longer effectuates program goals or agency priorities, subject to

the terms of the award and the limits of governing law. And to the extent Plaintiffs contend that FEMA may someday rely on broader language to terminate one of their awards for a reason not authorized by its operative terms or governing statute, that challenge can be adjudicated if FEMA actually does so.

Thus, Plaintiffs cannot establish that FEMA acts contrary to law merely by including the challenged Agency Priorities provision in its FY2026 award terms. To the extent the Court concludes that any particular language in FEMA's FY2026 Agency Priorities condition extends beyond the authority recognized in § 200.340(a)(4), any relief should be confined accordingly, rather than invalidating the Agency Priorities ground that tracks the regulation's text.

*(ii) FEMA has authority to include the termination-for-convenience provision in its discretionary awards.*

Plaintiffs' challenge to the termination-for-convenience provision likewise overlooks a fundamental feature of the awards to which that provision applies. FEMA did not reserve authority to terminate *every* non-disaster federal award for convenience. The provision applies only to discretionary non-disaster awards. ECF 51-3 at 4. That limitation was deliberate. FEMA's May 11 Memo expressly recognized EO 14332's distinction between discretionary awards and block, statutory formula, and disaster recovery grants and stated that FEMA's termination provision was structured to account for that limitation. ECF 48-3 at 5.

As explained above, Congress has afforded DHS substantial discretion in administering the discretionary grant programs at issue and in establishing terms governing those awards. *See* Argument II.A, B, *supra*. Courts have long recognized that statutory authority granting an agency discretion to establish or administer a federal program ordinarily encompasses some authority to discontinue it. *See Cal. Sea Urchin Comm'n v. Bean*, 883 F.3d 1173, 1184 (9th Cir. 2018) ("[W]here the agency has discretion to implement an experimental program, it can reasonably interpret the statute to allow it to terminate that program if the statute's purpose is no longer being served. And it follows with stronger logic that termination is permissible at the agency's discretion if the agency concludes that continuing the program would undermine the

stated purpose of the statute that authorizes it."); *Pennsylvania v. Lynn*, 501 F.2d 848, 855-56 (D.C. Cir. 1974) (holding that the Department of Housing and Urban Development possessed discretion to suspend housing-subsidy programs where it had "adequate reason to believe that they [were] not serving Congress's purpose," notwithstanding Congress's authorization of the programs).

Plaintiffs identify no statute categorically prohibiting FEMA from including the challenged termination provisions in the terms of those discretionary awards.[18] To the contrary, termination-for-convenience clauses have long been a feature of federal agreements. *See, e.g.*, *Ingersoll-Rand*, 780 F.2d at 77-78. *Ingersoll-Rand* recognized both the government's reserved contractual right to terminate for convenience, and the availability of a challenge to a particular exercise of that authority under governing contract principles. *Id.* at 77. Thus, although a particular termination may be challenged as unlawful, the possibility of an unlawful future exercise does not establish that FEMA lacked authority to include a termination-for-convenience provision in its discretionary awards *ab initio*.

FEMA's decision to reserve termination-for-convenience authority in the terms of awards that Congress has committed to its discretion is therefore not contrary to law.

**2. The Termination Conditions do not violate the Spending Clause.**

Plaintiffs' Spending Clause claim fares no better. They allege that the Termination Conditions permit FEMA to retroactively impose new priorities on previously awarded funds, fail to provide adequate notice of what recipients must do to retain their awards, operate

---

[18] OMB has proposed amendments to § 200.340 addressing termination of discretionary awards, including termination based on national interest. *See* Regulation for Federal Financial Assistance, 91 Fed. Reg. 32198, 32225-26, 32258 (May 29, 2026). The rule is not currently in effect. *See* Continuing Appropriations & Extensions Act, 2027, Pub. L. No. 119-103, § 157(a), 140 Stat. 987, 999 (Sept. 2, 2026). Although Defendants do not rely on the proposed rule as a source of present authority, OMB's description of the proposed amendment as further clarifying authority it views as already available under § 200.340(a)(4) is instructive. 91 Fed. Reg. at 32225. Should OMB promulgate a final rule while this action remains pending, Defendants reserve the right to address the effect of that rule on Plaintiffs' claims and requested relief.

coercively, and lack a sufficient relationship to the federal interest in the funded programs. ECF 44 ¶¶ 279-81; ECF 50 at 52-60. Those allegations misconstrue both the challenged terms and the nature of FEMA's discretionary grantmaking authority.

As an initial matter, the Termination Conditions do not impose a freestanding substantive obligation on recipients comparable to a condition requiring a State to enact a particular policy or undertake specified conduct. They instead identify circumstances under which FEMA may discontinue its own funding of an award. That distinction is relevant to Plaintiffs' attempt to apply *Dole*'s requirements as though the provisions commanded States to engage in otherwise unrelated conduct in exchange for federal funds. *See* 483 U.S. at 207. The challenged provisions instead concern FEMA's continued expenditure of the funds Congress entrusted it to administer.

Plaintiffs' coercion theory thus fails. The Termination Conditions do not threaten the loss of an established stream of funding under a separate program to compel States to accept a new federal policy, as in *NFIB*. *See* 567 U.S. at 580-82. They inform recipients, before acceptance of the award, of circumstances in which FEMA may terminate the particular award. Furthermore, the termination-for-convenience provision does not apply to block, statutory formula, or disaster recovery grants at all.

Recipients received advance notice of the Termination Conditions by way of Bulletin 582, which FEMA issued on September 18, 2026, and the FY2026 NOFOs published prior to that. *See* ECF 51-3; *see also, e.g.*, ECF 51-1 at 49; 51-10 at 39-40. And with respect to the Agency Priorities provision, FEMA has further specified the circumstances in which an award may be determined no longer to effectuate program goals or agency priorities, including where a specific award objective is ineffective at achieving program goals described in the NOFO; the design of the grant program is flawed relative to program goals or agency priorities; the program is not aligned with the DHS or FEMA Strategic Plan or successor documents; or FEMA changes or reevaluates the program's goals or priorities and determines that the award will be ineffective at achieving them. ECF 51-3 at 4. As subsection (f) of the Agency Priorities provision further states, any other basis for such a termination must itself be "based on program goals or agency

priorities and described in the termination notice provided to the recipient pursuant to 2 C.F.R. § 200.341." *Id.* Thus, recipients are not left to guess what FEMA means by an award that "no longer effectuates the program goals or agency priorities." The terms identify the circumstances that may support such a determination. That is sufficient to permit recipients to "exercise their choice knowingly, cognizant of the consequences of their participation." *See Dole*, 483 U.S. at 207 (quoting *Pennhurst*, 451 U.S. at 17).

Nor does the Spending Clause require FEMA to eliminate all judgment from those determinations. In *National Endowment for the Arts v. Finley*, the Supreme Court rejected a vagueness challenge to concededly "opaque" standards governing discretionary grants, explaining that "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." 524 U.S. 569, 588-89 (1998). A contrary rule, the Court observed, would call into question government programs awarding grants according to necessarily judgment-laden criteria such as "excellence." *Id*. at 589. Here, FEMA has done considerably more than announce an open-ended standard: it has identified six circumstances in which the Agency Priorities provision may be invoked and disclosed those circumstances to recipients as part of the terms governing FY2026 awards.

Plaintiffs invoke *New Jersey*, 837 F. Supp. 3d 258, to argue that FEMA's termination provisions impermissibly permit post-award changes to grant terms. *See* ECF 50 at 56. But *New Jersey* addressed a narrower issue: whether § 200.340(a)(4) itself authorizes termination based on program goals or agency priorities first identified after an award was made. *See* 837 F. Supp. 3d at 275-76. Here, by contrast, recipients were informed before accepting their awards that their awards may be terminated if they cease to effectuate identified program goals or agency priorities, and of the circumstances in which FEMA could make that determination. *See* ECF 51-3 at 4. Thus, whatever limitation *New Jersey* might place on a future termination based solely on a newly adopted post-award priority, it does not establish that recipients lacked notice of the termination condition itself or that the condition is facially invalid. Any challenge to such a future application may be assessed if and when it occurs. *See* Argument I.C, *supra*.

Nor are the Termination Conditions facially unrelated to the federal interest in the funded programs. The provisions do not condition FEMA funding on a recipient's conduct concerning some separate federal policy. They instead address whether Defendants should continue funding the particular award itself. The Agency Priorities provision asks precisely whether "the federal award" continues to effectuate those goals or priorities, while the termination-for-convenience provision is limited to discretionary awards and permits Defendants to discontinue an award that no longer advances the national interest. ECF 51-3 at 4. The relevant relationship therefore runs directly between Defendants' continued expenditure of federal funds and the purposes served by the award. Plaintiffs' contrary theory is premature for much the same reason as their other objections to hypothetical applications of these provisions: Defendants have not terminated any Plaintiff's award under either condition, so there is no concrete termination rationale against which the relatedness requirement can be assessed. If Defendants were to invoke either provision for a reason wholly unrelated to the federal interest in the particular program or award, Plaintiffs could challenge that application then. The possibility of such a future application does not establish that the provisions themselves are unrelated to the federal interests they govern.

Finally, FEMA's termination authority does not operate without procedural safeguards. FEMA must provide written notice of a termination consistent with 2 C.F.R. § 200.341, and its grant terms provide that, where applicable, the termination notice will identify the recipient's opportunity and process to object and provide information challenging the action under § 200.342. *See* ECF 51-3 at 5; *e.g.*, ECF 51-4 at 73 (award incorporating by reference Bulletin 582); *see also* 2 C.F.R. §§ 200.341-200.342. Section 200.342, in turn, requires federal agencies to maintain written procedures for objections, hearings, and appeals; requires an opportunity to object and submit information when termination is imposed as a remedy for noncompliance; and preserves any additional hearing or appeal rights provided by the statute or regulations governing the particular award. 2 C.F.R. § 200.342. These requirements further undermine Plaintiffs' suggestion that the challenged provisions confer an unreviewable authority to withdraw federal funds without notice or recourse.

### 3. The Termination Conditions are not arbitrary or capricious.

FEMA's Termination Conditions are not arbitrary or capricious simply because aspects of the FY2026 termination framework differ from prior grant practice. Plaintiffs overstate the novelty of the Agency Priorities concept, which predates FY2026. FEMA's updated FY2025 award terms, for instance, likewise permitted termination where an award "no longer effectuates the program goals or agency priorities," implementing the same authority reflected in § 200.340. *See* Sample FY2025 Award Terms at 8, *FEMA I*, No. 1:25-cv-206, ECF 76-1 (D.R.I. Oct. 21, 2025), attached here as Ex. O. The FY2026 term carries forward that prior termination ground while providing more detailed circumstances in which FEMA may determine that an award no longer effectuates program goals or agency priorities.

Even if the Court concludes that the FY2026 framework represents a policy change by specifying more detailed Agency Priorities criteria and adding a separate termination-for-convenience term, that change is not inherently arbitrary or capricious. Agencies may revise their policies so long as they acknowledge the change, act within their statutory authority, and provide good reasons for the new approach; they need not establish that the new policy is "better" than the prior one. *Fox*, 556 U.S. at 515.

FEMA did not obscure those changes here. In its May 11 memorandum, the Agency proposed a more comprehensive termination provision to address matters not covered by the DHS Standard Terms and Conditions and to implement EO 14332, while expressly accounting for the EO's limitation of termination for convenience to discretionary awards. *See* ECF 48-3 at 5; ECF 48-5 at 5. An executive order may itself supply a rational policy basis for an agency to alter its approach, so long as the agency acts within its own statutory authority and reasonably implements that policy. *See, e.g., Westwind Partners, LLP v. United States*, Nos. 24-1504C et al., 2026 WL 3081506, at *4-5 (Fed. Cl. Oct. 13, 2026) (concluding that an executive order supplied DHS with a rational basis to reevaluate existing procurements and that DHS's resulting cancellation decision was not arbitrary or capricious). FEMA's recommendation to update its termination provisions, among other provisions, was approved on May 14, 2026 by the Senior

Official Performing the Duties of the DHS Under Secretary for Management. ECF 48-3 at 2. FEMA thus acknowledged the change and explained the policy and grant-administration considerations underlying it; the APA requires no more. *See Fox*, 556 U.S. at 515.

The resulting distinctions FEMA adopted in the application of the Termination Conditions reflect the Agency's rational decision-making rather than the unexplained, across-the-board exercise of termination authority Plaintiffs posit. The Agency Priorities ground, which tracks the terminology of 2 C.F.R. § 200.340(a)(4), applies to non-disaster awards and further identifies particular circumstances in which an award may no longer effectuate program goals or agency priorities, while the broader termination-for-convenience authority is confined further to discretionary awards. *See* ECF 51-3 at 4. Under the APA's deferential standard, that is sufficient. *See Prometheus Radio Project*, 592 U.S. at 423.

## III. THE COURT SHOULD LIMIT ANY RELIEF TO THE PLAINTIFF STATES, GRANT PROGRAMS, AND CONDITIONS FOR WHICH PLAINTIFFS HAVE ESTABLISHED AN ENTITLEMENT TO RELIEF.

Plaintiffs seek broad relief exceeding their alleged injuries. They request wholesale vacatur of the Challenged Conditions, such that they would no longer condition funding for *any* State, even as to programs that are not properly before the Court. To the extent the Court were to conclude that any live claim warrants relief, that relief should be narrowly tailored to the particular Plaintiff States, programs, and conditions for which Plaintiffs have established entitlement to relief.

Such tailoring is especially warranted here because not all Plaintiff States have joined every claim; Plaintiffs expressly disclaim challenges to certain applications of the Challenged Conditions they nevertheless ask the Court to vacate wholesale; and FEMA has already rescinded the Election Security Conditions from all affected FY2026 HSGP awards in compliance with the *Nashville* Order, 2026 WL 2905123. *See* Ex. A (Bulletin 587); Ex. P (emails from FEMA to SAAs); Ex. Q (sample revised FY2026 HSGP award) at 42 (Art. 65).

As explained above, the Election Security Conditions now stand on a materially different footing from the remaining Challenged Conditions. Following the September 28, 2026 Order in *Nashville*, 2026 WL 2905123, FEMA rescinded the Election Security Conditions, including the associated 20% holdback, Information Bulletin No. 580, and the "Election Security Compliance Withhold" Agreement Article, and promptly reissued HSGP awards reflecting that rescission. *See* Ex. A (Bulletin 587); Ex. Q (sample revised FY2026 HSGP award) at 42 (Art. 65). This Court can order no additional prospective relief concerning those conditions.

If the Court concludes otherwise, it should, at a minimum, stay adjudication of those claims while the *Nashville* Order remains in force. *See Marquis*, 965 F.2d at 1154. Such a stay would conserve judicial resources without depriving Plaintiffs of any present protection because the *Nashville* Order already supplies the principal relief they seek. *See* Argument I.A, *supra*. To the extent the Court nevertheless reaches the merits of Plaintiffs' Election Security claims, Defendants incorporate their arguments below concerning the proper scope of any relief.

Plaintiffs' challenge to the Fusion Center Term presents a similar remedial limitation. Bulletin 589 superseded the challenged provisions of Art. 63 cited in Plaintiffs' Amended Complaint and Motion for Summary Judgment, and FEMA has since reissued the HSGP awards incorporating the corrected term, which eliminates the ERO seat and § 1357(g) participation requirements, and provides for more flexibility in the HSTF coordination requirement. *See* Ex. K (Bulletin 589); Ex. P (emails from FEMA to SAAs); Ex. Q (sample revised FY2026 HSGP award) at 41-42 (Arts. 64-65). Any relief must therefore be directed at the requirements that presently govern Plaintiffs' awards, not superseded language that no longer applies. And, as explained herein, those operative requirements are lawful and provide no basis for relief.

Defendants maintain that the APA does not authorize wholesale vacatur of agency action. *See United States v. Texas*, 599 U.S. 670, 695 (2023) (Gorsuch, J., concurring) (APA "does not say anything about 'vacating' agency action ('wholesale' or otherwise) . . . Still, from those two words alone ["set aside"], the district court thought the power to nullify the Guidelines with

respect to anyone anywhere surely follows . . . Color me skeptical.”).[19] The history and structure of the APA do not support that the “set aside” language in 5 U.S.C. § 706(2) authorizes a court to erase agency action universally. *See id*. (“Routinely, a court will disregard offensive provisions like these and proceed to decide the parties’ dispute without respect to them.”).

But even assuming § 706 authorizes vacatur of agency action in some circumstances, Plaintiffs’ requested relief illustrates why any such remedy should be limited to the agency action actually challenged and necessary to redress Plaintiffs’ alleged injuries. Plaintiffs expressly state that they do not challenge application of the Immigration Conditions to SBSRF because no Plaintiff asserting the Immigration Conditions claims has applied for SBSRF funding. *See* ECF 44 ¶ 150 n.8; ECF 50 at 21 n.8. Yet they seek vacatur of the Immigration Conditions without any program-specific limitation. ECF 44 at 83; ECF 50 at 60, 65. Such relief would reach SBSRF—the very application Plaintiffs have affirmatively placed outside this litigation—and therefore extend beyond any claim or injury they assert.

Defendants’ program-specific applications should not rise or fall together merely because they employ common standard-term language. Defendants did not apply the FY2026 Immigration Conditions as an indivisible rule across FEMA’s grant portfolio. *See* ECF 51-3. The DHS FY2026 Standard Terms and Conditions require a grant-by-grant determination whether and how the conditions apply, ECF 51-2 at 5, and FEMA separately analyzed the programs under consideration, *see, e.g.*, ECF 48-6, ECF 48-7. Even within RCPGP, for instance, the resulting application differed between the New Jersey and Miami-Dade RCPGP awards. *See* ECF 48-6 at 5. An adverse ruling as to one program thus should not automatically invalidate application of the same condition to another program governed by materially different statutory authority.

Plaintiffs’ requested relief is overbroad in another respect. Arizona and North Carolina do not join the causes of action challenging the Immigration Conditions. *See* ECF 44 at 67 n.10;

---

[19] Defendants recognize that this Court and others have held otherwise but nevertheless preserve the issue for further review. *See, e.g.*, *Dorcas Int’l Inst. of R.I. v. U.S. Citizenship & Immigr. Servs.*, 834 F. Supp. 3d 242, 325 (D.R.I. 2026); *Nashville*, 2026 WL 2905123, at *9-10.

ECF 50 at 15 n.15. Yet wholesale vacatur would eliminate those conditions with respect to awards to those States as well. The equitable relief entered in this action should not afford relief on a claim to States that deliberately declined to bring it, much less to nonparty States that have alleged no injury at all.

Those limitations follow from ordinary remedial principles. As the Supreme Court recently emphasized in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), equitable relief ordinarily operates to redress the injuries of the parties before the court, rather than to regulate the defendant's conduct toward the world at large. *See id.* at 844 (quoting *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975), for the principle that "neither declaratory nor injunctive relief . . . can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs" (cleaned up)). The same party-specific principles counsel against using § 706 to award relief to nonparties untethered from the claims adjudicated by this Court, or to parties who have expressly disclaimed relief regarding certain agency action. *See California v. Texas*, 593 U.S. 659, 672 (2021) (remedies "ordinarily operate with respect to specific parties" rather than "on legal rules in the abstract" (cleaned up; citations omitted)).

If the Court concludes that any remaining challenged term or condition is unlawful, any relief that purports to "set aside" such term or condition under 5 U.S.C. § 706(2) should extend no further than necessary to resolve the claims before it. At a minimum, any such relief should be limited (1) to the particular term or condition the Court finds unlawful; (2) to the grant program or programs as to which Plaintiffs have established that the term is unlawful; and (3) to the Plaintiff States that actually asserted and prevailed on the corresponding claim. With respect to the Immigration Conditions specifically, any relief should exclude SBSRF, which Plaintiffs expressly do not challenge, and should not extend to Arizona or North Carolina, which have not asserted the Immigration Conditions causes of action. Nor should an adverse ruling concerning the application of a condition to one grant program automatically invalidate the same condition as applied to another program governed by materially different statutory authority.

The same principles govern Plaintiffs' request for a permanent injunction. Although Plaintiffs seek injunctive relief only on behalf of the Plaintiff States and their subdivisions and instrumentalities, any injunction should be confined to the particular Plaintiff States, claims, and grant programs as to which entitlement to equitable relief has been established. *See Lewis v. Casey*, 518 U.S. 343, 357-60 (1996). The Court should not enjoin Defendants from enforcing portions of the Challenged Conditions that it finds lawful, applying a condition to grant programs not properly challenged in this action, or enforcing the Immigration Conditions against Plaintiff States that did not assert the corresponding claims. Such limitations would provide complete relief for any established injury without converting this case into an abstract adjudication on the validity of the Challenged Conditions across every State and every grant program.

Finally, if the Court decides to issue any relief, it should stay enforcement of that relief pending any appeal authorized by the Solicitor General. *See* Fed. R. App. P. 8(a). For the reasons explained above, Defendants are likely to succeed on appeal and will face irreparable harm absent a stay. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay"). At a minimum, the Court should administratively stay any injunctive relief it intends to order for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

## CONCLUSION

For the reasons explained above, the Court should deny Plaintiffs' Motion, grant Defendants' Cross-Motion, and enter final judgment for Defendants.

Plaintiffs' Election Security claims should be dismissed, or, alternatively, stayed while the *Nashville* Order remains in effect.

Any relief on the remaining claims should be narrowly limited to the Plaintiff States, claims, and grant programs for which Plaintiffs establish entitlement to relief.

Defendants otherwise rest on their briefing and defer to the Court as to the need for a hearing.

Respectfully submitted,

TODD BLANCHE
Attorney General

CHARLES C. CALENDA
First Assistant United States Attorney

*/s/ Rachna Vyas*

RACHNA VYAS
KEVIN BOLAN
Assistant U.S. Attorney
One Financial Plaza, 17th Floor
Providence, Rhode Island 02903
(401) 709-5000
(401) 709-5001 (Fax)
Email: Rachna.vyas@usdoj.gov

**CERTIFICATION OF SERVICE**

I hereby certify that on October 22, 2026, I electronically filed the foregoing Motion and it is available for viewing and downloading from the Court's CM/ECF system, and that the participants in the case that are registered CM/ECF users will be served electronically by the CM/ECF system.

*/s/ Rachna Vyas*
Assistant United States Attorney