**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF ILLINOIS, *et al.*,<br>*Plaintiffs*,<br>v.<br>FEDERAL EMERGENCY MANAGEMENT AGENCY, *et al.*,<br>*Defendants*. | Case No. 1:26-cv-00485-MSM-RLA<br>Hon. Mary S. McElroy |

**PLAINTIFF STATES'**
**REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**


INTRODUCTION .......... 1

BACKGROUND .......... 2

A. Defendants' Post-Litigation Conduct as to the Election Conditions .......... 2

B. Defendants' Post-Litigation Conduct as to the Fusion Center Condition. .......... 3

ARGUMENT .......... 5

I. Defendants' Jurisdictional Arguments Fail. .......... 5

A. Plaintiff States' challenge to the Termination Conditions is ripe. .......... 6

B. No part of this case is moot .......... 8

1. The judgment in *Nashville*, which defendants are actively seeking to vacate, does not moot this challenge to the Election Conditions. .......... 9

2. Plaintiff States have live challenges to both versions of the Fusion Center Condition. .......... 11

C. The Tucker Act does not impliedly forbid the relief sought in this case. .......... 13

D. 5 U.S.C. § 701(a)(2) does not preclude review of Plaintiff States' claims. .......... 14

II. The Challenged Conditions Are Unlawful. .......... 15

A. DHS and FEMA have no inherent authority to condition federal funds, nor does any overarching statute empower them to do so. .......... 16

B. The Immigration Conditions are unlawful. .......... 20

1. The Immigration Conditions, including the Fusion Center Condition, exceed statutory authority and are contrary to law. .......... 20

2. Imposing the Immigration Conditions was arbitrary and capricious. .......... 23

C. The Election Conditions are unlawful. .......... 26

1. The Election Conditions exceed statutory authority and are contrary to law. .......... 26

2. Imposing the Election Conditions was arbitrary and capricious. .......... 31

D. The Termination Conditions are unlawful. ... 33

1. The Termination Conditions exceed statutory authority and are contrary to law. ... 33

2. Imposing the Termination Conditions was arbitrary and capricious. ... 36

III. The Challenged Conditions Additionally Violate the Spending Clause. ... 38

IV. The Court Should Vacate the Challenged Conditions and Enter a Permanent Injunction that Protects Plaintiff States and Their Subdivisions... 42

CONCLUSION... 43

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967) ....................6

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ....................40

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ....................12

*Am. Hosp. Ass'n v. Kennedy*,
164 F.4th 28 (1st Cir. 2026) ....................24

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006)....................38

*Arrow-Hart & Hegeman Elec. Co. v. FTC*,
291 U.S. 587 (1934) ....................16

*Bais Yaakov of Spring Valley v. ACT, Inc.*,
798 F.3d 46 (1st Cir. 2015) ....................8, 11, 13

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ....................23

*Bennett v. Kentucky Dep't of Educ.*,
470 U.S. 656 (1985) ....................18

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................6

*Beyond Nuclear, Inc. v. NRC*,
113 F.4th 956 (D.C. Cir. 2024) ....................10

*Biden v. Missouri*,
595 U.S. 87 (2022) ....................17

*Bissonnette v. LePage Bakeries Park St., LLC*,
601 U.S. 246 (2024) ....................30

*Blanchette v. Connecticut Gen. Ins. Corps.*,
419 U.S. 102 (1974) ....................8

*California v. U.S. Dep't of Educ.*,
__ F. Supp. 3d __, 2026 WL 2754968 (D. Mass. Sept. 17, 2026) ....................................36

*California Sea Urchin Commission v. Bean*,
883 F.3d 1173 (9th Cir. 2018) ....................................34

*Campbell-Ewald Co. v. Gomez*,
577 U.S. 153 (2016) ....................................8

*Chamber of Com. of United States v. Lierman*,
90 F.4th 679 (4th Cir. 2024) ....................................10

*City of Arlington v. FCC*,
569 U.S. 290 (2013)....................................16

*City of Chicago v. Barr*,
961 F.3d 882 (7th Cir. 2020)....................................30

*City of Philadelphia v. Att'y Gen.*,
916 F.3d 276 (3d Cir. 2019) ....................................30

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020) ....................................1, 16, 19–21, 30, 34

*City of Salem v. Mullin*,
839 F. Supp. 3d 1320 (D. Or. 2026)....................................1, 6–7, 39–40

*Cnty. of King v. Turner*,
189 F.4th 819 (9th Cir. 2026) ....................................5. 16. 19

*Cnty. of Santa Clara v. Noem*,
815 F. Supp. 3d 979 (N.D. Cal. 2025) ....................................39

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024)....................................42

*Cruz v. Farquharson*,
252 F.3d 530 (1st Cir. 2001) ....................................8

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
637 F.3d 408 (D.C. Cir. 2011) ....................................7

*Cody v. Cox*,
509 F.3d 606 (D.C. Cir. 2007) ....................................15

*Dep't of Educ. v. California*,
604 U.S. 650 (2025) ....................................................................................................14

*Dep't of Com. v. New York*,
588 U.S. 752 (2019) ....................................................................................................15

*Doe v. Noem*,
152 F.4th 272 (1st Cir. 2025) ......................................................................................14

*Dole v. United Steelworkers of Am.*,
494 U.S. 26 (1990) ......................................................................................................29

*Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.*,
466 U.S. 435 (1984). ............................................................................................10, 13

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ....................................................................................................31

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
544 U.S. 280 (2005) ....................................................................................................10

*FBI v. Fikre*,
601 U.S. 234 (2024)..................................................................................................9. 11

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009)......................................................................................................37

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ....................................................................................................26

*Finnbin, LLC v. Consumer Prod. Safety Comm'n*,
45 F.4th 127 (D.C. Cir. 2022) .....................................................................................42

*Flagstaff Med. Ctr., Inc. v. Sullivan*,
962 F.2d 879 (9th Cir. 1992) .......................................................................................10

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ....................................................................................................11

*Home Depot U.S.A., Inc. v. Jackson*,
587 U.S. 435 (2019) ....................................................................................................27

*Illinois v. FEMA*,
801 F. Supp. 3d 75 (D.R.I. 2025)............................1, 5–6, 8, 12, 14–15, 24–25, 30, 38–39, 41

*Illinois v. Noem*,
813 F. Supp. 3d 282 (D.R.I. 2025)...........................................................4, 14–15, 22–24, 30

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
37 F.4th 746 (1st Cir. 2022) ....................24

*In re Savage Indus., Inc.*,
43 F.3d 714 (1st Cir. 1994) ....................10

*Ingersoll-Rand Co. v. United States*,
780 F.2d 74 (D.C. Cir. 1985) ....................35

*Kentucky v. Biden*,
57 F.4th 545 (6th Cir. 2023) ....................43

*Kinsella v. United States ex rel. Singleton*,
361 U.S. 234 (1960) ....................20

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
567 U.S. 298 (2012) ....................8

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013) ....................18–19

*Lang v. Soc. Sec. Admin.*,
612 F.3d 960 (8th Cir. 2010) ....................10

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ....................15

*Los Angeles Cnty. v. Davis*,
440 U.S. 625 (1979) ....................9

*Louisiana v. Biden*,
543 F. Supp. 3d 388(W.D. La. 2021) ....................37

*Lowe v. Gagné-Holmes*,
126 F.4th 747 (1st Cir. 2025) ....................12

*Mangual v. Rotger-Sabat*,
317 F.3d 45 (1st Cir. 2003) ....................6

*Massachusetts v. USDA*,
__ F. Supp. 3d __, 2026 WL 1815807 (D. Mass. June 24, 2026) ....................6, 15, 25

*McDonnell v. United States*,
579 U.S. 550 (2016) ....................29

*McInnis-Misenor v. Maine Med. Ctr.*,
319 F.3d 63 (1st Cir. 2003) ....................................................................................7

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982) ..............................................................................14

*Metro. Gov't of Nashville & Davidson Cnty. v. DHS*,
__ F. Supp. 3d __, 2026 WL 2905123 (D.D.C. Sept. 28, 2026) ...............................1–2, 26–28

*Metro. Gov't of Nashville & Davidson Cnty. v. DHS*,
No. 26-cv-2886 (D.D.C. Oct. 26, 2026) ..............................................................3, 28

*Michigan v. EPA*,
576 U.S. 743 (2015)..............................................................................................32

*Montany v. Univ. of New England*,
858 F.3d 34 (1st Cir. 2017) ..................................................................................36

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..............................................................................24–25, 32–33

*NAACP v. United States*,
No. 25-00965, 2026 WL 1265450 (D. Md. May 8, 2026)......................................34

*Nat'l All. to End Homelessness v. Turner*,
827 F. Supp. 3d 281 (D.R.I. 2026) ...............................................................5, 15, 19

*Nat'l Amusements, Inc. v. Town of Dedham*,
43 F.3d 731 (1st Cir. 1995) ..................................................................................19

*Nat'l Ass'n of Broadcasters v. FCC*,
39 F.4th 817 (D.C. Cir. 2022) ...............................................................................16

*Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*,
120 F.4th 904 (1st Cir. 2024) ................................................................................11

*Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*),
567 U.S. 519 (2012)..........................................................................................40–41

*Nat'l Institutes of Health v. Am. Pub. Health Ass'n*,
145 S. Ct. 2658 (2025) ....................................................................................13–14

*National Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) .............................................................................................39

*Nebraska v. Su*,
121 F.4th 1 (9th Cir. 2024) ..................................................................................37

*New Jersey v. OMB,*
837 F. Supp. 3d 258 (D. Mass. 2026) ....................35, 38–39

*New York v. Trump*,
171 F.4th 1 (1st Cir. 2026) ....................11, 15

*Ohio v. EPA*,
603 U.S. 279 (2024)....................1

*Oryszak v. Sullivan*,
576 F.3d 522 (D.C. Cir. 2009) ....................14

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981)....................38–39

*Pennsylvania v. Lynn*,
501 F.2d 848 (D.C. Cir. 1974) ....................34

*Perry Cap. LLC v. Mnuchin*,
864 F.3d 591 (D.C. Cir. 2017) ....................14

*Powell v. McCormack*, 395 U.S. 486, 497 (1969). ....................11

*Rhode Island v. Trump*,
781 F. Supp. 3d 25 (D.R.I. 2025)....................37

*Rhode Island Latino Arts v. Natl. Endowment for the Arts*,
800 F. Supp. 3d 351 (D.R.I. 2025) ....................37

*R.I. Coal. Against Dom. Violence v. Bondi*,
794 F. Supp. 3d 58 (D.R.I. 2025)....................5, 14

*R.I. Coal. Against Domestic Violence v. Kennedy*,
812 F. Supp. 3d 180 (D.R.I. 2025) ....................14

*Robbins v. Reagan*,
780 F.2d 37 (D.C. Cir. 1985)....................18

*South Dakota v. Dole*,
483 U.S. 203 (1987) ....................38

*Town of Barnstable v. O'Connor*,
786 F.3d 130 (1st Cir. 2015) ....................9

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ....................................................................................42

*United States v. California*,
__ F.4th __, 2026 WL 3212945 (9th Cir. Oct. 26, 2026) ....................................................31

*United States v. Concentrated Phosphate Exp. Ass'n*,
393 U.S. 199 (1968) ....................................................................................9

*United States v. Morrison*,
529 U.S. 598 (2000) ....................................................................................25

*United States v. Sastrom*,
96 F.4th 33 (1st Cir. 2024) ....................................................................................13

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*,
590 U.S. 604 (2020) ....................................................................................16

*W.R. Grace & Co. v. EPA*,
959 F.2d 360 (1st Cir. 1992) ....................................................................................6

*Washington v. FEMA*,
No. 25-cv-12006, 2025 WL 2229394 (D. Mass. Aug. 5, 2025). ............................................8

*Washington v. Dep't of Hous. & Urb. Dev.*,
No. 25-cv-626, 2026 WL 1863886 (D.R.I. June 29, 2026) ....................................................12

*West Virginia v. EPA*,
597 U.S. 697 (2022) ....................................................................................17

*W. Va. ex rel. Morrisey v. U.S. Dep't of the Treasury*,
59 F.4th 1124 (11th Cir. 2023) ....................................................................................6

*Westwind Partners, LLP v. United States,*
No. 24-1504C, 2026 WL 3081506 (Fed. Cl. Oct. 13, 2026) ..............................................37

*Wis. Right to Life, Inc. v. Schober*,
366 F.3d 485 (7th Cir. 2004). ....................................................................................10

*Woonasquatucket River Watershed Council v. USDA*,
186 F.4th 25 (1st Cir. 2026) ....................................................................................15

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009) ....................................................................................43

**Constitutional Provisions, Statutes, and Regulations**


U.S. Const. art. I, § 8, cl. 18....20

Pub. L. No. 119-21, 139 Stat. 71....21

Pub. L. No. 119-86, 140 Stat. 773....21

2 C.F.R.
§ 200.1....18
§ 200.340....35–36, 40

5 U.S.C.
§ 701....5, 14
§ 702....13
§ 706....5, 16, 33, 42

6 U.S.C.
§ 112....19–20
§ 124h....22
§ 603....21, 26
§ 604....27
§ 605....27–28
§ 608....21, 28–30
§ 609....27

8 U.S.C.
§ 1357....22
§ 1373....30

28 U.S.C.
§ 1346....13
§ 1491....13

31 U.S.C.
§ 6303....35
§ 6304....35

34 U.S.C. § 10102....19

42 U.S.C. § 1395x....17

46 U.S.C. § 70103....22

52 U.S.C. § 21085....31

## INTRODUCTION

For the second year in a row, DHS and FEMA have imposed conditions of staggering breadth on billions of dollars in federal funding that Congress authorized and appropriated for the States' use in preparing for and responding to emergencies and natural disasters. Plaintiff States brought suit to challenge those conditions, and DHS and FEMA have attempted to defend them as lawful and reasonable, explaining that the agencies acted to "ensure" that their "own funding is not spent in a manner contrary to" their programmatic goals. ECF 56 ("Opp.") at 33.

Defendants' arguments fail entirely to justify the challenged conditions. A federal agency "has no power to act . . . unless and until Congress confers power upon it," *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020), but DHS and FEMA assert a freestanding "[i]mplicit" power, Opp. 32, to impose conditions of their choosing on any and all funds they administer. That claim is profoundly wrong, and defendants make no other serious effort to ground the challenged terms in federal law. An agency's decision must also be "reasonable and reasonably explained," *Ohio v. EPA*, 603 U.S. 279, 292 (2024), but DHS and FEMA gave *no* explanation, much less a reasonable one, for imposing any of the challenged conditions—a gap that their litigation filings cannot (and mostly do not try to) fill. Nor can DHS and FEMA seriously argue the conditions comply with the Spending Clause, including because they are hopelessly ambiguous.

Courts have now invalidated each of the sets of conditions at issue in this case, or materially similar ones. *See Illinois v. FEMA*, 801 F. Supp. 3d 75 (D.R.I. 2025) (fiscal year 2025 Immigration Conditions), *appeal dismissed*, No. 25-2131 (1st Cir.); *Metro. Gov't of Nashville & Davidson Cnty. v. DHS*, __ F. Supp. 3d __, 2026 WL 2905123 (D.D.C. Sept. 28, 2026) (Election Conditions), *appeal docketed*, No. 26-5368 (D.C. Cir.); *City of Salem v. Mullin*, 839 F. Supp. 3d 1320 (D. Or. 2026) (Termination Conditions), *appeal docketed*, No. 26-6746 (9th Cir.). This Court should take

the same course, and both vacate the challenged conditions and enjoin defendants from enforcing them against Plaintiff States and their instrumentalities and subdivisions.

**BACKGROUND**

Plaintiff States do not describe the full background of this matter here, but summarize the events regarding the Election Conditions and the Fusion Center Condition that bear on defendants' mootness arguments. *See* Opp. 17–22.

**A. Defendants' Post-Litigation Conduct as to the Election Conditions.**

DHS and FEMA promulgated the Election Conditions on July 9, 2026, *see* ECF 51-1; 51-12; and Plaintiff States challenged them just two weeks later in the original complaint, ECF 1 ¶¶ 163–168, 178–208. Defendants then doubled down on the Election Conditions by issuing further guidance about how to comply with them on August 10. *See* ECF 51-13.

Separately, several municipalities in States not plaintiffs here also challenged the Election Conditions and won summary judgment on September 28, 2026. *Nashville*, 2026 WL 2905123. The *Nashville* court held that the Conditions exceeded FEMA's statutory authority and, indeed, that FEMA's contrary interpretation would raise grave constitutional concerns. *Id.* at *6–9. As to relief, DHS and FEMA objected to a universal remedy, maintaining the federal government's consistent position "that the APA does not authorize vacatur and that the court is limited to issuing only party-specific relief." *Id.* at *10. The court disagreed and "set aside" the Conditions on a universal basis because "vacatur is not restricted to the parties before the court." *Id.* at *9–10.

Defendants argue that Plaintiff States' challenge to the Election Conditions is moot due to the *Nashville* judgment. *See* Opp. 17–20. But their cross-motion for summary judgment does not mention that, by the time they filed it before this Court, they had already appealed the judgment in *Nashville* and sought relief from the judgment pending appeal. On October 22, 2026, several hours *before* they filed their brief here, DHS and FEMA appealed the ruling in *Nashville* and sought a

stay pending appeal from the district court. *See* Notice of Appeal, *Nashville*, No. 26-cv-2886 (D.D.C. Oct. 22, 2026), ECF No. 44 (Ex. 1); Defendants' Motion for Stay Pending Appeal, *Nashville*, No. 26-cv-2886 (D.D.C. Oct. 22, 2026), ECF No. 45 (Ex. 2). On October 26, that court denied the stay motion. *See Metro. Gov't of Nashville & Davidson Cnty. v. DHS*, No. 26-cv-2886 (D.D.C. Oct. 26, 2026) (Ex. 3). DHS and FEMA then immediately filed a stay motion at the D.C. Circuit, which remains pending. *See* Appellants' Motion for Stay Pending Appeal, *Metro. Gov't of Nashville & Davidson Cnty. v. DHS*, No. 26-5368 (D.C. Cir. Oct. 26, 2026) (Ex. 4).

Even as they actively seek to undo the *Nashville* judgment, in this case, DHS and FEMA explain that they have issued Information Bulletin 587, ECF 56-1, which pauses application of the Election Conditions for the time being, *see* Opp. 2, 8, 18–19, 73–74. DHS and FEMA fail to note, however, that Information Bulletin 587 provides: "If the [*Nashville*] Court's order is vacated or extinguished, the election administration conditions and 20% holdback will *immediately* become effective." ECF 56-1 at 4 (emphasis added). Last year, this Court invalidated a "condition precedent" much like this one as applied to the Immigration Conditions. *See Illinois v. FEMA*, No. 25-cv-206, 2025 WL 2908807 (D.R.I. Oct. 14, 2025). DHS and FEMA now seek to trigger that condition precedent for the Election Conditions by asking the D.C. Circuit to stay the *Nashville* judgment. *See* Ex. 4. If DHS and FEMA succeed in that attempt, then by the terms of Information Bulletin 587, Plaintiff States' pending Homeland Security Grant Program (HSGP) awards will again be subject to the Election Conditions "immediately." ECF 56-1 at 4.

**B. Defendants' Post-Litigation Conduct as to the Fusion Center Condition.**

DHS and FEMA do not dispute that the original awards under the Homeland Security Grant Program, issued on or about September 23, 2026, contained a Fusion Center Condition "that required fusion centers to" coordinate with local Homeland Security Task Forces, maintain a "seat" for Immigration and Customs Enforcement's ("ICE") Enforcement and Removal Operations, and

confirm participation in the § 287(g) program. Opp. 12; *see* ECF 51-4 art. 63; ECF 51-5 at 1–2. On October 2, 2026, in the amended complaint, Plaintiff States challenged that original Fusion Center Condition because it is yet another unauthorized condition requiring state cooperation with federal immigration enforcement. ECF 44 ¶¶ 157–159, 183–187.

On October 9, 2026, one week after they were sued over it, defendants modified the Fusion Center Condition via Information Bulletin 589. *See* ECF 56-11. Citing an alleged "administrative error" that placed "incorrect" language in the September 23 awards, *id.* at 2, defendants deleted the original Fusion Center Condition and replaced it with a new version that is different in certain respects. A memorandum in the administrative record dated October 8, 2026—six days after the amended complaint—claims that this newly revised Fusion Center Condition was actually finalized on August 20, 2026. ECF 48-8 at 1; *see also* Opp. 13 (reiterating this claim). The original Fusion Center Condition that appeared in September 23 award documents was allegedly drafted at some point "earlier" than August 20. ECF 48-8 at 1; Opp. 12. Not until October 15, 2026, nearly two weeks after the amended complaint, did FEMA amend actual award documents to include the new Fusion Center Condition instead of the original one. *See* Opp. 13; ECF 56-16 at 1–2.

DHS and FEMA do not explain, in the record or in their brief: (1) when the original Fusion Center Condition was drafted, other than allegedly at some point before August 20, 2026; (2) when or why it was discarded in favor of the new version of the Condition; (3) how the original version nevertheless ended up in September 23 award documents, other than the bare assertion of an "administrative error," ECF 48-8 at 3; ECF 56-11 at 2; or (4) why there is no documentation of the alleged August 20 decision but instead merely a memorandum dated six days after Plaintiff States amended their complaint. Defendants "provide no substantive, contemporaneous justification whatsoever" as to any of these details. *Illinois v. Noem*, 813 F. Supp. 3d 282, 305 (D.R.I. 2025).

## ARGUMENT

The Court has jurisdiction over this traditional APA challenge to the promulgation of grant terms and conditions. On the merits, defendants are fundamentally wrong that they have inherent or implied authority to do anything, let alone to attach conditions to federal grants of this breadth and significance. Rejecting that premise resolves this matter in Plaintiff States' favor because DHS and FEMA identify no statutory provision that could plausibly authorize the challenged conditions. *See* 5 U.S.C. § 706(2)(A), (C). For that reason, and because the conditions' promulgation was arbitrary and capricious, and violated the Spending Clause, *id.* § 706(2)(A), (B), the Court should grant Plaintiff States' motion for summary judgment and enter relief in the form requested.

### I. Defendants' Jurisdictional Arguments Fail.

Plaintiff States bring straightforward APA claims against a type of agency action that has become familiar to this Court and others since January 2025: the promulgation of novel terms and conditions on the award of federal funds. *See, e.g.*, *Nat'l All. to End Homelessness v. Turner*, 827 F. Supp. 3d 281, 290 (D.R.I. 2026); *FEMA*, 801 F. Supp. 3d at 89; *R.I. Coal. Against Domestic Violence v. Bondi*, 794 F. Supp. 3d 58, 67 (D.R.I. 2025); *see also Cnty. of King v. Turner*, 189 F.4th 819, 828 n.2 (9th Cir. 2026) ("The government does not contest on appeal that the decisions . . . to impose the challenged conditions are agency actions subject to APA review."). Defendants' threshold arguments against APA review all fail. First, Plaintiff States' challenge to the policy of promulgating the Termination Conditions is ripe, even if FEMA has not yet *enforced* that policy by terminating specific awards. Second, defendants' halting retreat in the face of litigation on the Election Conditions and the Fusion Center Condition does not resolve the live controversy as to those Conditions. Third, the Tucker Act does not affect this grant conditions case in any way. Finally, 5 U.S.C. § 701(a)(2) does not preclude review of agency decisions about grant conditions.

### A. Plaintiff States' challenge to the Termination Conditions is ripe.

Plaintiffs' challenge to the Termination Conditions suffers from no ripeness defect. To determine whether a case is ripe, courts examine "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Mangual v. Rotger-Sabat*, 317 F.3d 45, 59 (1st Cir. 2003) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

Here, the legal issues with the Termination Conditions are fit for judicial review, right now. On an APA claim, fitness overlaps with the question of the "degree to which any challenged agency action is final." *W.R. Grace & Co. v. EPA*, 959 F.2d 360, 364 (1st Cir. 1992); *accord FEMA*, 801 F. Supp. 3d at 88. Defendants' decision to impose the Termination Conditions on fiscal year 2026 funding was a final agency action—it "mark[ed] 'consummation' of the agency's decisionmaking process" and has "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). For non-disaster awards, defendants' own record confirms that a senior agency official approved the imposition of the Termination Conditions, and the agency promulgated that approval through an agency directive. Opp. 14–15. That directive applies the Termination Conditions to "non-disaster awards issued on or after August 28, 2026," ECF 51-3 at 3; ECF 51-4 art. 56 (incorporating September 18 Directive into Illinois' HSGP award). As to disaster awards, they remain subject to the agency's general terms and conditions, which also include a Termination Condition, ECF 51-2 at 16–17, and the promulgation of those general terms is final agency action subject to judicial review. *FEMA*, 801 F. Supp. 3d at 89; *Massachusetts v. USDA*, __ F. Supp. 3d __, 2026 WL 1815807, at *13 (D. Mass. June 24, 2026). As a result of this final agency action, DHS-administered funding has transformed from a "from a dependable source of support into an uncertain variable." *E.g.,* ECF 51-29 (Higgins Decl.), ¶ 72. Such a transformation has already occurred—it is not the kind of "contingent future event" defendants describe. Opp. 23; *see also*

*Salem*, 839 F. Supp. 3d at 1334 (finding plaintiff had Article III standing to challenge the Termination Conditions).

Furthermore, Plaintiff States' challenge "turns on legal issues not likely to be significantly affected by further factual development." *McInnis-Misenor*, 319 F.3d at 70. While defendants ask the Court to wait to see what "termination for convenience" looks like when they rely on that phrase to terminate a grant, the Court needs no more time or facts to address the central questions in this suit, such as whether Congress ever conferred such termination authority on DHS, whether such authority is consistent with DHS regulations, whether defendants provided sufficient reasons for promulgating this new term, or whether the new term is fatally ambiguous. *See infra* pp. 33–37, 39, 41; *see also CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 412 (D.C. Cir. 2011) ("In the absence of disputed facts that would bear on the statutory question, there [is] no benefit in waiting for the agency to develop a record before granting judicial review.").

There is no serious dispute that Plaintiff States will suffer hardship from waiting for judicial review. These Termination Conditions have created a "direct and immediate dilemma" warranting judicial intervention right now. *McInnis-Misenor*, 319 F.3d at 70. Because these once-predictable funding streams have become an uncertain variable, the Plaintiff States have "expended and will expend additional time and resources to plan for the likelihood that federal support for these vital programs could abruptly vanish." *E.g.*, ECF 51-20 (Dzbanko Decl.), ¶ 74. The Termination Conditions impose "job security risks" on the many employees who hold positions supported by DHS funding. *E.g.*, ECF 51-38 (Evans Decl.), ¶ 93. The termination risk threatens the Plaintiff States' ability to make "long-term commitments to contractors, service providers, or other venders, which in turn may lead them to demand higher prices, shorter contract terms, or termination protections." *E.g.*, ECF 51-72 (Opett Decl.), ¶ 83. And the risk of future termination is very real—

as the U.S. Government Accountability Office (GAO) recently reported, DHS terminated 362 grant awards in fiscal year 2025, deobligated over $1 billion, and "implemented a process in January 2026 to review grant programs and continue proposing grant terminations." GAO, *DHS Grants: Approach to Terminations and Pauses Disrupted Some Program Activities*, (GAO-26-109097, Sept. 17, 2026) at 3 (Ex. 5). Plaintiff States need not wait for the next grant termination—with the unlawful conditions sitting in grant documents like time bombs—before requesting judicial relief. *See Blanchette v. Connecticut Gen. Ins. Corps.*, 419 U.S. 102, 143 (1974) ("One does not have to await the consummation of threatened injury to obtain preventive relief"); *FEMA*, 801 F. Supp. 3d at 89 (same). When the "the prospect of harm nonetheless hangs overhead like the legendary Sword of Damocles . . . [i]t cannot be the case that a court must defer taking any palliative steps to avert the potential harm until the sword literally drops." *Washington v. FEMA*, No. 25-cv-12006, 2025 WL 2229394, at *3 (D. Mass. Aug. 5, 2025).

**B. No part of this case is moot.**

Plaintiff States' challenges to the Election Conditions and the Fusion Center Condition remain live controversies notwithstanding defendants' partial retreats in the face of litigation. "A case becomes moot . . . 'only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016) (quoting *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307 (2012)). Such impossibility arises only once the plaintiff has "received complete relief." *Bais Yaakov of Spring Valley v. ACT, Inc.*, 798 F.3d 46, 51 (1st Cir. 2015) (quoting *Cruz v. Farquharson*, 252 F.3d 530, 533 (1st Cir. 2001)). Plaintiff States have not received "complete relief" as to any challenged condition. As to the Election Conditions, FEMA appealed the judgment in *Nashville*, Ex. 1, and seeks immediate relief pending appeal, Ex. 4, and it promises to impose the Conditions "immediately" if it succeeds, ECF 56-1 at 4. As to the Fusion Center Condition, FEMA has merely modified it, not rescinded it,

*see* ECF 56-11, and any change that FEMA made came only after Plaintiff States filed suit about the original version, a situation that falls squarely within the voluntary-cessation exception to mootness. *See FBI v. Fikre*, 601 U.S. 234, 241 (2024). No part of this case is moot.

**1. The judgment in *Nashville*, which defendants are actively seeking to vacate, does not moot this challenge to the Election Conditions.**

DHS and FEMA have not abandoned the Election Conditions after their defeat in *Nashville*; on the contrary, they have appealed the *Nashville* judgment and are seeking immediate relief from it pending appeal. *See* Exs. 1, 4. They threaten that the Election Conditions will spring into effect "immediately" should they prevail on appeal. ECF 56-1 at 4. This reality dispenses with defendants' mootness argument against the Election Conditions challenge. Opp. 17–20. Common sense alone dictates that DHS and FEMA cannot both seek immediate reversal of a judgment and rely on that same judgment to moot out other cases. Nor would it be appropriate to stay this challenge to the Election Conditions, as DHS and FEMA request in the alternative, *id.* at 20, where DHS and FEMA are actively seeking to vacate the *Nashville* judgment and thereby bring about the "immediate[]" application of the Election Conditions.

Mootness doctrine aligns with common sense. "The Supreme Court has placed the 'heavy burden of persuasion' with respect to mootness on the party advocating for it." *Town of Barnstable v. O'Connor*, 786 F.3d 130, 142 (1st Cir. 2015) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)). "Intervening events must 'have completely and irrevocably eradicated the effects' of the parties' conduct in order for a case to be deemed moot." *Id.* (quoting *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979)). The ruling in *Nashville*, and defendants' half-hearted promise that they will comply with it up until the moment that they get it "vacated or extinguished," ECF 56-1 at 4, does not meet this rigorous standard.

In particular, courts have held that one court's ruling cannot moot out a separate proceeding if the first ruling could still be reversed on appeal. *See In re Savage Indus., Inc.*, 43 F.3d 714, 719 n.6 (1st Cir. 1994) (second dispute would not be moot if appeal had been taken in the first proceeding); *see also Chamber of Com. of United States v. Lierman*, 90 F.4th 679, 688 (4th Cir. 2024) (first judgment "did not necessarily moot this [second] case because there was an impending appeal which could (and ultimately did) vacate the [first] judgment"). In fact, the Supreme Court has held that even the remote possibility of a writ of certiorari prevents a first judgment from mooting out a still-pending case. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291 n.7 (2005); *see also Beyond Nuclear, Inc. v. NRC*, 113 F.4th 956, 963 n.5 (D.C. Cir. 2024). In contrast, a government defendant might successfully obtain dismissal on mootness if it does "not appeal the [first] case" and thereby "concedes that the [challenged act] is unconstitutional." *Wis. Right to Life, Inc. v. Schober*, 366 F.3d 485, 490 (7th Cir. 2004). But here, FEMA has done precisely the opposite, seeking to overturn the *Nashville* judgment as soon as possible.

In any event, even if defendants had durably complied with the judgment in *Nashville*, a live controversy would remain. In general, "as long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Emps.*, 466 U.S. 435, 442 (1984). In the circumstance of parallel judicial proceedings, "[p]artial relief in another proceeding cannot moot an action that legitimately seeks additional relief." *Flagstaff Med. Ctr., Inc. v. Sullivan*, 962 F.2d 879, 885 (9th Cir. 1992); *see also Lang v. Soc. Sec. Admin.*, 612 F.3d 960, 966 (8th Cir. 2010) (same). Plaintiff States continue to seek relief not achieved by the plaintiffs in *Nashville*, namely, a permanent injunction prohibiting from defendants from attempting to re-impose the Election Conditions on Plaintiff States in the future. *See* ECF 44 at 83 ¶ c; ECF 50 ("Mot.") 61–65. Plaintiff States'

continued request for injunctive relief is a “live issue[]” that “suppl[ies] the constitutional requirement of a case or controversy.” *Powell v. McCormack*, 395 U.S. 486, 497 (1969).

**2. Plaintiff States have live challenges to both versions of the Fusion Center Condition.**

Defendants also cannot moot out the challenge to the Fusion Center Condition, in whole or in part, through the modifications that they made to the Condition *after* Plaintiff States brought suit against it. Information Bulletin 589 modified but did not rescind the original Fusion Center Condition, purportedly because of an “administrative error” that left “incorrect” language in the original September 23, 2026, awards. ECF 56-11 at 2. But FEMA’s partial retreat does not affect this Court’s jurisdiction in any respect. First, any change that FEMA made to the Fusion Center Condition falls within the voluntary-cessation exception to mootness because there is “nothing, besides the [the agency’s] own discretion, to stop it from later resuming its challenged conduct.” *Nat’l Ass’n of Gov’t Emps., Inc. v. Yellen*, 120 F.4th 904, 912 n.4 (1st Cir. 2024). Second, the revised condition still requires state cooperation with federal immigration enforcement, so the modification has not delivered “complete relief” to Plaintiff States, *Bais Yaakov*, 798 F.3d at 51. Accordingly, there is a live challenge to the Fusion Center Condition, regardless of its form.

First, the challenge to the original Fusion Center Condition is not moot because FEMA’s post-complaint modification falls squarely with the voluntary-cessation exception to mootness. “A defendant’s ‘voluntary cessation of a challenged practice’ will moot a case only if the defendant can show that the practice cannot ‘reasonably be expected to recur.’” *Fikre*, 601 U.S. at 241 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)); *see also New York v. Trump*, 171 F.4th 1, 15 (1st Cir. 2026) (same). FEMA bears the “formidable burden” to “prove no reasonable expectation remains that it will return to its old ways.” *Fikre*, 601 U.S. at 241 (cleaned up). It cannot meet that burden here. Information Bulletin 589 made limited

revisions to the Fusion Center Condition with the mere stroke of a pen. *See* ECF 56-11. FEMA has made no commitment that it could not simply restore the original version at any time. In contrast, the Supreme Court has found mootness where a party has entered an "unconditional and irrevocable" covenant that "prohibits" the defendant from resuming the conduct at issue. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 93 (2013). Where the agency defendant "has preserved its discretion to reapply" the challenged policy, the claim is not moot. *FEMA*, 801 F. Supp. 3d at 87.

FEMA also cannot demonstrate that the original Fusion Center Condition "was ceased for a non-litigation reason." *Lowe v. Gagné-Holmes*, 126 F.4th 747, 758 (1st Cir. 2025). To the contrary, FEMA's account of the timing strains credulity. FEMA claims that the new, revised Fusion Center Condition was actually "finalized on August 20, 2026." ECF 48-8 at 3. There is no contemporaneous evidence of that alleged August 20 action in the administrative record; instead, FEMA attempts to substantiate it with a memorandum dated October 8, 2026, six days *after* Plaintiff States amended their complaint. *Id.* FEMA says that the Fusion Center Condition inserted into the HSGP awards on September 23, 2026, was actually "an earlier, incorrect draft," *id.* at 1, but FEMA provides no details about when that earlier draft was written or how it ended up in the HSGP awards. The only events that indisputably occurred are that FEMA imposed the Fusion Center Condition on September 23, was sued about it on October 2, and then hastily modified it on October 9. The simplest inference is that FEMA retreated from the original Fusion Center Condition due to the lawsuit. Such "evasive behavior fits within the voluntary cessation exception to the mootness doctrine." *Washington v. Dep't of Hous. & Urb. Dev.*, No. 25-cv-626, 2026 WL 1863886, at *4 (D.R.I. June 29, 2026).

Regardless, Plaintiff States at minimum have a live challenge to the new Fusion Center Condition, as defendants concede. *See* Opp. 22. Information Bulletin 589 did not grant "complete

relief" from the Fusion Center Condition sufficient to moot Plaintiff States' challenge to it. *Bais Yaakov*, 798 F.3d at 51; *see also United States v. Sastrom*, 96 F.4th 33, 37 (1st Cir. 2024) ("The power to effectuate a partial remedy is sufficient to prevent a case from being moot.") (cleaned up). The new version of the Fusion Center Condition found in Information Bulletin 589 still requires cooperation with immigration enforcement as a condition on HSGP funds. For instance, the new version still mandates, without any material change, that state-owned fusion centers undertake "formal coordination with the appropriate regional [Homeland Security Task Force] by providing intelligence, logistical, and operational support." ECF 56-11 at 3. Plaintiff States thus retain a "concrete interest . . . in the outcome of the litigation," *Ellis*, 466 U.S. at 442, as to both versions of the Fusion Center Condition.

**C. The Tucker Act does not impliedly forbid the relief sought in this case.**

The APA's waiver of sovereign immunity authorizes this challenge to specific agency policies, so the Tucker Act does not affect this Court's jurisdiction. *See Nat'l Institutes of Health v. Am. Pub. Health Ass'n* (*APHA*), 145 S. Ct. 2658, 2661 (2025) (Barrett, J., concurring) ("[T]he District Court was likely correct to conclude that it had jurisdiction to entertain an APA challenge to the guidance . . . ."). Defendants contend that the Tucker Act consigns any "dispute concerning the terms of the parties' grant relationship" to the Court of Federal Claims. Opp. 27. The APA waives the federal government's sovereign immunity as to any "action in a court of the United States seeking relief other than money damages" provided that no "other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. The Tucker Act, meanwhile, grants jurisdiction to the Court of Federal Claims over "any claim against the United States founded . . . upon any express or implied contract with the United States" exceeding ten thousand dollars. 28 U.S.C. §§ 1491(a)(1), 1346(a)(2). As a result, "the APA's limited waiver of

immunity does not extend to orders to enforce a contractual obligation to pay money." *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (quotation omitted).

But this case is not "in 'its essence' contractual," so the normal APA waiver applies. *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618–19 (D.C. Cir. 2017) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). The mere fact that a challenged agency policy "relate[s] to grants does not transform a challenge to that [policy] into a claim 'founded . . . upon' contract." *APHA*, 145 S. Ct. at 2661 (Barrett, J., concurring) (quoting 28 U.S.C. § 1491(a)(1)). This case instead presents familiar APA challenges to agency actions, namely, the promulgation of new terms and conditions for federal funds. "Like many other courts that have considered similar arguments," the Court should once again hold "that the Tucker Act does not cover challenges to grant funding conditions." *Noem*, 813 F. Supp. 3d at 298 (quoting *R.I. Coal. Against Domestic Violence*, 794 F. Supp. 3d at 67). Challenges to the "promulgation of grant conditions that govern eligibility for future funding" belong in the district courts. *FEMA*, 801 F. Supp. 3d at 90; *see also R.I. Coal. Against Domestic Violence v. Kennedy*, 812 F. Supp. 3d 180, 190 (D.R.I. 2025) (same).

**D. 5 U.S.C. § 701(a)(2) does not preclude review of Plaintiff States' claims.**

Defendants also reiterate their argument, made in many similar cases, that "determinations regarding the conditions of . . . grants are unreviewable under the APA" because grant conditions are "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). Opp. 28.[1] In general, courts must "read the § 701(a)(2) exception for action committed to agency discretion quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a

[1] Section 701(a)(2) preclusion would not affect the Court's subject-matter jurisdiction in the technical sense. *See Doe v. Noem*, 152 F.4th 272, 284 (1st Cir. 2025); *Oryszak v. Sullivan*, 576 F.3d 522, 526 & n.3 (D.C. Cir. 2009). But because it is a threshold issue preceding the merits, Plaintiff States address it here, as defendants did in their motion.

court would have no meaningful standard against which to judge the agency's exercise of discretion." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019) (quotations omitted). This Court and others have repeatedly rejected the federal government's attempts to preclude APA review of new funding conditions. *See USDA*, 2026 WL 1815807, at *18–20; *Nat'l Alliance to End Homelessness*, 827 F. Supp. 3d at 289–90; *Noem*, 813 F. Supp. 3d at 306–07; *FEMA*, 801 F. Supp. 3d at 91–92. Defendants make no attempt to distinguish those holdings.

Indeed, since last year, the First Circuit has only reaffirmed the limited scope of *Lincoln v. Vigil*, 508 U.S. 182 (1993), the case on which defendants primarily rely, *see* Opp. 29. As the First Circuit recently explained, *Vigil* held "that the Indian Health Service's decision to discontinue a program was committed to agency discretion by law—and thus unreviewable under the APA—on the 'limited ground that the allocation of funds from a lump-sum appropriation is an administrative decision traditionally regarded as committed to agency discretion and the relevant statutes . . . did not so much as mention the program at issue.'" *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 186 F.4th 25, 44 (1st Cir. 2026) (quoting *New York*, 171 F.4th at 19). A federal agency cannot merely "identify a few scattered statutes and grant programs that it contends leave the agency to choose how to best distribute the funds" and thereby preclude APA review under *Vigil*. *Id.* That is all that defendants do here. *See* Opp. 30–31. Defendants have not carried their "burden" of "rebut[ting] the presumption that agency action is judicially reviewable." *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007).

## II. The Challenged Conditions Are Unlawful.

Defendants imposed staggeringly intrusive conditions on federal grant programs Congress created to support States' efforts to protect and secure their residents. Their efforts to defend those conditions fall far short. Pressed for statutory authority that could ground the conditions, DHS and FEMA retreat repeatedly to the premise that Congress has impliedly authorized them to impose

*any* conditions "in line with Agency and program goals." Opp. 37; *see also id*. at 28, 32, 49. But federal agencies enjoy no such implied authority; rather, they possess "only such powers as are granted by statute." *Arrow-Hart & Hegeman Elec. Co. v. FTC*, 291 U.S. 587, 598 (1934). And defendants' attempt to justify the conditions under arbitrary-and-capricious review fail because the record DHS has offered contains no hint that defendants considered the costs or consequences of the policies they imposed. The conditions should be set aside under the APA. *See* 5 U.S.C. § 706(2)(A), (C).

**A. DHS and FEMA have no inherent authority to condition federal funds, nor does any overarching statute empower them to do so.**

DHS and FEMA have no inherent authority of any kind, let alone inherent authority to condition federal funds. "When an executive agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.'" *Providence*, 954 F.3d at 31 (quoting *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013)); *see also Nat'l Ass'n of Broadcasters v. FCC*, 39 F.4th 817, 819 (D.C. Cir. 2022) ("An agency must identify statutory authority for any action it takes."). Thus, in the funding context, agencies may not "impose . . . conditions that Congress had not vested [them] with authority to impose." *Providence*, 954 F.3d at 45. Simply put, "the challenged conditions can only be creatures of statute." *Cnty. of King*, 189 F.4th at 828. Furthermore, in this context, where the funding conditions would "significantly alter the balance between federal and state power," defendants must identify "exceedingly clear language" authorizing the conditions. *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 622 (2020); *see* Mot. at 22–23. Defendants at least purport to recognize these requirements, acknowledging at times that authority to condition funds "derives from Congress." Opp. 49.

But DHS and FEMA more often disregard these fundamental principles, asserting *implied* executive authority to impose conditions on federal funding as they deem appropriate, a theme that

recurs throughout their brief and undergirds their entire legal position. *See* Opp. 28 (because "[a]gencies have broad discretion in creating, awarding, and terminating specific grants," they may "set" the "terms and conditions" on such grants); *id.* at 32 (DHS has "[i]mplicit . . . discretion to implement appropriate standard terms and conditions"); *id.* at 49 (DHS need only show that conditions are "consistent with the statutory purposes and federal interests Congress identified for that program"). Indeed, DHS describes the grant programs that it administers as "*its own funding*," arguing that it may "ensure" that "its own funding is not spent in manner contrary to its efforts." *Id.* at 33 (emphasis added). But these programs are not DHS's "own funding"; rather, Congress established grant programs, appropriated funds for them, and tasked DHS with administering them. DHS has no residual authority to exceed the task that Congress conferred on it. "Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency [may] add pages and change the plot line." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (internal quotation marks omitted).

Defendants identify no authority for their contrary view. They argue that Congress does not need to "set out by statute every requirement of a grant program," *id.* at 34, but the cases they cite, far from endorsing inherent executive authority to condition federal funds, examined specific statutes and reached varied conclusions about the scope of lawful power delegated by Congress. In *Biden v. Missouri*, 595 U.S. 87 (2022), Congress had authorized the Secretary of Health and Human Services to set "such other requirements as the Secretary finds necessary in the interest of the health and safety of individuals" in hospitals, 42 U.S.C. § 1395x(e)(9); *see* 595 U.S. at 90–91. The majority and dissenting opinions disagreed whether a vaccine mandate fell within that statutory grant of authority, but all Justices began from the premise that the Secretary's action needed to "fall[] within the authorities that Congress has conferred upon him." *Id.* at 92. Similarly,

*Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656 (1985), involved an express non-supplanting condition enacted by Congress for Title I of the Elementary and Secondary Education Act, *id.* at 659–60, and the Supreme Court merely noted that the agency "could not prospectively resolve every possible ambiguity concerning particular applications of *the requirements of Title I*." *Id.* at 669 (emphasis added). In another case defendants cite, the Eleventh Circuit invalidated a statutory funding condition as unconstitutionally vague. *See W. Va. ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1146 (11th Cir. 2023). The court assumed without deciding that "an agency can resolve some ambiguity in a funding condition," but it held that "the condition itself must still be ascertainable on the face of the statute." *Id.* at 1148. *Morrisey* expressly rejected, not endorsed, DHS's theory that an agency may supply or clarify funding conditions where Congress has not spoken clearly. *Id.* at 1147–48.

The rule that conditions on federal funding must trace their way to a federal statute applies with equal force to discretionary grants, meaning those where Congress has empowered the agency "to exercise judgment" in "select[ing] the recipient or the amount of Federal funding." 2 C.F.R. § 200.1. Even when an agency has discretion to choose recipients of funds, it cannot "tak[e] irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985). Defendants argue that if DHS can "decide under its appropriation statutes not to award any grant funding to any of the Plaintiff States at all" under a given program, then DHS may freely impose any condition it wants on that program. Opp. 32. This greater-implies-the-lesser argument fails. A general power to confer a benefit does not imply the power to deny that benefit for unauthorized or impermissible reasons. *See, e.g.*, *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 608 (2013) ("Even if respondent would have been entirely within its rights in denying the permit for some other reason, that greater authority does not imply a lesser power to condition

permit approval on petitioner's forfeiture of his constitutional rights."); *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 747 (1st Cir. 1995) (similar). Even as to discretionary grant programs, then, an agency must locate affirmative authority to establish a specific condition on access to federal funds.

Finally, lacking *inherent* authority to condition federal funds, DHS and FEMA attempt to find generalized statutory authority in the Homeland Security Act of 2002. But the provision they cite serves only to highlight the weakness of their position: The DHS Secretary is authorized "to make contracts, grants, and cooperative agreements . . . as may be necessary and proper to carry out the Secretary's responsibilities under this chapter or otherwise provided by law[.]" 6 U.S.C. § 112(b)(2); *see* Opp. 4, 32, 49, 52 (citing this provision). This enabling clause does not grant DHS the freestanding authority it claims. In *Providence*, the First Circuit addressed a considerably more specific provision authorizing the Assistant Attorney General to "exercise such other powers or functions" delegated to him, "including placing special conditions on all grants." 34 U.S.C. § 10102(a)(6). Even this language, the court held, did "not constitute an independent grant of authority to the Assistant AG to impose whatever conditions he may deem advisable"; rather, such authority would need to derive from "another statute that vests authority in the Assistant AG to impose the challenged conditions." 954 F.3d at 45. Or, as this Court recently held, a residual clause reading "such other factors as the Secretary determines to be appropriate" conveys no authority to condition funds in ways not contemplated by Congress. *Nat'l All. to End Homelessness*, 827 F. Supp. 3d at 290 (quoting 42 U.S.C. § 1136a(b)(1)(G)); *accord Cnty. of King*, 189 F.4th at 834–35 (same residual clause did not allow the federal government to impose conditions "where Congress has not prohibited the activity at issue").

The statutory provision on which DHS here relies is even less helpful than those found deficient in these cases: It does not authorize the DHS Secretary to impose *any* "conditions" on federal grants, but simply to "make" grants when "necessary and proper" to carry out other duties. 6 U.S.C. § 112(b)(2). Like the Constitution's necessary-and-proper clause, *see* U.S. Const. art. I, § 8, cl. 18, such a provision "is not itself a grant of power," but merely "a caveat that the [Secretary] possesses all the means necessary to carry out the specifically granted" responsibilities. *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 247 (1960). It provides no general power to impose invented conditions on federal funds.

**B. The Immigration Conditions are unlawful.**

**1. The Immigration Conditions, including the Fusion Center Condition, exceed statutory authority and are contrary to law.**

That the Immigration Conditions exceed DHS's and FEMA's statutory authority follows immediately from the foregoing discussion. DHS set off on this mission to condition federal funds on cooperation with federal immigration enforcement over a year and a half ago. But DHS has never identified any statute passed by Congress that even arguably conveys authority to impose such conditions—because none exists. The simplest reason that the Immigration Conditions are unlawful is that DHS "lacked statutory authority to impose the challenged conditions" in the first place, *Providence*, 954 F.3d at 45 n.9 (declining to reach alternative arguments because the agency lacked statutory authority), and the Court should resolve that question in this case.

Defendants do not seriously contend that any specific provision of law permitted them to impose the Immigration Conditions on the most significant sources of FEMA funds to the States: HSGP's two largest subcomponents (the State Homeland Security Program (SHSP) and the Urban Area Security Initiative) and the Emergency Management Performance Grant Program (EMPG), which collectively account for over $840 million to Plaintiff States. *See* Opp. 32 n.12, 49–52.

Defendants offer a table of the statutory provisions authorizing these programs, *id.* at 50–52, but identify no specific provision that they think grants them the authority to impose the Immigration Conditions. DHS and FEMA argue vaguely that these statutory provisions "confirm that FEMA's determinations were grounded in congressionally identified interests in law enforcement, border security, terrorism prevention, emergency preparedness, infrastructure, and Federal-State coordination," *id.* at 50, and state that defendants "considered" "each program's statutory provisions" in deciding whether to impose the Immigration Conditions, *id.* at 52. But breezy assertions of this sort fall far short of carrying DHS and FEMA's burden to identify a federal statute *actually authorizing* them to act. *See Providence,* 954 F.3d at 31 (the "question of whether either of these sources authorized the imposition of the challenged conditions reduces to an exercise in statutory construction").

The analysis is no different as to discretionary grants or the handful of specific programs that defendants identify. As discussed, *supra* pp. 18–19, initial discretion in selecting grant recipients does not imply limitless power to impose conditions on such grants. Nor do any of the authorizing statues for defendants' selected grant programs authorize the conditions. Opp. 52–53. Operation Stonegarden is an HSGP subcomponent that supports "collaboration and coordination among federal, state, local, tribal, and territorial law enforcement agencies to strengthen border security." ECF 51-1 at 23. Congress funds this program as one part of the overall State Homeland Security Grant Program appropriation, *see* Pub. L. No. 119-86, div. A, tit. III, § (1), 140 Stat. 773, 789; Pub. L. No. 119-21, § 90005(a)(1)(D), 139 Stat. 71, 360; so it is subject to the overall provision in the HSGP statute that funds be allocated based only on risk and effectiveness, 6 U.S.C. § 608(a)(1), (2), with allocation "not [governed] by any other provision of law," *id.* § 603(c)(2). As this Court has already held as to HSGP in general, "[n]one of the statutory factors for evaluating

relative risk encompass recipients' civil immigration priorities." *Noem*, 813 F. Supp. 3d at 305. Nor does the statute establishing the Port Security Grant Program authorize FEMA to impose the conditions: That program provides funds to States "to deter a transportation security incident," 46 U.S.C. § 70103(b)(2)(A), meaning a terrorist attack or other large disaster at a port, and the statute contains no hint of statutory authority to commandeer local law enforcement (which is presumably why defendants point to no specific statutory language, *see* Opp. 53, that they think has that effect).

Finally, the Fusion Center Condition is also not authorized by any statute and is contrary to law. Defendants effectively concede that the original Fusion Center Condition is contrary to law because it mandates that States accept DHS officials into their fusion centers and ratify § 287(g) immigration-cooperation agreements, both of which Congress has expressly made optional. *See* 6 U.S.C. § 124h(h)(2); 8 U.S.C. § 1357(g)(9); *see also* Opp. 54–55 (offering no counterargument that the original condition violates these provisions). Plaintiff States are thus entitled to judgment as to the original condition.

Even if the Court were to consider the new, modified Fusion Center Condition, that version is still unlawful, insofar as it still requires cooperation with immigration enforcement. The new version mandates that state-owned fusion centers undertake "formal coordination with the appropriate regional [Homeland Security Task Force] by providing intelligence, logistical, and operational support." ECF 56-11 at 3; *compare* ECF 51-5 at 1 (nearly identical language in original Fusion Center Condition). The Bulletin expressly notes that those Task Forces "were created through Section 6 of Executive Order 14159," the Invasion EO, in part to "ensure the use of all available law enforcement tools *to faithfully execute the immigration laws*." ECF 56-11 at 3 (emphasis added). That is precisely the sort of immigration-cooperation mandate that Congress has granted DHS no authority to impose, just like all the other Immigration Conditions.

Information Bulletin 589 also carries forward the original requirements to hold fusion center "seats" for ICE Enforcement and Removal Operations and to participate in § 287(g) agreements, ECF 51-5 at 1–2, purportedly changing these to a requirement merely to "update" FEMA on whether the States do those things, ECF 56-11 at 3–4. The subtext of FEMA's requiring such "updates" could not be plainer, particularly where FEMA simultaneously reserves for itself the ability to terminate grant agreements for any reason it its total discretion. *See infra* pp. 34, 41. "Since the beginning of the current administration, the executive branch has repeatedly sought to tie federal grant funding for programs like HSGP to state and local governments' assistance with federal immigration enforcement." *Noem*, 813 F. Supp. 3d at 291. As recently as this Wednesday, October 28, 2026, a FEMA spokesperson reiterated its view that "cities and states that break the law and prevent the arrest of criminal illegal aliens should not receive federal funding."[2] State officials cannot "lightly disregard [defendants'] thinly veiled threats" of adverse action "if [Plaintiff States] do not come around." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963). The latest Fusion Center Condition still "attempt[s] to bully the states into making promises they have no obligation to make at the risk of losing critical disaster and other funding already appropriated by Congress." *FEMA*, 2025 WL 2908807, at *1. It is unlawful.

**2. Imposing the Immigration Conditions was arbitrary and capricious.**

Imposing the Immigration Conditions on the programs listed in the September 18 Directive was also arbitrary and capricious.

To start, DHS and FEMA have paid no heed to the States' reliance interests in billions of dollars in federal funds. *See* Mot. 31–32. Defendants attempt to respond on this topic through legal

---

[2] Elaine Briseño, *States Seek To Block Fed's Renewed Immigration Grant Terms*, Law360 (Oct. 28, 2026) (Ex. 6), https://www.law360.com/articles/2543584.

argument in their brief, Opp. 59–60, but that comes too late: "[A]n agency must stand by the reasons it provided at the time of its decision and cannot rely on post-hoc rationalizations developed and presented during litigation." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 37 F.4th 746, 761 (1st Cir. 2022); *see also Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."). The Immigration Conditions Memos, ECF 48-6, -7, do not mention the States' reliance interests, let alone explain a basis upon which they can be discounted. That deficiency alone requires that the September 18 Directive's re-imposition of the Immigration Conditions be set aside. *See, e.g.*, *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 33 (1st Cir. 2026) (denying stay of preliminary injunction because "the administrative record previewed below is devoid of evidence that the federal government considered the hospitals' significant reliance interests—a critical factor in the analysis of an arbitrary-and-capricious claim").

In their brief, though nowhere in the administrative record, defendants argue that each new fiscal year obviates prior reliance interests because Plaintiff States can have no legitimate "expectation that annual federal preparedness grants will remain available under . . . terms comparable to those governing earlier fiscal years." Opp. 59. But there is no "annual appropriation" exception to the change-in-position doctrine: "The fact that Defendants deviated from an informal decision," like prior-year funding conditions, "does not absolve Defendants of their responsibility to provide some semblance of adequate reasoning for that change." *Noem*, 813 F. Supp. 3d at 305. Thus, this Court already held last year, as to these same major FEMA grants, that Plaintiff States have legitimate reliance interests because they "structured their budgets and emergency preparedness planning for decades around consistent federal support." *FEMA*, 801

F. Supp. 3d at 94; *see also USDA*, 2026 WL 1815807, at *22 (rejecting the same argument that there are no "reliance interests on the continued provision of USDA funding on the same terms and conditions that governed previous awards").

Another independently adequate basis to vacate the September 18 Directive is that DHS and FEMA did not consider the effects on local criminal enforcement and public safety of mandating cooperation with federal immigration authorities. The Immigration Conditions Memos contain no discussion of this topic. ECF 48-6, -7. In their brief, defendants argue that the topic was addressed because FEMA, charged with "administering federal programs," assessed whether immigration enforcement was "relevant to the effectiveness of *the selected programs*." Opp. 60 (emphasis added). Plaintiff States are making a different point: *Local* crime solving, which is one of the States' core sovereign functions, *United States v. Morrison*, 529 U.S. 598, 618 (2000), suffers when local law enforcement must also help to enforce federal immigration law, *see* ECF 51-23, -24, -57, -69 (testimony from law enforcement officers to that effect). To this day, despite a round of prior litigation that aired the same topic, DHS and FEMA have offered no "satisfactory explanation" for why such effects are irrelevant. *State Farm*, 463 U.S. at 43. Instead, they have "entirely failed to consider [that] important aspect of the problem." *Id.*

The only topic that the Immigration Conditions Memos discuss is an alleged programmatic "nexus" between the Immigration Conditions, on the one hand, and "immigration activities, law enforcement, or national security," on the other. ECF 48-6 at 2. Defendants' brief, similarly, claims at a high level of generality that "impaired cooperation or information sharing with DHS," writ large, "could affect the operation of programs." Opp. 58. DHS and FEMA protest that they need not present "empirical proof" of such connections. *Id.* at 59.

Defendants set the bar too low. To be sure, "[t]he APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (2021). But, in *Prometheus Radio*, the FCC in fact did weigh "significant record evidence," including multiple data sets that bore on the problem under consideration. *Id.* at 423–25. The FCC then made "a reasonable predictive judgment based on the evidence it had." *Id.* at 427. In this case, by contrast, DHS and FEMA offer nothing beyond speculation: "[A]n individual immigrating illegally" might "seek to import or use biological agents," but DHS cites no examples. ECF 48-7 at 2. States' declining to "share information" about "immigration enforcement" "may . . . frustrate the objectives of the EMPG program by impeding the effective management of hazards that threaten national security," but DHS does not explain how. *Id.* at 4. "[A]ctions designed to hinder support for immigration law enforcement" negatively affect efforts to "reduce the relative risk of terrorism," but DHS does not say why. *Id.* at 5. These are factual claims about the relationship between national security and civil immigration enforcement, and DHS needed to muster evidence to support them.

### C. The Election Conditions are unlawful.

#### 1. The Election Conditions exceed statutory authority and are contrary to law.

Defendants' defense of the Election Conditions fares no better. Again, defendants identify no language in the HSGP statute affirmatively authorizing them to impose the Election Conditions. That is why another court has already held that the conditions exceed their statutory authority. *See Nashville*, 2026 WL 2905123, at *6–8. And defendants' remaining arguments likewise lack merit.

*First*, defendants claim that FEMA has "substantial discretion" to impose the Election Conditions under the HSGP statute merely because 6 U.S.C. § 603(a) provides that FEMA "*may* award [HSGP] grants" to States. Opp. 38–39 (emphasis defendants'). But defendants ignore all

the rest of the statute's text, particularly language that mandates allocating funding consistent with statutory criteria. The statute immediately proceeds to use mandatory language *requiring* FEMA to provide annual formula funding to States under HSGP. For the Urban Area Security Initiative component, § 604(b) states that the Administrator "*shall* designate high-risk urban areas to receive grants under this section based on procedures under this subsection" (emphasis added). Similarly, for the State Homeland Security Grant Program, § 605(e) sets forth a "[m]inimum allocation" that the FEMA Administrator "*shall*" provide to each State (emphasis added). Another section, in turn, lists authorized uses for the funds, and it mandates that FEMA "shall permit" grant recipients to "use grant funds" for the authorized purposes. *Id.* § 609(a)–(b). A single "may" cannot be read to impart the "substantial discretion" that defendants claim. Opp. 38–39; *see Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). Indeed, Plaintiff States explained in the motion that, under *Providence*, the formula nature of the HSGP program forecloses imposing the Election Conditions, Mot. 34–35, and defendants have no response at all.

*Second*, defendants' lengthy argument that election systems are "critical infrastructure" under the HSGP statute, Opp. 39–41, is immaterial. The authority to *fund* projects relating to election-related critical infrastructure does not imply the power to demand that States change any and all election policies as a condition on HSGP funds, especially when the cost of implementing those policies far outstrips the funds at issue. *See* Mot. 40–41. "[T]he [HSGP] statute gives FEMA the authority to fund projects proposed by states and high-risk urban areas; it does not give FEMA authority to use the possibility of grants to induce states or high-risk urban areas to carry out the federal government's preferred projects at their own expense." *Nashville*, 2026 WL 2905123, at

*6. So, the conditions are unlawful, "[e]ven assuming FEMA [is] pursuing the statute's stated purposes." *Nashville*, slip op. at 3 (Ex. 3).

*Third*, even when it comes to election infrastructure, FEMA is not actually "pursuing the statutes' stated purposes." *Id.* The HSGP statute is concerned with the risk of terrorism, not routine election administration. The statute authorizes FEMA only to administer HSGP funding to support proposed projects that protect critical infrastructure from "terrorism." *See, e.g.*, 6 U.S.C. §§ 605(a), 608(a)(1). The Homeland Security Act of 2002 defines "terrorism" as activity that is "dangerous to human life" or "potentially destructive" in a way that appears intended to "intimidate or coerce" the United States, such as through "mass destruction, assassination, or kidnapping." *Id.* § 101(18). For example, FEMA may fund state proposals for "physical/site security measures (e.g., locks, shatter-proof glass, alarms, access controls)" at election sites, as well as "cybersecurity risk assessments, training, and planning." *Nashville*, 2026 WL 2905123, at *8. "But FEMA's conditions here . . . address routine election administration decisions rather than the types of terrorist act threats contemplated by the statute." *Id.*; *see also* Amicus Br. of the Bipartisan Am. Election Project, ECF 55 at 9 (quoting then-DHS Secretary Johnson's statement explaining that DHS's designation of election infrastructure as "critical" did "*not* mean a federal takeover, regulation, oversight or intrusion concerning elections in this country").

Defendants fare no better when relying on statutory provisions that direct FEMA, when allocating HSGP funding, to consider certain risk factors, including the "threat, vulnerability, and consequences related to infrastructure" and "the most current threat assessments available to the Department." Opp. 39 (citing 6 U.S.C. § 608(a)(1)(D)–(E)). Defendants appear to construe these risk factors to mean that they can condition or deny funding to States whose policies they disagree with, so long as they view the policies they disagree with as having "vulnerabilities," or

"consequences related to [critical] infrastructure." This again misreads the statute. At the outset, as discussed, *supra* pp. 27–28, these allocation provisions do not provide statutory authority to impose funding conditions. In any event, the *noscitur a sociis* canon "dictates that words grouped in a list should be given related meaning," *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990) (quotation omitted), and should be "applied . . . in order to avoid the giving of unintended breadth to the Acts of Congress," *McDonnell v. United States*, 579 U.S. 550, 569 (2016) (citation omitted). The risk factors defendants cite appear within a list of 11 "consideration[s]" relevant to assessing a jurisdiction's "relative threat, vulnerability, and consequences from acts of *terrorism*." *Id.* § 608(a)(1) (emphasis added). And other considerations in that list include a State or urban area's "population density," "history of threats, including whether it has been the target of a prior act of terrorism" and "its likely need to respond to acts of terrorism occurring in nearby jurisdictions." *See, e.g.*, *id.* § 608(a)(1)(B)–(C), (H). This statutory context makes clear that the "threat assessments" or "vulnerabilit[ies]" contemplated by the statute are those that specifically relate to acts of terrorism—not unrelated matters of election administration.

Defendants also cite Congress's inclusion of a residual clause in the types of threats FEMA may "consider" under the HSGP statute, 6 U.S.C. § 608(b)(9), but that clause underscores FEMA's lack of authority to impose the Election Conditions. The residual clause appears following a list of eight other types of "threat[s]": "Biological," "Chemical," "Cyber," "Explosives," "Incendiary," "Nuclear," "Radiological," and "Suicide Bombers." *Id.* § 608(b)(1)-(8).[3] The statute then includes

[3] FEMA suggests that cybersecurity concerns are sufficient to justify the Election Conditions, but as discussed below, *infra* p. 32, only one of the Conditions could even arguably implicate such threats (*i.e.*, the hand-marking condition). Even that condition, which would dramatically alter the way millions of Americans vote, goes well beyond any conceivable cyber threat and would eliminate a form of voting that has been safely used for decades. Accordingly, neither the allusion to "cyber" threats in § 608(b) nor the 2024 Threat Assessment could authorize the Election

"such other factors as are determined relevant by the Administrator." *Id.* § 608(b)(9). But, under the *ejusdem generis* canon, "courts interpret a general or collective term at the end of a list of specific items in light of any common attributes shared by the specific items." *Bissonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246, 252 (2024) (cleaned up). Accordingly, the residual clause in the HSGP statute authorizes the FEMA Administrator to consider threats comparable, in scale and physical harm, to "Suicide bombers" or "Biological," "Chemical," and "Nuclear" attacks. 6 U.S.C. § 608(a)(1). It does not confer any authority to add funding conditions, let alone unrelated conditions, such as those dictating the administration of elections. *See Providence*, 954 F.3d at 40–41; *see also Cnty. of King*, 189 F.4th at 834; *Noem*, 813 F. Supp. 3d at 305.

*Fourth*, defendants' argument concerning the Voter Verification Condition similarly fails to identify statutory language authorizing that condition. Defendants assert that this condition "relied on an information-sharing mechanism that Congress has expressly authorized," noting that the Supreme Court recently allowed implementation of the modified SAVE system to move forward. Opp. 41–42. But that is irrelevant. Regardless of whether DHS could use the modified SAVE program to verify information that a State *voluntarily* shares pursuant to 8 U.S.C. § 1373, no statute authorizes defendants to *require* such information sharing as a condition of receiving HSGP funding. Indeed, many courts, including the First Circuit, have held that § 1373 provides no authorization to impose a condition on funding. *See, e.g.*, *Providence*, 954 F.3d at 36; *City of Philadelphia v. Att'y Gen.*, 916 F.3d 276, 288–91 (3d Cir. 2019); *City of Chicago v. Barr*, 961 F.3d 882, 897–908 (7th Cir. 2020); *cf. also FEMA*, 801 F. Supp. 3d at 82, 97–98 (invalidating funding condition requiring compliance with 8 U.S.C. § 1373).

---

Conditions. Indeed, even assuming it were relevant to FEMA's statutory authority to impose the Conditions, the Threat Assessment focuses primarily on foreign disinformation and pressure campaigns, neither of which is addressed by any of the Conditions. *See* ECF 56-7 at 19.

*Fifth*, and finally, defendants fail to identify any other federal statute that authorizes the Election Conditions, and they fail to rebut Plaintiff States' arguments that the Election Conditions in fact conflict with other federal election statutes. "Through various election statutes, Congress established a clear policy on voter eligibility, delegating responsibility for voter roll maintenance [and] vote processing to the states." *United States v. California*, __ F.4th __, 2026 WL 3212945, at *11 (9th Cir. Oct. 26, 2026) (Bennett, J., concurring). Defendants do not seriously dispute that many of the Election Conditions are contrary to these federal laws—for instance, that the Voter Verification Condition, is contrary to law because it requires removal of certain individuals from voter rolls within 120 days of the award, violating the National Voter Registration Act's "quiet period" prohibition on the systematic removal of voters from the rolls during the 90 days prior to a federal election. *See* Mot. 36. Nor do defendants dispute that the Election Conditions would override the Help America Vote Act's ("HAVA") guarantee of state discretion in selecting their voting systems. *See id.*; 52 U.S.C. § 21085. Defendants instead argue that § 21085 speaks to "compliance with HAVA itself" and does not preclude them from dictating the States' selection of voting systems pursuant to separate statutory authority. Opp. 42. Defendants' claim that they may invoke separate statutory authority to override that discretion would render § 21085 a nullity—running headlong into the "strong presumption that repeals by implication are disfavored." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up). The Election Conditions are unlawful.

**2. Imposing the Election Conditions was arbitrary and capricious.**

As Plaintiff States explained, Mot. 36–43, imposing the Election Conditions was arbitrary and capricious because FEMA provided no reasoned explanation for doing so and utterly failed to consider important aspects of the problem. FEMA does not meaningfully contest either argument.

First, FEMA does not identify a contemporaneous, reasoned explanation for the Election Conditions. Instead, it points to two reports: a 2026 CISA report regarding election software

("2026 CISA Report") and a 2024 FBI report regarding insider threats to elections ("2024 FBI Report"). ECF 56-13, -14. But neither report was included or even mentioned in the administrative record, and "courts may not accept . . . counsel's *post hoc* rationalizations for agency action." *State Farm*, 463 U.S. at 50; *see also Michigan v. EPA*, 576 U.S. 743, 758 (2015) (review is restricted to "the grounds the agency invoked when it took the action").

Even if the Court could consider these reports, neither provides a "reasoned explanation" for the Conditions. The 2026 CISA Report recommends the use of "human-readable paper ballots," which would include readable ballots produced by machines such as ballot-marking devices. ECF 56-13 at 5. FEMA's hand-marking requirement goes well beyond this recommendation because it generally forbids the use of *any* ballot-marking device, not just those that rely on QR or bar codes, and instead requires all ballots to be hand-marked by voters. *See, e.g.*, ECF 51-13 at 3 (requiring States to "[i]ndicate the target election by which all affected jurisdictions will be using handmarked paper ballots"). Nothing in the CISA Report supports such a far-reaching overhaul of the way Americans vote. *See* Mot. 9, 36. And although the CISA Report recommends manual audits, ECF 56-13 at 6, it prescribes no specific procedure or threshold—unlike FEMA's arbitrary and unsupported imposition of a 5% audit, which goes well beyond the typical and empirically-based thresholds used across Plaintiff States. *See, e.g.*, ECF 51-25 (Robinson Decl.), ¶ 25; ECF 51-28 (Rudy Decl.), ¶ 17. Lastly, the CISA Report does not mention, or in any way support, the imposition of a reconciliation, voter verification, or election worker verification procedures.

The 2024 FBI Report is even less relevant. It focuses solely on "insider threats," and thus could only conceivably relate to the election worker verification condition. The Report recommends several measures to protect against such threats—for example, access control and chain-of-custody procedures—but does not support or even recommend any measures related to

election-worker eligibility, let alone the baseless and unexplained mandate that all such workers be U.S. citizens. ECF 56-14 at 3–5.

Second, FEMA does not dispute that it "entirely failed to consider [several] important aspect[s] of the problem." *State Farm*, 463 U.S. at 43. Plaintiff States outlined numerous structural issues with the Election Conditions, including (among others) that: States have relied for decades on their constitutional authority to administer elections; it would be impossible for recipient agencies (which have no authority over elections) to implement the Conditions; and the Conditions would impose staggering costs, potentially reaching billions of dollars, far exceeding the amounts of the grants themselves. Mot. 39–43. FEMA does not claim that it considered these issues (nor could it, based on the record), nor does it assert that it could lawfully disregard them. Yet each of these issues should have been considered, and because they were not, the Election Conditions are arbitrary and capricious.

### D. The Termination Conditions are unlawful.

#### 1. The Termination Conditions exceed statutory authority and are contrary to law.

DHS likewise fails to refute that the Termination Conditions are not authorized by statute and are contrary to existing regulation. 5 U.S.C. § 706(2)(A), (C).

First, DHS offers no response at all to Plaintiff States' argument that the agency lacks any statutory authority to apply the Termination Conditions to non-discretionary grant programs. DHS cites nothing that would authorize the agency to claw back allocated funds based on "updated program goals or agency priorities," "successor policies or documents," or "other reasons" where the relevant grantmaking statutes mandate funding to the States based on defined formulas, such as for the EMPG, HSGP, and NSGP grant programs. *See* Mot. 43–44. To the contrary, DHS appears to concede that for these and other non-discretionary grant programs, neither it nor any other

federal agency has been authorized to "to withhold congressionally appropriated funds based on changed agency priorities." Opp. 65.

Nor does DHS cite to any statute that would authorize it to terminate a "discretionary" grant award for "convenience," which the Termination Conditions define to include instances when "the award no longer advances the national interest." ECF 51-3 at 4, § (III)(B)(2)(a)(i)(4). Instead, DHS reiterates its view that it has "substantial discretion in administering the discretionary grant programs at issue and in establishing terms governing those awards." Opp. 67. But, as explained above, *supra* pp. 18–19, discretion to *select* recipients is distinct from the power to terminate an award. Courts have rejected the exact argument that DHS advances here, holding that the termination of already-awarded "discretionary" grants is *not* "committed to agency discretion" and that "[w]hatever discretion Defendants may have in termination or discontinuation of these grants is provided, delineated, and restricted by th[e] statutory and regulatory frameworks." *NAACP v. United States*, No. 25-cv-00965, 2026 WL 1265450, at *32 (D. Md. May 8, 2026). DHS attempts to flip the burden, arguing that Plaintiff States have not identified a "statute categorically prohibiting FEMA from including the challenged termination provisions in the terms of th[e] discretionary awards." Opp. 68. But the rule is not—and never has been—that an agency can act however it wants absent "a statute categorically prohibiting" it from acting. The rule, instead, is that "an agency literally has no power to act . . . unless and until Congress confers power upon it." *Providence*, 954 F.3d at 31; *see supra* pp. 16–18. Neither *California Sea Urchin Commission v. Bean*, 883 F.3d 1173 (9th Cir. 2018), nor *Pennsylvania v. Lynn*, 501 F.2d 848 (D.C. Cir. 1974), cases defendants cite, requires a different analysis—both cases involved terminations tied to a purpose set by *Congress* in authorizing statutes. Here, the "updated program goals or agency priorities" justifying termination are completely disconnected from Congress's authorization.

DHS finally asserts that "termination-for-convenience clauses have long been a feature of federal agreements," citing *Ingersoll-Rand Co. v. United States*, 780 F.2d 74 (D.C. Cir. 1985). *See* Opp. 68. But the court in *Ingersoll-Rand* was addressing the procurement context. *See* 780 F.2d at 75 (contract with Air Force for "procurement of air compressors"). The present case, of course, does not involve procurement, and termination-for-convenience clauses have not been extended to federal grantmaking. Congress itself has recognized that these two legal instruments are distinct and serve different ends. *Compare* 31 U.S.C. § 6303(1) (purpose of "procurement contract" is to "acquire . . . property or services for the direct benefit or use" of the federal government), *with id.* § 6304(1) (purpose of grant agreement" is to "transfer a thing of value to the State . . . to carry out a public purpose").

Second, DHS all but concedes that the Termination Conditions are contrary to existing regulations, devoting several pages to explaining how *some* terminations under the Termination Conditions would be based on agency goals and priorities identified at the time the award issued, in accord with the existing regulation. *See* Opp. 63–67. But Plaintiff States challenge the *additional* authority the Termination Conditions claim—the power to terminate a grant on the ground that it does not effectuate goals or priorities identified *after* the issuance of the award, and to terminate a discretionary grant for any reason at all. DHS does not seriously dispute that such terminations based on newly identified priorities *are* contrary to 2 C.F.R. § 200.340(a)(4), and therefore contrary to law. The power to terminate based on updated goals and priorities goes beyond the existing regulation, which "does not authorize agencies to terminate awards based on new agency priorities not identified at the time of the award" and "only allows for terminations where a grant no longer can achieve the program goals and agency priorities identified when the award was first made." *New Jersey v. OMB*, 837 F. Supp. 3d 258, 276 (D. Mass. 2026) ("*OMB*"); *see also California v.*

*U.S. Dep't of Educ.*, __ F. Supp. 3d __, 2026 WL 2754968, at *30 (D. Mass. Sept. 17, 2026) ("2 C.F.R. § 200.340(a) does not authorize the termination of awards based on a failure to effectuate agency priorities identified after the grant was awarded.").

**2. Imposing the Termination Conditions was arbitrary and capricious.**

DHS fails to rebut—and in many cases, fails even to address—Plaintiff States' showing that imposing the Termination Conditions was arbitrary and capricious. DHS does not dispute that it failed to consider a critical aspect of the problem: Plaintiff States' need for—and longstanding reliance on—consistent, reliable funding streams to prevent and prepare for life-threatening natural disasters and emergencies, *see* Mot. 49–50. Likewise, DHS does not contest that it failed to consider whether any of the relevant grantmaking statutes actually authorize the Termination Conditions, *id*. at 48, or that the Conditions necessarily empower DHS to act based on factors Congress did not intend to consider, *id*. at 51–52. DHS's glaring failure "to put forth any arguments in [its] opposition to defendants' motion for summary judgment" on these issues "constitutes abandonment of any such claim." *Montany v. Univ. of New England*, 858 F.3d 34, 41 (1st Cir. 2017) (finding forfeiture of argument where party failed to brief a response).

As for the sole argument DHS addresses—its failure to provide a reasoned explanation for the addition of the Termination Conditions—DHS's responses fall flat. The agency contends that the challenged conditions are not actually a change in policy and even if they were, they are adequately explained by a presidential Executive Order. Opp. 72. DHS is wrong on both points.

First, DHS itself characterizes the for-convenience provision as "*adding* a separate . . . term"—an admission that the term is a departure from what was previously included. Opp. 72 (emphasis added). Moreover, while DHS asserts that the other challenged Termination Conditions merely delineate "more detailed circumstances" under which FEMA may terminate grants authorized by 2 C.F.R. § 200.340, Opp. 69, this argument again ignores the fact the Termination

Clause allows for termination based on *post-hoc* changes to agency goals, policies, policies, or documents, while § 200.340 does not. *See* Mot. 45–46. The Termination Conditions amount to a seismic expansion of DHS' unilateral termination powers—more drastic, and with the potential to effect broader swaths of the population, than even the changes at issue in the seminal Supreme Court APA change-in-position decisions. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 517 (2009) (concerning the FCC expanding its enforcement scope from repeat incidents of indecent language in a broadcast to single incidents).

Second, given that the Termination Conditions constitute a policy change, their adoption was arbitrary and capricious because DHS failed to "show that there are good reasons for the new policy." *Id.* at 515. DHS contends that referencing Executive Order ("EO") 12332 was a "rational policy basis" for the changed policy. Opp. 72. But "conclusory statements" that "merely defer to" an executive order are not "reasoned analysis." *Rhode Island v. Trump*, 781 F. Supp. 3d 25, 46 (D.R.I. 2025), *appeal dismissed*, No. 25-1477, 2025 WL 3459538 (1st Cir. Nov. 25, 2025); *see also R.I. Latino Arts v. Nat'l Endowment for the Arts*, 800 F. Supp. 3d 351, 373 (D.R.I. 2025) (same); *Louisiana v. Biden*, 543 F. Supp. 3d 388, 414 (W.D. La. 2021), *vacated and remanded on other grounds*, 45 F.4th 841 (5th Cir. 2022) (same). This principle makes good sense: holding otherwise would "shockingly allow Presidents to insulate any desired rulemaking from judicial review with the single stroke of an executive pen." *Nebraska v. Su*, 121 F.4th 1, 15 (9th Cir. 2024). DHS's single citation for the contrary position is an inapposite and unreviewed Court of Federal Claims decision, Opp. 72, where the agency action at issue was a procurement contract recission arising out of a specific agency review applying an EO—not a sweeping agency policy change adopting the EO as a broadly applicable agency rule. *See Westwind Partners, LLP v. United States*, No. 24-1504C, 2026 WL 3081506, at *4 (Fed. Cl. Oct. 13, 2026).

## III. The Challenged Conditions Additionally Violate the Spending Clause.

The Conditions lastly violate the Spending Clause because they are ambiguous, "unrelated to the federal interest" at issue, and "so coercive . . . [that] pressure turns into compulsion." *South Dakota v. Dole*, 483 U.S. 203, 207, 211 (1987) (quotations omitted).

*First*, DHS has not shown that any of the Conditions provide the "clear notice" the Constitution requires. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). As to the Immigration Conditions, this Court has already held that they "deprive[] the states of the ability to make informed decisions, rendering the conditions constitutionally invalid." *FEMA*, 801 F. Supp. 3d at 96. Defendants argue that by adding language to only two of the Conditions, the Cooperation Condition and the Benefits Condition, they have cured this violation. Opp. 53–54. But the conditions still provide "no meaningful standards" for compliance. 801 F. Supp. 3d at 96. For instance, defendants do not even attempt to explain how state agencies could identify all the many individuals who might receive an undefined "public benefit" to avoid "incentiviz[ing] illegal immigration" in violation of the new Benefits Condition.

The Election Conditions similarly fail to provide clear notice. Defendants observe that they provide notice of the Elections Conditions in the HSGP NOFO, but the Spending Clause requires more than just *awareness* of the conditions—a state must be able to "to ascertain what is expected of it" from those conditions. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Plaintiffs States do *not* know what is expected of them given the Conditions' requirement that Plaintiff States comply with "guidelines" or "methodology" that defendants expressly say may change at any time. *See* Mot. 55; *OMB*, 837 F. Supp. 3d at 282 ("But if the regulation is construed to allow the program goals and agency priorities . . . to change, the required notice [under *Pennhurst*] is lacking."). Nor have defendants provided any clarity as to other ambiguities, such as the requirement to "tak[e] timely corrective action consistent with applicable law," ECF 51-1 at

15–16. Defendants still provide no standard for "timely corrective action," nor do they identify "applicable law."

As to the Termination Conditions, DHS argues that the text of the Conditions is "sufficient" to provide clear notice, and any uncertainty simply results from the unpredictability of how defendants may *use* this condition in the future. Opp. 69–70. But the Supreme Court has instructed that the "legitimacy" of the spending power "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst*, 451 U.S. at 17. "There can, of course, be no knowing acceptance if a State is . . . unable to ascertain what is expected of it." *Id.* Here, a State that agrees to the conditions "would have no clear notice of the extent of the conditions attached to the accepted federal funding," because the Conditions allow termination based "on indiscernible terms like 'convenience,' changes to 'agency priorities,' or the 'national interest.'" *Salem*, 839 F. Supp. 3d at 1339. This uncertainty as to what, if anything, a State can do to avoid termination and when a termination might occur, and based on what rationale, deprives the States from making "an informed choice," because the States cannot know at the time of acceptance what "the program goals and agency priorities the grant is being measured against" actually are. *OMB*, 837 F. Supp. 3d at 282. That is flatly inconsistent with the Spending Clause. [4]

*Second*, defendants fail to show that the conditions are related to the federal programs to which defendants have attached them.[5] For the Immigration Conditions, defendants attempt to

---

[4] DHS's reliance on *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), *see* Opp. 70, is misplaced, as that case involved neither a Spending Clause challenge to funding conditions nor an open-ended provision that would allow a federal agency to terminate a grant based on unknown future conditions.

[5] Defendants also observe in passing that the Supreme Court has not yet struck down a funding condition on this basis. Opp. 43. But lower courts, including this Court, have repeatedly enforced the relatedness requirement. *See, e.g.*, *FEMA*, 801 F. Supp. 3d at 96; *see also Salem*, 839 F. Supp. 3d at 1339–40; *Cnty. of Santa Clara v. Noem*, 815 F. Supp. 3d 979, 1036 (N.D. Cal. 2025).

defend a relationship between immigration enforcement and the affected programs with a chart listing various statutes that mention interests such as law enforcement, border security, terrorism prevention, emergency preparedness, infrastructure, and Federal-State coordination. Opp. 50–52. For the Election Conditions, defendants again conflate protecting critical infrastructure from terrorist attacks with any separate policy issue that might involve that critical infrastructure—here, election administration. *Id.* at 44. But, as Plaintiff States observed in their moving brief, Congress has not drawn defendants' desired connection between these topics and the challenged conditions in enacted law, Mot. 29–30, 56–57, and defendants cannot conjure up that connection themselves. *Cf. Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Agencies may play the sorcerer's apprentice but not the sorcerer himself.").

As to the Termination Conditions, DHS argues there is no relatedness problem because the Conditions merely tie "continued expenditure of federal funds" to "the purposes served by the award." Opp. 71. But the Conditions by their terms give agencies wide discretion to terminate for goals or priorities that have *nothing* to do with the purposes set by Congress or the agency before the award was made. Indeed, by going beyond DHS's power under 2 C.F.R. § 200.340 to terminate grants based on pre-defined goals and priorities, the Termination Conditions, by definition, assert authority to terminate for reasons *unrelated* to pre-defined goals and priorities. Moreover, because the Termination Conditions destabilize federal emergency preparedness and disaster relief funding, the new conditions run directly "counter to the programs' purposes of providing *orderly* and *reliable* funding to states and local governments." *Salem*, 839 F. Supp. 3d at 1340.

*Third*, defendants fail to rebut the coercive nature of conditions, another independent basis for their invalidity. *See Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 577 (2012) (plurality opinion). Defendants try to limit *NFIB*'s bar on coercive restrictions to instances where

"continued receipt of funding under a separate, entrenched federal program" is premised on "acceptance of a new program." Opp. 54. But *NFIB*'s rule is not limited to its precise facts. The Constitution broadly prohibits "[c]onditions that do not . . . govern the use of funds" and those that "take the form of threats to terminate other significant independent grants" to "pressur[e] the States to accept policy changes." *NFIB*, 567 U.S. at 581. That is exactly the situation here: DHS has inserted the Conditions into the entirely separate matter of emergency preparedness funding to compel States to change their policies. *See id.* If anything, the coercion here is "even more pronounced because the threatened funds involve essential public safety responsibilities rather than optional or peripheral programs." *FEMA*, 801 F. Supp. 3d at 96.

As to the Termination Conditions, in particular, defendants argue that they do not coerce because they do not "requir[e] a State to enact a particular policy or undertake specified conduct." Opp. 69. But defendants seek unlimited power to terminate awards for any reason—including disagreements over policy or conduct—granting the agency a "power akin to undue influence." *NFIB*, 567 U.S. at 577. With this condition in place, defendants "could retaliate against a [State] (to the detriment of those in need of relief) while protected by the vagaries of convenience, changing priorities, and national interest." *Salem*, 839 F. Supp. 3d at 1339. Or, as in this case, even if the Immigration and Election Conditions are invalidated, the Terminations Conditions would still enable DHS to coerce compliance by threatening to terminate awards unless the States comply with such conditions. *See supra* p. 23 (giving the example of the Fusion Center Condition). The Termination Conditions thus impermissibly leverage the States' dependence on essential federal funding to exert precisely the kind of coercive pressure that the Spending Clause forbids.

## IV. The Court Should Vacate the Challenged Conditions and Enter a Permanent Injunction that Protects Plaintiff States and Their Subdivisions.

Finally, Plaintiff States seek only the relief they are entitled to by law, none of which is "overbroad." First, Plaintiff States seek the vacatur of the agency action they challenge, the promulgation of the three sets of challenged conditions. Mot. 60. This Court's power to vacate those conditions flows directly from the text of the APA, which authorizes district courts to "hold unlawful and set aside agency action, findings, and conclusions." 5 U.S.C. § 706(2). Courts have interpreted "set aside" to include vacatur. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). The Supreme Court's decision in *Trump v. CASA, Inc.*, did not change this interpretation. 606 U.S. 831, 847 n.10 (2025) ("Nothing we say today resolves the distinct question whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action."). Such vacatur should include the Election Conditions and both versions of the Fusion Center Condition, notwithstanding defendants' mootness arguments. *See supra* pp. 8–13.[6]

Plaintiff States separately seek injunctive relief, Mot. 61–65, and defendants do not appear to contest that, if the Court concludes the conditions are unlawful, an injunction would be proper. *See* Opp. 77. Defendants argue that any injunction should be "confined to the particular Plaintiff States, claims, and grant programs as to which entitlement to equitable relief has been established," *id.*, and, Plaintiff States have no quarrel with that general rule (including that any injunction against the Immigration Conditions would not reach the SBSRF or Plaintiff States North Carolina or Arizona). As applied here, that means that Plaintiff States are entitled to an injunction running to

[6] Defendants object to vacatur as "overbroad" to the extent it would reach the State Border Security Reinforcement Fund ("SBSRF"), Opp. 75, but the Court can vacate an agency action in part, *Finnbin, LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 136 (D.C. Cir. 2022), and Plaintiff States have no objection to that remedy here.

their instrumentalities and subdivisions, as defendants do not appear to dispute. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 362 (2009) ("State political subdivisions are merely departments of the State . . . .") (quotation and alteration omitted); *Kentucky v. Biden*, 57 F.4th 545, 557 (6th Cir. 2023) ("An injunction barring the federal government from enforcing [a] mandate against the States would also run to the States' subdivisions . . . ."). Likewise, Plaintiff States are entitled to an injunction against the Termination Conditions as attached to all grant programs administered by defendants, given that defendants chose to apply those conditions to all programs that they administer. Mot. 18–20. Only an injunction of that nature and scope will provide Plaintiff States with complete relief.

## CONCLUSION

The Court should enter judgment in Plaintiff States' favor, declare that the defendants' promulgation of the challenged conditions was contrary to the Constitution and laws of the United States, vacate the promulgation of the challenged conditions, and permanently enjoin defendants from implementing or enforcing the challenged conditions (or substantially similar conditions) against Plaintiff States, including their subdivisions and instrumentalities.

October 30, 2026

Respectfully submitted,

**ROB BONTA**
ATTORNEY GENERAL OF CALIFORNIA

Michael L. Newman
*Senior Assistant Attorney General*
Lee I. Sherman
James E. Stanley
*Supervising Deputy Attorneys General*
Jesse Basbaum
Lisa C. Ehrlich
Deylin Thrift-Viveros
*Deputy Attorneys General*

/s/ Delbert Tran
Delbert Tran
*Deputy Attorney General*
California Department of Justice
455 Golden Gate Ave.
San Francisco, CA 94102
(415) 229-0110
delbert.tran@doj.ca.gov

*Attorneys for the State of California*

**KWAME RAOUL**
ATTORNEY GENERAL OF ILLINOIS

/s/ Alex Hemmer
Alex Hemmer
*Deputy Solicitor General*
R. Henry Weaver
*Public Interest Counsel*
Michael M. Tresnowski
*Assistant Attorney General*
Office of the Illinois Attorney General
115 LaSalle Street
Chicago, IL 60603
(773) 590-7932
alex.hemmer@ilag.gov

*Attorneys for the State of Illinois*

**JENNIFER DAVENPORT**
ATTORNEY GENERAL OF NEW JERSEY

/s/ Shankar Duraiswamy
Shankar Duraiswamy
*Deputy Solicitor General*
Mayur P. Saxena
*Assistant Attorney General*
Yael Fisher
Bassam Gergi
Meghan Musso
*Deputy Attorneys General*
New Jersey Office of Attorney General
25 Market Street, PO Box 093
Trenton, NJ 08625-0093
(609) 376-2745
shankar.duraiswamy@law.njoag.gov

*Attorneys for the State of New Jersey*

**PETER F. NERONHA**
ATTORNEY GENERAL OF RHODE ISLAND

/s/ Kathryn M. Sabatini
Kathryn M. Sabatini (R.I. Bar No. 8486)
*Chief, Civil Division*
*Special Assistant Attorney General*
Paul Meosky (RI Bar No. 10742)
*Special Assistant Attorney General*
Rhode Island Attorney General's Office
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 1882
ksabatini@riag.ri.gov

*Attorneys for the State of Rhode Island*

**KRISTIN K. MAYES**
ATTORNEY GENERAL OF ARIZONA

/s/ Hayleigh S. Crawford
Hayleigh S. Crawford
*Deputy Solicitor General*
Office of the Arizona Attorney General
2005 North Central Avenue
Phoenix, AZ 85004
(602) 542-3333
Hayleigh.Crawford@azag.gov
ACL@azag.gov

*Attorneys for the State of Arizona*

**PHILIP J. WEISER**
ATTORNEY GENERAL OF COLORADO

/s/ Sarah H. Weiss
David Moskowitz
*Deputy Solicitor General*
Sarah H. Weiss
*Senior Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
sarah.weiss@coag.gov

*Attorneys for the State of Colorado*

**WILLIAM TONG**
ATTORNEY GENERAL OF CONNECTICUT

/s/ Andrew M. Ammirati
Andrew M. Ammirati
*Assistant Attorney General*
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
(860) 808-5090
andrew.ammirati@ct.gov

*Attorneys for the State of Connecticut*

**KATHLEEN JENNINGS**
ATTORNEY GENERAL OF DELAWARE

/s/ Vanessa L. Kassab
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Attorneys for the State of Delaware*

**BRIAN L. SCHWALB**
ATTORNEY GENERAL FOR THE DISTRICT OF COLUMBIA

/s/ Nicole S. Hill
Nicole S. Hill
*Assistant Attorney General*
Office of the Attorney General
for the District of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov

*Attorneys for the District of Columbia*

**ANNE E. LOPEZ**
ATTORNEY GENERAL OF HAWAIʻI

/s/ Kalikoʻonālani D. Fernandes
Kalikoʻonālani D. Fernandes
*Solicitor General*
Department of the Hawaiʻi Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Attorneys for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR EX REL. ANDY BESHEAR**, IN HIS OFFICIAL CAPACITY AS GOVERNOR OF THE COMMONWEALTH OF KENTUCKY

/s/ S. Travis Mayo
S. Travis Mayo
*General Counsel*
Sam Flynn
*Chief Deputy General Counsel*
Laura C. Tipton
*Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov

*Attorneys for Plaintiff Office of the Governor* ex rel. *Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky*

**AARON M. FREY**
ATTORNEY GENERAL OF MAINE

/s/ John E. Belisle
John E. Belisle
*Assistant Attorney General*
Office of Maine Attorney General
6 State House Station
Augusta, Maine 04333-006
(207)626-8800
john.belisle@maine.gov

*Attorneys for the State of Maine*

**ANTHONY G. BROWN**
ATTORNEY GENERAL OF MARYLAND

/s/ Robert N. Brewer
Robert N. Brewer
*Assistant Attorney General*
Office of the Maryland Attorney General
200 Saint Paul Place
20th Floor
Baltimore, MD 21202
(410) 576-6924
rbrewer@oag.maryland.gov

*Attorneys for the State of Maryland*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF MASSACHUSETTS

/s/ Nita Kumaraswami Klunder
Nita K. Klunder
Vanessa Arslanian
*State Trial Counsels*
Julia S. Canney
*Assistant Attorney General*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2394
nita.klunder@mass.gov

*Attorneys for the Commonwealth of Massachusetts*

**DANA NESSEL**
ATTORNEY GENERAL OF MICHIGAN

/s/ Neil Giovanatti
Neil Giovanatti
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa Street
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Attorneys for the State of Michigan*

**KEITH ELLISON**
ATTORNEY GENERAL OF MINNESOTA

/s/Katherine Bies
Katherine Bies
*Assistant Attorney General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us

*Attorneys for the State of Minnesota*

**AARON D. FORD**
ATTORNEY GENERAL OF NEVADA

/s/ K. Brunetti Ireland
K. Brunetti Ireland
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Attorneys for the State of Nevada*

**RAÚL TORREZ**
ATTORNEY GENERAL OF NEW MEXICO

/s/ Mark Noferi
Mark Noferi
*Senior Litigation Counsel*
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
(505) 640-2891
mnoferi@nmdoj.gov

*Attorneys for the State of New Mexico*

**LETITIA JAMES**
ATTORNEY GENERAL OF NEW YORK

/s/ Stephen C. Thompson
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Stephen C. Thompson
*Special Counsel*
28 Liberty Street
New York, NY 10005
(212) 416-6183
stephen.thompson@ag.ny.gov

*Attorneys for the State of New York*

**JEFF JACKSON**
ATTORNEY GENERAL OF NORTH CAROLINA

Laura Howard
*Chief Deputy Attorney General*

/s/ Daniel P. Mosteller
Daniel P. Mosteller
*Associate Deputy Attorney General*
North Carolina Department of Justice
P.O. Box 629
Raleigh, NC 27602
(919) 716-6026
dmosteller@ncdoj.gov
dwilkes@ncdoj.gov

*Attorneys for the State of North Carolina*

**DAN RAYFIELD**
ATTORNEY GENERAL OF OREGON

/s/ Thomas H. Castelli
Thomas H. Castelli
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
(971) 673-1880
thomas.castelli@doj.oregon.gov

*Attorneys for the State of Oregon*

**JOSH SHAPIRO**
GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA

/s/ Jacob B. Boyer
Jennifer C. Selber
Jacob B. Boyer
*Governor's Office of General Counsel*
30 North 3rd Street
Suite 200
Harrisburg, PA 17101
jacobboyer@pa.gov

*Attorneys for Governor Josh Shapiro*

**CHARITY R. CLARK**
ATTORNEY GENERAL OF VERMONT

/s/ Julio A. Thompson
Julio A. Thompson
*Co-Director, Civil Rights Unit*
Officer of the Vermont Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-5519
julio.thompson@vermont.gov

*Attorneys for the State of Vermont*

**JAY JONES**
ATTORNEY GENERAL FOR THE COMMONWEALTH OF VIRGINIA

/s/ Megan C. Keenan
Megan C. Keenan
*Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us

*Attorneys for the Commonwealth of Virginia*

**NICHOLAS W. BROWN**
ATTORNEY GENERAL OF WASHINGTON

/s/ Tyler Roberts
Tyler Roberts
*Assistant Attorney General*
Cristina Sepe
*Deputy Solicitor General*
Washington State Office of the Attorney General
800 Fifth Avenue
Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Tyler.Roberts@atg.wa.gov
Cristina.Sepe@atg.wa.gov

*Attorneys for the State of Washington*

**JOSHUA L. KAUL**
ATTORNEY GENERAL OF WISCONSIN

/s/ Frances Reyolds Colbert
Frances Reynolds Colbert
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
(608) 266-9226
frances.colbert@wisdoj.gov

*Attorneys for the State of Wisconsin*